BRETT A. SHUMATE
Assistant Attorney General
Civil Division
DREW C. ENSIGN
Deputy Assistant Attorney General
TIBERIUS DAVIS
Counsel to the Assistant Attorney General
ANTHONY NICASTRO
Acting Director
Office of Immigration Litigation
General Litigation and Appeals Section
ELIANIS PEREZ
Assistant Director
JULIAN KURZ
Trial Attorney

*Attorneys for the United States*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
## ST. PAUL DIVISION

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>  v.<br><br>State of Minnesota; City of Minneapolis, Minnesota; City of St. Paul, Minnesota; Hennepin County, Minnesota; Keith Ellison, Attorney General of Minnesota, in his official capacity; Dawanna S. Witt, Hennepin County Sheriff, in her official capacity;<br><br>    Defendants. | CIVIL No._____<br><br>**COMPLAINT** |

Plaintiff, the United States of America, brings this civil action for declaratory and injunctive relief, alleging as follows:

## PRELIMINARY STATEMENT

1.    Within hours of assuming the Presidency, President Trump declared that a "national emergency exists at the southern border of the United States" from the unprecedented "illegal entry of aliens." Proclamation 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327, 8327 (Jan. 20, 2025). This declaration was necessary given the flood of illegal immigration into our Nation under the prior administration, resulting from unchecked illegal entry into our borders. As a result, millions of illegal aliens settled in American communities in flagrant violation of federal law. "Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans." Exec. Order 14,159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025).

2.    Despite the ongoing threat to American lives and communities, State and local politicians insist on harboring criminal offenders from federal law enforcement. These "sanctuary jurisdictions" intentionally obstruct federal law enforcement and celebrate thwarting the constitutional obligation of the President of the United States to take care that federal immigration law be faithfully executed. *See* Exec. Order 14,287, *Protecting American Communities From Criminal Aliens*, 90 Fed. Reg. 18761 (Apr. 28, 2025). The efforts of states and their localities to thwart this effort threatens the safety of American citizens. Such blatant disregard for federal law is not merely a political statement, but jeopardizes the public safety of all Americans. Accordingly, the United States files this action to preserve the integrity of federal law penned by Congress.

3.  Specifically, under the leadership of Governor Tim Walz, the State of Minnesota has become one such sanctuary jurisdiction. In furtherance of the President's executive order, Attorney General Bondi sent a letter to Minnesota Governor Tim Walz on August 13, 2025, informing him that Minnesota "has been identified as [a jurisdiction] that engages in sanctuary policies and practices that thwart federal immigration enforcement to the detriment of the interests of the United States." Letter from Attorney General Pamela Jo Bondi to Governor Tim Walz (Aug. 13, 2025). The letter urged the Governor to take steps to "eliminate laws, policies, and practices that impede federal immigration enforcement." *Id*. Rather than take the Attorney General's concerns seriously, Governor Walz stated that the federal government was pursuing a "misguided political agenda" that "is fundamentally inconsistent with our founding principles as a nation." Letter from Governor Tim Walz to Attorney General Bondi (Aug. 19, 2025). Governor Walz has reaffirmed and celebrated that Minnesota and various localities within the state intend to continue obstructing federal immigration enforcement, allowing criminals in their jurisdictions to be released into American communities despite known dangerous consequences. *See* Letter from Minnesota Governor Tim Walz to Attorney General Pamela J. Bondi (Aug, 19, 2025).

4.  Accordingly, the United States brings this action against the State of Minnesota, the City of Minneapolis, the City of St. Paul, and Hennepin County to stop them from enforcing state and local laws that impede the Executive from enforcing federal immigration law: Minnesota Statute § 171.12, Subdivision 7b(e); Minnesota Statute § 171.12, Subdivision 11(a)-(e); Minnesota Statute § 168.327, Subdivision 6; Minneapolis Code of Ordinances, Title 2, Chapter 19.30(a)(1) and (a)(3); Minneapolis Code of Ordinances, Title 2, Chapter 19.60(d); St. Paul Code of Ordinances, Part III, Title III, Chapter 44.02(a)(2); St. Paul Code of Ordinances, Part III, Title III, Chapter 44.03(a)(1) and (a)(3); St. Paul Code of Ordinances, Part III, Title III, Chapter 44.06(d); and Hennepin County

- 4 -

Sheriff's Administrative Directive 21-02.

5.    In addition, the United States challenges Article I, section 10 of the Minnesota Constitution, to the extent that it prohibits state law enforcement agencies from detaining aliens pursuant to immigration detainers or performing immigration enforcement functions pursuant to 8 U.S.C. § 1357(g)(1) agreements. Minnesota Attorney General Advisory Opinion 3a-20250206, which many localities treat as binding authority, interpreted Article I, section 10 as prohibiting state law enforcement agencies from detaining aliens pursuant to immigration detainers. And the Opinion's reasoning suggests that the Attorney General interprets Article I, section 10 as prohibiting state law enforcement officers from performing immigration enforcement functions pursuant to § 1357(g)(1) agreements. As a result of the Opinion, many local authorities have refused to cooperate with federal immigration agencies.

6.    Minnesota's unwillingness to cooperate with Federal immigration agencies has endangered public safety, resulting in criminals being released into Minnesota rather than turned over to immigration authorities for removal from the United States as required by federal law.

7.    The challenged provisions have the purpose and effect of deliberately impeding Federal law enforcement from carrying out their responsibilities. Many of the provisions were crafted to intentionally obstruct state officials from sharing information with federal immigration officials, contrary to federal law. The restrictions on information sharing even extend to basic information such as release dates and custodial status, thereby impairing the detention of removable aliens, including dangerous criminals, as mandated by federal law.

8.    The challenged laws are not a mere passive effort to avoid providing state resources to Federal officials but rather are an active and deliberate effort to obstruct federal immigration enforcement by, among other things, impeding the communication between federal and local law

enforcement that keeps Americans safe.

9.   The Court must put an end to Minnesota and its localities' scheme to openly flout federal law, as the Supremacy Clause of the U.S. Constitution requires.

## JURISDICTION AND VENUE

10.   The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

11.   Venue is proper in this jurisdiction because the acts and omissions that form the basis for this Complaint occurred within this judicial district. *See* 28 U.S.C. § 1391(b).

12.   The Court has the authority to provide the requested relief under 28 U.S.C. §§ 1651, 2201, and 2202, and under the Court's inherent equitable powers.

