# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

### St. Paul Division

| | |
|---|---|
| United States of America, | |
| Plaintiff, | Court File No. 0:25-cv-03798 |
| v. | The Honorable Judge Eric C. Tostrud |
| State of Minnesota; City of Minneapolis, Minnesota; City of St. Paul, Minnesota; Hennepin County, Minnesota; Keith Ellison, Attorney General of Minnesota, in His official capacity; Dawanna S. Witt, Hennepin County Sheriff, in her official Capacity, | |
| Defendants. | |

---

### BRIEF IN SUPPORT OF CITY OF ST. PAUL, MINNESOTA'S MOTION TO DISMISS

---

i

## TABLE OF CONTENTS

Introduction ........................................................................................................ 1

Factual Background ........................................................................................... 3

Standard of Review ........................................................................................... 7

Argument............................................................................................................ 8

    I.    The Saint Paul Separation Ordinance is Not Preempted ............................. 9

        A.    The Separation Ordinance's restrictions on participating in civil immigration enforcement do not conflict with the INA. ................. 11

            1.   Under the INA, local participation in federal immigration enforcement is voluntary, so the Saint Paul Separation Ordinance creates no conflict by declining to participate or share information. ................................................................... 13

            2.   Under the Tenth Amendment's anti-commandeering doctrine, the INA cannot be construed to require the City to participate in federal law enforcement efforts. .................................................. 21

        B.    The Separation Ordinance's restrictions on recording immigration information or disclosing confidential information of crime victims are not expressly preempted by 8 U.S.C. §§ 1373 and 1644. ........... 23

            1.   Under *Murphy*, the statutes do not qualify as preemption provisions. ..................................................................... 24

            2.   Sections 1373 and 1644 are unconstitutional under the Tenth Amendment and, as invalid laws, cannot preempt the Separation Ordinance.................................................................... 27

    II.    The Separation Ordinance Does Not Discriminate Against The Federal Government. ..................................................................... 29

    III.    The Separation Ordinance Does Not Directly Regulate The Federal Government. ..................................................................... 32

    IV.    Counts One, Two, and Six as directed against Saint Paul must be dismissed due to lack of standing. .................................................. 33

Conclusion ..................................................................................................... 37

## INTRODUCTION

The fundamental purpose of Saint Paul's Separation Ordinance, codified in Chapter 44 of Saint Paul's Administrative Code, is to promote public safety and protect all Sain Paul residents from crime. To fight crime effectively, the police must have open lines of communication with all Saint Paul communities, including undocumented residents. Such community policing efforts depends upon officers developing trust and candor with residents in every neighborhood. When those bonds are formed, residents are more willing to provide vital information to help solve crimes and prevent violences, such as an offender's name or whereabouts. That system breaks down, however, when residents are afraid to speak with police or to report crimes because they are afraid speaking to the police will lead to them or their loved ones being deported. Such fear will chill, and may even halt, the necessary cooperation with the police required to ensure a successful community policing strategy.

For reasons, Saint Paul's Separation Ordinance provides that City public safety officials will not question, arrest, or detain persons for violations of federal civil immigration law. Saint Paul Code of Ordinances, Administrative Code, Chapter 44.03. Similarly, the Separation Ordinance provides that City officials will not inquire into persons' immigration status unless it is a necessary element of the specific city services being provided. *Id.* Ch. 44.02. This clear delineation keeping police and city officials separate from civil immigration enforcement removes the chill from talking to the police.

Just as important, and in perfect accord with the Separation Ordinance's goal of combatting crime, nothing in the Separation Ordinance prevents the police from enforcing

1

state and local criminal laws against anyone, undocumented or not. The Ordinance likewise leaves officers free to assist with *criminal* immigration enforcement or the investigation of other federal crimes. *See id.* Ch. 44.03(a)(4–5).

The goal of this careful balance is to keep all City residents safe and to maximize the benefits of otherwise limited City resources by directing them where they can be most beneficial. In this lawsuit, however, the United States seeks to overturn this carefully crafted policy and conscript Saint Paul and its agents into forced cooperation within a federal immigration enforcement scheme.

Plaintiff now seeks to nullify the City's policy as reflected in its Separation Ordinance by asserting that the Immigration and Nationality Act ("INA") preempts the Ordinance under the Supremacy Clause. But this legal theory is fundamentally flawed. The statutes enacted by Congress as part of the INA do not support the present attack on the City's policy. The INA imposes requirements on aliens and defines the roles of federal immigration officials. It does not prevent laws like the Separation Ordinance. Nor does it require state and local governments to participate in civil immigration enforcement. Under the INA, state and local participation is entirely voluntary. Indeed, the INA cannot compel participation, because doing so would amount to unlawful commandeering of States and municipalities in violation of the Tenth Amendment.

Plaintiff's alternative attempt to invalidate the Separation Ordinance based on intergovernmental immunity fares no better. The Separation Ordinance does not discriminate against the federal government, for it does not treat other governmental bodies more favorably, and the Ordinance's decision to opt out of federal civil immigration

2

enforcement does not constitute discrimination. Nor does the Ordinance directly regulate the federal government; addressing instead only the roles of Saint Paul employees and officials.

To the extent Plaintiff goes even further and attempts to target Saint Paul as part of Plaintiff's separate challenges to the actions of the Minnesota Attorney General or the statutory enactments of the Minnesota State legislature, any such claims direct towards Saint Paul fail on their face for lack of Article III standing.

If the administration believes more resources are needed to realize its immigration enforcement goals, it can ask Congress to enact new measures or provide more funding, and Congress can decide. What the federal government cannot do, however, is conscript local governments into administering federal civil immigration law. Under the federal system that divides power between Congress on the one hand, and States and municipalities on the other, Saint Paul remains free to deploy its police officers in the ways that best keep all its residents safe. The Complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND

In May 2004, the City of Saint Paul first enacted Chapter 44 of Saint Paul's Administrative Code, entitled "Employee Authority in Immigration Matters," which is colloquially referred to as Saint Paul's "Separation Ordinance." (*See* A. Hsu Decl., Exhibit A, St. Paul Code of Ordinances, Administrative Code, Chapter 44.) The Separation Ordinance reflects the City's intention to focus its limited municipal resources on the health and safety of its residents rather than enforcement of federal civil immigration laws. (*Id.* at Ch. 44.01.) Effective local law enforcement requires building sustained trust and

3

relationships within local communities, and that trust may be undermined when local law enforcement is employed to enforce civil immigration laws rather than focusing on their primary mission of public safety and local criminal enforcement.[1] In balancing these policy concerns, the Separation Ordinance explicitly acknowledges the federal government's legal authority "to enforce immigration laws in the United States, in Minnesota and in the city." (Hsu Decl., Ex. A, at Ch. 44.01) The stated purpose of the Separation Ordinance is not to limit or impede the actions of federal agents, but rather to define the scope of city officials' roles in relation to civil immigration enforcement actions and to focus the City's finite resources on the local objectives most pertinent to serving its residents and their needs.

