UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

United States of America,

          Plaintiff,

    vs.                               Civ. No. 25-3798 (ECT/JFD)

State of Minnesota; City of Minneapolis, Minnesota; City of St. Paul, Minnesota; Hennepin County, Minnesota; Keith Ellison, Attorney General of Minnesota, in his official capacity; Dawanna S. Witt, Hennepin County Sheriff, in her official capacity,

          Defendants.

## STATE DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

## INTRODUCTION

The United States asks the Court to invalidate Article I, Section 10 of the Minnesota Constitution; an *advisory* Attorney General Opinion (the AG Opinion); and four provisions of state law regulating the privacy of data concerning state-issued identifications. Its claims are based on theories of preemption and discrimination against the federal government. The United States asserts that Minnesota cannot prohibit itself from executing federal immigration detainers or from sharing certain data with federal immigration enforcement officials. In other words, the United States asserts that it can conscript a sovereign State to do its bidding. It cannot. In fact, the United States has asserted these same claims in serial litigation against other States, and it has notched losses in each such lawsuit; its claims here likewise founder.

# BACKGROUND

## I.    PROCEDURAL HISTORY.

On September 29, 2025, the United States filed a Complaint against Minnesota, the Minnesota Attorney General (the State Defendants) and several local government defendants. The United States asserts three claims against the State Defendants. Count One alleges that Article I, Section 10 of the Minnesota Constitution, and an Attorney General Opinion interpreting it, are preempted by federal law under a conflict-preemption theory. Count Two asserts that a series of state ID data privacy laws (the State Statutes) are preempted under theories of express and conflict preemption. And Count Six asserts that the State Statutes are invalid under a theory unlawful discrimination against the federal government.

## II.    FACTS AND THE CHALLENGED STATE STATUTES.

### A.    The Attorney General Issues a Nonbinding Opinion that the Minnesota Constitution Prohibits Holding Individuals on Immigration Detainers When those Individuals Would Otherwise Be Released.

In January 2025, the Ramsey County Attorney requested, under Minnesota Statutes section 8.07, an opinion from the Minnesota Attorney General regarding whether Ramsey County can lawfully hold individuals based on civil immigration detainer requests from U.S. Immigration & Customs Enforcement (ICE). In February 2025, the Attorney General issued an opinion responding to the question. (Carter Decl. Ex. 1[1] (the AG Opinion).)

---

[1]    This Court may consider the AG Opinion because it is embraced by the complaint and a matter of public record. *See Hummel v. Minn. Dep't of Agric.*, 430 F. Supp. 3d 581, 586–87 (D. Minn. 2020).

The AG opinion reviewed the following three aspects of federal and state law. First, ICE issues immigration detainers "to advise another law enforcement agency that [ICE] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a). Detainers request that an agency notify ICE before releasing the individual and "maintain custody of the alien for a period not to exceed 48 hours . . . to permit assumption of custody by [ICE]." *Id.* § 287.7(d). Generally, it is not a crime for a removable person to be present in the United States. *See Arizona v. United States*, 567 U.S. 387, 407 (2012). A detainer indicates ICE believes a person may be removable but does not by itself indicate suspicion of criminal activity. *See, e.g.*, *Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 465 (4th Cir. 2013); *see Orellana v. Nobles Cnty.*, 230 F. Supp. 3d 934, 945 (D. Minn. 2017). Further, detainers are issued by ICE officers; are not judicial warrants; and are not reviewed by neutral magistrates. 8 C.F.R. § 287.7; *Abel v. United States*, 362 U.S. 217, 232 (1960).

Second, in 2017, this Court held that Nobles County officials violated the Fourth Amendment by holding a person on an immigration detainer after he would have otherwise been released. *See Orellana,* 30 F. Supp. 3d at 944–46. That decision notes that Nobles County stopped honoring ICE detainers in July 2015 after significant questions about their legality. *Id.* at 940-41. In 2018, citing *Orellana*, this Court held it was "clearly established that an ICE Detainer alone cannot support local law enforcement's continued detention of an alien." *Parada v. Anoka Cnty.*, 332 F. Supp. 3d 1229, 1243 (D. Minn. 2018).

Third, in 2019, the Minnesota Court of Appeals affirmed an injunction that prohibited Nobles County from detaining individuals based on ICE detainers and

warrants.[2] *See Esparza v. Nobles Cnty.*, No. A18-2011, 2019 WL 4594512 (Minn. Ct. App. Sept. 23, 2019). The court noted that "Minnesota law generally provides that peace officers may seize an individual . . . *only* as authorized by state statute," and found that there is no state statute authorizing seizure based on ICE detainers or warrants. *Id.* at *6–7 (emphasis in original). It also concluded that federal law did not permit state or local officers to make immigration arrests unauthorized by state law. *Id.* at *8–10.

The AG Opinion largely tracks *Esparza*'s analysis. It notes that under the Minnesota Constitution, "[a]n arrest that is unauthorized by statute is illegal." (AG Opinion at 5.) Because no state statute authorizes arrests based on immigration detainers and because federal law does not permit State or local officers to make immigration arrests unauthorized by state law, the AG Opinion concludes that "Minnesota law prohibits state and local law enforcement agencies from holding someone based on an immigration detainer if the person would otherwise be released from custody." (*Id.* at 2.)

The United States alleges that "[a]s a result of the Opinion, many local authorities have refused to cooperate with federal immigration agencies." (Compl. ¶ 5.) It acknowledges the AG Opinion "supposedly lacks binding effect" but then asserts "it is *de facto* binding" and "has caused many Minnesota localities to stop honoring ICE detainers." (*Id.* ¶ 54.) The United States does not identify any such localities.

---

[2]     As noted above, Nobles County adopted a policy in 2015 barring officials from holding individuals solely based on immigration detainers. The detentions in *Esparza* were based on both an immigration detainer *and* an ICE arrest "warrant." *See Esparza v. Nobles Cnty.*, 2018 WL 6263254, at *2 (Minn. Dist. Ct. Oct. 19, 2018).

