UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

United States of America,

     Plaintiff,

v.

State of Minnesota; City of
Minneapolis, Minnesota; City of St.
Paul, Minnesota; Hennepin County,
Minnesota; Keith Ellison, Attorney
General of Minnesota, in his official
capacity; Dawanna S. Witt, Hennepin
County Sheriff, in her official capacity;

     Defendants.

Case No. 25-CV-03798 (ECT/JFD)

**CITY OF MINNEAPOLIS'
MEMORANDUM OF LAW IN
SUPPORT OF MOTION TO
DISMISS**

---

## <u>INTRODUCTION</u>

The federal government is illegally attempting to press gang sovereign

states and municipalities into participating in its immigration enforcement

scheme.  Defendant City of Minneapolis ("Minneapolis") has made a policy

decision that it would harm public safety and would be an improvident use of

finite city resources to have any Minneapolis employees participate in, or for

Minneapolis to operate its municipal programs for the purpose of, enforcing

federal immigration laws.  This is codified in Minneapolis' ordinances, Title 2,

Chapter 19 ("Separation Ordinance"), which has been in effect since 2003.

Despite the federal government's claims, no law requires Minneapolis to aid the

federal government in immigration enforcement, and the Constitution of the United States would prohibit any law requiring it. Nor does Minneapolis' decision to not participate in immigration enforcement "discriminate" against the federal government. These questions have been decided against the federal government already in multiple jurisdictions, but it nevertheless continues to bring the same frivolous claims. The federal government has failed to state a claim against Minneapolis and all claims against Minneapolis should be dismissed.

## **FACTS**

### I.   **Facts Alleged in Plaintiff's Complaint or Documents Embraced by Plaintiff's Complaint.**

Plaintiff, the United States of America, regulates immigration and enforces federal immigration laws through its executive agencies, including the Department of Justice ("DOJ") and the Department of Homeland Security ("DHS"). (ECF 1 "Compl." ¶ 13.) DHS's component agencies enforcing immigration law include Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP"). (*Id.*)

The Defendants are the State of Minnesota ("Minnesota"), Hennepin County, Minneapolis, and the City of St. Paul ("St. Paul"), Minnesota Attorney General Keith Ellison ("Ellison"), and Hennepin County Sheriff Dawanna Witt ("Witt").

On his first day in office in January of 2025, President Trump declared that a "national emergency exists at the southern border of the United States[.]" (Compl. ¶ 1.)[1]  Allegedly, millions of individuals are settled in American communities in violation of federal immigration law.  (Compl. ¶ 1.)  Without giving any specific number, the President has declared that "many" of these individuals "present significant threats to national security and public safety[.]" (*Id.*)

The Complaint alleges that DHS, through ICE and CBP, conducts a significant volume of law enforcement activities in Minnesota, especially in Minneapolis and St. Paul.  (*Id.* ¶ 73.)  CBP is responsible for enforcing immigration laws at and between the ports of entry.  (*Id.*)  According to the CBP's website, there are no ports of entry in Minneapolis.  (Robertson Decl. ¶ 2, Ex. A.)  ICE-Enforcement and Removal Operations ("ICE-ERO") has issued 2,988 detainers and made 1,522 at-large arrests in the St. Paul Area of Responsibility since fiscal year 2024 as of July 15, 2025.  (Compl. ¶ 73.)

On February 6, 2025, Attorney General Ellison issued an advisory opinion regarding whether a county can lawfully hold individuals in custody based on civil immigration detainer requests from ICE.  (*Id.* ¶ 52, ECF 32-1.)  Ellison's

---

[1] The City of Minneapolis is over 1,000 miles away from the southern border of the United States.  (Robertson Decl. ¶ 1.)

opinion was that neither the state nor federal constitutions permitted such a detention. (*See* ECF 32-1 at 5.) Plaintiffs allege it has caused many Minnesota localities to stop honoring ICE detainers and "certain law enforcement agencies" consider the opinion binding on them. (Compl. ¶ 54.)

The Complaint alleges that "almost all local jails" would honor ICE detainers and cooperate with ICE before Ellison's opinion. (*Id.* ¶ 76.) However, now "most counties," citing the opinion, refuse to honor ICE detainers or to provide ICE with notifications of release for those individuals with detainers. (*Id.*) Those counties that notify ICE of release of individuals with detainers no longer allow ICE to take custody of the individual in the jail's sally-port but make ICE wait outside the jail, where sometimes the family of that person is also waiting. (*Id.* ¶ 77.) Plaintiff alleges that sally-port transfers of custody are preferable for safety reasons. (*Id.* ¶¶ 50, 78.) Additionally, sometimes the ICE agents are not informed by the county of the exact time of release and the ICE agents either arrive too late or too early. (*Id.*) This sometimes wastes a few hours of the agents' time waiting for a release. (*Id.*) Alternatively, they must spend time and resources locating the individuals they were too late to pick up. (*Id.*) The Complaint alleges that the individuals who are not picked up in time "can threaten" public safety or commit additional crimes. (*Id.*) Plaintiff cites no specific examples of when an additional crime or public safety threat has

4

occurred when their agents were too late to pick up a detainee. (*See generally* ECF 1.) Plaintiff blames the jails for ICE's new policy to arrest individuals with detainers at courthouses. (*Id.* ¶ 79.)

The Complaint takes issue with Minnesota Statutes § 171.12, subds. 7b(e), 11(c), and 11(d), and § 168.327, subd. 6, Minneapolis Ordinance Title 2, Chapter 19, St. Paul Ordinance Part III, Title III, Chapter 44, and Hennepin County Administrative Directive 21-02. (*Id.* ¶¶ 55, 60, 66, 71.)

The Complaint alleges the Minnesota statutes, all relating to driver's license information, have caused local law enforcement agencies to refuse to provide ICE-ERO with information about individuals' potential addresses, photos, vehicles, or arrest or traffic reports. (*Id.* ¶¶ 80-81.) For example, the Minnesota State Patrol has refused to provide DWI reports as it had done in the past. (*Id.* ¶ 82.) When ICE officers use the Minnesota Driver and Vehicle Services system to look for information, they are blocked based on Minn. Stat. § 171.12. (*Id.* ¶ 83.)

The Complaint further alleges that the Minneapolis and St. Paul ordinances have caused "local law enforcement officers" to refuse to "provide ICE with information that aids ICE in immigration investigations" or to provide marked units and patrol officers to establish a perimeter during ICE enforcement operations. (*Id.* ¶¶ 84-85.) The Complaint notes one incident from "several years

5

ago" in which the St. Paul Police did not assist an ICE-ERO officer who was pursuing someone. (*Id.* ¶ 86.) Additionally, it mentions an incident from 2024 in which an individual was arrested by Minneapolis Police Officers, ICE lodged a detainer, but the individual was released by a "county jail." (*Id.* ¶ 88.) Some days later, after the individual was charged and posted bail, ICE had again lodged a detainer, but the Hennepin County Jail released him without notifying ICE. (*Id.*) The individual was arrested three days later, still in the Twin Cities, without having committed any additional crimes. (*Id.*)

Attorney General Pam Bondi sent a letter to Governor Tim Walz on August 13, 2025, stating that "Congress has codified the duty of states and local governments to cooperate in immigration enforcement efforts." (*Id.* ¶ 3.) The letter stated that Minnesota had been identified as a jurisdiction whose sanctuary policies and practices "thwart federal immigration enforcement[.]" (Compl. ¶ 3.) The letter was not addressed to the City of Minneapolis. (*See id.*)

Plaintiff alleges nine claims (Compl. ¶¶ 22-32):

Count One – Violation of the Supremacy Clause (Preemption of Minnesota Constitution) against all Defendants.