## PARTIES

13.   Plaintiff, the United States of America, regulates immigration under its constitutional and statutory authorities and enforces federal immigration laws through its Executive agencies, including the Departments of Justice, State, Labor, and Homeland Security. The Department of Homeland Security's ("DHS") component agencies include U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP").

14.   Defendant Minnesota is a State of the United States.

15.   Defendant Hennepin County is a county in Minnesota.

16.   Defendant City of Minneapolis is a city in Minnesota.

17.   Defendant City of St. Paul is a city in Minnesota.

18.   Defendant Keith Ellison is the Attorney General of Minnesota. He issued Advisory Opinion 3a-20250206 and is Minnesota's chief law enforcement officer. The United States sues Defendant Ellison in his official capacity.

19.   Defendant Dawanna S. Witt is the Hennepin County Sheriff. She issued Administrative

Directive 21-02. The United States sues Defendant Witt in her official capacity.

## CONSTITUTIONAL AND STATUTORY BACKGROUND

### Federal Authority Over Immigration

20. The Constitution affords Congress the power to "establish an uniform Rule of Naturalization" and to "regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3, 4. The Constitution also authorizes the President of the United States to "take Care that the Laws be faithfully executed." *id.* art. II, § 3.

21. Based on its enumerated constitutional and sovereign powers to control and conduct relations with foreign nations, the federal government has an inherent obligation and broad authority to establish immigration laws. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952).

22. The States cannot obstruct or take discriminatory action against the execution of those laws, *see Arizona v. United States*, 567 U.S. 387, 394–95 (2012); *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality); *id.* at 444–47 (Scalia, J., concurring), as only the federal government maintains the authority to grant an alien the privilege to enter our nation and controls the terms and conditions of such privilege. *See Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950).

23. Congress exercised its authority to make laws governing the entry, presence, status, and removal of aliens by enacting provisions of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*

24. The INA confers upon Executive agencies extensive authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or found to be, unlawfully in the United States. *See* 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231.

25. The INA also authorizes the Secretary of Homeland Security to "establish such regulations;

prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the [INA]." 8 U.S.C. § 1103(a)(3).

26.  Pursuant to § 1103(a)(3), and to effectuate the relevant provisions of the INA, the Secretary of Homeland Security has directed immigration officers to issue an immigration "detainer," which is "a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange and assume custody." 8 C.F.R. § 287.7(a).

27.  Immigration detainers are essential to federal law enforcement as they "serve[] to advise another law enforcement agency that [DHS] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a); *see* 8 U.S.C. §§ 1103(a)(3), 1226(a), (c), 1231(a), 1357(d).

28.  When DHS "issue[s] a detainer for an alien not otherwise detained by a criminal justice agency, such agency *shall* maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department." 8 C.F.R. § 287.7(d) (emphasis added).

29.  Congress also has mandated that, in cases involving controlled substance offenses, ICE officers must consider issuing detainers if they have "reason to believe that the alien may not have been lawfully admitted to the United States or otherwise is not lawfully present in the United States." 8 U.S.C. § 1357(d)(1).

30.  Congress mandates DHS issue a detainer for any alien who is "charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person." 8 U.S.C. §

1226(c)(1)(E)(ii).[1]

31.  On January 29, 2025, President Trump signed the Laken Riley Act into law. The law bears the name of a nursing student who was killed by a criminal alien. After entering the United States illegally, the alien committed additional crimes but was released before immigration authorities were given the opportunity to intervene. *See* Laken Riley Act, S. 5, 119th Cong. (2025). The Act mandates DHS detain aliens who are unlawfully present in the United States and have been arrested for certain crimes. *Id.*

### Federal Statutory Scheme for Cooperation with States

32.  "Consultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. Accordingly, Congress has directed that a federal, state, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, DHS "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see* 8 U.S.C. § 1644 (same); *see also* 8 U.S.C. § 1357(g)(10)(A) (providing for state and local "communicat[ion] with [DHS] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States").

33.  Likewise, Congress mandates that "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from," among other things, "[m]aintaining" "information regarding the immigration status, lawful or unlawful, of any individual," or "[e]xchanging such information with any other Federal, State, or local government entity." 8 U.S.C. § 1373(b).

---

[1] The fact that Congress codified ICE's authority to issue detainers in these types of cases does not "limit the issuance of immigration detainers" in other cases. *Comm. for Immigrant Rights of Sonoma Cnty. v. Cnty. of Sonoma*, 644 F. Supp. 2d 1177, 1199 (N.D. Cal. 2009).

34.   Congress enacted these provisions "to prevent any State or local law, ordinance, executive order, policy, constitutional provision, or decision of any Federal or State court that prohibits or in any way restricts any communication between State and local officials and the INS." H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep. to Welfare Reform Act, codified at 8 U.S.C. § 1644).

35.   Congress also codified basic principles of cooperation required between local authorities and the federal government. For example, federal law contemplates that removable aliens in local custody who have been convicted of state or local offenses will generally serve their state or local criminal sentences before being subject to removal, but that they will be taken into federal custody upon the expiration of their state prison terms or release from local custody. *See* 8 U.S.C. §§ 1226(c), 1231(a)(1)(B)(iii), (a)(4). And Federal authorities must "make available" to state and local authorities "investigative resources . . . to determine whether individuals arrested by such authorities for aggravated felonies are aliens." 8 U.S.C. § 1226(d)(1)(A).

36.   Federal officials also must "designate and train officers and employees . . . to serve as a liaison to" state and local officials "with respect to the arrest, conviction, and release of any alien charged with an aggravated felony." 8 U.S.C. § 1226(d)(1)(B); *see* 8 U.S.C. §§ 1226(c), 1231(a).

37.   Congress also authorized states and localities to "cooperate with the [federal government] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(B).

38.   In addition, Section 1357(g)(1) of Title 8 provides that "the Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens

across State lines to detention centers), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law."

39. Such cooperation occurs under color of federal authority, not State authority: "An officer or employee of a State or political subdivision of a State acting under color of authority under this subsection, or any agreement entered into under this subsection, shall be considered to be acting under color of Federal authority for purposes of determining the liability, and immunity from suit, of the officer or employee in a civil action brought under Federal or State law." 8 U.S.C. § 1357(g)(8). Section 1357(g)(1) thus grants local officers the powers and immunities of federal immigration officials.