To achieve these goals, Chapter 44.02(a)(2) provides that City employees providing general city services shall not solicit immigration information or inquire about immigration status unless specifically required to do so to facilitate city services. 44.02(a)(2) additionally provides that City employees shall not record or maintain any such immigration information unless specifically required by law and charges employees to maintain the confidentiality of such information to the "fullest extent permitted by the laws

---

[1] Empirical research confirms that so-called "sanctuary jurisdictions" have lower crime rates than other jurisdictions. *See, e.g.*, Tom K. Wong, "The Effects of Sanctuary Policies on Crime and the Economy," Center for American Progress (Jan. 26, 2017), https://www.americanprogress.org/article/the-effects-of-sanctuary-policies-on-crime-and-the-economy/ (finding that 35.5 fewer crimes are committed per 10,000 people in sanctuary counties compared to nonsanctuary counties); Catalina Amuedo-Dorantes & Monica Deza, "Can Sanctuary Policies Reduce Domestic Violence?" Center for Growth and Opportunity at Utah State University (May 20, 2020), https://www.thecgo.org/research/can-sanctuary-policies-reduce-domestic-violence/ (finding that "the adoption of sanctuary policies is accompanied by a lower rate of domestic homicides involving a female Hispanic victim").

of the United States and the state." That same section also elaborates that city officials shall not discriminate against any current or potential service users on the basis of immigration status. Section 44.02(a)(3) further provides that "other than complying with lawful subpoenas," city employees shall not employ limited city resources "solely for the purpose of detecting or apprehending persons whose only violation is or may be being undocumented."

Chapter 44.03(a)(1) similarly provides that public safety officials shall not undertake any law enforcement action "for the sole purpose of detecting the presence of undocumented persons, or to verify immigration status." Section 44.03(a)(3) further establishes that public safety officials "may not question, arrest, or detain any person for violations of federal civil immigration laws except when immigration status is an element of the crime or when enforcing 8 U.S.C. 1324(c)." Notably, Section 44.03(a)(4) expressly provides that "[n]othing in this chapter shall prohibit public safety personnel from assisting federal law enforcement officers in the investigation of criminal activity involving individuals present in the United States who may also be in violation of federal civil immigration laws." Similarly, the same section expressly states that public safety personnel are not prohibited from identifying criminal suspects or assessing the risk of flight of criminal suspects. The principal objectives reflected in that section is that City public safety officials should be focused on criminal law enforcement, not civil immigration enforcement. And officials are not precluded from assisting in the apprehension or detention of criminal suspects simply because they may overlap with civil immigration laws.

5

Chapter 44.06 outlies the process for City certifying agencies to process certification requests for U Nonimmigrant Status Certifications or a T Visa Declaration of Law Enforcement Officer for Victim of Trafficking in Persons. The U Nonimmigrant Status is "set aside for victims of certain crimes who have suffered mental or physical abuse and are helpful to law enforcement or government officials in the investigation or prosecution of criminal activity." U.S. CITIZENSHIP AND IMMIGRATION SERVICES, *Victims of Criminal Activity: U Nonimmigrant Status*, available at https://www.uscis.gov/humanitarian/victims-of-criminal-activity-u-nonimmigrant-status (last accessed Jan. 7, 2026). The T Nonimmigrant Status is "a temporary immigration benefit that enables certain victims of a severe form of trafficking in persons to remain in the United States for an initial period of up to 4 years if they complied with any reasonable request for assistance from law enforcement in the detection, investigation, or prosecution of human trafficking or qualify for an exemption or exception." U.S. CITIZENSHIP AND IMMIGRATION SERVICES, *Victims of Criminal Activity: T Nonimmigrant Status*, available at https://www.uscis.gov/humanitarian/victims-of-human-trafficking-t-nonimmigrant-status (last accessed Jan. 7, 2026). As part of that review and certification process, City agencies may be required to gather otherwise private or confidential data about the victims seeking certifications. Accordingly, section 44.06(d) provides that any such private or confidential data obtained through the certification process must not be disclosed "except as provided in the Minnesota Government Data Practices Act or as otherwise required by law or court order." Section 44.06(d) does not provide any express conditions related to

6

immigration-related information and offers only the general directive that private or confidential information must not be disclosed unless required by law.

Viewed in the broader context of the City's Separation Ordinance as a whole, these provisions reflect the City's measured policy decisions as to how best to husband its limited resources and direct them to their best effect in service of Saint Paul's residents.

## STANDARD OF REVIEW

In order to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Complaint must state a "claim to relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

When ruling on a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Id.* at 572 (quotations omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## ARGUMENT

Plaintiff alleges two primary claims against Saint Paul. Count Four of the Complaint alleges that certain provisions of the Saint Paul Separation Ordinance are preempted by various provisions of the INA, including 8 U.S.C. §§ 1357, 1373, and 1644, and 8 C.F.R. § 287.7. Count Eight of the Complaint alleges that the same provisions of the Separation Ordinance violate the intergovernmental immunity doctrine by discriminating against the federal government. Both of these claims, however, fail on their face.

First, Plaintiff's preemption claims fail for two separate reasons: (1) the federal statutes cited by Plaintiff do not preempt Saint Paul's Separation Ordinance; and (2) the Tenth Amendment's anti-commandeering doctrine precludes any preemptive effect by the federal statutes cited by Plaintiff. Thus, Plaintiff's preemption claims against Saint Paul as reflected in Count Four of the Complaint should be dismissed with prejudice.

Second, Plaintiff's intergovernmental immunity claim fails because Plaintiff does not identify any relevant comparator receiving more favorable treatment than the federal government under Saint Paul's Separation Ordinance. Additionally, the anticommandeering doctrine is similarly fatal to Plaintiff's discrimination claim. For these reasons, Count Eight of the Complaint against Saint Paul should be dismissed with prejudice.

To the extent Plaintiff has also alleged Counts One, Two, and Six against all defendants collectively, those claims similarly fail against Saint Paul because Plaintiff fails to allege the necessary elements of causation and redressability required to establish Article III standing against Saint Paul. Those counts address an advisory opinion issued by the

Minnesota Attorney General and various Minnesota state statutes regulating the actions of the State's Department of Transportation. Neither the opinion nor the statutes were issued or enacted by Saint Paul and Saint Paul is not the principal entity responsible for enforcing those provisions. Thus, those three counts, to the extent they are directed against Saint Paul, also fail on their face and should be dismissed accordingly.

## I.    The Saint Paul Separation Ordinance is Not Preempted.

In Count Four, Plaintiff alleges that the Saint Paul Separation Ordinance is preempted by federal law. However, the Complaint does not state any valid preemption claim against Saint Paul's Separation Ordinance. Preemption under the Supremacy Clause can take three forms: Congress can enact language in a statute that expressly preempts state law (express preemption); Congress's intent to displace state law can be evident from a pervasive scheme of federal regulation in a field (field preemption); or preemption can occur when state law conflicts with federal law (conflict preemption). *See Arizona v. United States*, 567 U.S. 387, 399–400 (2012) (outlining three forms of preemption).