4

The United States also alleges that the AG Opinion has caused local law enforcement agencies to "believe that they cannot . . . enter § 1357(g)(1) agreements,"[3] which authorizes immigration enforcement agreements between the federal government and state or local governments. (Compl. ¶ 96.) The AG Opinion does not opine on the legality of those agreements or discourage agencies from entering them. (AG Opinion at 7 & n.9.)

## II.    THE STATE STATUTES.

The United States challenges four provisions of state statutory law: Minnesota Statutes section 171.12, subdivision 7b(e); subdivision 11(c); subdivision 11(d)[4]; and section 168.327, subdivision 6. (Compl. ¶¶ 55-59.)

**Minn. Stat. § 171.12, subd. 7b(e): Data Privacy.** Minnesota issues two kinds of drivers' licenses and identification cards (collectively, IDs): those that are compliant with the federal 2005 REAL ID Act and those that are not. Minn. Stat. § 171.09 subd. 2.

---

[3]    Public records published by ICE shows Minnesota law enforcement agencies signed eight such agreements with ICE between the issuance of the AG Opinion and the filing of the Complaint. *See* Immigration & Customs Enforcement, 287(g) Participating Agencies, https://perma.cc/QNK4-UH9R.

[4]    The Complaint refers to "Subdivision 11(a)-(e)" once in its "Preliminary Statement." All other references to subdivision 11, including those in the Prayer for Relief, are limited to subdivisions 11(c) and 11(d). As a result, the Complaint only asserts claims related to subdivisions 11(c) and 11(d), and this brief is likewise confined to those two provisions. If the Complaint is construed to attack subdivisions 11(a), 11(b), and 11(e), State Defendants intend all of their arguments to extend to those subdivisions as well. Any such claims would fail for reasons articulated herein.

Minnesota law refers to the latter as noncompliant IDs. *Id.* at subd. 5. Federal law expressly anticipates the issuance of noncompliant IDs. *See* 6 C.F.R. § 37.71.

> Subdivision 7b(e) applies to data on individuals relating to noncompliant IDs:

> Prior to disclosing . . . any data on individuals relating to a noncompliant driver's license or identification card, the commissioner or a driver's license agent must require the data requester to certify that the data requester must not use the data for civil immigration enforcement purposes or disclose the data to a state or federal government entity that primarily enforces immigration law or to any employee or agent of any such government entity.

Minn. Stat. § 171.12, subd. 7b(e).

**Minn. Stat. § 171.12, subd. 11(c): Limited Data Sharing Permissions.**

Subdivision 11(c) applies to certain data on individuals who have applied for noncompliant IDs. It provides:

> As authorized or required by state or federal law, the commissioner or a driver's license agent may share or disseminate data on individuals who have applied for or been issued a noncompliant driver's license or identification card that are not immigration status data to a government entity, as defined in section 13.02, subdivision 7a, or to a federal government entity that does not enforce immigration law, provided that the receiving entity must not use the data for civil immigration enforcement purposes or further disclose the data to a state or federal government entity that primarily enforces immigration law or to any employee or agent of any such government entity.

*Id.* subd. 11(c).

**Minn. Stat. § 171.12, subd. 11(d): Prohibitions on Sharing Data for Federal Immigration Purposes.** Subdivision 11(d) applies to sharing data on individuals who applied for noncompliant IDs with federal government entities that primarily enforce immigration laws. It provides:

> Notwithstanding any law to the contrary, the commissioner or a driver's license agent must not share or disseminate any data on individuals who have

applied for or been issued a noncompliant driver's license or identification card to any federal government entity that primarily enforces immigration law, except pursuant to a valid search warrant or court order issued by a state or federal judge.

*Id.* subd. 11(d).

**Minn. Stat. § 168.327, subd. 6: Annual Data Use and Security Audits.** This statute mandates that "subscribers" of State driver and vehicle records data conduct annual audits of their data practices and their compliance with the data privacy certification required under section 171.12, subdivision 7b(e). It provides that:

Each subscriber under subdivision 4 or 5a must annually engage an independent professional organization to audit its uses of data and its information technology security procedures, including: (1) the methods and practices employed in the processing and use of driver and vehicle services data; and (2) compliance with the certification required under section 171.12, subdivision 7b, paragraph (e). Within 30 days of the date of the audit report, each subscriber must submit each report to the legislative auditor and the commissioner.

*Id.* § 168.327, subd. 6.

## STANDARD

The plaintiff bears the burden of establishing subject matter jurisdiction. *Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019). In a "facial attack" on jurisdiction under Federal of Civil Procedure 12(b)(1), like this one, "the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016).

On a motion to dismiss under Rule 12(b)(6), a court must accept a complaint's factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Gorog*

*v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014). The allegations must "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

All the United States' claims against the State Defendants fail and should be dismissed. The arguments below are organized by substantive issue: Section I addresses subject matter jurisdiction; Section II addresses anticommandeering; and Section III addresses preemption. More specifically:

- Section I explains why this Court lacks subject matter jurisdiction over Count One insofar as that Count asks the Court to invalidate the AG Opinion;

- Section II explains why the anticommandeering doctrine and *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 472 (2018), require the dismissal of Counts One and Two;

- Section III explains why, even if the United States could avoid anticommandeering, Counts One and Two must be dismissed because the United States' preemption arguments fail for a variety of other reasons;

- And section IV explains why the United States' unlawful discrimination claim fails because it alleges no discriminatory treatment.