Count Two – Violation of the Supremacy Clause (Preemption of Minnesota Statutes) against all Defendants.

Count Three – Violation of the Supremacy Clause (Preemption of Minneapolis Ordinance) against Minneapolis.

Count Four - Violation of the Supremacy Clause (Preemption of St. Paul Ordinance) against St. Paul.

Count Five - Violation of the Supremacy Clause (Preemption of Administrative Directive) against Hennepin County and Witt.

Count Six - Violation of the Supremacy Clause (Discrimination against the Federal Government) against all Defendants.

Count Seven - Violation of the Supremacy Clause (Discrimination against the Federal Government) against Minneapolis.

Count Eight - Violation of the Supremacy Clause (Discrimination against the Federal Government) against St. Paul.

Count Nine - Violation of the Supremacy Clause (Discrimination against the Federal Government) against Hennepin County and Witt.

Plaintiff seeks declaratory judgment and a permanent injunction.  (Compl. ¶¶ 32-33.)

## II.    Public Record of Minneapolis' Separation Ordinance

Chapter 19 of Title 2 of the Minneapolis Code of Ordinances was originally enacted on July 11, 2003.  (Robertson Decl. Ex. B at 1-2.)  The ordinance's purpose was to "clarif[y] the communication and enforcement relationship between the

city and the United States Department of Homeland Security and other federal

agencies with respect to the enforcement of civil immigration laws." (*Id.* at 2.) It

noted that "the city does not operate its programs for the purpose of enforcing

federal immigration laws." (*Id.*)

The ordinance noted that public safety officials were prohibited from

"undertak[ing] any law enforcement action for the purpose of detecting the

presence of undocumented persons, or to verify immigration status, including

but not limited to questioning any person or persons about their immigration

status." (*Id.* at 3.) Additionally, public safety officials could not "question, arrest

or detain any person for violations of federal civil immigration laws except when

immigration status is an element of the crime or when enforcing 8 U.S.C.

1324(c)." (*Id.* at 4.) However, the ordinance provided, that "[n]othing in this

chapter shall prohibit public safety personnel from assisting federal law

enforcement officers in the investigation of criminal activity involving

individuals present in the United States who may also be in violation of federal

civil immigration laws." (*Id.* at 4.) The ordinance also stated that it did not

prohibit city employees from responding to a properly issued subpoena. (*Id.* at

4.)

The ordinance was amended on December 15, 2017, to add a new section

19.60 with the purpose of codifying Minneapolis' existing practice in processing

8

requests for U-Visa and T-Visa certifications[2] from victims of crime in a timely

fashion and to standardize practices across departments.  (Robertson Decl. Ex. F.)

One purpose of the U- and T-Visas is to:

> strengthen the ability of law enforcement agencies to detect,
> investigate, and prosecute cases of domestic violence, sexual assault,
> trafficking of aliens, and other crimes described in section
> 101(a)(15)(U)(iii) of the Immigration and Nationality Act committed
> against aliens, while offering protection to victims of such offenses in
> keeping with the humanitarian interests of the United States. This
> visa will encourage law enforcement officials to better serve
> immigrant crime victims and to prosecute crimes committed against
> aliens.

Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, §

1513, 114 Stat. 1533.  The Minneapolis City Council considered this purpose in

enacting the ordinance.  (Robertson Decl. Ex. D at 9 ("Congress sought not only

to prosecute perpetrators of crimes committed against immigrants, but also to

strengthen relations between law enforcement and immigrant communities").)

In addition to standardizing the review process and criteria for Minneapolis, the

Ordinance also provides that "City certifying agencies[3] shall not disclose

---

[2] U- and T-Visas are types of nonimmigrant visas that allow individuals who are
the victims of certain enumerated crimes, including domestic violence or
trafficking, to obtain a visa if law enforcement certifies that they have been a
victim of a crime and have been or would be helpful in the prosecution of that
crime.  8 U.S.C. §§ 1184(o) & (p), 1101(a)(15)(T) & (U).

[3] "City certifying agencies" are defined in the Ordinance as City departments
that have "legal authority to sign a U Visa Nonimmigrant Status Certification or

personal information of victims obtained through the certification request process except as provided in the Minnesota Government Data Practices Act or as otherwise required by law or court order." (Robertson Decl. Ex. E at 2.)

In December 2025, Minneapolis amended the ordinance again. (Robertson Decl. Ex. F (showing changes enacted).) The amended ordinance contains a more descriptive purpose and policy statement providing, in part, that, "[t]he city formally prioritizes using its finite resources to advance the health and safety of its residents. If city personnel were to enforce federal immigration laws for the federal government, it would squander limited municipal resources, have deleterious effects on public safety, and have a chilling effect on immigrant populations' willingness to report crime and cooperate with the city's public safety efforts." Mpls. Ord. § 19.10. The amended ordinance also clarifies what "city resources" may not be used for immigration enforcement: "city facilities, property, moneys, equipment, data [or] technology." Mpls. Ord. § 19.20(a)(3). However, it specifically says that that the provisions do not apply "when required by law," or "to comply with any properly issued judicial subpoena or other compulsory legal process" and that "[d]ata subject to 8 U.S.C. §§ 1373 and

_____

a T Visa Declaration of Law Enforcement Officer for Victim of Trafficking in Persons," and include the City Attorney's Office, Minneapolis Police Department, and the Minneapolis Civil Rights Department. Mpls. Ord. § 19.60(a)(2).

10

1644 are exempt from this provision." *Id.* This section also requires the city to provide employee training on the expectations in the Separation Ordinance. Mpls. Ord. § 19.20(a)(5).

The amended ordinance creates a new section regarding access to city property. Mpls. Ord. § 19.25. First, it states that no person or entity may use city parking lots, ramps, vacant lots, or garages for "a staging area, processing location, operations base, or any other similar use for enforcing federal immigration laws." Mpls. Ord. § 19.25(a). It notes that these facilities are not open to the general public for any similar activities and provides that "federal, state, or local government entities or personnel will not receive special or enhanced access to city property for operations enforcing federal immigration laws." *Id.* It also states that spaces in city facilities that are not open to the general public are not open for enforcement of federal immigration laws unless there is a judicial warrant or "when access is otherwise required by law." Mpls. Ord. § 19.25(b). It notes that Minneapolis employees do not have legal authority to consent to permit access to these spaces absent a judicial warrant or other legal obligation. *Id.* However, it provides that this section "shall not be construed as restricting or interfering with the execution of court orders or judicial warrants, or the enforcement of criminal law, nor as limiting the rights of any person or entity under state or federal law." Mpls. Ord. § 19.25.

11

The amended ordinance also creates a requirement for reporting regarding use of city public safety personnel to assist federal law enforcement officers in the investigation of criminal activity involving individuals present in the United States who may also be in violation of federal civil immigration laws. Mpls. Ord. § 19.40. It adds procedural requirements to the section regarding complaints and disciplines for violations of the Separation Ordinance. Mpls. Ord. § 19.50. It also explicitly provides that Minneapolis "shall not enter into an agreement, under Section 1357(g) of Title 8 of the United States Code (287g agreement) or any other provision of federal law, to participate in the enforcement of federal immigration laws." Mpls. Ord. § 19.30(4).

However, the ordinance is clear that it does not prohibit Minneapolis employees from responding to a judicial subpoena, other compulsory legal process, or a data request when a response is required by law. Mpls. Ord. § 19.70. Finally, it specifically adds that "Nothing in this chapter shall be construed to violate federal law. The City and its departments and employees will comply with federal law including 8 U.S.C. §§ 1373 & 1644." Mpls. Ord. § 19.60.