40. Congress criminalized efforts to obstruct immigration enforcement by, among other things, prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any building or any means of transportation." 8 U.S.C. § 1324(a)(1)(A)(iii). When state officials intentionally shield aliens from deportation through deliberate laws and policies to thwart federal law enforcement, they run afoul of this prohibition.

41. Although Congress, out of respect for the states, permits states and local jurisdictions to punish aliens for state criminal violations before the federal government removes them, *see* 8 U.S.C. § 1231(a)(4)(A) (providing that, subject to limited exceptions, Federal agents "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment"), Congress intentionally crafted a statutory scheme to enable federal law enforcement to detain and remove aliens once released from state custody.

42. Congress provided that the removal period begins immediately upon release from state criminal custody and that detention during this period is mandatory. 8 U.S.C. § 1231(a)(1)(B)(iii),

(a)(2); *see also* 8 U.S.C. § 1226(c)(3), § 1357(d) (directing immigration officers to obtain a detainer to facilitate the transfer of criminal aliens from state to federal custody); 8 U.S.C. § 1226(c)(3) ("The Secretary of Homeland Security shall issue a detainer for an alien . . . and, if the alien is not otherwise detained by Federal, State, or local officials, shall effectively and expeditiously take custody of the alien.").

43.   So although Congress acknowledged the need for states to punish aliens who violate their criminal laws, Congress expected that states would not otherwise obstruct federal immigration authorities from detaining criminal aliens upon their release from state custody. If ICE lacks knowledge of criminal aliens' release dates, it cannot exercise its statutory obligation to arrest criminal aliens when they are released, as an essential part the Executive's obligation to protect Americans.

44.   Federal law also contemplates that DHS be able to inspect all applicants for admission and take appropriate action against inadmissible aliens, even ones who are transferred to State or local custody pending prosecution. *See* 8 U.S.C. §§ 1182, 1225(b)(2); 8 C.F.R. § 235.2. And 8 U.S.C. § 1357(a)(1) authorizes ICE "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." Any state law or policy that prevents federal law enforcement from such inspection or interrogation stands as an obstacle to ICE's statutory and regulatory mandate.

### Supremacy Clause and Preemption Principles

45.   The Supremacy Clause of the Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

46.   A state or city enactment violates the Supremacy Clause if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *see also Arizona*, 567 U.S. at 399. Federal immigration law preempts state or local laws that conflict with federal enforcement priorities or obstruct federal operations.

47.   The Constitution's Supremacy Clause also embodies the doctrine of intergovernmental immunity, which "generally immunizes the Federal Government from state laws that directly regulate or discriminate against it." *United States v. Washington*, 596 U.S. 832, 835 (2022) (citing *South Carolina v. Baker*, 485 U.S. 505, 523 (1988)).

48.   A State or local law violates this doctrine if it "regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *North Dakota*, 495 U.S. at 435. Discrimination occurs when a state or locality "treats someone else better than" the federal government or singles out the federal government for "less favorable treatment." *Id.* at 438; *Washington*, 596 U.S. at 839.

49.   The doctrine operates even in the absence of a specific conflicting federal law, ensuring that "federal officers are immune from state interference with acts 'necessary and proper' to the accomplishment of their federal duties." *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993) (citing *In Re Neagle*, 135 U.S. 1, 10 (1890), *aff'd*, 54 F.3d 825 (D.C. Cir. 1995)).

50.   The challenged provisions single out federal immigration authorities for unique restrictions. Some of them condition information sharing on non-use for immigration purposes, while others compel ICE to conduct hazardous at-large arrests rather than safe custody transfers. The challenged provisions discriminate impermissibly against the federal government and violate the intergovernmental immunity doctrine.

- 13 -

## THE CHALLENGED PROVISIONS

### The State of Minnesota

**A. Advisory Opinion 3a-20250206 and Article I, section 10 of the Minnesota Constitution**

51.  Article I, section 10, of the Minnesota Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or things to be seized."

52.  On February 6, 2025, the Minnesota Attorney General issued an opinion interpreting Article I, section 10 as prohibiting state and local law enforcement agencies from detaining aliens pursuant to immigration detainers. Advisory Opinion 3a-20250206 at 3–4 (the "Opinion").[2]

53.  The Opinion also included the Attorney General's conclusion that neither Minnesota nor federal law authorizes state or local officials to arrest individuals based on immigration detainers. *Id.* at 5–8.

54.  Although the Opinion supposedly lacks binding effect according to the Attorney General's Office, it is *de facto* binding. The Opinion has caused many Minnesota localities to stop honoring ICE detainers. And certain law enforcement agencies have advised ICE that they perceive it as a binding interpretation of the Minnesota Constitution.

**B. Minnesota Laws**

55.  The United States challenges Minnesota Statute § 171.12, Subdivision 7b(e); Minnesota Statute § 171.12, Subdivision 11(c) and (d); and Minnesota Statute § 168.327, Subdivision 6

---

[2] https://www.ag.state.mn.us/office/opinions/3a-20250206.pdf

on the grounds that, as specified herein, these statutes conflict with federal law, create obstacles to federal statutory purposes, discriminate against the federal government, and impede cooperation between federal immigration officials and state and local authorities.

56. Minnesota Statute § 171.12, Subdivision 7b(e) provides that, before the Minnesota Department of Transportation ("DOT") shares data relating to a "noncompliant driver's license or identification card," the intended recipient must certify that it will not use the data for civil immigration enforcement purposes or disclose the data to a state or federal government entity that primarily enforces immigration law.[3] The provision also imposes civil and criminal penalties for violations.

57. Minnesota Statute § 171.12, Subdivision 11(c) provides that "the commissioner or a driver's license agent may share or disseminate data on individuals who have applied for or been issued a noncompliant driver's license or identification card that are not immigration status data to a government entity, as defined in section 13.02, subdivision 7a, or to a federal government entity that does not enforce immigration law, provided that the receiving entity must not use the data for civil immigration enforcement purposes or further disclose the data to a state or federal government entity that primarily enforces immigration law or to any employee or agent of any such government entity."