Plaintiff principally alleges that the Separation Ordinance conflicts with various sections of the INA. (*See* Compl. ¶¶ 115–121.) However, Plaintiff's conflict preemption theory fails on its face. While the Complaint does not explicitly allege an express preemption theory, to the extent any such theory may be inferred from the Complaint, that theory too fails on its face. The final form of preemption (field preemption) is neither implied nor directly alleged in the Complaint and therefore is not addressed as part of this motion as no such claim is alleged in the Complaint (and would be subject to dismissal regardless). *See Adams v. Am. Family Mut. Ins. Co.*, 813 F. 3d 1151, 1154 (8th Cir. 2016)

("A theory of liability that is not alleged or even suggested in the complaint would not put a defendant on fair notice and should be dismissed.").

First, as to conflict preemption, Plaintiff contends that the Separation Ordinance conflicts with the INA because the Ordinance prevents SPPD from assisting ICE in enforcing civil immigration violations. But there is no conflict in this case, because the INA does not obligate City officers to participate in civil detention efforts. The INA's terms make clear that local participation in the federal regulatory scheme is voluntary. Saint Paul may therefore decide, as it has through its Separation Ordinance, to have its police force focus on local criminal enforcement and to preserve the necessary trust with its residents required to effectively accomplish that objective. Saint Paul's decision to direct its finite resources towards that goal rather than federal immigration enforcement does not amount to obstruction or interference with federal objectives. Any reading of the INA that would foreclose Saint Paul's choice would effectively force Saint Paul's police officers to participate in federal immigration enforcement. Such a reading would plainly violate the Tenth Amendment's anticommandeering doctrine, which forbids the federal government from conscripting local police officers into administering a federal regulatory scheme.

Second, to the extent any express preemption theory may be inferred from the Complaint, Plaintiff's principal allegations rely upon 8 U.S.C. §§ 1373 and 1644, which prohibit local government entities from restricting the police from maintaining or sharing citizenship or immigration status information. These sections are not valid preemption provisions, however, and cannot sustain an express preemption claim. Furthermore, the statutes are facially unconstitutional under the anticommandeering doctrine because they

10

purport to restrict Saint Paul's ability to enact legislation managing its own police force. Accordingly, neither statute exerts preemptive force over the Separation Ordinance.

### A. The Separation Ordinance's restrictions on participating in civil immigration enforcement do not conflict with the INA.

Plaintiff contends that the Separation Ordinance is impliedly preempted by the INA because it "imposes an obstacle" to the enforcement of federal immigration law. (*See* Compl. ¶¶ 115–120.)

When assessing a preemption claim, regardless of the form, the Court "begin[s] with the assumption that the historic police powers of the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *R.J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th 1170, 1176 (8th Cir. 2023) (citing *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008)). This presumption applies equally to Saint Paul as it does to the State because preemption "of local ordinances is analyzed the same way as that of statewide laws." *Hillsborough Cnty. v. Automated med. Labs., Inc.*, 471 U.S. 707, 713 (1985).

Conflict preemption doctrine impliedly preempts an ordinance if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995).[2] Whether conflict preemption applies "is a matter of judgment, to be informed by examining the federal

---

[2] The conflict preemption doctrine also includes "cases where compliance with both federal and state regulations is a physical impossibility." *Arizona v. U.S.*, 567 U.S. 387, 399 (2012). However, the "physical impossibility" class of conflict preemption is not an issue in the present case and has not been alleged in the Complaint.

statute as a whole and identifying its purpose and intended effects." *Crosby Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). But the "[i]mplied preemption analysis does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives; such an endeavor would undercut the principal that it is Congress rather than the courts that pre-empts state law." *Chamber of Com. Of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (citation omitted). The burden rests on Plaintiff as the party invoking preemption to show that conflict preemption applies. *See Williams v. Nat'l Football League*, 582 F.3d 863, 880 (8th Cir. 2009) (burden is on party asserting federal preemption of state law).

Courts find that state laws pose an obstacle only where applying the state law would "do major damage to clear and substantial federal interests." *Hillman v. Maretta*, 569 U.S. 483, 491 (2013). "It is not a mere possibility of inconvenience in the exercise of powers, but an immediate constitutional repugnancy that can by implication alienate and extinguish a pre-existing right of (state) sovereignty)." *Goldstein v. California*, 412 U.S. 546, 554–55 (1973) (alteration in original). Where "the federal government may, without the cooperation of local law enforcement agencies, expend extra efforts and resources to apprehend" those subject to removal, the state law "does not create the kind of 'direct' obstacle necessary to trigger conflict preemption." *County of Ocean v. Grewal*, 475 F. Supp. 3d 355, 382 (D.N.J. 2020).

In this case, Plaintiff alleges that certain provisions of the Separation Ordinance "impose an obstacle" to the purpose of various provisions of the INA. (*See* Compl. ¶¶ 116–120.) First, Plaintiff contends that Chapter 44.02(a)(2) of the Ordinance imposes an

obstacle to the purpose of 8 U.S.C. § 1357(g)(1) because it "prohibits public safety officials from performing immigration enforcement functions pursuant to a § 1357(g) agreement." (*Id.* ¶ 117.) Second, Plaintiff alleges that Chapter 44.03(a)(1) and 44.03(a)(3) of the Ordinance impose an obstacle to the purpose of 8 C.F.R. § 287.7(d) because it "prohibits public safety officials from temporarily maintaining custody over aliens pursuant to Federal immigration detainers."  (*Id.* ¶¶ 68, 118.) Finally, Plaintiff alleges that Chapter 44.06(d) of the Ordinance imposes an obstacle to the purpose of 8 U.S.C. §§ 1373 and 1644 because it "restricts city agencies from sending immigration-status information to DHS. (*Id.* ¶ 119.) As a matter of law, however, these provisions present no conflict with the INA.

### 1. Under the INA, local participation in federal immigration enforcement is voluntary, so the Saint Paul Separation Ordinance creates no conflict by declining to participate or share information.

The Separation Ordinance does not pose any obstacle to the purposes and objectives of the INA or any other statutes cited by Plaintiff because none of the cited statutes impose a mandatory obligation on Saint Paul or its agents to participate in federal immigration enforcement. The structure and language of the INA plainly sets forth a framework of voluntary cooperation in which Saint Paul is free to refuse participation in related federal enforcement actions. Accordingly, the INA provisions cited by Plaintiff do not support any applicable conflict preemption over Saint Paul's Separation Ordinance.

Whether conflict preemption applies "is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *R.J. Reynolds*, 60 F.4th at 1178 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S.

363, 373 (2000)). Furthermore, because the Separation Ordinance regulates the Saint Paul's local law enforcement officers, and thereby implicates Saint Paul's traditional police powers, the Court must presume that the INA does not preempt that authority unless it was the "clear and manifest purpose of Congress." *R.J. Reynolds*, 60 F.4th at 1178; *see also U.S. v. California*, 921 F.3d 865, 887 n.11 (9th Cir. 2019) ("A state's ability to regulate its internal law enforcement activities is a quintessential police power.").