## I.    COUNT ONE, INSOFAR AS IT ASKS THAT THE AG OPINION BE INVALIDATED, FAILS FOR LACK OF JUSTICIABILITY.[5]

Except regarding "school matters," Attorney General opinions are nonbinding. *See* Minn. Stat. § 8.07; *see also Star Trib. Co. v. Univ. of Minn. Bd. of Regents*, 683 N.W.2d

---

[5]    The allegation that the AG Opinion caused state law enforcement agencies to forgo partnership agreements with ICE is squarely contradicted by the Opinion itself. Federal law permits ICE to enter into partnership agreements (known as "287(g)" or "1357(g)"

274, 289 (Minn. 2004). The United States concedes that "the Opinion supposedly lacks binding effect[.]" (Compl. ¶ 54.) And while the Attorney General can issue advisory opinions, federal courts cannot. *See, e.g.*, *KCCP Tr. v. City of N. Kan. City*, 432 F.3d 897, 899 (8th Cir. 2005). Both federal and state courts have widely held that advisory opinions from state attorneys general and others do not present justiciable controversies and would require courts to issue their own advisory opinions.[6] Some conclude that plaintiffs lack standing; others that the issue is not ripe; and others a mix of justiciability principles. But they all reach the same conclusion: a want of justiciable controversy.

---

agreements). *See* 8 U.S.C. § 1357(g). The United States alleges that the AG Opinion caused Minnesota law enforcement agencies to "believe that they cannot . . . enter § 1357(g)(1) agreements[.]" (Compl. ¶ 96.) But the AG Opinion does not opine on the legality of these agreements or discourage agencies from entering them. (AG Opinion at 7 & n.9; *see also* Compl. ¶¶ 52–53.) Because the AG Opinion does not address § 1357(g) agreements, the Opinion cannot have caused an injury related to § 1357(g) agreements. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

[6]    *See Just. 360 v. Stirling*, 42 F.4th 450, 459–60 (4th Cir. 2022); *Belgau v. Inslee*, 359 F. Supp. 3d 1000, 1011–12 (W.D. Wash. 2019); *Campaign for S. Equal. v. Miss. Dep't of Hum. Servs.*, 175 F. Supp. 3d 691, 702 (S.D. Miss. 2016); *Worman v. Healey*, 293 F. Supp. 3d 251, 260 (D. Mass. 2018); *Kemler v. Poston*, 108 F. Supp. 2d 529, 538–39 (E.D. Va. 2000); *John P. Agnew & Co. v. Hoage*, 99 F.2d 349, 351–52 (D.C. Cir. 1938); *Brown v. Grosskopf*, 984 N.E.2d 1167, 1170 (Ill. App. Ct. 2013); *City of Jackson v. Heritage Sav. & Loan Ass'n*, 639 S.W.2d 142, 145–46 (Mo. Ct. App. 1982); *Askew v. City of Ocala*, 348 So.2d 308, 310 (Fla. 1977); *Saefke v. Stenehjem*, 673 N.W.2d 41, 46 (N.D. 2004); *Am. Veterans v. City of Austin*, 2005 WL 3440786, at *2–3 (Tex. Ct. App. Dec. 15, 2005); *Gershman Inv. Corp. v. Danforth*, 517 S.W.2d 33, 35 (Mo. 1974); *Kelley v. Bd. of Registration in Optometry*, 218 N.E.2d 130, 133 (Mass. 1966); *Hitchcock v. Kloman*, 76 A.2d 582, 584 (Md. 1950); *Suehr v. State Ethics Comm'n*, 651 A.2d 648, 649 (Pa. Commw. Ct. 1994); *League of Women Voters v. Sec'y of State*, 957 N.W.2d 731, 749–50 (Mich. 2020); *State ex rel. York v. Turpen*, 681 P.2d 763, 767 (Okla. 1984); *Keating v. Johnson*, 918 P.2d 51, 58 (Okla. 1996).

The same is true here. The challenge to the AG Opinion[7] should be dismissed for lack of standing and ripeness.

### A.    The United States Lacks Standing.

To establish standing, a plaintiff must show (i) an injury in fact; (ii) causation; and (iii) redressability. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). The United States meets none of these requirements with respect to the AG Opinion.

**First**, the Complaint does not allege an injury-in-fact. While the United States alleges that it disagrees with the Attorney General's nonbinding opinion, mere disagreement with a state official's opinion about the law creates no Article III injury. *See Saginaw Cnty., Mich. v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 956 (6th Cir. 2020) ("differences of opinion" regarding government's powers are not cognizable injuries).

Similarly, the United States alleges that the "Opinion has caused many Minnesota localities to stop honoring ICE detainers." (Compl. ¶ 54; *see also id.* ¶¶ 5, 75–79, 96.) This alleged change in behavior is not a cognizable injury because the United States never had any entitlement to the desired behavior in the first place. As detailed below, federal law expressly gives localities the option of disregarding detainers. *See infra* § III.A. Nor does the United States allege that anyone has violated the law, let alone in a way that creates

---

[7]    The Complaint is ambiguous as to whether Count 1 seeks to invalidate Article I, Section 10 of the Minnesota Constitution independently from the challenge to the AG Opinion. If the United States is only challenging Minnesota Constitution "as interpreted by" the AG Opinion, then the justiciability arguments in this section would dispose of the Count 1 in its entirety.

Article III standing. *See Saginaw Cnty.*, 946 F.3d at 956 (noting that violations of law alone do not "injure the government in an Article III way").

**Second**, the Complaint alleges no injury that is caused by the AG Opinion or redressable by the Court. Federal courts "cannot redress injury that results from independent action of some third party not before the court." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quotation omitted). The Supreme Court has thus rejected "standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Id.* (quotation omitted); *see also Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976) (no standing because it was speculative that Treasury Secretary ruling caused local hospitals to deny services to poor).

Here, the AG Opinion cannot cause injury because it is nonbinding: to the extent local officials are not honoring detainers it is because of their independent judgement—not the AG Opinion. Similarly, "vacating" the AG Opinion would not provide relief because local officials would remain free to disregard detainers. *See infra* § III.A. For these reasons, courts have routinely found causation and redressability not met in suits challenging nonbinding opinions. *See supra* n.6. So too here.