## PROCEDURAL HISTORY

Plaintiff filed the Complaint in this Court on September 29, 2025. (ECF Doc. 1.) Summons issued as to all named Defendants on September 30, 2025.

(ECF 5.)  Plaintiff served all Defendants except the City of Minneapolis in
November 2025.  (ECF 13 at 1 (served Minnesota and Ellison November 19,
2025), 2 (served Hennepin County, Witt, and St. Paul on November 20, 2025).)  In
addition, on December 5, 2025, Plaintiff entered into a stipulation with all
Defendants, except the City of Minneapolis, to extend those Defendants' time to
respond to the Complaint until January 7, 2025.  (*Id.* at 3.)

The City of Minneapolis was served with the Summons and Complaint on
January 8, 2026, the day after all other Defendants had filed motions to dismiss.
(Kelly Geistler Decl. ¶¶ 3, 4; ECF 17-21, 23-34.)  The service occurred 101 days
after the Complaint was filed.

## STANDARD OF REVIEW

A claim survives a Rule 12(b)(6) motion to dismiss only if the complaint's
nonconclusory allegations, accepted as true, make it not just "conceivable" but
"plausible" that the defendant is liable. *Mitchell v. Kirchmeier*, 28 F.4th 888, 895
(8th Cir. 2022), citing *Ashcroft v. Iqbal*, 556 U.S. 662, 680-83 (2009).  To survive a
motion to dismiss, a complaint must contain sufficient factual matter, accepted as
true, to state a claim to relief that is plausible on its face. *Gorog v. Best Buy Co.*, 760
F.3d 787, 792 (8th Cir. 2014), quoting *Iqbal*, 556 U.S. at 678. A court must accept as
true all the factual allegations in the complaint and draw all reasonable
inferences in the plaintiff's favor. *Gorog,* 760 F.3d at 787. But "[t]hreadbare

recitals of the elements of a cause of action, supported by mere conclusory statements," do not establish a plausible allegation. *Iqbal*, 556 U.S. at 678. Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

On a 12(b)(6) motion, the court cannot defer to any legal conclusions or formulaic recitations of the claims' elements. *Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*, 641 F.3d 1023, 1027 (8th Cir. 2011) (citations omitted). A pleading that offers only "labels and conclusions . . . will not do." *Gallagher v. City of Clayton*, 699 F.3d 1013, 1016 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678).

When a defendant brings a Rule 12(b)(1) challenge to subject matter jurisdiction based on a deficiency in the pleadings, the court uses the same standard of review used in Rule 12(b)(6) motions. *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 520–21 (8th Cir. 2007). "The plaintiff must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims"

14

-- here, the right to subject matter jurisdiction -- "rather than facts that are merely consistent with such a right." *Id.*

When a defendant brings a Rule 12(b)(4) or 12(b)(5) motion to dismiss on insufficiency of process or insufficiency of service of process, the court may (and usually must) review affidavits outside of the pleadings, and this does not convert the motion to one for summary judgment. *Seretse v. Andersen Corp.*, No. CIV. 12-CV-323 SRN, 2013 WL 2434876, at *4 (D. Minn. June 4, 2013) (citing *Hahn v. Bauer,* No. 09–cv–2220 (JNE/JJK), 2010 WL 396228, at *5 (D.Minn. Jan. 27, 2010)). Although Rules 12(b)(4) and 12(b)(5) address slightly different bases for dismissal,[4] the distinction is often blurred and it is appropriate "to present and analyze service issues under both rules." *Id.* (citing *Adams v. AlliedSignal Gen. Aviation Avionics*, 74 F.3d 882, 884 n.2 (8th Cir. 1996)). On a motion to dismiss under either 12(b)(4) or 12(b)(5), the plaintiff must establish prima facie evidence

---

[4] Another court in this district adopted the following distinction, "challenges to 'substantive deficiencies in the summons, complaint or accompanying documentation' are for insufficient process,… while a challenge to the 'mode of delivery or the lack of delivery of the summons and complaint' asserts insufficient service of process. *Warehouse Invs., L.L.C. v. Affiliated Fm Ins. Co.*, No. 420CV00397JAJHCA, 2021 WL 2211691, at *3 (S.D. Iowa Mar. 16, 2021)(quoting *Wyatt v. Kozlowski*, No. 19-CV-159W(F), 2021 WL 130978, at *7 (W.D.N.Y. Jan. 14, 2021)).

that there was sufficient process and service of process. *Id.* (citing *Hahn*, 2010 WL 396228, at *6).

## ARGUMENT

**I.    The Complaint should be dismissed because Plaintiff failed to serve Minneapolis within 90 days of filing the Complaint.**

"A district court has the power to dismiss a case for failure to comply with its rules." *Marshall v. Warwick*, 155 F.3d 1027, 1030 (8th Cir. 1998). Under the Federal Rules of Civil Procedure, a complaint is subject to dismissal if the plaintiff fails to serve the complaint on the defendant within 90 days after filing it with the court. Fed. R. Civ. P. 4(m). The plaintiff bears the burden of "having the summons and complaint served within the time allowed by Rule 4(m)." Fed. R. Civ. P. 4(c)(1). If a defendant is not served within 90 days after a complaint is filed, a court "must" either dismiss the action without prejudice or order that service be made within a specified time. Fed. R. Civ. P. 4(m). A "court must extend the time for service for an appropriate period" if the plaintiff shows good cause for the failure. *Id.*

Under Rule 4(m), "a district court must engage in a two-step analysis of motions to dismiss a complaint premised upon untimely service of process." *Colasante v. Wells Fargo Corp.*, 81 Fed.Appx. 611, 612 (8th Cir. 2003). First, "if the district court concludes there is good cause for plaintiff's failure to serve within [90] days, it shall extend the time for service." *Kurka v. Iowa Cty., Iowa*, 628 F.3d

16

953, 957 (8th Cir. 2010). "Second, if good cause is not shown, the district court still retains the discretion to grant an extension of the time for service," *Colasante*, 81 Fed.Appx. at 613 (*quoting Adams v. AlliedSignal Gen. Aviation Avionics*, 74 F.3d 882, 887 (8th Cir. 1996)), but "[t]o warrant a discretionary extension, the plaintiff must establish excusable neglect." *Kurka*, 628 F.3d at 957.  Put another way, "there is justifiable delay ('good cause')," and then "there is excusable neglect …. In the first case, that of good cause, an extension is mandatory; in the second, that of excusable neglect, it is permissive[.]" *Coleman v. Milwaukee Bd. of Sch. Directors*, 290 F.3d 932, 934 (7th Cir. 2002).

"A showing of good cause requires at least excusable neglect—good faith and some reasonable basis for noncompliance with the rules." *Adams*, 74 F.3d at 887 (internal quotation marks omitted).  "Generally, for purposes of Rule 4(m), 'good cause' requires some showing of diligence on the part of the plaintiffs." *Attkisson v. Holder*, 925 F.3d 606, 627 (4th Cir. 2019).  "A delay in service resulting from the mere inadvertence, neglect, or mistake of a litigant's attorney does not constitute good cause."  *AIG Managed Mkt. Neutral Fund v. Askin Cap. Mgmt., L.P.*, 197 F.R.D. 104, 108 (S.D.N.Y. 2000); *In re Kirkland*, 86 F.3d 172, 174 (10th Cir. 1996) (same).