58. Minnesota Statute § 171.12, Subdivision 11(d) provides that "the commissioner or a driver's license agent must not share or disseminate any data on individuals who have applied for or been issued a noncompliant driver's license or identification card to any federal government entity that primarily enforces immigration law, except pursuant to a valid search warrant or court

---

[3] The DOT issues "noncompliant" driver's licenses or identification cards to applicants who, during the application process, do not prove that they are lawfully present in the United States.

order issued by a state or federal judge."

59.    Minnesota Statute § 168.327, Subdivision 6 provides that a subscriber of the DOT's driver records subscription service "must annually engage an independent professional organization to audit its uses of data and its information technology security procedures, including: . . . (2) compliance with the certification required under section 171.12, subdivision 7b, paragraph (d)."[4] In other words, this provision requires entities that obtain driver's license data to conduct annual audits to ensure that they have not disclosed the data to federal immigration agencies, further evidencing the State's intent to treat the federal government discriminately.

### The City of Minneapolis

60.    The United States also challenges several provisions of the Minneapolis Code of City Ordinances, Title 2, Chapter 19. "This chapter clarifies the communication and enforcement relationship between the city and the United States Department of Homeland Security and other federal agencies with respect to the enforcement of civil immigration laws." Ch. 19.10.

61.    Chapter 19.40 provides that "Complaints of a violation of this chapter shall be shall be [sic] subject to disciplinary action under the appropriate union contract, civil service commission rules, or department work rules."

62.    Chapter 19 explicitly targets the United States for restrictions on cooperation and information sharing. Its restrictions do not apply to other entities, including other States.

63.    Chapter 19.30(a)(1) prohibits public safety officials from undertaking any law enforcement action for the purpose of detecting undocumented persons or verifying immigration

---

[4] The reference to section 171.12, subdivision 7b, paragraph (d) should be a reference to paragraph (e). In the original version of the House Bill, the certification requirement appeared at paragraph (d). Minn. House File No. 3436 (2023). But the requirement subsequently shifted to paragraph (e). 2024 Minn. Sess. Law Serv. Ch. 104. The provision has not yet been updated.

- 16 -

status. Chapter 19.30(a)(3) prohibits public safety officials from questioning, arresting, or detaining any person for a violation of federal civil immigration laws, "except when immigration status is an element of the crime or when enforcing 8 U.S.C. 1324(c)." These provisions conflict with, and impose an obstacle to the purpose of, 8 U.S.C. § 1357(g)(1) to the extent that they prohibit law enforcement agencies from performing immigration enforcement functions pursuant to a § 1357(g) agreement.

64.    Chapter 19.30(a)(3) also conflicts with, and imposes an obstacle to the purpose of, 8 C.F.R. § 287.7(d) to the extent that it prohibits public safety officials from temporarily maintaining custody over aliens pursuant to immigration detainers as contemplated by federal law.

65.    Chapter 19.60(d) provides that "City certifying agencies shall not disclose personal information of victims obtained through the certification request process except as provided in the Minnesota Government Data Practices Act or as otherwise required by law or court order."[5]

### The City of St. Paul

66.    The United States also challenges several provisions of the St. Paul Code of Ordinances, Part III, Title III, Chapter 44. The Chapter is entitled "Employee Authority in Immigration Matters." The Chapter restricts "the communication and enforcement relationship between the city and [DHS] and other federal agencies with respect to the enforcement of civil immigration laws." Ch. 44.01.

67.    Chapter 44.02(a)(2) provides, in relevant part, that "Information about immigration status in the possession of or known to city employees and representatives, however received, shall not be maintained or recorded except as otherwise specifically required by law."

---

[5] Chapter 19.60(a)(1) defines a "[c]ertification request" as "[a] request made by a victim of crime, or the victim's attorney or other appropriate representative, to a city certifying agency for a U Nonimmigrant Status certification or a T Visa Declaration of Law Enforcement Officer for Victim of Trafficking in Persons for persons eligible under 8 U.S.C. §1101(a)(15)(T) and (U) as provided in the Victims of Trafficking and Violence Prevention Act of 2000."

68.    Chapter 44.03(a)(1) prohibits public safety officials from undertaking any law enforcement action for the purpose of detecting undocumented persons or verifying immigration status. Chapter 44.03(a)(3) prohibits public safety officials from questioning, arresting, or detaining any person for a violation of federal civil immigration laws, "except when immigration status is an element of the crime or when enforcing 8 U.S.C. 1324(c)."

69.    Chapter 44.06(d) provides that "City certifying agencies must not disclose private or confidential information about victims obtained through the certification request process except as provided in the Minnesota Government Data Practices Act or as otherwise required by law or court order."[6]

70.    To evidence the City's intention to enforce its prohibition on communication with Federal law enforcement, Chapter 44.04(a) threatens any "employee of the city who violates" Chapter 44 with "disciplinary action, such as oral reprimands, written reprimands, suspension without pay, and discharge."

### Hennepin County

71.    The United States additionally challenges Hennepin County Sheriff's Administrative Directive 21-02 (June 9, 2021), which provides as follows:

> The Hennepin County Sheriff's Office will not hold individuals in custody at the Adult Detention Center when the only documentation for that individual to be held in custody is a [DHS/ICE] Immigration Detainer. These detainers (1247G, 1247A, 1200, and 1205) are administrative warrants which are not signed by a judge and do not constitute judicial authority to hold an individual. ICE <u>will not</u> be notified of the admittance or release of any individual based on any of these detainers. If continued detention of an individual for ICE is authorized based on a judicially signed immigration warrant, ICE will be notified when they become the holding agency. Absent a judicially signed immigration warrant authorizing the continued

---

[6] Chapter 44.06(a)(1) defines a "[c]ertification request" in the same way as Chapter 19.60(a)(1) of the Minneapolis Code. *See supra*, n. 5.

detention of an individual for ICE, that individual will be released from custody when all local charges or other holds have been disposed of.

\*     \*     \*

72.  The challenged statutes, ordinances, and directives are not neutral refusals to cooperate with federal authorities. Instead, the challenged laws and policies represent deliberative and affirmative prohibitions specifically targeting federal immigration enforcement. By imposing penalties, audit requirements, and categorical restrictions targeting immigration enforcement, Defendants have singled out DHS for less favorable treatment. Defendants have created special burdens that do not apply to other governmental or private actors and have regulated DHS unfavorably based on its federal status. That is precisely the discrimination against federal authorities that the intergovernmental immunity doctrine forbids. *Washington*, 596 U.S. at 839.