In this case, the INA does not obligate Saint Paul to do any of the things restricted by the Separation Ordinance. The plain text of the INA makes it evident that its primary purpose is governing the conduct of federal immigration agents and that any involvement of state or municipal law enforcement officers is purely voluntary. Of the various INA provisions cited in the Complaint, most of them only delineate how *federal* agents operate within the *federal* immigration system. For example, both 8 U.S.C. §§ 1182 and 1227 list various classes of alien that are inadmissible to the United States or removable by federal authorities. 8 U.S.C. § 1226(a) authorizes federal agents to arrest an alien based on a warrant issued by the Attorney General (rather than a warrant signed by a judge) and discusses when the alien may be released. 8 U.S.C. § 1226(c) requires federal authorities to take certain aliens into federal custody after their release from state or local custody. And 8 U.S.C. § 1231 addresses the timing and procedures for the federal government's removal of an alien, including whether the alien may or must be detained by federal authorities during that process. These statutes regulate the federal government and therefore do not conflict with anything in the Separation Ordinance, which regulates only City agencies and employees. These sections reflect the broader purpose of the INA, which

is not to compel action from state or municipal entities, but rather to regulate the conduct of *federal* agents and to provide the framework for states or cities to *voluntarily* cooperate with the federal government.

The specific INA provisions that Plaintiff identifies as directly conflicting with the Separation Ordinance do not counter this understanding of the broader INA, and, if anything, only further reinforce that participation by state and local governments is voluntary under the INA. Accordingly, the choice of a state or municipality, as reflected in Saint Paul's Separation Ordinance, "to refrain from participation [in federal immigration enforcement] cannot be invalid under the doctrine of obstacle preemption where, as here, it retains the right of refusal." *McHenry Cnty. v. Kwame Raoul*, 44 F. 4th 581, 592 (7th Cir. 2022) (analyzing Illinois Way Forward Act prohibiting State and local officials from enforcing federal civil immigration law and holding that various provisions of INA do not support conflict preemption).

First, Plaintiff contends that Chapter 44.02(a)(2) of the Separation Ordinance conflicts with 8 U.S.C. § 1357(g)(1) because it "prohibits law enforcement agencies from performing immigration enforcement functions pursuant to a § 1357(g) agreement." (Compl. ¶ 117.) 8 U.S.C. § 1357(g) authorizes the Attorney General to enter into "agreements" with state or local authorities to assist with immigration arrests and detention. That same section, however, explicitly states that "[n]othing in this subsection shall be construed to require any State or political subdivision of a State to enter into [such] an agreement." *Id.* § 1357(g)(9). Numerous federal courts addressing similar provisions under the INA have repeatedly recognized that the INA's statutory framework only provides for

*voluntary* cooperation from state or municipal entities. *See U.S. v. Illinois*, 796 F. Supp. 3d 494, 530 (N.D. Ill. 2025) (analyzing preemption effect of section 1357 and noting that state officers' "assistance is permissible under the INA, not mandatory"); *Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 362, 381 (D.N.J. 2020) (discussing section 1357(g), and dismissing preemption challenge to New Jersey's Immigrant Trust Directive because "[t]here is no indication that Congress, in enacting the INA, sought to usurp" local "decision[s] not to cooperate with the enforcement of federal immigration law"), *aff'd on other grounds*, 8 F.4th 176 (3d Cir. 2021); *see also McHenry*, 44 F.4th at 592 ("It would make no sense to hold that a federal statute premised on State cooperation preempts a State law withholding that cooperation."); *California*, 921 F.3d at 887 (holding state law limiting state officers' cooperation with federal immigration authorities does not conflict with any obligations under the INA, because "federal law does not actually mandate any state action"); *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("Federal law does not suggest the intent—let alone a "clear and manifest" one—to prevent states from regulating whether their localities cooperate in immigration enforcement. Section 1357 does not require cooperation at all." (citations omitted)).

For these reasons, the Ninth Circuit in *California* rejected a similar preemption challenge to a California statute—the California Values Act (also known as SB 54)—similar to the Separation Ordinance. Like the Separation Ordinance, SB54 "limited[ed] law enforcement's 'discretion to cooperate with immigration authorities.'" *California*, 921 F.3d at 876 (citation omitted). More specifically, SB 54 prohibited state and local law enforcement agencies from "detaining an individual on the basis of a hold request;

providing information regarding a person's release date or other personal information, such as the individual's home address or work address; and assisting immigration authorities in certain activities." *Id.* (cleaned up). The Ninth Circuit held that these state prohibitions were not preempted. The court explained that "SB 54 does not directly conflict with any obligations that the INA or other federal statutes impose on state or local governments," because the INA does not require any particular action on the part of California or its political subdivisions." *Id.* at 887, 889. Aside from 8 U.S.C. § 1373 (a statute addressed in further detail below in Section III), "the various statutory provisions to which the United States points direct *federal* activities, not those of state or local governments." *Id.* at 887. Similarly, the Separation Ordinance does not conflict with the INA or section 1357 because the federal statute does not impose any mandatory obligation on states or municipalities.

The same is true of 8 C.F.R. § 287.7(d), which Plaintiff alleges conflicts with the Separation Ordinance's Chapter 44.03(a)(3). 8 C.F.R. 287 governs immigration "detainers," which is a notification from federal agents that they want to take custody of an alien being held by local law enforcement. As Plaintiff acknowledges in the Complaint, however, a detainer is merely a "request" that a local entity hold an alien or notify DHS prior to an alien's release date. (Compl. ¶¶ 26–27.) Minnesota federal courts have similarly recognized that "Section 287.7 is clear that detainers are merely 'request[s]' to law-enforcement agencies to hold individuals" and that "law-enforcement agencies receiving those requests are free to disregard the ICE detainer." *Garcia v. Speldrich*, No. 13-CV-3182, 2014 WL 3864493, at *12 (D. Minn. Aug. 6, 2014) (citing *Galarza v. Szalczyk*, 745 F.3d 634, 645 (3d Cir. 2014)). A detainer "does not compel state or local LEAs to detain

17

suspected aliens subject to removal pending release to immigration officials," and local law enforcement is "free to disregard" it. *Galarza*, 745 F.3d at 645; *see also California*, 921 F.3d at 887 ("an administrative warrant issued by federal authorities" does not "compel[] any action by a state or local official"); *United States v. Illinois*, 796 F. Supp. 3d 494, 528 (stating § 287.7 "[d]etainers are requests, not requirements" and holding local restrictions on local law enforcement agencies enforcing federal detainers did not pose obstacle to the INA and were not preempted by the same). Because a detainer is not a command that an alien be held for later federal arrest, the Separation Ordinance's decision that Saint Paul public safety officers will not arrest or detain persons merely for violations of federal civil immigration laws does not conflict with federal law.