Similarly, the AG Opinion could not have "caused" localities to stop honoring detainers because, for years before the opinion issued, both state and federal courts have held it unlawful for to detain persons solely under ICE detainers. *See Orellana*, 230 F. Supp. 3d at 944–46; *Parada*, 332 F. Supp. 3d at 1243; *Esparza*, 2019 WL 4594512, at *5–10. These decisions expose individuals and municipalities to significant liability for executing detainers. It is not plausible that years after these decisions, the nonbinding AG

Opinion newly caused localities to stop honoring detainers. Indeed, this Court noted in *Orellana* that Nobles County changed its policy detainer in 2015 in response to legal pressures, years before the AG Opinion issued. *Orellana*, 230 F. Supp. 3d at 940.

Nor would a decision vacating the AG Opinion redress any "injury." Those judicial decisions would temper law enforcement from executing a detainer and risking liability. At best, it is speculative whether vacating the AG opinion would cause localities to honor detainers, and plaintiffs cannot rely on "standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Murthy*, 603 U.S. at 57; *see also Just. 360*, 42 F.4th at 460 (arguments about how third party would act if nonbinding AG opinion were stricken "is speculation built on speculation").

### B.    The Dispute Is Not Ripe.

The United States' challenge to the AG Opinion also fails for lack of ripeness. Ripeness considers "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *United States v. Gates*, 915 F.3d 561, 563 (8th Cir. 2019). The United States' challenge is not fit for judicial review, and there is no hardship to refraining from a decision.

Start with fitness. This prong "safeguards against judicial review of hypothetical or speculative disagreements." *Id.* For a dispute to be fit for review, the legal question "must not be abstract but must define an issue which is concrete and specific." *Cass Cnty. v. United States*, 570 F.2d 737, 740 (8th Cir. 1978).

The United States' challenge is too abstract, hypothetical, and speculative to be fit. The AG Opinion expresses just that—an opinion—but does not itself compel local officials

to ignore immigration detainers. The United States may *disagree* with the opinion, but "[t]here is no support for the contention that the judicial power extends to the adjudication of such differences of opinion." *United States v. West Virginia*, 295 U.S. 463, 474 (1935). In *West Virginia*, federal and state officials disagreed on whether a river was subject to federal regulation, but without "an actual or threatened interference" with federal authority the mere disagreement of opinion was "too vague and ill-defined to admit of judicial determination." *Id.* at 474.

Here too, the nonbinding AG Opinion does not interfere with any claimed authority by the United States. Nor does this case present any concrete facts to consider. The AG Opinion is hypothetical and does not consider the detention of any particular person. Nor does the complaint allege any specific person has violated the law by complying with or ignoring an immigration detainer. The United States alleges only that it disagrees, in the abstract, with the Attorney General's opinion. That claim is not ripe for review. *See John P. Agnew*, 99 F.2d at 351–52 (complaint "sets forth at best a difference of opinion" that "has not become sufficiently ripe and clarified to be the subject of a declaratory judgment"); *Rendell*, 938 A.2d at 560; *Worman*, 293 F. Supp. 3d at 260–61; *Kemler*, 108 F. Supp. 2d at 542; *Brown*, 984 N.E.2d at 1170.

The United States' claim also fails the hardship prong of the ripeness analysis. This prong considers whether delayed review "inflicts significant practical harm." *Parrish*, 761 F.3d at 875. It is not met here because the United States's alleged injury is "speculative" and "[a]bstract." *See Pub. Water Supply Dist. No. 10 v. City of Peculiar*, 345 F.3d 570, 573

13

(8th Cir. 2003). And speculative and abstract injuries do not inflict any harm that is sufficiently imminent to warrant Article III review.

## II. COUNTS ONE AND TWO FAIL UNDER THE ANTICOMMANDEERING DOCTRINE AND *MURPHY*.

On the merits, Counts One and Two assert that Minnesota must act on federal immigration detainers and share information with federal immigration authorities. These arguments violate the anticommandeering doctrine because the Constitution "'confers upon Congress the power to regulate individuals, not States.'" *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 472 (2018) (quoting *New York v. United States*, 505 U.S. 144, 166 (1992)). As much as the United States may wish it were otherwise, Minnesota is a sovereign state, and the federal government cannot conscript it or its employees.

### A. The Anticommandeering Doctrine Limits Congress's Regulatory Power and Confines Federal Preemption Authority.

*Murphy* elucidated the interplay between anticommandeering and preemption. Preemption is based on the Supremacy Clause, but "that Clause is not an independent grant of legislative power to Congress. Instead, it simply provides a rule of decision." *Id.* at 477 (citation modified).  As such, for a federal law to preempt state law, it must satisfy two requirements: "First, it must represent the exercise of a power conferred on Congress by the Constitution; pointing to the Supremacy Clause will not do. Second, since the Constitution confers upon Congress the power to regulate individuals, not States, [the federal law] at issue must be best read as one that regulates private actors." *Id.* (citation modified). The second requirement encapsulates the anticommandeering doctrine, and *Murphy* illustrates how that doctrine defeats the United States' preemption arguments here.

14

**B.** **Under The Anticommandeering Doctrine, Only Federal Laws that Are Best Read to Regulate Private Actors Can Preempt State Law.**

The anticommandeering doctrine is the expression of a fundamental, structural-powers decision incorporated into the Constitution: the decision to withhold from Congress the power to issue orders directly to the States. When the original States declared their independence, they claimed inherent sovereign powers—in the words of the Declaration of Independence, the authority "to do all . . . Acts and Things which Independent States may of right do." ¶ 32. The Constitution limited but did not abolish the States' sovereign—the States retained "a residuary and inviolable sovereignty." The Federalist No. 39, p. 245 (C. Rossiter ed. 1961) (J. Madison). Thus, in our government of dual sovereignty both the federal government and the States wield sovereign powers.

True, the Constitution limits state sovereignty in several ways. As noted by *Murphy*, "it directly prohibits the States from exercising some attributes of sovereignty"; "[s]ome grants of power to the Federal Government . . . impose implicit restrictions on the States"; and "the Constitution indirectly restricts the States by granting certain legislative powers to Congress" while also providing, in the Supremacy Clause, that federal law is the supreme law of the land. 584 U.S. at 470-71.