As for whether excusable neglect exists, "[t]he determination of whether neglect is excusable is at bottom an equitable one, taking account of all relevant

17

circumstances surrounding the party's omission." *Kurka*, 628 F.3d at 959 (citations and quotations omitted).  The Eighth Circuit generally considers the following factors for determining excusable neglect: "(1) the possibility of prejudice to the defendant, (2) the length of delay and the potential impact on judicial proceedings, (3) the reason for delay, including whether the delay was within the party's reasonable control, and (4) whether the party acted in good faith." *Id.*  But "[t]hese factors do not bear equal weight as the reason for delay is generally a key factor in the analysis." *Id.*

"[A] municipal corporation … must be served by: (A) delivering a copy of the summons and of the complaint to its chief executive officer; or (B) serving a copy of each in the manner prescribed by that state's law for serving a summons or like process on such a defendant."  Fed. R. Civ. P. 4(j)(2).  Under Minnesota law, a municipal corporation like the City of Minneapolis can be served by delivering a copy of the summons to its chief executive officer (in Minneapolis' case, the Mayor of Minneapolis) or to the City Clerk.  Minn. R. Civ. P. 4.03(e)(2); Minneapolis City Charter, § 7.1(a) ("The chief executive officer is the Mayor").  Plaintiff filed this Complaint on September 29, 2025.  The Court Clerk issued a summons on September 30, 2025.  Under the rules, Plaintiff was required to serve Minneapolis no later than Monday, December 29, 2025.  Plaintiff did not serve the City until January 8, 2026.  (Geistler Decl., ¶¶ 3, 4.)  Plaintiff did not move the

Court for an extension of the time allowed for service and has put forth no reason—let alone good cause—for its late service. The circumstances indicate that neither good cause nor excusable neglect exists.

Plaintiff appears to have timely served several other Defendants (including another municipal corporation, the City of St. Paul) in this lawsuit, showing both that it knows how to effectuate service and that it is aware of the requirement to complete service timely. Plaintiff knew, or undoubtedly should have known, that it had not served Minneapolis. Plaintiff also had the means to effect timely service. There has been no showing of diligence on Plaintiff's part, nor any reasonable ground for noncompliance with the rules, that would justify a finding of good cause.

Plaintiff's disregard for the requirements of Rule 4(m) with respect to Minneapolis also does not constitute excusable neglect. "[I]nattention to details and deadlines, without any showing of special circumstances," provides no basis for a finding of excusable neglect. *Colasante v. Wells Fargo Corp.*, 211 F.R.D. 555, 562 (S.D. Iowa 2002), *aff'd sub nom. Colasante v. Wells Fargo Corp.*, 81 F. App'x 611 (8th Cir. 2003). Again, no showing of special circumstances has been made.

The length of the delay will also have an impact on judicial proceedings. The hearing on the other parties' motions to dismiss is currently set for March 2, 2026. (ECF 18.) This motion, filed on January 29, 2026, within 21 days of service

of the Complaint, will not, under the timelines provided by the local rules, be fully briefed by March 2, 2026. L.R. 7.1(c)(1). Therefore, the Court will either have to hold two separate motion hearings or delay the hearing so all the motions to dismiss may be heard together.

Minneapolis is also prejudiced by the delay. Plaintiff's late service of the Complaint on Minneapolis coincides with Plaintiff's escalation of aggressive, violent, and lawless actions throughout Minneapolis under the guise of immigration enforcement—an operation Plaintiff has dubbed Operation Metro Surge, which began on December 1, 2025, and continues through this day. (Robertson Decl. ¶ 8.) The expansion of Operation Metro Surge to an unprecedented 3,000 federal immigration agents, contemporaneous with the late-served Complaint in this matter, was followed closely by notice by Plaintiff's agencies to Minneapolis of several reviews seeking substantial amounts of information. (Robertson Decl. ¶¶ 9.) All of these actions by Plaintiff have severely strained the City's legal resources. (Robertson Decl. ¶ 10.)

Courts around the country dismiss complaints for late service when the plaintiff fails to show diligence or "meticulous efforts to comply with the rule," even when the plaintiff is *pro se* or when some error by a third party played a role in delaying service. *In re Kirkland*, 86 F.3d at 176; *see also Kurka*, 628 F.3d at 958 (affirming dismissal and concluding no good cause existed where court clerk

20

erroneously failed to issue summons but plaintiff's counsel "failed to take any action to follow up with the clerk or otherwise move the case forward before" the deadline for service expired). The federal government, with its vast resources, should not be held to a *lower* standard than any other plaintiff. Nor should the Court grant a retroactive extension when none was even requested by Plaintiff here and when doing so would amount to condoning Plaintiff's unexplained flouting of rules that every other litigant must abide by. The Court should dismiss the claims against Minneapolis because of Plaintiff's failure to comply with Rule 4(m).

## II.    Plaintiff has not plausibly alleged standing against Minneapolis.

Even if the Court does not dismiss the claims against Minneapolis under Fed. R. Civ. P. 4(m), Plaintiff's claims against Minneapolis should be dismissed with prejudice for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) because Plaintiff lacks Article III standing to seek its desired relief against Minneapolis. Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *McNaught v. Nolen*, 76 F.4th 764, 768 (8th Cir. 2023), quoting *Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 997 (8th Cir. 2022).

The "irreducible constitutional minimum" required to establish standing involves three elements: (1) the plaintiff suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Arc of Iowa v. Reynolds*, 94 F.4th 707, 710 (8th Cir. 2024), citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiff, as the party invoking federal court jurisdiction, bears the burden of establishing these elements. *Id.*

At the motion to dismiss stage, a plaintiff must set forth specific facts sufficient to demonstrate its standing. *Red River Freethinkers v. City of Fargo*, 679 F.3d 1015, 1022 (8th Cir. 2012). Because "standing is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996), that showing must be made "separately for each form of relief sought," *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 185 (2000); *see, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) (although plaintiff had standing to seek damages, he lacked standing to pursue injunctive relief).

Here, Plaintiff seeks three forms of relief: (1) a declaration that Minneapolis' separation ordinance is invalid; (2) an award of litigation costs and fees; and (3) an injunction against future enforcement of Minneapolis' ordinance. The first two cannot supply jurisdiction here. A request for declaratory relief can never independently provide federal jurisdiction, so courts must assess Article III

standing as the action would exist "'in the absence of the declaratory judgment suit.'" *California v. Texas*, 593 U.S. 659, 673 (2021) (quoting *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 197 (2014)). Similarly, litigation costs and fees cannot support federal jurisdiction because "an interest that is merely a 'byproduct' of the suit itself cannot give rise to a cognizable injury in fact for Article III standing purposes." *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000). Under this rule, a desire for "reimbursement of the costs of litigation cannot alone support standing," *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 108 (1998), nor can an interest in attorney's fees, *Diamond v. Charles*, 476 U.S. 54, 70-71 (1986).

Therefore, to establish jurisdiction as to Minneapolis, Plaintiff must plausibly allege Article III standing regarding injunctive relief as to Minneapolis. To satisfy Article III standing requirements and thereby show that an actual case or controversy exists, "the party must show it has suffered some actual or threatened injury that can be traced to the allegedly illegal conduct and that is capable of being redressed." *Keller v. City of Fremont*, 719 F.3d 931, 947 (8th Cir. 2013). The injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.*, quoting *Lujan*, 504 U.S. at 560. The focus must be whether the complaint contains sufficient "factual matter," as opposed

23

to conclusions and labels, to satisfy the required elements. *See e.g. Gorog,* 760 F.3d at 792.

Here, Plaintiff has not alleged sufficient "factual matter," as opposed to conclusory statements and speculation, that would establish that it faces an actual and imminent injury resulting from Minneapolis' ordinance. Paragraphs 84 and 85 of the Complaint make vague references to "local law enforcement officers" and "city police departments" but they do not specify in any fashion what Minneapolis did that allegedly violated Plaintiff's rights or federal law. Therefore, the injury alleged is neither concrete nor particularized. Paragraph 87 states that when Minneapolis arrested a noncitizen, the *county* jail refused to honor a detainer. Minneapolis is not the County. Paragraph 87 does not allege an injury fairly traceable to Minneapolis' conduct. There is no other conduct alleged regarding Minneapolis in the Complaint.