### THE CHALLENGED PROVISIONS' IMPACT ON FEDERAL IMMIGRATION ENFORCEMENT

73.  DHS, through ICE and CBP, conducts a significant volume of law enforcement activities in Minnesota, especially in Minneapolis and St. Paul. Since Fiscal Year 2024, ICE-Enforcement and Removal Operations has issued 2,988 detainers and made 1,522 at-large arrests in the St. Paul Area of Responsibility (as of July 15, 2025). CBP is responsible for enforcing the immigration laws at and between the ports of entry, including by apprehending attempted entrants with criminal convictions or who pose national security risks.

74.  The challenged laws and policies impede DHS officers from performing their statutory duties and fulfilling their statutory authority, especially the authority provided by 8 U.S.C. § 1357(a)(1).

75.  Advisory Opinion 3a-20250206 has increased ICE's operational costs at the expense of American taxpayers because it has caused ICE officers to expend additional time, and has caused

ICE to devote additional resources, to arrest the same number of aliens that it arrested before the Opinion issued.

76.   Before the Attorney General issued the Opinion, almost all local jails honored ICE detainers and otherwise cooperated with ICE. However, since the Attorney General issued the Opinion, most counties have refused to honor ICE detainers or provide ICE with notifications of release of aliens subject to removal. These counties have cited the Opinion as the reason for their open defiance of federal law.

77.   A few counties still notify ICE that criminal aliens will be released but no longer allow ICE to take custody of such aliens in jails' sally ports. Due to this change, in many cases ICE must send teams of officers to wait for aliens outside jails, where the target alien's family often waits alongside the officers to pick up the alien.

78.   Compared to arrests outside jails or in other public places, custody transfers in sally ports are far safer for ICE officers, aliens, and the public. The Opinion also has caused many counties to refuse to advise ICE of the exact time that removeable aliens will be released. As a result, ICE officers sometimes arrive at jails too late to arrest target criminal aliens or arrive far too early and then waste several hours waiting for target aliens to be released. Sometimes ICE has difficulty re-locating target aliens, expending resources and time to locate them. In the meantime, the aliens can threaten public safety and commit additional crimes. This lost time not only results in an increase in taxpayer resources but delays the Federal immigration agencies' constitutional charge to take care that Federal immigration laws are enforced and eliminate threats to the public safety of American communities.

79.   Because many jails no longer honor ICE detainers, ICE in some cases has begun to arrest recently released aliens at courthouses.

80.    Similarly, "noncompliant driver's license" statutes have prevented ICE Enforcement and Removal Operations ("ERO") from obtaining critical information about aliens necessary to carry out its statutory and regulatory obligations. Since Minnesota enacted these statutes, many local law enforcement agencies refuse to provide ERO with information about aliens' potential addresses, photos, and information on their potential vehicles.

81.    This lack of information sharing not only violates federal law but has severely impeded ERO's ability to gather intelligence. State and local agencies also often refuse to provide arrest or traffic reports because they may contain information that the statutes prohibit state and local agencies from disclosing to ICE. Agencies do not want to risk exposing their employees to the state statute's criminal penalties.

82.    In the past, the Minnesota State Patrol routinely provided DWI reports to ERO St. Paul, regardless of the disposition or progress of the case. Recently, however, the State Patrol has refused to provide DWI reports.

83.    When ICE officers search the Minnesota Driver and Vehicle Services system for information on a potential illegal alien, they receive the following message:

> You have queried a legitimate Minnesota Driver and Vehicle Services credential. But information may not be shared under Minnesota State Statute 171.12 Subd. 11(d). This message should not be construed that the individual does not have legal presence in the United States, the person's driving privileges have been withdrawn, or that the credential/identification presented is fake. If you ran the query by driver's license number, we recommend running the query by name and date of birth as it might return law enforcement information that is not governed by Minnesota State Statute 171.12.

This intentional concealment of immigration information thwarts ICE ability to enforce our Nation's immigration laws in accordance with statutory and regulatory mandates.

84.    Since Minneapolis and St. Paul enacted the challenged City Ordinances, local law enforcement officers have refused to provide ICE with information that aids ICE in immigration investigations. The refusals have significantly impeded ICE's efforts to enforce our Nation's immigration laws.

85.    Moreover, since Minneapolis and St. Paul enacted the Ordinances, the city police departments have refused to assist ICE by providing marked units and patrol officers to establish a perimeter during ICE enforcement operations. Such assistance reduces risks for ICE officers and the public because it creates a more secure environment.

86.    To exemplify this point, several years ago an ERO officer was on foot pursuing an alien who had escaped from ICE custody. When the officer requested assistance, St. Paul Police officers initially assisted. But when the officers learned that the requester was an ICE officer and that the subject was an immigration violator, they abandoned the officer alone on the street, even though the alien had stolen a car upon his escape from the county jail.

87.    In August 2024, the Minneapolis Police Department arrested an alien, German Adriano Llangari Inga, for vehicular homicide. ICE lodged a detainer, but the county jail refused to honor it and released the criminal alien back into the community without notifying ICE.

88.    In May 2025, the Hennepin County Attorney charged Llangari with criminal vehicular homicide. A week later, the Hennepin County Sheriff's Office arrested him. ICE immediately lodged an immigration detainer. However, after Llangari posted bail, the Hennepin County Jail released him without honoring the detainer or notifying ICE of the release. Three days later, an ICE St. Paul Fugitive Operations team located and apprehended Llangari in St. Louis Park, Minnesota.

89.    Minnesota's sanctuary laws impede federal immigration enforcement and require ICE to expend significant resources to locate and detain dangerous criminal aliens. Sometimes, the barriers

prevent ICE from locating aliens, resulting in dangerous convicted criminals being set loose into American communities.

## CLAIMS FOR RELIEF

### COUNT ONE – VIOLATION OF THE SUPREMACY CLAUSE (PREEMPTION OF THE MINNESOTA CONSTITUTION) AGAINST ALL DEFENDANTS

90.   The United States hereby incorporates paragraphs 1–90 of the Complaint as if fully stated herein.

91.   The Minnesota Attorney General Advisory Opinion 3a-20250206 and Article I, section 10 of the Minnesota Constitution, as interpreted by the Opinion, conflict with, and create obstacles to, the enforcement of federal immigration law.