In fact, responding to detainers could result in a violation of federal law. In honoring a detainer, the police may end up holding detainees beyond the time they would normally be released by the police. And that, in turn, could subject Saint Paul to liability under the Fourth Amendment for unlawful prolonged seizures unsupported by a neutral determination of probable cause. *See, e.g., Orellana v. Nobles Cnty.*, 230 F. Supp. 3d 934, 946 (D. Minn. 2017) (holding county liable for Fourth Amendment violation arising from prolonged detention of plaintiff based solely on 8 C.F.R. 287(d) federal retainer request).

Plaintiff's final explicit allegation that Chapter 44.06(d) conflicts with and imposes an obstacle to the purpose of 8 U.S.C. §§ 1373 and 1644 similarly fails because the plain text of the Ordinance does not conflict with the statutes cited. Chapter 44.06(d) provides only that any private or confidential information about victims obtained by city officials through the certification process for a "U Nonimmigrant Status Certification or a T Visa

Declaration" must be protected from disclosure except as otherwise required by law or court order. St. Paul Code of Ord., Part III, Title III, Chapter 44.06(d). Chapter 44.06(d) provides no express prohibition on the sharing or exchanging of information with federal law enforcement "regarding the immigration status, lawful or unlawful, of any individual," which is the limited type of information subject to the negative prohibitions set forth in sections 1373 and 1644. *See California*, 921 F.3d at 892 (holding that plain language of 8 U.S.C. § 1373 limits its reach to information strictly pertaining to immigration status and does not include other information like release dates and addresses). Rather, the language of Chapter 44.06(d) provides a general statement of protection regarding private or confidential information, it makes no mention of specific immigration information either in its disclosure restrictions or its applicability. Furthermore, even if such information was encompassed under the Ordinance's restrictions, the language of the Ordinance plainly provides that even private or confidential information may be disclosed where "otherwise required by law or court order." As such, nothing in the language of Chapter 44.06(d) supports an implied theory of conflict preemption based on sections 1373 or 1644. Furthermore, because any collaboration or communication under the INA is permissive, not mandatory, even if the Ordinance's information-related provisions did implicate section 1373's or 1644's prohibitions, there would still be no basis to support an implied conflict preemption theory because there would remain no resulting obstacle to the purpose of the INA. *See U.S. v. Illinois*, 796 F. Supp. 3d at 531 ("Because any collaboration under the INA is permissive, not mandatory, there is no hook for the United State's preemption argument with respect to maintaining or sharing information about people in custody.").

19

In short, nothing in the INA requires the City to participate in federal immigration enforcement activities. When assessing preemption claims, courts have a "duty to respect not only what Congress wrote but, as importantly, what it didn't write." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 765 (2019). And here, Congress chose not to write the INA to require local participation, leaving Saint Paul free to exercise its own judgment about how best to keep its residents safe. *See California*, 921 F.3d at 887 (noting that no provision of the INA compels any action by a state or local official). It cannot conflict with the INA for Saint Paul to exercise that choice. "Given that Congress specifically preserved" Saint Paul's authority to make its own decisions, "it stands to reason that Congress did not intend to prevent [it] from using appropriate tools to exercise that authority." *Whiting*, 563 U.S. at 600–01.

Plaintiff's preemption theory is also not helped by contending that the Separation Ordinance "impede[s]" federal law enforcement efforts. (Compl. ¶¶ 4, 84–85.) As the Ninth Circuit noted in its analysis of similar INA provisions, the "[City]'s decision not to assist federal immigration enforcement in its endeavors is not an 'obstacle' to that enforcement effort." *California*, 921 F.3d at 888. In other words, "refusing to help is not the same as impeding." *Id.*

Equally important, obstacle preemption does not arise just because Saint Paul's approach to public safety may lead "federal authorities to expend greater resources to enforce immigration laws." *Id.* This "does not create the kind of 'direct' obstacle necessary to trigger conflict preemption." *Cnty. of Ocean*, 475 F.3d at 382 (cleaned up). Treating Saint Paul's decision "to refrain" from participation as an obstacle would create an implied

20

mandate to participate. *California*, 921 F.3d at 887, 890. But such a mandate cannot be implied. *Id.* at 890. Again, the INA leaves the choice to state and local governments.

For all these reasons, the INA does not preempt Saint Paul's Separation Ordinance or its restrictions on participation in federal civil immigration enforcement. Saint Paul is free to conclude that the best use of its limited police resources is fighting local crime and building the community trust necessary to do so effectively.

## 2. Under the Tenth Amendment's anti-commandeering doctrine, the INA cannot be construed to require the City to participate in federal law enforcement efforts.

Plaintiff's conflict preemption theory also fails for a separate, fundamental reason: The INA cannot be construed to compel Saint Paul's participation in civil immigration enforcement (and thereby preempt the Separation Ordinance's restrictions) because that would constitute an unconstitutional commandeering of local officials in violation of the Tenth Amendment.

Under the anticommandeering doctrine, "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997). Indeed, "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York v. United States*, 505 U.S. 144, 162 (1992).

In *Printz*, the Supreme Court held that Congress cannot require the "forced participation" of local governments in a federal law enforcement regime. 521 U.S. at 918. *Printz* struck down a federal statute that required local law enforcement officers to conduct background checks on gun purchasers in accord with federal law. The Court explained that

"[t]he Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Id.* at 935. *See also Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 473 (2018) (the anticommandeering principle "is important" for multiple reasons, including because it "reduces the risk of tyranny and abuse" from the federal government and "prevents Congress from shifting the costs of regulation to the States") (cleaned up); *Printz*, 521 U.S. at 922 ("The power of the Federal Government would be augmented immeasurably if it were able to impress into its service—and at no cost to itself—the police officers of the 50 States.").

This constitutional principle squarely applies here. Congress can no more force local officers to participate in federal immigration enforcement than it can force them to spend time and money administering a federal firearm regime. Indeed, numerous courts have explained that construing the INA to require state and local officials to assist with federal immigration demands would amount to unconstitutional commandeering. *See California*, 921 F.3d at 891 ("California has the right, pursuant to the anticommandeering rule, to refrain from assisting with federal [immigration] efforts," and the federal government "could not *require* California's cooperation without running afoul of the Tenth Amendment."); *El Cenizo*, 890 F.3d at 178 ("[T]he Tenth Amendment prevents Congress from compelling Texas municipalities to cooperate in immigration enforcement."); *Galarza*, 745 F.3d at 644 (holding that if immigration detainers were construed as "a command" to local officers, that "would violate the anti-commandeering doctrine of the

Tenth Amendment"); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 534 (N.D. Cal. 2017) ("By seeking to compel states and local jurisdictions to honor civil detainer requests . . . the Executive Order violates the Tenth Amendment's provisions against conscription.").

The anticommandeering doctrine protects Saint Paul's freedom to decide, as it did in its Separation Ordinance, that its residents are safer when police officers maintain open lines of communication with immigrant communities to fight local crime. The Constitution does not allow the federal government to conscript officers into federal service in lieu of this crucial mission. For this additional reason, the INA does not preempt the Separation Ordinance or its limitations on participating in civil immigration enforcement.