The legislative powers granted to Congress are, however, limited. The Constitution confers on Congress only certain enumerated powers, and all other legislative power is *reserved for the States*. *Id.* "And conspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States. The

anticommandeering doctrine simply represents the recognition of this limit on congressional authority." *Id.*

The anticommandeering doctrine therefore prohibits the federal government from "compel[ling] the States to enact or administer a federal regulatory program." *New York*, 505 U.S. at 188. Nor can it conscript state or local officers directly, *Printz v. United States*, 521 U.S. 898, 935 (1997), or coerce States to action through improper influence, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012). These principles apply no matter how strong the federal interest. *New York*, 505 U.S. at 178. Therefore, Congress may not wield States as federal tools. *Murphy* noted that adherence to anticommandeering is critical for myriad reasons: it is a bulwark against abuse of government power; it promotes political accountability by enabling voters to distinguish which sovereign is responsible for a specific policy; and it prevents Congress from shifting regulatory costs to the States. 584 U.S. at 473–74.

Using this framework, *Murphy* explained that for a federal law to preempt state law and avoid running afoul of the anticommandeering doctrine it "must be best read as one that regulates private actors." 584 U.S. at 477. Laws "best read" as those that regulate private actors include those that regulate only private actors and or "evenhandedly regulate[] an activity in which both States and private actors engage." *Id*. at 475–76.

To determine whether a federal law regulates private actors, courts must "look beyond the phrasing employed" and interrogate whether the law in substance affects the rights of private actors. *Id.* at 478. *Murphy* illustrated this point using *Morales v. TransWorld Airlines*, Inc., 504 U.S. 374 (1992). *Morales* considered a federal law that

lifted certain federal airline regulations. *Id.* at 378. The law provided that "no State or political subdivision thereof . . . shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any [covered] air carrier." *Murphy*, 584 U.S. at 478 (alteration original) (quotation omitted). Although the federal law's plain text appeared to only act upon States, *Murphy* observed that it was preemptive because it conferred on "private entities (i.e., covered carriers) a federal right to engage in certain conduct subject only to certain (federal) constraints" by prohibiting States from constraining covered carriers. *Id.* at 478–79.

### C.    Count One Fails Because the Federal Provisions Regarding Detainers Cannot Be Read to Regulate Private Actors.

With that legal framework in mind, the United States' preemption claim in Count One fails because it relies on federal laws that cannot be best read as regulating private actors.

This claim relies on two federal provisions: 8 C.F.R. sections 287.7(d) and 1357(g). (Compl. ¶¶ 92-96.) Neither regulate private actors and, as such, they have no preemptive effect under the anticommandeering doctrine.[8] The plain text of each provision makes that clear. First, section 287.7(d) states that: "Upon a determination by the Department to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien . . . ." This language applies to *criminal justice*

---

[8] As explained below, the United States' preemption argument on detainers also founders because federal law gives States the choice to execute—or not—immigration detainers. *See supra* § III.A. In other words, there can be no preemption because Congress explicitly acknowledged that States may choose not to execute immigration detainers.

*agencies*—not private actors. While the regulations do not define "criminal justice agency," no reasonable interpretation of the phrase could encompass private actors. 8 C.F.R. section 287.1 refers to "an agency engaged in the administration of criminal justice pursuant to statute, executive order, or delegation by the Secretary." And it also states that such agencies include the courts and "[a] government agency or component which performs the administration of criminal justice." This usage compels the conclusion that criminal justice agencies are comprised of federal, state, and local government entities, not private actors. This usage also accords with other regulations that refer to "criminal justice agencies" in terms that limit the phrase to government entities. *See, e.g.*, 5 C.F.R. § 911.102 (referring to State and local criminal justice agencies); 28 C.F.R. § 20.3(g) (defining criminal justice agencies as courts and "[a] governmental agency . . . that performs the administration of justice). Accordingly, section 287.1(d) regulates no private actors, and it therefore cannot be a valid preemption provision.

The same is true of 8 U.S.C. § 1357(g), which deals with agreements between the United States Attorney General and "a State, or any political subdivision of a State." It has no bearing on private actors and therefore cannot preempt any state law. *See United States v. California*, 921 F.3d 865, 890 (9th Cir. 2019).

Finally, consider the United States' position on detainers more generally. It asserts that any Minnesota law that "prohibits state law enforcement agencies from detaining aliens pursuant to immigration detainers" is preempted. To put it plainly, the United States asserts that it can require the States to administer and enforce its immigration regulatory program. This argument is anathema to the anticommandeering doctrine and an afront to

state sovereignty. *See Printz*, 521 U.S. at 935 (applying anticommandeering principles to federal statute requiring state and local law enforcement officers to perform background checks and related tasks in connection with applications for handgun licenses). If the United States cannot command States to do something as innocuous as perform background checks, as the Supreme Court held in *Printz*, the federal government surely cannot command a State to hold prisoners against its will.

### C. Count Two Fails Because Neither § 1373 Nor § 1644 Can Be Read to Regulate Private Actors.

Count Two fails for the same reasons. Section 1373(a) provides that:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful of any individual.