Importantly, the Complaint contains no allegations that Minneapolis operates a jail, received a detainer request, received a data request, or any other conduct that allegedly would show some actual or threatened injury that can be traced to the allegedly illegal conduct by Minneapolis and that is capable of being redressed. To the extent that Plaintiff's allegations could be read to suggest that some day Plaintiff may seek information from Minneapolis and be rebuffed pursuant to Minneapolis' ordinance, the Supreme Court has made clear that

"[s]uch 'some day' intentions – without any description of concrete plans, or indeed even any specification of when the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require" for Article III standing to seek injunctive relief. *Lujan*, 504 U.S. at 564; *Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009) (same). And even if Plaintiff had alleged some past conduct by Minneapolis, it is well-settled that mere exposure to past conduct does not confer Article III standing to seek injunctive relief if unaccompanied by any continuing, present adverse effects. *See Lyons*, 461 U.S. at 102.

Therefore, Plaintiff lacks standing to seek injunctive relief as to Minneapolis. Accordingly, Plaintiff has not plausibly alleged jurisdiction and the Complaint must be dismissed as to Minneapolis.

## A. Count One does not state a plausible claim against Minneapolis.

Count One is entitled "Violation of the Supremacy Clause (Preemption of the Minnesota Constitution)" and is asserted against all Defendants. Count One asserts that the Minnesota Attorney General Advisory Opinion 3a-20250206 and Article I, section 10 of the Minnesota Constitution, as interpreted by the Opinion, conflict with, and create obstacles to, the enforcement of federal immigration law. (Compl. ¶91.) Specifically, Plaintiff asserts that if DHS issues a detainer for

25

an alien not otherwise detained by a criminal justice agency, 8 C.F.R. § 287.7(d)
requires the agency to maintain custody of the alien for a set time so that DHS
may assume custody. (*Id.* ¶ 92.) Plaintiff asserts that the Attorney General's
interpretation conflicts with and imposes an obstacle to 8 U.S.C. § 1357(g)(1) and
8 C.F.R. § 287.7(d), and therefore violates the Supremacy Clause of the U.S.
Constitution. (*Id.* ¶¶ 91-98.)

Plaintiff does not state a plausible claim in Count One against
Minneapolis. A claim has facial plausibility when the plaintiff pleads factual
content that allows the court to draw the reasonable inference that the defendant
is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. The Complaint contains
no allegations that Plaintiff has ever issued a detainer to Minneapolis, that
Minneapolis has refused to honor a detainer request, nor that Minneapolis has
relied upon the Attorney General's advisory opinion or the Minnesota
Constitution in refusing to honor a detainer request. In fact, the Complaint does
not allege that Minneapolis operates a jail at all.[5] Simply put, there is nothing in

---

[5] It is a matter of public record that the City of Minneapolis does not operate a
jail.  The jail facilities located in Minneapolis are operated by Hennepin County.
*See* Minn. Stat. § 387.11 ("The sheriff shall have the charge and custody of the
county jail and receive and safely keep therein all persons lawfully committed
thereto … .").

the Complaint factually connecting Minneapolis with detainer requests issued by Plaintiff.

Accordingly, the Complaint does not include facts that would entitle Plaintiff to legal redress under the theory asserted in Count One. Therefore, Count One is not plausibly alleged against Minneapolis and it should be dismissed as to Minneapolis.

### B. Count Two does not state a plausible claim against Minneapolis.

Count Two is entitled "Violation of the Supremacy Clause (Preemption of Minnesota Statutes)" and is asserted against all Defendants. Count Two asserts that three state statutes – Minn. Stat. § 171.12, subd. 7b(e); Minn. Stat. § 171.12, subd. 11(c) and (d); and Minn. Stat. § 168.327, subd. 6 – conflict with and create obstacles to the enforcement of federal immigration law. (Compl. ¶ 100.) Count Two asserts that these state statutes are preempted under express preemption and conflict preemption. (*Id*. ¶ 101.) Plaintiff alleges that the statutes conflict with 8 U.S.C. § 1373(a), and 8 U.S.C. § 1644. As a preliminary matter, these are state statutes which were passed by the Minnesota Legislature, not by Minneapolis. Additionally, Plaintiff has failed to allege any claim against Minneapolis related to these statutes.

      1.    *Minn. Stat. § 171.12, subd 7b(e)*

As defined by state statute, "noncompliant" driver's licenses and identification cards are those that do not satisfy the REAL ID Act. *See* Minn. Stat. § 171.01, subd. 41a; § 171.019, subd. 2(b). One section challenged by Plaintiff, Minn. Stat. § 171.12, subd. 7b(e), requires that prior to disclosing data on an individual related to "noncompliant" ID cards, the Minnesota Commissioner of Public Safety or a driver's license agent must require the data requester to certify that the data requester must not use the data for civil immigration enforcement purposes or disclose the data to a state or federal government entity that primarily enforces immigration law or to any employee or agent of any such government entity. It also states that a data requester that violates the certification may be liable in a civil action or may be subject to criminal penalties, among other consequences.

Plaintiff asserts that this statute is preempted by federal law. But the Complaint contains no allegations that Minneapolis acts as a driver's license agent or has any data on "noncompliant" IDs, nor that Minneapolis has ever been asked to share noncompliant ID information with Plaintiff and declined to do so citing the statute.

2.    *Minn. Stat. § 171.12, subd. 11(c) and (d)*

Plaintiff also asserts that Minn. Stat. § 171.12, subd. 11(c) and (d) are preempted by federal law. Subdivisions 11(c) and (d) address when the Minnesota Commissioner of Public Safety or a driver's license agent may or may not share certain data about individuals who have applied for or been issued a "noncompliant" driver's license or identification card.

Plaintiff asserts that this statute is preempted by federal law. But the Complaint contains no allegations that Minneapolis acts as a driver's license agent or has any data on "noncompliant" IDs, nor that Minneapolis has ever been asked to share noncompliant ID information with Plaintiff and declined to do so citing the statute.

3.    *Minn. Stat. § 168.327, subd. 6*

Plaintiff also asserts that Minn. Stat. § 168.327, subd. 6 is preempted by federal law. Section 168.327 requires that subscribers of the State of Minnesota's driver records subscription service "must annually engage an independent professional organization to audit its uses of data and its information technology security procedures, including: . . . (2) compliance with the certification required under section 171.12, subdivision 7b, paragraph (d)," one of the statutes discussed above.

Plaintiff asserts that this statute is preempted by federal law. But the Complaint contains no allegations that Minneapolis has a subscription to the State of Minnesota's drivers' records subscription service, or that it has ever certified anything under section 171.12.

Plaintiff's allegations do not state a plausible preemption claim against Minneapolis. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. Nothing in the Complaint suggests that Minneapolis has involvement with the statutes in question. Count Two should be dismissed as to Minneapolis.

In addition, the City of Minneapolis notes that Counts I and II also fail on the merits, as discussed in the Memorandum of the State of Minnesota and Attorney General Ellison. (ECF 31 at 8-28.)