92.   Specifically, Title 8 section 287.7(d) of the C.F.R. provides that, when DHS "issue[s] a detainer for an alien not otherwise detained by a criminal justice agency, such agency *shall* maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by [DHS]." (emphasis added). Thus, to the extent the Minnesota Attorney General has interpreted Article I, section 10 of the Minnesota Constitution to prohibit Minnesota law enforcement agencies from maintaining custody over aliens pursuant to otherwise lawful ICE detainers absent a judicial warrant or a probable cause finding, this interpretation conflicts with, and imposes an obstacle to the implementation of, 8 C.F.R. § 287.7(d).

93.   The Opinion's interpretation of Article I, section 10 also conflicts with, and imposes an obstacle to the purpose of, section 287.7(d) because that section requires that State and local law enforcement agencies temporarily "maintain custody" over aliens pursuant to federal immigration detainers. The Opinion's interpretation also bans local officials from honoring voluntary detainers even if they wanted to.

94.   The Opinion and Article I, section 10 also conflict with, and impose an obstacle to the purpose of, 8 U.S.C. § 1357(g)(1) to the extent they prohibit State law enforcement officers from performing immigration enforcement functions under 8 U.S.C. § 1357(g) agreements.

95.   The Opinion also erroneously concludes that federal law cannot provide local officers with the authority to detain people for immigration violations. This interpretation conflicts with, and imposes an obstacle to the purpose of, § 1357(g)(1) because § 1357(g)(1) provides that qualified state and local officers "may carry out" immigration enforcement functions pursuant to § 1357(g) agreements. Such arrangements deputize local law enforcement to work on behalf of the Federal government. But the Opinion's interpretation of the Minnesota Constitution prohibits local officials from contracting with and working with federal immigration enforcement contrary to Congress's purposes and authorizations.

96.   As a result of the Opinion, local law enforcement agencies believe that they cannot honor detainer requests or enter § 1357(g)(1) agreements. Local law enforcement agencies therefore refuse to honor detainer requests that they otherwise would or enter into § 1357(g)(1) agreements. This noncompliance significantly hampers the ability of federal officials to enforce our Nation's immigration laws in Minnesota, posing an obstacle federal law.

97.   Accordingly, the Opinion and Article I, section 10, as interpreted by the Opinion violate the Supremacy Clause, *see* U.S. Const. art. VI, cl. 2, interfere with federal law, and create obstacles to the enforcement of federal immigration law both on their face and as applied to the Federal Government.

98.   Therefore, the United States is entitled to declaratory judgment that the Opinion and Article I, section 10, as interpreted by the Opinion, violate the Supremacy Clause and are therefore invalid, as well as an injunction prohibiting Defendants and their successors, agents, and employees,

from enforcing the Opinion and Article I, section 10, as interpreted by the Opinion.

### COUNT TWO – VIOLATION OF THE SUPREMACY CLAUSE
### (PREEMPTION OF MINNESOTA STATUTES)
### AGAINST ALL DEFENDANTS

99.    The United States hereby incorporates paragraphs 1–99 of the Complaint as if fully stated herein.

100.  Minnesota Statute § 171.12, Subdivision 7b(e); Minnesota Statute § 171.12, Subdivision 11(c) and (d); and Minnesota Statute § 168.327, Subdivision 6 (the Minnesota statues) conflict with, and create obstacles to, the enforcement of federal immigration law.

101.  The Minnesota statutes also undermine federal immigration law's protections for information sharing of immigration status and are thus preempted under both express and conflict preemption principles. *See, e.g.*, 8 U.S.C. §§ 1373(a), 1644.

102.  Specifically, subdivision 7b(e) conflicts with, and imposes an obstacle to the purposes of, 8 U.S.C. §§ 1373 and 1644. These federal statutes provide that no state or local government entity may be prohibited or in any way restricted from sending immigration-status information to DHS, maintaining such information, or exchanging such information with any other federal, state, or local government entity. Subdivision 7b(e) conflicts with these federal statutes because it restricts the circumstances under which Minnesota's DOT may send immigration-status data to DHS or exchange such data with other government entities, contrary to the text of §§ 1373 and 1644.

103.  Subdivision 11(c) and (d) conflict with 8 U.S.C. §§ 1373 and 1644 because they restrict the DOT from sending immigration-status data to DHS, contrary to express language of the federal statutes.

104. Minnesota Statute § 168.327, Subdivision 6 provides that a subscriber of the DOT's driver records subscription service "must annually engage an independent professional organization to

audit its uses of data and its information technology security procedures, including: . . . (2) compliance with the certification required under section 171.12, subdivision 7b, paragraph (d)."[7] In other words, this provision requires entities that obtain driver's license data to conduct annual audits to ensure that they have not disclosed the data to federal immigration agencies, further evidencing the State's intent to treat the federal government discriminately.

105. Subdivision 6 conflicts with 8 U.S.C. §§ 1373 and 1644, as to "subscriber[s]" that are government entities, because it "in any way" restricts such entities from, and imposes an obstacle to them, sending immigration-status data to DHS.

106. Accordingly, the challenged provisions of the Minnesota statutes violate the Supremacy Clause, *see* U.S. Const. art. VI, cl. 2, interfere with federal law, and create obstacles to the enforcement of federal immigration law both on their face and as applied to the Federal Government.

107. Therefore, the United States is entitled to declaratory judgment that the challenged provisions of the Minnesota statutes violate the Supremacy Clause and are therefore invalid, as well as an injunction prohibiting Defendants and their successors, agents, and employees, from enforcing the challenged provisions the Minnesota statues.

### COUNT THREE – VIOLATION OF THE SUPREMACY CLAUSE (PREEMPTION OF ORDINANCES) AGAINST THE CITY OF MINNEAPOLIS

108. The United States hereby incorporates paragraphs 1–108 of the Complaint as if fully stated herein.

---

[7] The reference to section 171.12, subdivision 7b, paragraph (d) should be a reference to paragraph (e). In the original version of the House Bill, the certification requirement appeared at paragraph (d). Minn. House File No. 3436 (2023). But the requirement subsequently shifted to paragraph (e). 2024 Minn. Sess. Law Serv. Ch. 104. The provision has not yet been updated.

109. Minneapolis Code of Ordinances, Title 2, Chapter 19.30(a)(1) and (a)(3); Minneapolis Code of Ordinances, Title 2, Chapter 19.60(d) conflict with, and create obstacles to, the enforcement of federal immigration law.