### B.   The Separation Ordinance's restrictions on recording immigration information or disclosing confidential information of crime victims are not expressly preempted by 8 U.S.C. §§ 1373 and 1644.

While the Complaint does not appear to allege any theory of express preemption based on 8 U.S.C. §§ 1373 and 1644 against Saint Paul's Separation Ordinance specifically, it does direct express preemption claims against several other Defendants.[3] To the extent such theory may also be addressed towards Saint Paul and its Ordinance, however, any such claim fails as a matter of law because neither of the two statues carry any preemptive effect.

---

[3] None of Plaintiff's explicit claims against Saint Paul invoke the language of an express preemption theory. (*See* Compl. ¶¶ 116–120.) On the other hand, similar claims raised against the City of Minneapolis, Hennepin County Defendants, and the State of Minnesota all explicitly identify express preemption theories. (*See* Compl. ¶¶ 101–02, 110, 125.)

Sections 1373 and 1644 prohibit States and local governments from restricting their employees form maintaining or sharing citizenship or immigration status information. The Complaint does not specifically identify any provisions of Saint Paul's Separation Ordinance that would be subject to express preemption under these sections. Regardless, sections 1373 and 1644 cannot expressly preempt the Separation Ordinance for two reasons.[4] First, preemption doctrine applies only to statutes that regulate private actors, but sections 1373 and 1644 regulate government entities. Second, the statutes are unconstitutional under the anticommandeering doctrine, because they amount to direct orders to state and local governments.

### 1.    Under *Murphy*, the statutes do not qualify as preemption provisions.

In *Murphy*, the Supreme Court explained that "every form of preemption is based on a federal law that regulates the conduct of private actors, not the States." 584 U.S. at 479. Following *Murphy*, the Supreme Court reaffirmed that state law is preempted only if the federal law "imposes restrictions or confers rights on private actors." *Kansas v. Garcia*, 589 U.S. 191, 202 (2020). This private actor requirement is a natural corollary to the anticommandeering doctrine, because "even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *New York v. U.S.*, 505 U.S. 144, 166 (1992) (collecting cases).

---

[4] These same two reasons offer a separate, independent basis to dismiss any conflict preemption theory based on sections 1373 and 1644 as well, because neither statute has any preemptive effect regardless of the form of the alleged preemption.

Sections 1373 and 1644 do not satisfy the private-actor requirement for preemption claims. They regulate only state and local government actors, not private parties. They therefore lack preemptive force under *Murphy* and cannot be read to preempt the Separation Ordinance.

Specifically, section 1373(a) states in relevant part that "*a Federal, State, or local government entity or official may not*, prohibit, or in any way restrict, any government entity or official from sending to . . . [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a) (emphasis added). Applying *Murphy*, the Third Circuit held that this language does not preempt state or local law because it "is a clear prohibition on state action" and "says nothing about private actors, so it cannot be fairly read to regulate them." *Ocean Cnty. Bd. Of Comm'rs v. Att'y Gen. of State of New Jersey*, 8 F.4th 176, 182 (3d Cir. 2021). Other courts that have addressed the preemptive effect of § 1373 directly have uniformly found that the statute is not a preemptive provision. *See, e.g., Illinois*, 796 F. Supp. 3d at 520 (listing cases).

The result is the same for section 1373(b). It similarly states that "*no person or agency may prohibit, or in anyway restrict, a Federal, State, or local government entity from* doing any of the following with respect to information regarding the immigration status, lawful, or unlawful of any individual: (1) Sending such information to, or requesting or receiving such information from, [DHS]. (2) Maintaining such information. (3) Exchanging such information with any other Federal, State, or local government entity." (emphasis added). While the subsection states that "no person," rather than "no official," shall restrict or prohibit information sharing, "person" must be read narrowly to mean

someone cloaked with government authority—i.e., a government actor. "That's because private actors can neither 'prohibit[]' state action nor 'restrict[]' it." *Ocean Cnty.*, 8 F.4th at 182. So section 1373(b), like section 1373(a), regulates only government actors, not private parties.

Section 1644, for its part, contains substantively the same restrictions as section 1373, and therefore suffers from the same fatal defect in that it also does not regulate private conduct. *See id.*[5]

The fact that "neither § 1373 nor § 1644 regulates private actors is fatal" to Plaintiff's preemption claim because "[a] federal statute that does not regulate private actors cannot serve as a basis for preemption." *Ocean Cnty.*, 8 F.4th at 182 (citing *Murphy*); *see also, e.g.*, *Colorado v. U.S Dep't of Just.*, 455 F. Supp. 3d 1034, 1059 (D. Colo. 2020) ("By their plain terms, [sections 1373 and 1644] affect state and local government entities and officials; they do not regulate private actors as *Murphy* requires for preemption."). To the extent these statutes purport to prohibit states or their localities from limiting information-sharing by their own officers, they are a "direct command to the States," which is just "what the anticommandeering rule does not allow." *Murphy*, 584 U.S. at 480. As such, because neither section regulates private actors, they are not statutes that can preempt the Separation Ordinance.

---

[5] Section 1644 provides in relevant part that "no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States." 8 U.S.C. § 1644.

**2.    Sections 1373 and 1644 are unconstitutional under the Tenth Amendment and, as invalid laws, cannot preempt the Separation Ordinance.**

Sections 1373 and 1644 also cannot preempt the Separation Ordinance because they are unconstitutional under the anticommandeering doctrine. The doctrine "prohibits Congress from dictating what laws or regulations a state may or may not enact." *Minn. Auto Dealers Assoc. v. Minnesota*, 520 F. Supp. 3d 1126, 1140 (D. Minn. 2021) (citing *Murphy*, 584 U.S. at 480).

In *Murphy*, the Supreme Court applied the anticommandeering doctrine to invalidate a federal statute that prohibited States form enacting a law (one authorizing sports gambling). 584 U.S. at 481. Sections 1373 and 1644 are structured the same way: they too purport to prohibit state and local governments from enacting a law (one prohibiting sharing or maintaining citizenship or immigration status information). As in *Murphy*, there is "simply no way to understand" these provisions prohibiting a type of legislation "as anything other than a direct command to the States. And that is exactly what the anticommandeering rule does not allow." *Id.* at 480.

Furthermore, personnel decisions regarding a state's own officers "is a decision of the most fundamental sort for a sovereign entity." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Accordingly, by prohibiting Saint Paul from regulating certain conduct (information sharing) by its employees, sections 1373 and 1644 effectively "eliminate[] the City's ability to control its employees' communications," and thereby "effect[] a federally-imposed restructuring of power within state government." *City of Chicago v.*

*Sessions*, 321 F. Supp. 3d 855, 870, 873 (N.D. Ill. 2018). That is untenable because "[a] state's ability to control its officers and employees lies at the heart of state sovereignty." *Id.* at 869.