8 U.S.C. § 1373(a). Section 1644 contains nearly identical language.[9]

These statutes are not valid preemptive provisions because they do not regulate private actors in language or effect. The plain text of § 1373 only operates on state and local government entities and officials. It prohibits restrictions on their ability to share certain immigration-related information. Because it is a provision that addresses information sharing between government actors, § 1373 does not create or restrict the rights of any private actor. Instead, it addresses how governments share information "regarding

---

[9]   Because § 1644 contains nearly identical language the two provisions are analyzed below simultaneously with reference to only § 1373. *See, e.g.*, *States v. Illinois*, 796 F. Supp. 3d 494, 515 (N.D. Ill. 2025).

citizenship or immigration status." Section 1373 does not, however, alter what private actors can or cannot do or affect their citizenship or immigration status. Courts that have considered the issue post-*Murphy* have reached this same conclusion. *See, e.g.*, *United Illinois*, 796 F. Supp. 3d at 523; *Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 372 (D.N.J. 2020), *aff'd sub nom. Ocean Cnty. Bd. of Comm'rs v. Att'y Gen.*, 8 F.4th 176 (3d Cir. 2021); *Colorado v. U.S. Dep't of Just.*, 455 F. Supp. 3d 1034, 1059–60 (D. Colo. 2020); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 330–31 (E.D. Penn. 2018), *aff'd on relevant grounds sub nom. City of Philadelphia v. Att'y Gen. of U.S.*; *see also California*, 921 F.3d at 890. This Court should reach the same conclusion and hold that §§ 1373 and 1644 are not valid preemption provisions because they do not regulate private actors.

### III.   COUNTS ONE AND TWO ALSO FAIL BECAUSE THE UNITED STATES' FAILS TO STATE VALID PREEMPTION CLAIMS.

Even if the provisions of federal law relied on by the United States could somehow be read as regulating private conduct, its preemption arguments would still fail on other grounds. Although state laws must give way to conflicting federal laws, courts assume that Congress does not preempt lightly. *See Pharm. Research & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1140 (8th Cir. 2024). "'[T]he purpose of Congress is the ultimate touchstone of pre-emption analysis.'" *Id.* (quoting *Cipollone v. Liggett Grp. Inc.*, 505 U.S. 504, 516 (1992)). "Consideration of issues arising under the Supremacy Clause starts with the assumption that the historic police powers of the States are not to be superseded by Federal Act unless that is the clear and manifest purpose of Congress." *Id.* (quoting *Cipollone*, 505 U.S. at 516) (citation modified). In particular, "there is a 'presumption that state or local

regulation of matters related to health and safety is not invalidated under the Supremacy Clause.'" *Id.* (quoting *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715 (1985)).

Federal law can preempt state law in three ways: express preemption, conflict preemption, or field preemption. *Murphy*, 584 U.S. at 477. Each works the same way: "Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Id.* The United States asserts only a conflict preemption theory regarding the Minnesota Constitution and the AG Opinion, but it asserts express and conflict preemption regarding the State Statutes.[10] "Express preemption exists where Congress uses 'explicit pre-emptive language' to express its purpose." *In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Pracs. Litig.*, 621 F.3d 781, 792 (8th Cir. 2010). "Conflict preemption exists where compliance with both state and federal law is impossible, or the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Soo Line R.R. Co. v. Werner Enters.*, 825 F.3d 413, 420 (8th Cir. 2016) (citation modified). As such, conflict preemption itself comes in two flavors: impossibility and obstacle.

Under any preemption theory, the United States' claims fail.

---

[10]    The United States does not raise field preemption, so that type of preemption is not addressed here. In any event, any field preemption argument would likewise fail.

A. **Count One Fails Because Federal Law Makes Compliance with Immigration Detainers Voluntary, Which Defeats the United States' Conflict Preemption Claim.**

**Impossibility.** The United States' impossibility preemption theory does not work because it is possible to comply with the Minnesota Constitution and the AG Opinion as well as the cited federal provisions. The United States asserts that these state provisions prohibit the continued detention of someone on an immigration detainer who would otherwise be released. So, to succeed on an impossibility theory, the United States must show that federal law *requires* honoring immigration detainers. But even the United States does not take this position. (Compl. ¶ 93; *see also id.* at ¶ 26, p.33 (conceding that detainers are voluntary).) That concession is appropriate because the text of the applicable regulations and case law confirm that detainers are voluntary.

8 C.F.R. section 287.7(d) provides that upon issuance of a detainer to a criminal justice agency, "such agency shall maintain custody of the alien for a period not to exceed 48 hours[.]" But that language must be read alongside the remainder of section 287.7. Start with the title. Section 287.7(d) is titled "Temporary detention at Department *request*." Next, its text provides that a detainer "*serves to advise* another law enforcement agency that the Department seeks custody of an alien presently in the custody of that agency." (emphasis added). It continues: "The detainer *is a request* that such agency advise the Department, prior to release of the alien . . . ." § 287.7(a) (emphasis added).

"Request" is the key word. Indeed, "[t]he words 'shall maintain custody,' . . . appear next to the use of the word 'request' throughout the regulation." *Galarza v. Szalczyk*, 745 F.3d 634, 640 (3d Cir. 2014). It is therefore "hard to read the use of the word 'shall' in the

timing section to change the nature of the entire regulation." *Id.* Instead, "the word 'shall' serves only to inform an agency that otherwise decides to comply with an ICE detainer that it should hold the person no longer than 48 hours."[11] *Id.*; *see also Prim v. Raoul*, 2021 WL 214641, at *3 (N.D. Ill. Jan. 21, 2021) ("The Code of Federal Regulations explicitly provides that ICE detainers are not compulsory. . . . This language is not ambiguous.").[12]

For these reasons, courts have overwhelmingly held that detainers are not mandatory. *See, e.g., N.S. v. Dixon*, 141 F.4th 279, 282 (D.C. Cir. 2025) ("an ICE detainer is a 'request,' not an order"); *California*, 921 F.3d at 887 (administrative warrants do not "*compel*[] any action by a state or local official"); *Galarza*, 745 F.3d at 639–41; *Illinois*, 796 F. Supp. 3d at 528; *United States v. Valdez-Hurtado*, 638 F. Supp. 3d 879, 885 (N.D. Ill. 2022); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 510 (N.D. Cal. 2017).[13]

Finally, as discussed above, *supra* § II, reading section 287.7 to require local officials to detain persons would invalidate it under the anticommandeering doctrine.

---

[11]    If section 287.7(d) required detention, it would set a minimum time for detention and not only a maximum.