## III. Plaintiff's claim that Minneapolis' Separation Ordinance violates the Supremacy Clause fails as a matter of law.

Plaintiff alleges that three provisions of the prior version of Minneapolis' Separation Ordinance violate the Supremacy Clause because they "conflict with, and create obstacles to, the enforcement of federal immigration law." (Compl. ¶ 109.) This is essentially a claim that certain sections of Minneapolis' Separation Ordinance are preempted by federal law. *See Crosby v. Nat'l Foreign Trade*

*Council*, 530 U.S. 363, 372 (2000) (Supremacy Clause designates federal law as the supreme law of the land and local laws can be preempted if that is Congress' intent). Congress can manifest an intent to preempt local laws in three ways: 1) through the express language of the federal statute; 2) implicitly, when the local law conflicts with or is an obstacle to enforcement of federal law; or 3) by occupying the field, that is completely legislating in an area with no room for state regulation. *WinRed, Inc. v. Ellison*, 59 F.4th 934, 941 (8th Cir. 2023) (citations omitted).

The Minneapolis Separation Ordinance provisions that Plaintiff alleges are preempted are sections 19.30(a)(1) (currently 19.30(1)), 19.30(a)(3) (currently 19.30(3)), and 19.60(d) (currently 19.80(d)). (Compl. ¶ 109.) Plaintiff alleges that these provisions are expressly preempted by and conflict with and impose an obstacle to the purpose of 8 U.S.C. §§ 1373 and 1644, "because it restricts city agencies from sending immigration-status information to DHS, contrary to the express text of §§ 1373 and 1644." (Compl. ¶ 110.) Additionally, Plaintiff alleges that section 19.30(a)(3) also conflicts with 8 C.F.R. § 287.7(d) regarding ICE detainers, and 8 U.S.C. § 1357(g)(1) by prohibiting law enforcement agencies from entering into § 1357(g) agreements to perform immigration enforcement. However, none of these allegations support a claim of a violation of the Supremacy Clause because there is no conflict between the Separation Ordinance

31

and federal immigration law.  The federal statutes cited by Plaintiff simply do not impose immigration enforcement requirements on local governments.  Nor has Plaintiff plausibly alleged that Minneapolis' Separation Ordinance, in the more than 20 years it has been in effect, has imposed any obstacle to federal immigration enforcement.  Even if federal law either imposed the requirements to assist in immigration enforcement as Plaintiff claims, or regulated local government entities directly, such an imposition would be barred by the anti-commandeering doctrine.  Either way, Plaintiff's claim fails as a matter of law.

## A. The Separation Ordinance is not expressly preempted by federal immigration law.

When deciding whether a local law is expressly preempted by a federal statute, the court must focus on the plain wording of the preemption clause of the federal statute at issue, "which necessarily contains the best evidence of Congress' pre-emptive intent." *Watson v. Air Methods Corp.*, 870 F.3d 812, 817 (8th Cir. 2017) (quoting *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016)).  Here, the Complaint cites two federal statutes as forming the basis of its express preemption claim.

The two statutes cited by Plaintiff are largely the same: 8 U.S.C. § 1373, entitled "Communication between government agencies and the Immigration and Naturalization Service," and 8 U.S.C. § 1644, "Communication between State

32

and local government agencies and Immigration and Naturalization Service."
They each contain the clause, "Notwithstanding any other provision of Federal,
State, or local law," and each provision goes on to restrict other government
entities as follows:

> (a) Federal, State, or local government entity or official may not
> prohibit, or in any way restrict, any government entity or official
> from sending to, or receiving from, the Immigration and
> Naturalization Service information regarding the citizenship or
> immigration status, lawful or unlawful, of any individual.

8 U.S.C. § 1373(a)

> (b) no person or agency may prohibit, or in any way restrict, a
> Federal, State, or local government entity from doing any of the
> following with respect to information regarding the immigration
> status, lawful or unlawful, of any individual:
>
>> (1) Sending such information to, or requesting or receiving
>> such information from, the Immigration and
>> Naturalization Service.
>> (2) Maintaining such information.
>> (3) Exchanging such information with any other Federal,
>> State, or local government entity.

8 U.S.C. § 1373(b)

> no State or local government entity may be prohibited, or in any
> way restricted, from sending to or receiving from the
> Immigration and Naturalization Service information regarding
> the immigration status, lawful or unlawful, of an alien in the
> United States.

8 U.S.C. § 1644.

The plain language of these statutes does not *require* any local government entity or local government official to provide information on immigration status. They merely prohibit local government entities or officials from restricting the sharing of that information. Importantly, the "information" at issue is limited strictly to information "regarding the immigration status, lawful or unlawful, of" either "any individual," per § 1373, or "an alien in the United States," per § 1644.

The allegedly conflicting Minneapolis ordinance provisions do not have any restrictions on relaying information regarding immigration status. Minneapolis Ordinance § 19.30(1) (formerly 19.30(a)(1)) and § 19.30(3) (formerly 19.30(a)(3)) fall under the same limiting introductory language, and together they provide as follows:

> To the extent permitted by law, employees of the police and fire departments, and the city attorney's office – criminal division … shall be governed by the following requirements:
>> (1) Public safety officials shall not undertake any law enforcement action for the purpose of enforcing federal immigration laws, or to verify immigration status, including but not limited to questioning any person or persons about their immigration status.
>> …
>> (3) Public safety officials shall not question, arrest or detain any person for violations of the purpose of enforcing federal immigration laws including, but not limited to, through traffic stops or the creation of or participation in checkpoints.

Mpls. Ord. §§ 19.30(1) & (3) (formerly §§ 19.30(a)(1) & (a)(3)).

Clause (3) does not place any restrictions on any individual's ability to disseminate information regarding an individual's immigration status and therefore on its face cannot be expressly preempted by §§ 1373 and 1644. Clause (1) prohibits law enforcement from making inquiries into an individual's immigration status, but it is immediately limited by the language "to the extent permitted by law." Therefore, even if this provision could be read to prohibit any Minneapolis public safety officials from sending or receiving immigration information to or from DHS,[6] to the extent it might conflict with §§ 1373 or 1644, the ordinance does not apply and therefore cannot conflict with federal law.

The same is true of the other Minneapolis ordinance provision identified in the Complaint as purportedly expressly preempted by §§ 1373 and 1644, Minneapolis Ordinance § 19.80(d) (formerly 19.60(d)). This provision relates to immigrant victims of certain crimes who request certification for their U- or T-Visas through a city certifying agency. The provision provides for data privacy for "personal information of victims obtained through the certification request process except as provided in the Minnesota Government Data Practices Act or as otherwise required by law or court order." The provision explicitly allows the disclosure of any information that is "required by law." But even if that were

---

[6] And this would be in effect only if such a federal prohibition is lawful, *see infra* at 41.

insufficient under the requirements of §§ 1373 and 1644, the term "personal information" is not defined in § 19.80(d). Statutes should be construed to avoid constitutional conflicts. *Arizona v. United States*, 567 U.S. 387, 415 (2012). To the extent the Court determines it necessary to do so to avoid a constitutional conflict, the Court may construe the ordinance to exclude information covered by §§ 1373 and 1644 from the definition of "personal information," and the ordinance would not be preempted. [7]

Finally, even if the savings clauses and explicit limitations in the individual provisions were not sufficient to avoid preemption, the entirety of Minneapolis' Separation Ordinance includes a general savings clause which states that, "[n]othing in this chapter shall be construed to violate federal law. The City and its departments and employees will comply with federal law including 8 U.S.C. §§ 1373 & 1644." The ordinance itself directs that it is not to be construed to violate federal law, and it explicitly states that the City, its departments, and employees will comply with federal law, and lists 8 U.S.C. §§ 1373 and 1644 as statutes that will be complied with. The ordinance, on its face,

---

[7] However, as §§ 1373 and 1644 are unlawful as they directly regulate local governments and violate the anti-commandeering doctrine such a construction is not necessary, *see infra* at 41.