110. Specifically, the Ordinances conflict with, and impose an obstacle to the purpose of, 8 U.S.C. §§ 1373 and 1644 because it restricts city agencies from sending immigration-status information to DHS, contrary to the express text of §§ 1373 and 1644.

111. Chapter 19.30(a)(3) also conflicts with and imposes an obstacle to the purpose of and text of 8 C.F.R. § 287.7(d) because it prohibits local officials from honoring ICE detainers, including mandatory 48 hour detainers.

112. Chapter 19.30(a)(3) also conflicts with, and imposes an obstacle to the purpose of, 8 U.S.C. § 1357(g)(1) to the extent that it prohibits law enforcement agencies from performing immigration enforcement functions pursuant to a § 1357(g) agreement.

113. Accordingly, the Ordinances violate the Supremacy Clause, *see* U.S. Const. art. VI, cl. 2, interfere with federal law, and create obstacles to the enforcement of federal immigration law both on their face and as applied to the Federal Government.

114. Therefore, the United States is entitled to declaratory judgment that the challenged Ordinances violate the Supremacy Clause and are therefore invalid, as well as an injunction prohibiting the City of Minneapolis and its successors, agents, and employees, from enforcing the challenged provisions of the Ordinances.

## COUNT FOUR – VIOLATION OF THE SUPREMACY CLAUSE (PREEMPTION OF ORDINANCES) AGAINST THE CITY OF ST. PAUL

115. The United States hereby incorporates paragraphs 1–115 of the Complaint as if fully stated herein.

- 27 -

116.  St. Paul Code of Ordinances, Part III, Title III, Chapter 44.02(a)(2); St. Paul Code of Ordinances, Part III, Title III, Chapter 44.03(a)(1) and (a)(3); St. Paul Code of Ordinances, Part III, Title III, Chapter 44.06(d) conflict with, and create obstacles to, the enforcement of federal immigration law.

117.  Chapter 44.02(a)(2) conflicts with, and imposes an obstacle to the purpose of, 8 U.S.C. § 1357(g)(1) to the extent that it prohibits law enforcement agencies from performing immigration enforcement functions pursuant to a § 1357(g) agreement.

118.  Chapter 44.03(a)(3) also conflicts with, and imposes an obstacle to the purpose of, 8 C.F.R. § 287.7(d) to the extent that it prohibits public safety officials from temporarily maintaining custody over aliens pursuant to Federal immigration detainers.

119.  Chapter 44.06(d) also conflicts with and imposes an obstacle to the purpose of, 8 U.S.C. §§ 1373 and 1644 because it restricts city agencies from sending immigration-status information to DHS.

120.  Accordingly, the Ordinances violate the Supremacy Clause, *see* U.S. Const. art. VI, cl. 2, interfere with federal law, and create obstacles to the enforcement of federal immigration law both on their face and as applied to the Federal Government.

121.  Therefore, the United States is entitled to declaratory judgment that the challenged Ordinances violate the Supremacy Clause and are therefore invalid, as well as an injunction prohibiting the City of St. Paul and its successors, agents, and employees, from enforcing the challenged provisions of the Ordinances.

### COUNT FIVE – VIOLATION OF THE SUPREMACY CLAUSE
### (PREEMPTION OF ADMINISTRATIVE DIRECTIVE)
### AGAINST HENNEPIN COUNTY AND HENNEPIN COUNTY SHERIFF, DAWANNA S. WITT, IN HER OFFICIAL CAPACITY

122.   The United States hereby incorporates paragraphs 1–122 of the Complaint as if fully stated herein.

123.   Hennepin County Sheriff's Administrative Directive 21-02 conflicts with, and creates obstacles to, the enforcement of federal immigration law.

124. Specifically, the Directive conflicts with, and imposes an obstacle to the purpose of, 8 C.F.R. § 287.7(d) because it prohibits public safety officials from temporarily maintaining custody over aliens pursuant to immigration detainers, contrary to federal law.

125. The third sentence of the Directive conflicts with, and imposes an obstacle to the purpose of, 8 U.S.C. §§ 1373 and 1644 to the extent that it restricts the sending of immigration-status information to DHS, contrary to the text of §§ 1373 and 1644.

126.   Accordingly, the Administrative Directive violates the Supremacy Clause, *see* U.S. Const. art. VI, cl. 2, interferes with federal law, and creates obstacles to the enforcement of federal immigration law both on its face and as applied to the Federal Government.

127.   Therefore, the United States is entitled to declaratory judgment that the challenged Administrative Directive violates the Supremacy Clause and is therefore invalid, as well as an injunction prohibiting Hennepin County and Hennepin County Sheriff, Dawanna S. Witt, in her official capacity, as well as their successors, agents, and employees, from enforcing the challenged provisions of the Administrative Directive.

## COUNT SIX – VIOLATION OF THE SUPREMACY CLAUSE
## (UNLAWFUL DISCRIMINATION AGAINST THE FEDERAL GOVERNMENT)
## AGAINST ALL DEFENDANTS

128.   The United States hereby incorporates paragraphs 1–128 of the Complaint as if fully stated herein.

129.   Minnesota Statute § 171.12, Subdivision 7b(e); Minnesota Statute § 171.12, Subdivision

11(c) and (d); and Minnesota Statute § 168.327 unlawfully discriminate against the Federal Government.

130. Minnesota Statute § 171.12, Subdivision 7b(e) discriminates against DHS because it permits the DOT to share data with entities that will not use the data for immigration-enforcement purposes but not with entities, such as DHS, that will use the data for federal immigration purposes.

131. Minnesota Statute § 171.12, Subdivision 11(c) and (d) also discriminate against the federal government because they permit the dissemination of immigration-status data to government entities that do not enforce immigration law but prohibit dissemination to entities, such as DHS, that enforce immigration law and use the data for immigration enforcement purposes.

132. Minnesota Statute § 168.327, Subdivision 6 also discriminates against the federal government because it requires auditing to ensure nondisclosure to DHS but does not require auditing to ensure nondisclosure to other entities.

133. These provisions of the Minnesota statutes single out federal immigration officials and entities, expressly and implicitly, for unfavorable and uncooperative treatment. The challenged provisions indeed treat Federal immigration officials and entities worse than private individuals and other government officials and entities. Many of the statutes expressly reference and restrict cooperation with federal immigration authorities and no other entities. Because immigration enforcement is an inherently Federal function, these laws necessarily discriminate against the Federal government.