Finally, if Saint Paul cannot control whether and how its employees share information with the federal government, it cannot affirmatively opt-out of enforcing federal immigration laws. *Illinois*, 796 F. Supp. 3d at 523. This conflicts with the guiding principle of anticommandeering: knowing and voluntary cooperation. *Id.* Sections 1373 and 1644 would effectively strong-arm Saint Paul into cooperating with federal enforcement by removing the City's ability to refuse cooperation at a policy-level. Given these considerations, numerous other courts have held that sections 1373 and 1644 amount to unlawful commandeering. *See Oregon v. Trump*, 406 F. Supp. 3d 940, 971 (D. Or. 2019), *aff'd in part, vacated in part sub nom. City & Cty. of San Francisco v. Garland*, 42 F.4th 1078, 1079 (9th Cir. 2022); *City of Phila. v. Sessions*, 309 F. Supp. 3d 289, 331 (E.D. Pa. 2018), *aff'd in part, vacated in part on other grounds sub nom. City of Phila. v. Attorney Gen.*, 916 F.3d 276, 291 (3d Cir. 2019); *City & Cty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 953 (N.D. Cal. 2018), *aff'd in part, vacated in part on other grounds*, *City & Cty. of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020); s*ee also United States v. California,* 314 F. Supp. 3d 1077, 1101 (E.D. Cal. 2018) (finding Section 1373 "highly suspect" because it "dictate[s] what states may and may not do, in contravention of the Tenth Amendment"), *aff'd on other grounds*, 921 F.3d 865 (9th Cir. 2018).

For these reasons, sections 1373 and 1644 are unconstitutional and cannot preempt the Separation Ordinance. *See Kansas*, 589 U.S. at 202 ("[F]ederal restrictions or rights

28

that are said to conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress.").

## II.    The Separation Ordinance Does Not Discriminate Against The Federal Government.

In Count Eight, Plaintiff alleges that the Separation Ordinance unlawfully discriminates against the federal government because it "single[s] out federal immigration officials and entities, expressly or implicitly, for unfavorable and uncooperative treatment." (Compl. ¶¶ 140–41.) Plaintiff alleges that this purported discriminatory treatment violates the doctrine of intergovernmental immunity, under which the "Supremacy Clause generally immunizes the Federal Government from state laws that directly regulate or discriminate against it." *U.S. v. Washington*, 596 U.S. 832, 835 (2022). Simply put, the Separation Ordinance does not violate this doctrine because it does not discriminate against the federal government.

To prevail on this claim, the challenged provisions of Saint Paul's Separation Ordinance must "singl[e] out the [f]ederal [g]government for unfavorable treatment." *Washington*, 596 U.S. at 839. Plaintiff must allege that Saint Paul treats another comparable class "better than it treats" the federal government. *Washington v. United States*, 460 U.S. 536, 537 (1983). In this regard, to sustain its claim, Plaintiff must identify a relevant comparator. *See McHenry Cnty.*, 44 F.4th at 594 (dismissing intergovernmental immunity claim based on failure to identify similarly situated actors to the federal government). "The mere fact that the [ordinance] touches on an exclusively federal sphere is not enough to establish discrimination. *Id. Cf. California*, 921 F.3d at 881 (explaining that

intergovernmental immunity "is not implicated when a state merely references or even singles out federal activities in an otherwise innocuous enactment").

In this case, despite making conclusory assertions that federal officials are treated "worse than private individuals and other government officials and entities," Plaintiff does not identify any specific similarly situated entities that receive differential treatment under the Separation Ordinance. This failure to identify a relevant comparator is independently fatal to Plaintiff's claim.

Additionally, aside from the initial policy statement under Chapter 44.01, none of the operative provisions of the Separation Ordinance explicitly hold out the federal government or any of its agencies for any differential treatment. All of the challenged provisions are neutrally applicable to all parties and are otherwise expressly limited to the regulation and direction of Saint Paul's own officers. For example, Chapter 44.02(a)(2) merely directs City officials to limit their collection and recording of certain immigration information and to treat such information generally as confidential "to the fullest extent permitted by the laws of the United States and the state." The provision provides only a general directive on the classification and treatment of confidential information generally. It does not require City agents or agencies to treat the federal government less favorably than other law enforcement agencies. To the extent Chapter 44.02(a)(2) may prohibit disclosure of immigration-related information, it prohibits City agents and agencies from disclosing immigration-related information not just to federal immigration authorities but to anyone, including state and local governmental entities, except where required by law.

This same reasoning similarly defeats Plaintiff's claims of discrimination based on Chapter 44.06(d). That provision similarly provides only a general prohibition on disclosure of private or confidential information obtained from crime victims. It makes no distinction as to whom any such disclosure should be made but rather restricts any disclosure regardless of the recipient unless otherwise required by law or court order. The provision applies generally to everyone, which means there can be no actionable differential treatment to sustain Plaintiff's claim.

Chapter 4403(a)(1) and (a)(3) also make no reference whatsoever to any federal agency, but rather simply direct the scope of duties for the City's own public safety officials. These provisions only direct City Officials to limit their involvement in civil immigration enforcement actions. They do not identify any other actors or agencies for differential treatment but rather state only a general prohibition for City officers alone. The provisions do not identify any exception for assisting such actions if they involve entities other than the federal government but rather direct a prohibition on City agents and agencies involving themselves in any related civil immigration enforcement actions.

Declining to participate in the federal sphere of operations is not discrimination. As the Seventh Circuit highlighted in *McHenry County*, "a policy choice by the State not to cooperate with the federal government's [immigration] detention operations" does not constitute discrimination under the intergovernmental immunity doctrine. 44 F.4th at 594; *see also Cnty. of Ocean*, 475 F. Supp. 3d at 385 (rejecting claim that state prohibition on information sharing constituted discrimination because it interfered with federal "authority to regulate federal immigration law").

Finally, the Tenth Amendment's anticommandeering doctrine forecloses Plaintiff's discrimination claim. That doctrine prevents state and local entities from being forced to participate in federal immigration enforcement. (*See supra* Section I.A.2.) But "[a] finding that [the Separation Ordinance] violates the doctrine of intergovernmental immunity would imply that [Saint Paul] *cannot* . . . refuse[e] to assist their enforcement efforts—a result that would be inconsistent with the Tenth Amendment and the anticommandeering rule." *California*, 921 F.3d at 891. The intergovernmental immunity doctrine cannot be used as an end run around the Tenth Amendment.

For these reasons, the Separation Ordinance does not discriminate against the federal government, and Plaintiff's intergovernmental immunity claim in Count Eight should be dismissed with prejudice.

### III. The Separation Ordinance Does Not Directly Regulate The Federal Government.

The Complaint does not appear to assert an explicit intergovernmental immunity claim based on any direct regulation of the federal government under the Separation Ordinance. However, out of an abundance of caution, Saint Paul addresses that alternative theory here as any such claim would also be subject to dismissal.