[12]    Any conceivable ambiguity "is clarified on numerous fronts." *Galarza*, 745 F.3d at 634. This includes caselaw, the fact that the INA does not authorize federal officials to command state or local officials to detain people, and the fact the United States's position that detainers are mandatory conflicts with its prior positions. *See id.* at 640–42.

[13]    *See also Morales v. Chadbourne*, 996 F. Supp. 2d 19, 40 (D.R.I. 2014); *Villars v. Kubiatowski*, 45 F. Supp. 3d 791, 802 (N.D. Ill. 2014); *Buquer v. City of Indianapolis*, 797 F. Supp. 2d 905, 911 (S.D. Ind. 2011); *Carchman v. Nash*, 473 U.S. 716, 719 (1985); *Ortega v. U.S. ICE*, 737 F.3d 435, 437 (6th Cir. 2013); *Liranzo v. United States*, 690 F.3d 78, 82 (2d Cir. 2012); *United States v. Uribe-Rios*, 558 F.3d 347, 350 n.1 (4th Cir. 2009); *United States v. Female Juvenile, A.F.S.*, 377 F.3d 27, 35 (1st Cir. 2004); *Giddings v. Chandler*, 979 F.2d 1104, 1105 n.3 (5th Cir. 1992).

Because its text permits a finding that detainers are voluntary, the canon of constitutional avoidance is one more reason to reject the United States's interpretation. *See, e.g.*, *Saxton v. FHFA*, 901 F.3d 954, 959 (8th Cir. 2018). Because detainers are requests, not requirements, it is possible to comply with the Minnesota Constitution, the AG Opinion and 8 C.F.R. section 287.7. There is no conflict preemption based on impossibility.

**Obstacle.** The United States' obstacle preemption theory likewise fails because detainers are requests. Neither the Minnesota Constitution nor the AG Opinion obstruct federal immigration enforcement in any way. The United States alleges that the AG Opinion "has caused ICE officers to expend additional time, and has caused ICE to devote additional resources, to arrest the same number of aliens that it arrested before the Opinion issued." (Compl. ¶ 75.) But detainer compliance is optional, and Minnesota cannot obstruct federal law by exercising an option that federal law gives it. As courts have found in other challenges to detainer policies, "[d]eclining an option offered by a federal statute cannot create a conflict for preemption purposes." *Illinois*, 796 F. Supp. 3d at 529; *see also McHenry Cnty. v. Raoul*, 44 F.4th 581, 592 (7th Cir. 2022) ("[T]he choice of a state to refrain from participation cannot be invalid under the doctrine of obstacle preemption where, as here, it retains the right of refusal."); *California*, 921 F.3d at 889 (no conflict preemption where "[f]ederal law provides states and localities the *option*, not the *requirement*, of assisting federal immigration authorities" (emphases original)).

The United States does not allege Minnesota is affirmatively disrupting immigration enforcement, only that it is not helping. Declining to assist immigration enforcement, as opposed to impeding it, does not establish obstacle preemption. *See California*, 921 F.3d

at 888 ("California's decision not to assist federal immigration enforcement . . . is not an 'obstacle' to that enforcement effort" because "refusing to help is not the same as impeding"); *Illinois*, 796 F. Supp. 3d at 529 (no obstacle preemption where challenged laws "don't make ICE's job more *difficult*; they just don't make it *easier*" (emphasis original)); *Cnty. of Ocean*, 475 F. Supp. 3d at 381 ("[A] state's decision not to participate in the enforcement of federal civil immigration law [does] not prevent the federal government from fulfilling the objectives of Congress.").

**B.     Count Two Must Be Dismissed Because the United States' Express and Conflict Preemption Arguments About the State Statutes Fail.**

       **1.     Section 1373 does not expressly preempt the State Statutes because it only encompasses information about a person's federal immigration classification.**

Express preemption applies when Congress declares its intention to preempt state law, and therefore the question is functionally one of statutory interpretation. *See Cipollone*, 505 U.S. at 517. While "the plain wording" of an express preemption clause "contains the best evidence of Congress' pre-emptive intent," *Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016), "the structure and purpose of the statute as a whole" may also be relevant where the plain text is ambiguous or fails to define the scope of preemption, *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996) (quotation omitted). Thus, the express preemption challenge here turns on the scope of § 1373.

The United States urges the Court to adopt an expansive view of § 1373's scope that courts have repeatedly rejected. For example, it asserts that § 1373 covers data like home addresses and photographs. (Compl. ¶ 80.) The assertion contradicts § 1373's plain

meaning, because the statute only applies to data on citizenship or immigration status. Home addresses and photographs are not such data because they have nothing to do with a person's federal immigration status. This issue has been treated extensively by other courts, and each has rejected the United States' capacious reading in favor of a narrow interpretation. *See United States v. New York*, No. 1:25-CV-00205 (AMN/MJK), 2025 WL 3718641, at *7 (N.D.N.Y. Dec. 23, 2025) (collecting cases). "[T]he best reading of § 1373 (and § 1644 by extension) is that it only pertains to information regarding a person's legal classification under federal law." *Illinois*, 796 F. Supp. at 518; *see also id.* at 551-59 (holding that a narrow interpretation is supported by text, structure, and legislative history).

The narrow scope of data covered by § 1373 defeats the United States' claim that express preemption entitles it to the broad data covered by the State Statutes. Taking these statutes in turn, section 171.12 subdivision 7b(e), applies to "data on individuals relating to a noncompliant driver's license or identification card." These data include the data displayed on a noncompliant ID, such as, name, address, date of birth, photograph, organ donor status, etc. *See* Minn. Stat. § 171.07. But these data have nothing to do with a person's federal immigration status, and § 1373 is therefore inapplicable. Subdivision 11(d) applies to "data on individuals who have applied for or been issued a noncompliant driver's license or identification card." So, it covers an even broader swath of data on individuals because it simply covers all data on individuals who have applied for a noncompliant ID. Section 1373 certainly does not encompass all data on individuals who happened to apply for a noncompliant ID. Section 168.327, subdivision 6, refers back to the data covered by section 171.12 subdivision 7b(e). Thus, the United States' claims based on section 168.327

therefore suffer from the same flaw as those based on section 171.12 subdivision 7b(e). Finally, the United States' assertion that § 1373 preempts section 171.12 subdivision 11(c) is especially strained because subdivision 11(c) explicitly carves out immigration status data from the data to which it applies. Subdivision 11(c) applies only to "data . . . that are not immigration status data," so it expressly avoids § 1373.