36

is not expressly preempted by 8 U.S.C. §§ 1373 and 1644, and Plaintiff's claims

fail on that basis.

### B. The Separation Ordinance does not conflict with federal law or create an obstacle.

Plaintiff claims that the identified sections of Minneapolis' Separation

Ordinance, 19.30(a)(1) (currently 19.30(1)), 19.30(a)(3) (currently 19.30(3)), and

19.60(d) (currently 19.80(d)), are conflict-preempted.  (Compl. ¶ 109.)  A local law

is preempted under a conflict-preemption theory where either: 1) "it is

impossible for a private party to comply with both state and federal law"; or 2)

under the circumstances of the case, the challenged law, "stands as an obstacle to

the accomplishment and execution of the full purposes and objectives of

Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)

(citations and quotations omitted).  What constitutes an "obstacle" is "informed

by examining the federal statute as a whole and identifying its purpose and

intended effects." *Id.*

The clear purpose of 8 U.S.C. §§ 1373 and 1644 as discussed *supra* is the

voluntary sharing of information from government entities, agencies, or officials.

Voluntary is the key word because neither statute requires that information be

provided to DHS, only that information sharing cannot be prohibited.

37

Similarly, the Code of Federal Regulations provision identified in the Complaint, is another example of a request for voluntary participation from local government entities.  (Compl. ¶ 111 (citing 8 C.F.R. § 287.7(a))).  This code provision stems from the U.S. Attorney General's power to issue warrants for the arrest and detention of an alien pending a decision on whether that alien is to be deported.  8 U.S.C. § 1226(a); *see also* 8 U.S.C. § 1357.  Pursuant to that authority, the Code of Federal Regulations creates a form called an Immigration Detainer-Notice of Action, or a "detainer."  8 C.F.R. § 287.7(a).  A detainer is issued to another law enforcement agency and advises that "law enforcement agency that the Department seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien."  *Id.*  A detainer is specifically defined as a "request" that the agency advise DHS officials when the subject of the detainer will be released so that the person may be taken into custody.  *Id.*  The regulation goes on to state that when a detainer is issued "for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien … in order to permit assumption of custody by the Department."  8 C.F.R. § 287.7(d).  However, immigration regulations cannot authorize a violation of the Fourth Amendment.  *United States v. Brignoni-Ponce*, 422 U.S. 873, 877 (1975).  In this district, a detainer issued under 8 C.F.R. § 287.7(d) is not sufficient by itself under the Fourth Amendment to hold an

38

individual in custody, rather there must be probable cause both to believe that the person is in the United States in violation of the law and is likely to escape before a warrant can be obtained. *Orellana v. Nobles Cnty.*, 230 F. Supp. 3d 934, 945 (D. Minn. 2017) (citing 8 U.S.C. § 1357(a)(2)). A detainer by itself legally cannot supply a basis for any local law enforcement officer to hold anyone and any command in the Code of Federal Regulations that local law enforcement continue to hold someone who would otherwise be released is unenforceable as unconstitutional. Therefore, like the information-sharing statutes, immigration "[d]etainers are requests, not requirements." *United States v. Illinois*, 796 F. Supp. 3d 494, 528 (N.D. Ill. 2025)(citing 8 C.F.R. § 287.7(a); 8 U.S.C. § 1226(c)(3); *Prim v. Raoul*, 2021 WL 214641, at *3 (N.D. Ill. Jan. 21, 2021); *Villars v. Kubiatowski*, 45 F. Supp. 3d 791, 802 (N.D. Ill. 2014)).

Finally, 8 U.S.C. § 1357(g) provides that the U.S. Attorney General *may* enter into agreements with state or local government agencies to have qualified officers or employees of the agency function as an immigration officer. 8 U.S.C. § 1357(g)(1). However, the subsection is very clear that "[n]othing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement with the Attorney General under this subsection." 8 U.S.C. § 1357(g)(9). That is, local participation in federal immigration enforcement is completely optional under 8 U.S.C. § 1357(g).

Because none of the statutes identified by Plaintiff require the participation of Minneapolis or its officers or employees, there is no basis to find that there is a direct conflict. For important policy reasons such as conservation of city resources and promotion of public safety,[8] Minneapolis has chosen not to participate in immigration enforcement and, except in the instances where it may not prohibit certain actions, has directed its officers and employees not to use their time and the city's resources to participate in immigration enforcement. This is no conflict. A local jurisdiction may use lawful means to "discontinue assistance" with the enforcement of federal laws without causing a preemption issue. *United States v. Missouri*, 114 F.4th 980, 986 (8th Cir. 2024), *cert. denied,* 146 S. Ct. 90 (2025).

These specific issues have already been litigated in multiple cases. For example, in the Northern District of New York the court found, "because Section 1373 'does not mandate that State or local law enforcement authorities cooperate with federal immigration officers[,]' it also does not conflict with the challenged

---

[8] One facet of encouraging public safety, that is making sure that the immigrant population is not afraid to report crime and does not become a vulnerable target of crime, is an important policy goal recognized in the Immigration and Naturalization Act itself when Congress created U- and T-visas under 8 U.S.C. §§ 1184(o) & (p), 1101(a)(15)(T) & (U). *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 1513, 114 Stat. 1533 (U- and T-visas "will encourage law enforcement officials to better serve immigrant crime victims and to prosecute crimes committed against aliens").

provisions" of the local law. *United States v. New York*, No. 1:25-CV-00205 (AMN/MJK), 2025 WL 3718641, at *8 (N.D.N.Y. Dec. 23, 2025); *see also United States v. California*, 921 F.3d 865, 887 (9th Cir. 2019) ("neither an administrative warrant issued by federal authorities nor any other provision of law identified by the United States *compels* any action by a state or local official"); *United States v. Illinois*, 796 F. Supp. 3d at 522-23; *Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 376-79 (D.N.J. 2020), *aff'd on other grounds*, 8 F.4th 176 (3d Cir. 2021); *Colorado v. U.S. Dep't of Just.*, 455 F. Supp. 3d 1034, 1059-60 (D. Colo. 2020). Declining the federal government's invitation to participate in immigration enforcement, including declining to share information, holding individuals on detainers, or enter into 1357(g) agreements, cannot be sufficient for conflict or obstacle preemption as a matter of law. *McHenry County v. Raoul*, 44 F.4th 581, 591-92 (7th Cir. 2022).

## IV. A ruling for the Federal Government would violate the Tenth Amendment anti-commandeering principle.

The only way the challenged provisions of Minneapolis' Separation Ordinance could be preempted by federal law would be if federal law *required* local law enforcement agencies to undertake law enforcement action for the purpose of detecting presence of undocumented persons or to verify immigration status. But federal law does not and cannot require that. Any

41

argument that Minneapolis' Ordinance is preempted by the cited federal statutes because these statutes *do* require enforcement participation by Minneapolis, or its officers or employees, fails for an additional, weightier reason: the Tenth Amendment's anti-commandeering principle. *United States v. Illinois*, 796 F. Supp. 3d at 531.

The Tenth Amendment bars Congress from "command[ing] the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997). This anti-commandeering doctrine prohibits the federal government from "compel[ling] the States to implement, by legislation or executive action, federal regulatory programs." *Printz*, 521 U.S. at 925; *see also, e.g., Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 473 (2018); *New York v. United States*, 505 U.S. 144, 161 (1992). The anti-commandeering principle is "one of the Constitution's structural protections of liberty." *Murphy*, 584 U.S. at 455 (citations and quotations omitted). It also "promotes political accountability," because when "Congress itself regulates, the responsibility for the benefits and burdens of the regulation is apparent. Voters who like or dislike the effects of the regulation know who to credit or blame. By contrast, if a State imposes regulations only because it has been commanded to do so by Congress, responsibility is blurred." *Id.* at 473–74.