134. The challenged provisions are inconsistent with the doctrine of intergovernmental immunity and therefore violate the Supremacy Clause.

**COUNT SEVEN – VIOLATION OF THE SUPREMACY CLAUSE**
**(UNLAWFUL DISCRIMINATION AGAINST THE FEDERAL GOVERNMENT)**
**AGAINST THE CITY OF MINNEAPOLIS**

135.  The United States hereby incorporates paragraphs 1–135 of the Complaint as if fully stated herein.

136.  Minneapolis Code of Ordinances, Title 2, Chapter 19.30(a)(1) and (a)(3); Minneapolis Code of Ordinances, Title 2, Chapter 19.60(d) — unlawfully discriminate against the federal Government. So too does Hennepin County Sheriff's Administrative Directive 21-02.

137.  These Ordinances single out federal immigration officials and entities, expressly and implicitly, for unfavorable and uncooperative treatment. The challenged provisions indeed treat federal immigration officials and entities worse than private individuals and other government officials and entities. Many of these policies expressly reference and restrict cooperation with federal immigration authorities and no other entities.

138.  The challenged provisions are inconsistent with the doctrine of intergovernmental immunity and therefore violate the Supremacy Clause.

**COUNT EIGHT – VIOLATION OF THE SUPREMACY CLAUSE**
**(UNLAWFUL DISCRIMINATION AGAINST THE FEDERAL GOVERNMENT)**
**AGAINST THE CITY OF ST. PAUL**

139.  The United States hereby incorporates paragraphs 1–139 of the Complaint as if fully stated herein.

140.  St. Paul Code of Ordinances, Part III, Title III, Chapter 44.02(a)(2); St. Paul Code of Ordinances, Part III, Title III, Chapter 44.03(a)(1) and (a)(3); and St. Paul Code of Ordinances, Part III, Title III, Chapter 44.06(d) — unlawfully discriminate against the federal Government.

141.  These Ordinances single out federal immigration officials and entities, expressly and implicitly, for unfavorable and uncooperative treatment. The challenged provisions indeed treat

federal immigration officials and entities worse than private individuals and other government officials and entities. Many of these policies expressly reference and restrict cooperation with federal immigration authorities and no other entities.

142. The challenged provisions are inconsistent with the doctrine of intergovernmental immunity and therefore violate the Supremacy Clause.

<u>**COUNT NINE – VIOLATION OF THE SUPREMACY CLAUSE**</u>
<u>**(UNLAWFUL DISCRIMINATION AGAINST THE FEDERAL GOVERNMENT)**</u>
<u>**AGAINST HENNEPIN COUNTY AND HENNEPIN COUNTY SHERIFF, DAWANNA**</u>
<u>**S. WITT, IN HER OFFICIAL CAPACITY**</u>

143. The United States hereby incorporates paragraphs 1–143 of the Complaint as if fully stated herein.

144. Hennepin County Sheriff's Administrative Directive 21-02 — unlawfully discriminates against the federal Government.

145. This directive singles out federal immigration officials and entities, expressly and implicitly, for unfavorable and uncooperative treatment. The challenged provision indeed treats federal immigration officials and entities worse than private individuals and other government officials and entities. This policy expressly references and restricts cooperation with federal immigration authorities and no other entities.

146. The challenged provision is inconsistent with the doctrine of intergovernmental immunity and therefore violates the Supremacy Clause.

**PRAYER FOR RELIEF**

WHEREFORE, the United States respectfully requests that this Court grant the following relief:

1. Enter a judgment declaring that the following challenged provisions violate the Supremacy Clause and are therefore invalid:

- Article I, section 10 of the Minnesota Constitution, to the extent that it prohibits state

and local law enforcement agencies from voluntarily detaining aliens pursuant to immigration detainers or prohibits state law enforcement officers from performing immigration enforcement functions pursuant to 8 U.S.C. § 1357(g)(1) agreements;

- Minnesota Statute § 171.12, Subdivision 7b(e);

- Minnesota Statute § 171.12, Subdivision 11(c) and (d);

- Minnesota Statute § 168.327, Subdivision 6;

- Minneapolis Code of Ordinances, Title 2, Chapter 19.30(a)(1) and (a)(3);

- Minneapolis Code of Ordinances, Title 2, Chapter 19.60(d);

- St. Paul Code of Ordinances, Part III, Title III, Chapter 44.02(a)(2);

- St. Paul Code of Ordinances, Part III, Title III, Chapter 44.03(a)(1) and (a)(3);

- St. Paul Code of Ordinances, Part III, Title III, Chapter 44.06(d); and

- Hennepin County Sheriff's Administrative Directive 21-02.

2.   Issue a permanent injunction that prohibits Defendants and their successors, agents, and employees, from enforcing the following provisions:

- Article I, section 10 of the Minnesota Constitution, to the extent that it prohibits state and local law enforcement agencies from voluntarily detaining aliens pursuant to immigration detainers or prohibits state law enforcement officers from performing immigration enforcement functions pursuant to 8 U.S.C. § 1357(g)(1) agreements;

- Minnesota Statute § 171.12, Subdivision 7b(e);

- Minnesota Statute § 171.12, Subdivision 11(c) and (d);

- Minnesota Statute § 168.327, Subdivision 6;

- Minneapolis Code of Ordinances, Title 2, Chapter 19.30(a)(1) and (a)(3);

- Minneapolis Code of Ordinances, Title 2, Chapter 19.60(d);

- St. Paul Code of Ordinances, Part III, Title III, Chapter 44.02(a)(2);

- St. Paul Code of Ordinances, Part III, Title III, Chapter 44.03(a)(1) and (a)(3);

- St. Paul Code of Ordinances, Part III, Title III, Chapter 44.06(d); and

- Hennepin County Sheriff's Administrative Directive 21-02.

3. Award the United States its litigation costs and fees; and

4. Award any other relief that the Court deems just and proper.


DATED: September 29, 2025

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

TIBERIUS DAVIS
Counsel to the Assistant Attorney General

ANTHONY NICASTRO
Acting Director

*Elianis Perez*

ELIANIS PEREZ
Assistant Director
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 616-9124
elianis.perez@usdoj.gov

JULIAN KURZ
Trial Attorney

*Attorneys for the United States*

- 34 -