Direct regulation occurs when a local law or regulation "places a prohibition on the Federal Government." *McHenry Cnty.*, 44 F.4th at 592 (citations omitted). But the Separation Ordinance contains no prohibition on federal action; on its face, it applies to and regulates only Saint Paul's own agents and agencies. *See id.* at 593 (rejecting direct regulation claim against Illinois statute because it "regulates only State and local entities

32

and law enforcement—not the federal government"); *see also Cnty. of Ocean*, 475 F. Supp. 3d at 385 ("[T]he Directive does not regulate the United States directly; it regulates only the conduct of state and local law enforcement agencies in the State of New Jersey."). Nothing in the Separation Ordinance prevents the federal government from directing its own agents and resources to pursuing civil immigration enforcement actions.

Any alternative theory of intergovernmental immunity based on direct regulation of the federal government would therefore be subject to dismissal with prejudice.

### IV. Counts One, Two, and Six as directed against Saint Paul must be dismissed due to lack of standing.

Counts One, Two, and Six of the Complaint allege preemption and intergovernmental immunity claims arising from various Minnesota state statutes and an opinion issued by the Minnesota Attorney General regarding Article I, Section 10, of the Minnesota Constitution. (Compl. ¶¶ 90–107, 128–34.) Despite alleging the challenged provisions to be products of alleged action by the State of Minnesota, Plaintiff addresses these claims against all defendants, including Saint Paul. (*Id.* ¶¶ 51–59, 90–107, 128–34.) However, to the extent each of these counts is directed against Saint Paul, they must all be dismissed under Rule 12(b)(1) for lack of standing and for failure to state a claim under Rule 12(b)(6). *See Murthy v. Missouri*, 603 U.S. 43, 61 (2024) ("plaintiffs must demonstrate standing for each claim that they press against each defendant, and for each form of relief that they seek" (cleaned up)).

To establish Article III standing against a defendant, a plaintiff must establish that the alleged injury is "fairly traceable to the challenged action of the defendant, and not the

result of the independent action of some third party." *Balogh v. Lombardi*, 816 F.3d 536, 543 (8th Cir. 2016) (cleaned up). In the context of a statutory challenge such as the instant matter, "the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision." *Id.* (quotations omitted). Similarly, standing also requires that a plaintiff's injury be "redress[able] by a favorable decision." *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015). "The redressability prong is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute." *Id.* (quotations omitted).

First, Count One is predicated entirely on an advisory opinion issued by the Minnesota Attorney General. (Compl. ¶¶ 90–98.) Specifically, Plaintiff alleges that the advisory opinion is preempted because it conflicts with 8 U.S.C. § 1357 and 8 C.F.R. § 287.7 because it prohibits local law enforcement agencies from entering into § 1357(g) agreements and from honoring administrative detainer requests. Although the Complaint directs Count One against all defendants, Plaintiff alleges no facts to support any inference that Saint Paul had any role or responsibility in issuing the challenged opinion from the Attorney General. While the Complaint implies that "certain law enforcement agencies" have interpreted the opinion as a binding interpretation of the Minnesota Constitution, (*see* Compl. ¶ 54), Plaintiff tellingly omits any specific allegations that Saint Paul or its agents are involved in any fashion with such interpretations. As Saint Paul had no control or authority over the issuance of the challenged advisory opinion, there is no traceable connection between the challenged provision and any action by Saint Paul in relation to the same. For the same reason, the redressability prong for standing also fails because Saint

Paul had no authority to enact or enforce the challenged opinion. *Cf. Renollett v. State of Minnesota, Dep't of Educ.*, NO. 03-cv-6452, 2004 WL 1576716, at *6 (D. Minn. July 13, 2004) ("The MDE is not a proper defendant to this claim because liability may not flow from decisions over which State Defendants have no control and cannot legally influence."). Accordingly, Count One as directed against Saint Paul should be dismissed with prejudice for lack of standing and failure to state a cause of action.[6]

Second, Counts Two and Six are centered on two particular state statutes governing the disclosure of certain data by the state Department of Transportation or any related subscribers to the DOT's driver records subscription service. (Compl. ¶¶ 99–107, 128–34.) As alleged, Minnesota Statue § 171.12, and its corresponding subdivisions, limits the use and disclosure of certain data governed by the statute from being used for civil immigration enforcement purposes. (*Id.* ¶¶ 56–58.) The government entities charged with enforcing these provisions are the Department of Transportation, its commissioner, or a "driver's license agent". *See* Minn. Stat. § 171.12, subds. 7b, 11. Minn. Stat. § 168.327, subd. 6, provides that any subscriber to a Driver records or Vehicle records subscription service established by the DOT must certify its compliance with the disclosure prohibitions set forth in section 171.12, subd. 7b, and must submit to an annual audit of its data uses and its information technology security procedures. The challenged statutory provisions were

---

[6] Regardless of whether Plaintiff can establish the requisite causation and redressability against Saint Paul, Count One would still fail to state a cause of action against Saint Paul because the INA, including section 1357, and 8 C.F.R. § 287.7 do not impose any mandatory obligation on Saint Paul and therefore lack any preemptive effect. (*See supra*, Section I.) The anticommandeering doctrine would also similarly bar any preemptive effect as alleged in Count One. (*See id.*)

neither passed by Saint Paul, addressed to Saint Paul directly, nor are they directly enforceable by Saint Paul. Indeed, the challenged provisions principally direct themselves towards the "commissioner or a driver's license agent," not to a municipality such as Saint Paul. The Complaint itself appears to acknowledge that the challenge state statutes reflect the State's conduct and intent, not Saint Paul's. (*See* Compl. ¶ 59 (highlighting challenged statutory provisions as evidence of "State's intent to treat the federal government discriminately").)

As Saint Paul is neither responsible for enacting the statutes, nor principally responsible for enforcing them (as evidence by the challenged statutory provisions themselves, which are directed toward the DOT commissioner), Plaintiff has failed to establish the requisite causal link necessary to establish Article III standing for Counts Two and Six as directed against Saint Paul. For these reasons, both Counts as directed against Saint Paul should be dismissed with prejudice.[7]

---

[7] Both counts also fail to state a cause of action for the same reasons that Plaintiff's other claims against Saint Paul fail. The INA and its constituent provisions, including section 1373 and 1644, do not carry any preemptive effect, either implicitly through a conflict theory or explicitly through an express preemption theory. (*See supra*, Sections I.A & I.B.) Similarly, the discrimination claim raised in Count Six fails to state a claim because Plaintiff fails to identify a relevant comparator and any such claim in this context would be barred by the anticommandeering doctrine. (*See supa*, Section II.)

## CONCLUSION

For all the foregoing reasons, the Court should grant Saint Paul's Motion to Dismiss Plaintiff's claims against Saint Paul and dismiss all claims against Saint Paul with prejudice.

IRENE KAO
City Attorney

Dated:  January 7, 2026

*/s/ Alexander Hsu*
Alexander Hsu, #0399275
Assistant City Attorney
750 City Hall and Court House
15 West Kellogg Boulevard
Saint Paul, MN 55102
651-266-8769
colin.laffey@ci.stpaul.mn.us

*Attorneys for Defendants City of
Saint Paul, Minnesota*

37