Section 1373's narrow scope cannot be ballooned to encompass and preempt the State Statutes, and the United States' express preemption arguments should be rejected.

### 2.  The United States' conflict preemption theory also fails because the State Statutes do not pose an obstacle to any federal laws.

The United States also asserts that the State Statutes "conflict with, and create obstacles to, the enforcement of federal immigration law." (Comp. ¶ 100.) Aside from § 1373, which the United States treats as an express preemption provision, it points to no federal provision where compliance with the federal provision and the State Statutes would be an impossibility. The conflict preemption issue here is therefore whether the State Statutes pose an obstacle to the federal government's enforcement of immigration law.

With respect to data sharing and access, the United States makes essentially the same argument as it did about detainers: it argues that federal immigration law reflects Congress's intent to "codif[y] basic principles of cooperation required between local authorities and the federal government" and, by stanching the flow of information, the State Statues pose an obstacle to that goal, (Compl. ¶¶ 35, 100-04). But this obstacle preemption argument runs into the same problem as that for detainers. *See* s*upra* § III.A. The United States does not allege Minnesota is affirmatively disrupting immigration enforcement, only

27

that it is not helping by sharing data. As noted above, declining to assist immigration enforcement cannot establish obstacle preemption and the obstacle preemption argument related to the State Statutes must therefore be rejected.

## IV.    COUNT SIX FAILS BECAUSE THE MINNESOTA LAW DOES NOT DISCRIMINATE.

State law cannot discriminate against the federal government by setting it apart for less favorable treatment based on its federal governmental status. *United States v. Washington*, 596 U.S. 832, 839 (2022). "A state law or regulation discriminates against the federal government if it treats comparable classes of federal and state employees differently, advantaging the state employees," *Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 763 (9th Cir. 2025) (citing *Dawson v. Steager*, 586 U.S. 171, 175–76 (2019)), and there are no significant differences between the classes justify the differential treatment, s*ee Dawson*, 586 U.S. at 175. Built into this analysis is the necessity of a comparator: "the mere fact that the [state law] touches on an exclusively federal sphere is not enough to establish discrimination." *McHenry Cnty.*, 44 F.4th at 594.

Here the United States' claim fails because it can point to no comparable class of state employees that are treated differently under the State Statutes. The State Statutes certainly affect the federal government because it is the primary enforcer of civil immigration law. But the line these statutes draw is based on whether an agency primarily enforces immigration law, not whether the agency is federal or state. Moreover, the United States has already conceded that it cannot identify a comparator class of non-federal entities that enforce immigration law. *See Illinois*, 796 F. Supp. 3d at 534 ("[T]he United States concedes that only the federal government enforces civil immigration law.").

With no comparator class, the United States cannot show that the State Statutes treat federal immigration authorities unfavorably simply for being federal actors and not just for their role in enforcing civil immigration laws. The State Statutes' plain text further reinforces that the State Statutes in no way discriminate based on federal status. Section 171.12 subdivision 11(c), for example, prohibits the disclosure of "data to *a state or federal* government entity that primarily enforces immigration law." Minn. Stat. § 171.12 subd. 11(c) (emphasis added). The United States has no claim of unlawful discrimination where the statute explicitly treats comparable state entities in the same manner as affected federal entities. The United States also alleges that Minn. Stat. section 168.327 unlawfully discriminates against it because it requires audits "to ensure nondisclosure to DHS but [not] to ensure nondisclosure to other entities." (Compl. ¶ 132.) This claim also fails because the audit requirement applies to all subscribers of driver records, not only the federal government.

The Complaint also fails to allege that the State Statutes impose burdens on the federal government in the way the federal discrimination doctrine considers problematic. Unlike most discrimination cases in which a State affirmatively levies a tax or cost on the federal government, *see, e.g.*, *Washington*, 596 U.S. at 838–39, the State Statutes here simply decline to ease the burden of civil immigration enforcement by permitting data sharing and access. The State's decision not to affirmatively help the federal government enforce its regulations does not constitute discrimination against the federal government. *McHenry Cnty.*, 44 F.4th at 594 n.7; *Illinois*, 796 F. Supp. 3d at 534; *United States v. California*, 314 F. Supp. 3d 1077, 1111 (E.D. Cal. 2018), *aff'd in part, rev'd in part*, 921

F.3d 865 (9th Cir. 2019) (describing California's decision not to help the Federal government implement its immigration enforcement regime: "The State retains the power to make this choice and the concerns that led California to adopt this policy justify any differential treatment that results.").

## CONCLUSION

For the explained above, all claims asserted in the Complaint against Minnesota and the Attorney General should be dismissed with prejudice.

Dated:  January 7, 2026                    Respectfully submitted,

                                           KEITH ELLISON
                                           Attorney General
                                           State of Minnesota

                                           */s/ Brian S. Carter*
                                           Brian S. Carter
                                           Special Counsel
                                           Atty. Reg. No. 0390613

                                           JOSEPH RICHIE
                                           Special Counsel
                                           Atty. Reg. No. 0400615

                                           MADELEINE DEMEULES
                                           Assistant Attorney General
                                           Atty. Reg. No. 0402648

                                           445 Minnesota Street, Suite 600
                                           St. Paul, Minnesota 55101-2125
                                           (651) 300-0921 (Voice)
                                           (651) 282-5832 (Fax)
                                           Joseph.Richie@ag.state.mn.us

                                           *Attorneys for Defendants State of Minnesota and Minnesota Attorney General Keith Ellison*

|#6240907-v1

30