42

The federal government's challenge to Minneapolis's Separation Ordinance here is, effectively, a demand that the City permit the federal government to conscript the City's police department and other City public safety employees into carrying out federal immigration enforcement on the federal government's behalf. But any mandate by the federal government that the City use its public safety employees to do the federal government's immigration enforcement work violates the anti-commandeering doctrine and is prohibited by the Tenth Amendment. It is, put simply, unconstitutional. *See, e.g., City & Cnty. of San Francisco v. Trump*, 779 F. Supp. 3d 1077, 1082 (N.D. Cal.) (executive orders to withhold federal funding to "sanctuary jurisdictions" likely violate Tenth Amendment because they impose coercive conditions intended to commandeer local officials into enforcing federal immigration practices and law).

## V.   The Complaint fails to state a claim that Minneapolis unlawfully discriminates against the federal government.

In Count Seven, the Complaint alleges that Ordinance sections 19.30(a)(1) and (a)(3) (now 19.30(1) and 19.30(3)), and 19.60(d) (now 19.80(d)), unlawfully discriminate against the federal government.[9]  (ECF 1, ¶ 136.)  It alleges that

---

[9] Confusingly, Count Seven, although styled as a count against the City of Minneapolis, also alleges that Hennepin County Sheriff's Administrative Directive 21-02 unlawfully discriminates against the federal government. Because that allegation is directed against a Defendant other than the City of

these provisions "single out federal immigration officials and entities, expressly and implicitly, for unfavorable and uncooperative treatment" and treat them "worse than private individuals and other government officials and entities." (*Id.* ¶ 137.)   The Complaint asserts that these provisions are inconsistent with the doctrine of intergovernmental immunity and therefore violate the Supremacy Clause.  (*Id.* ¶ 138.)

The intergovernmental immunity doctrine originated from the Supremacy Clause.  *United States v. Washington*, 596 U.S. 832, 838 (2022).  It prohibits "state laws that either regulate the United States directly or discriminate against the Federal Government or those with whom it deals (e.g., contractors)."  *Id.* (cleaned up).  Courts take "a functional approach to claims of governmental immunity, accommodating of the full range of each sovereign's legislative authority."  *North Dakota v. United States*, 495 U.S. 423, 435 (1990).

A state law discriminates against the federal government when it "treats similarly situated state and federal [actors] differently" in a way that cannot be explained by "significant difference[s]" between the two. *Dawson v. Steager*, 586 U.S. 171, 177 (2019) (internal quotation marks omitted).  A law may also

---

Minneapolis, it is not further addressed in this Memorandum.  Similarly, Count Six is styled as a count against "all defendants," but the allegations under Count Six are solely about Minnesota state statutes, not about any Minneapolis ordinances.

44

discriminate against the federal government "if it regulates them unfavorably on some basis related to their governmental status." *United States v. Washington*, 596 U.S. at 839.

### A. The challenged provisions of Mpls. Ord. § 19.30 do not discriminate against the federal government.

M.C.O. § 19.30(1) (formerly 19.30(a)(1)) provides:

Public safety officials shall not undertake any law enforcement action for the purpose of enforcing federal immigration laws, or to verify immigration status, including but not limited to questioning any person or persons about their immigration status.

M.C.O. § 19.30(3) (formerly 19.30(a)(3)) provides:

Public safety officials shall not question, arrest or detain any person for the purpose of enforcing federal immigration laws including, but not limited to, through traffic stops or the creation of or participation in checkpoints.

Neither of these provisions violates the intergovernmental immunity doctrine under the Supremacy Clause. Instead, the federal government's attempt to have this Court invalidate these provisions itself attempts an unconstitutional overreach: an attempt to commandeer City employees for purposes of federal immigration enforcement, a violation of the Tenth Amendment. *See, supra.*

45

      1.    *The Complaint fails to allege that federal immigration officials and entities are "similarly situated" with any other actors or that they are treated worse than any other similarly situated actors.*

A state law violates intergovernmental immunity only if it treats the federal government worse than it treats other actors that are similarly situated. Here, the Complaint does not allege that Plaintiff *is* similarly situated with any other actor. Nor does it identify which government entities or private persons, if any, are similarly situated with federal immigration officials and entities. For this reason, too, the Complaint fails to state a plausible claim that Minneapolis unlawfully discriminates against Plaintiff.

### B. Minneapolis Ordinance § 19.80(d) (formerly 19.60(d)) does not discriminate against the federal government.

Mpls. Ord. § 19.80(d) (formerly 19.60(d)) provides that "City certifying agencies shall not disclose personal information of victims obtained through the certification request process [defined elsewhere in this section as the certification process for U- and T-Visas] except as provided in the Minnesota Government Data Practices Act or as otherwise required by law or court order."

Under this provision, personal information of victims obtained through the U- and T-Visa certification process is not available to *anyone* except in three circumstances: disclosure pursuant to the Minnesota Government Data Practices Act; disclosure otherwise required by law; or disclosure required by court order.

When none of those three exceptions applies, the prohibition on disclosure applies regardless of whether the information is requested by the federal government or its agents or contractors, or by any other government entity or private person. In other words, the provision treats everyone—including the federal government and its agents, employees and contractors, as well as people and entities unaffiliated with the federal government—who seeks personal information of victims the same way; it does not single out the federal government for worse treatment. "The State does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them." *Washington v. United States*, 460 U.S. 536, 544–45 (1983). Because no one is treated better than the federal government under this provision, Plaintiff's discrimination claim based on this provision also fails.

### C. The anti-commandeering doctrine also forecloses Plaintiff's intergovernmental immunity claim.

As discussed, *supra*, the Tenth Amendment protects Minneapolis' decision not to participate in enforcing immigration law. By that same logic, the federal government cannot attempt to coerce Minneapolis into enforcing federal immigration law by claiming that Minneapolis' constitutionally protected refusal unlawfully discriminates against or regulates the federal government. *Illinois*, 796 F.Supp. at 535-36. Plaintiff's claims must be dismissed on this basis as well.

47

## CONCLUSION

Plaintiff failed to timely serve Minneapolis and its claims should be dismissed on that basis alone.  But even on the merits, Plaintiff's claims are legally insufficient on the face of the Complaint.  Plaintiff has no standing to seek claims against Minneapolis as it has identified no injury traceable to Minneapolis. Counts One and Two are actually claims against the State of Minnesota, not Minneapolis.  Plaintiff cannot establish that the challenged Minneapolis Ordinance provisions are preempted by federal statutes, both because of the plain language and savings clauses in the ordinances, and because federal law provides that participating in the identified statutory schemes is entirely voluntary.  To the extent Plaintiff claims that participation is compulsory, that argument runs afoul of the Tenth Amendment's anti-commandeering doctrine.  Finally, the identified ordinances do not discriminate against the federal government.  Plaintiff's Complaint should be dismissed in its entirety.

Dated:  January 29, 2026                KRISTYN ANDERSON
                                        City Attorney

                                        By: */s/Heather Robertson*
                                        HEATHER ROBERTSON (#0390470)
                                        SARA J. LATHROP (#310232)
                                        MUNAZZA HUMAYUN (#0390788)
                                        Assistant City Attorneys
                                        Minneapolis City Attorney's Office
                                        350 South Fifth Street
                                        Minneapolis, MN 55415
                                        (612) 299-2742
                                        (612) 431-1826
                                        (612) 431-2468
                                        heather.robertson@minneapolismn.gov
                                        sara.lathrop@minneapolismn.gov
                                        munazza.humayun@minneapolismn.gov

                                        Attorneys for Defendant City of Minneapolis