## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) **Case No. 0:25-cv-03798-ECT-JFD** |
| **STATE OF MINNESOTA,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |
| _____ | ) |

## UNITED STATES' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 3

    A. Federal Immigration Law and Cooperative Enforcement ............................. 3

    B. Minnesota Law and the Attorney General's Opinions ................................. 6

    C. Harms to Federal Immigration Enforcement ............................................... 9

LEGAL STANDARDS .......................................................................................... 11

    A. Rule 12(b)(6) ............................................................................................... 11

    B. Rule 12(b)(1) ............................................................................................... 11

    C. Rules 12(b)(4) and 12(b)(5) ...................................................................... 12

ARGUMENT.......................................................................................................... 13

    A. The United States Has Standing, and this Case Is Justiciable. ............................. 13

    B. Federal Law Preempts the Challenged State and Local Provisions. .................. 21

        1. Certain Challenged Laws Conflict with 8 C.F.R. § 287.7(d)..................... 23

        2. The Minnesota Constitution as Interpreted by the Attorney General's Opinion Conflicts with 8 U.S.C. § 1357(g)(1)............................................ 28

        3. Minnesota and the Cities' Information-Sharing Restrictions Conflict with 8 U.S.C. §§ 1373 and 1644 ....................................................................... 32

    C. The Challenged Provisions Violate the Intergovernmental Immunity Doctrine. 38

    D. The Federal Provisions Do Not Violate the Tenth Amendment ........................ 43

    E. The Claims Against Minneapolis Should Not Be Dismissed Under Rule 4(m). 51

CONCLUSION ....................................................................................................... 54

## TABLE OF AUTHORITIES

### Cases

*Abel v. United States*,
    362 U.S. 217 (1960) ............................................................... 27

*Arizona v. United States*,
    567 U.S. 387 (2012) ......................................................... *passim*

*Bennett v. Spear*,
    520 U.S. 154 (1997) ............................................................... 19

*Boeing Co. v. Movassaghi*,
    768 F.3d 832 (9th Cir. 2014) ............................................... 41

*Carbo v. United States*,
    364 U.S. 611 (1960) ............................................................... 46

*Chamber of Com. v. Whiting*,
    563 U.S. 582 (2011) ............................................................... 22

*City of El Cenizo v. Texas*,
    890 F.3d 164 (5th Cir. 2018) ......................................... 28, 31

*City of New York v. United States*,
    179 F.3d 29 (2d Cir. 1999) ........................... 5, 33, 35, 45, 48-49

*City of Philadelphia v. Sessions*,
    309 F. Supp. 3d 289 (E.D. Penn. 2018) ............................... 51

*Cnty. of Ocean v. Grewal*,
    475 F. Supp. 3d 355 (D.N.J. 2020) ..................................... 51

*Colasante v. Wells Fargo Corp.*,
    81 F. App'x 611 (8th Cir. 2003) ......................................... 52

*Colorado v. DOJ*,
    455 F. Supp. 3d 1034 (D. Colo. 2020) ............................... 50

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000) ......................................... 21, 32, 37, 51

*Ctr. for Biological Diversity v. Strommen*,
    2021 WL 3683491 (D. Minn., Aug. 19, 2021) ..................... 17

*Dawson v. Steager*,
    586 U.S. 171 (2019) ............................................................... 41

*Demore v. Kim*,
   538 U.S. 510 (2003) ..................................................................... 4-5, 22

*Farmers Ins. Exch. v. Hjelle*,
   2015 WL 303658 (Minn. Ct. App. Jan. 26, 2015) ..................................... 31

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ......................................................................... 16

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
   458 U.S. 141 (1982) ......................................................................... 21

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ..................................................................... 16, 21

*Galarza v. Szalczyk*,
   745 F.3d 634 (3d Cir. 2014) .............................................................. 26

*Haaland v. Brackeen*,
   599 U.S. 255 (2023) ......................................................................... 48

*Hines v. Davidowitz*,
   312 U.S. 52 (1941) .......................................... 19, 21, 26, 29, 36-37, 49-50

*Hustad v. Mitsubishi Heavy Indus. Am., Inc.*,
   2005 WL 348298 (D. Minn. Feb. 10, 2005) ......................................... 52-53

*Int'l Paper Co. v. Ouellette*,
   479 U.S. 481 (1987) ......................................................................... 31

*Kurka v. Iowa Cnty.*,
   628 F.3d 953 (8th Cir. 2010) .......................................................... 51-52

*Lamar, Archer & Cofrin, LLP v. Appling*,
   584 U.S. 709 (2018) ......................................................................... 35

*Levy v. Ohl*,
   477 F.3d 988 (8th Cir. 2007) .............................................................. 7

*Lopez v. INS*,
   758 F.2d 1390 (10th Cir. 1985) ........................................................... 27

*Loughrin v. United States*,
   573 U.S. 351 (2014) ......................................................................... 35

*McHenry County v. Raoul*,
   44 F.4th 581 (7th Cir. 2022) .............................................................. 26

*McCulloch v. Maryland*,
  17 U.S. (4 Wheat.) 316 (1819) ................................................... 51

*Mendoza v. ICE*,
  849 F.3d 408 (8th Cir. 2017) ..................................................... 27

*Murphy v. NCAA*,
  584 U.S. 453 (2018) ....................................................... 44, 49-50

*New York v. Dep't of Justice*,
  951 F.3d 84 (2d Cir. 2020) ........................................................ 47

*New York v. United States*,
  505 U.S. 144 (1992) ................................................................. 44

*Nielsen v. Preap*,
  586 U.S. 392 (2019) ......................................................... 4-5, 22

*North Dakota v. United States*,
  495 U.S. 423 (1990) ........................................................... 40, 43

*Orellana v. Nobles Cnty.*,
  230 F. Supp. 3d 934 (D. Minn. 2017) ........................................ 27

*Osborn v. United States*,
  918 F.2d 724 (8th Cir. 1990) ................................................ 11-12

*Parada v. Anoka Cnty.*,
  332 F. Supp. 3d 1229 (D. Minn. 2018) ...................................... 27

*Perry v. Precythe*,
  121 F.4th 711 (8th Cir. 2024) .................................................... 11

*Printz v. United States*,
  521 U.S. 898 (1997) ..................................................... 44, 46, 48

*Rollerblade, Inc. v. Rappelfeld*,
  165 F.R.D. 92 (D. Minn. 1995) ............................................. 52-53

*Russello v. United States*,
  464 U.S. 16 (1983) ................................................................. 35

*Silva v. United States*,
  866 F.3d 938 (8th Cir. 2017) .................................................... 31

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ............................................................... 13

*Stahl v. U.S. Dep't of Agriculture,*
  327 F.3d 697 (8th Cir. 2003) ........................................................................ 7

*State of Minn. by Humphrey v. Standard Oil Co.*
  568 F. Supp. 556 (D. Minn. 1983) ............................................................... 15

*State v. Minnesota Sch. of Bus., Inc.,*
  935 N.W.2d 124 (Minn. 2019) .................................................................... 15

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) .................................................................................... 20

*United States v. Alas,*
  63 F.4th 269 (4th Cir. 2023) .......................................................... 5, 28, 45

*United States v. California,*
  921 F.3d 865 (9th Cir. 2019) ...................................................................... 26

*United States v. Darby,*
  312 U.S. 100 (1941) .................................................................................... 51

*United States v. Illinois,*
  796 F. Supp. 3d 494 (N.D. Ill. 2025) .................................................... 35, 50

*United States v. King Cnty.,*
  Washington, 122 F.4th 740 (9th Cir. 2024) ............................................... 39

*United States v. Missouri,*
  114 F.4th 980 (8th Cir. 2024) ........................................................ 13-14, 17

*United States v. New York,*
  2025 WL 3718641 (N.D.N.Y. Dec. 23, 2025) ........................................... 35

*United States v. Ovando-Garzo,*
  752 F.3d 1161 (8th Cir. 2014) .................................................................... 27

*United States v. Washington,*
  596 U.S. 832 (2022) ....................................................... 19, 38-40, 42, 51

*Virginia v. American Booksellers Ass'n,*
  484 U.S. 383 (1988) .................................................................................... 20

*Warmington v. Bd. of Regents of Univ. of Minn.,*
  998 F.3d 789 (8th Cir. 2021) ...................................................................... 11

*Washington v. United States,*
  460 U.S. 536 (1983) .................................................................................... 38

## Federal Rules of Civil Procedure

Rule 4(m) ............................................................................................... 51-53

Rule 12(b)(1) ............................................................................................. 11

Rule 12(b)(4) ............................................................................................. 12

Rule 12(b)(5) ............................................................................................. 12

Rule 12(b)(6) ............................................................................................. 11

## Federal Statutes and Regulations

8 C.F.R. § 287.5 ................................................................................... 28, 30

8 C.F.R. § 287.7 ......................................... 2, 5, 18, 23-26, 29, 47

8 U.S.C. § 1182 ............................................................................................. 24

8 U.S.C. § 1226 ............................................................... 4, 5, 24, 25

8 U.S.C. § 1231 ............................................... 4, 22-23, 24, 38, 47

8 U.S.C. § 1306 ............................................................................................. 38

8 U.S.C. § 1357 ................................................................................... *passim*

8 U.S.C. § 1373 ......................... 2, 3, 6, 23, 35-39, 45, 47-48, 50

8 U.S.C. § 1644 ......................................................... 23, 36, 45

42 U.S.C. § 1983 ................................................................... 26, 27

## State and Local Laws

Minn. Stat. § 168.327, subd. 6 ............................................. 8, 18, 38

Minn. Stat. § 171.12 subd. 7b(e) ....................................... 8, 18, 33, 38

Minn. Stat. § 171.12 subd. 11(c) ........................................ 8, 33, 38, 41

Minn. Stat. § 171.12, subd. 11(d) ...................................... 8, 18, 33, 38

Minn. Stat. § 168.327, subd. 6 ............................................. 8, 18, 38

Minneapolis Code, chs. 19.10, 19.60(d)............................................. 8

St. Paul Code ch. 44.06(d)....................................................................... 8

## INTRODUCTION

Minnesota and the other Defendants have actively obstructed and impeded federal immigration enforcement through their laws and policies. Congress designed a comprehensive immigration scheme that allows states and localities to detain aliens for violations of their laws but in turn expects them to cooperate with the federal government by transferring aliens and providing information about them to federal authorities. Defendants' laws purposefully undermine Congress's objectives by prohibiting local law-enforcement agencies from honoring detainers, assisting with immigration enforcement under cooperative agreements, or sharing vital information. The results are disastrous. Federal immigration authorities cannot cooperate with local officials and cannot securely take dangerous aliens into custody. This Court must stop Defendants' lawless and reckless policies that put officers and the community at risk.

These dangers are not abstract or speculative. By restricting routine cooperation, information sharing, and secure custodial transfers, Defendants' laws force federal officers to locate and arrest removable aliens after they have been released into the community. Olson Decl. ¶¶ 13, 21–22. At-large arrests are inherently more dangerous than controlled transfers from secure facilities. *Id.* ¶¶ 13, 28–40, 43–47. Defendants' policies thus increase the risk of confrontation and harm to federal officers, members of the public, and aliens alike. *Id.* ¶¶ 28–40, 43–48.

The operational consequences of Defendants' laws have coincided with escalating obstruction and violence directed at federal officers carrying out lawful immigration enforcement in Minnesota. *Id.* ¶¶ 28–47. Officers have been surrounded, blocked,

1

threatened, and assaulted while attempting to execute arrests and search warrants that would have been unnecessary if secure custodial transfers were permitted. *Id.* ¶¶ 28–40. These conditions endanger not only officers but also members of the public, who are exposed to enforcement actions in uncontrolled settings. *Id.* ¶¶ 28–31, 34–37, 40, 43. These concrete safety harms underscore that Defendants' laws do far more than express policy disagreement—they reshape federal enforcement operations in ways that heighten danger and interfere with core federal functions.

The challenged measures include Article I, section 10 of the Minnesota Constitution, which the Minnesota Attorney General interprets as prohibiting civil immigration detention. The Minnesota Constitution thus effectively nullifies the federal detainer regulation, 8 C.F.R. § 287.7(d), which requires continued custody for a brief time to permit federal assumption of control. This interpretation likewise obstructs Congress's cooperative-enforcement framework under 8 U.S.C. § 1357(g)(1), which allows local law enforcement to assist in investigating, arresting, and detaining aliens voluntarily. As a result of the Attorney General's interpretation of state law, localities believe that they cannot lawfully honor detainers or engage in cooperative agreements, which has led some of them to pause existing cooperation. Olson Decl. ¶¶ 15, 19-20, 23. This uncooperativeness requires DHS officers to conduct at-large arrests and allows removable aliens to be released when otherwise they would have been transferred directly into federal custody. Compl. ¶¶ 54, 76–79, 87–89; Olson Decl. ¶¶ 13, 18, 21-22. Those consequences frustrate the federal objective of orderly and secure custody transfers.

Minnesota law, local ordinances, and policies also restrict the voluntary exchange of immigration-related information in conflict with 8 U.S.C. §§ 1373 and 1644. Certain state and local laws condition information sharing on non-use for immigration enforcement or prohibit disclosure to DHS altogether, including information concerning individuals already in state custody. Compl. ¶¶ 7-8, 55-59, 62, 65, 67, 69, 71-72, 80-83. These restrictions impede the free flow of information that Congress sought to protect, and discriminate against federal immigration authorities in violation of intergovernmental immunity principles. Congress expressly preempted such laws, and, in any event, Defendants' laws erect substantial barriers to federal policy.

Defendants' laws frustrate federally prescribed custody transfers, undermine congressionally authorized cooperative-enforcement programs, and restrict the exchange of immigration-related information. Because the challenged measures stand as obstacles to the accomplishment and execution of federal law, they are preempted under the Supremacy Clause. And the Tenth Amendment does not stand in the way of preemption. The federal laws regulate aliens, and immigration is a core federal function. The Court should deny Defendants' Motions to Dismiss.

## BACKGROUND

**A.    Federal Immigration Law and Cooperative Enforcement.**

The Immigration and Nationality Act ("INA") establishes a comprehensive federal framework governing the admission, detention, and removal of noncitizens. *Arizona v. United States*, 567 U.S. 387, 395–96 (2012). Within that framework, Congress has made clear choices about how immigration enforcement should operate when removable aliens

are encountered by state and local law-enforcement agencies in the course of ordinary criminal justice activity.

Congress has long recognized that cooperation between federal immigration authorities and state and local law enforcement is both inevitable and essential. For instance, the INA often mandates that DHS take custody of aliens "convicted of" certain crimes, but only "when the alien is released" from state custody. 8 U.S.C. § 1226(c)(1); *accord id.* § 1226(c)(3); *see also id.* § 1357(d) (authorizing immigration officials to take custody of an alien who violated "any law relating to controlled substances" if the "alien is not otherwise detained by . . . State[ ] or local officials"); *id.* §§ 1231(a)(1)(B)(iii), (a)(2)(A), (a)(4)(A) (providing that DHS "shall detain" an alien with an order of removal "[d]uring the removal period," but that if an alien "is detained or confined" by state authorities, the period does not start until "the alien is released"). So Congress allowed states first to detain, charge, sentence, and incarcerate aliens for violations of state law. But federal law often mandates that DHS take custody over aliens when they are released from state custody. Federal immigration law is thus designed to function alongside state processes by enabling federal authorities to identify removable aliens while they are in state custody and to take custody in a secure manner upon release. *Nielsen v. Preap*, 586 U.S. 392, 396–99 (2019); *Demore v. Kim*, 538 U.S. 510, 518–21 (2003).

To facilitate cooperative federalism, Congress and DHS have adopted several interlocking mechanisms. First, DHS regulations authorize immigration detainers, which permit federal officials to request notice that aliens will be released and to take them into custody for removal purposes during a brief transfer window. *See* 8 C.F.R. § 287.7(d)

(When DHS "issue[s] a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by [DHS]."); *Arizona*, 567 U.S. at 410. That mechanism reflects Congress's judgment that custody transfers from state or local detention are safer, more efficient, and less disruptive than at-large arrests. *See Demore*, 538 U.S. at 513, 518–21 (explaining that Congress mandated detention upon release from criminal custody based on concerns that release into the community posed safety and flight risks); *Nielsen*, 586 U.S. 392, 396–99 (same); 8 U.S.C. § 1226(c)(3) (requiring DHS to issue detainers in certain cases).

Second, Congress authorized DHS to enter into voluntary cooperative-enforcement agreements with state and local agencies under 8 U.S.C. § 1357(g)(1).[1] These agreements permit trained and federally supervised state or local officers to perform specified functions, including investigation, apprehension, and detention of aliens. *See Arizona*, 567 U.S. at 408–09. Participation is voluntary, but when a jurisdiction elects to participate, federal law defines the scope and operation of the delegated authority. *Id.* Cooperating local officials are thus "deputize[d]" to enforce federal immigration law under color of federal law. *United States v. Alas*, 63 F.4th 269, 274 (4th Cir. 2023).

---

[1] Section 1357(g)(1) provides that "the Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States . . . , may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law."

Third, Congress enacted 8 U.S.C. §§ 1373 and 1644 to protect the free flow of immigration-related information between state and local officials and federal immigration authorities.[2] *See City of New York v. United States*, 179 F.3d 29, 32–35 (2d Cir. 1999). Those provisions prohibit state and local governments from restricting communications with DHS regarding an individual's citizenship or immigration status. *Id.* Congress enacted these provisions to prevent States from erecting legal barriers that would interfere with federal enforcement efforts by suppressing information uniquely within state custody or control. H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.).

Together, these provisions reflect Congress's judgment that federal immigration enforcement depends on predictable custody transfers, voluntary cooperation by willing state partners, and the unimpeded exchange of information. In exchange for letting states enforce their laws first, Congress expected localities to facilitate secure custody transfers and share vital information. *Arizona*, 567 U.S. at 408.

**B.    Minnesota Law and the Attorney General's Opinions.**

Minnesota has adopted a series of statutes, local ordinances, and executive-branch legal interpretations that directly affect whether and how state and local officials may interact with federal immigration authorities. Start with Article I, section 10 of the Minnesota Constitution, which the Minnesota Attorney General's February 2025 Opinion

---

[2] Section 1373(a) provides that "Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual."

interprets as prohibiting state and local officers from exercising custodial authority for civil immigration purposes absent a judicial warrant.[3] *See* Minn. Att'y Gen. Advisory Op. 3a-20250206 (Feb. 6, 2025); Compl. ¶¶ 5, 52–54. Though styled as advisory, the Attorney General's Opinion announced a categorical constitutional rule: that state and local officers lack authority to maintain custody for civil immigration enforcement, and that federal law—including immigration detainers and § 1357(g) agreements—does not supply such authority. *See* Compl. ¶¶ 52–54. A December 2025 follow-up Opinion reaffirmed that interpretation and acknowledged that the February Opinion had prompted confusion and caused some agencies to curtail cooperation. Minn. Att'y Gen. Advisory Op. 3a-390a6 (Dec. 12, 2025).[4]

At the municipal level, Minneapolis has adopted ordinances that regulate cooperation with federal immigration authorities through restrictions on communication and information flow. Chapter 19 of the Minneapolis Code expressly states that its purpose is to govern "the communication and enforcement relationship between the city and the federal government including the United States Department of Homeland Security and other federal agencies with respect any and all efforts to [enforce] any federal civil

---

[3] Article I, section 10 provides: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or things to be seized."

[4] The December Opinion is available at https://www.ag.state.mn.us/Office/Opinions/3a-390a6_20251212.pdf. The Court may take judicial notice of the December Opinion. *Stahl v. U.S. Dep't of Agriculture*, 327 F.3d 697, 700 (8th Cir. 2003); *Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007).

immigration law." Ch. § 19.10. The chapter thus targets interactions with DHS (the agency that enforces civil immigration laws) as a distinct category, rather than regulating law-enforcement communications or information sharing generally. By structuring its provisions around DHS-specific limits on questioning, information collection, and disclosure, Minneapolis has adopted a legal regime that predictably suppresses the flow of information to federal immigration authorities.

In parallel, Minnesota statutes and local enactments impose additional restrictions on cooperation with DHS. Certain provisions condition information sharing on non-use for immigration enforcement or prohibit disclosure to DHS altogether, even when the same information may be shared with other federal or state agencies. *See*, *e.g.*, Minn. Stat. § 171.12, subds. 7b(e), 11(c)–(d); Minn. Stat. § 168.327, subd. 6; Minneapolis Code, chs. 19.10, 19.60(d); St. Paul Code ch. 44.06(d).[5]

Other local directives—including policies adopted by Hennepin County—bar compliance with immigration detainers while permitting cooperation with other law-enforcement requests. *See* Hennepin Cnty. Sheriff's Admin. Directive 21-02 ("The Hennepin County Sheriff's Office will not hold individuals in custody at the Adult Detention Center when the only documentation for that individual to be held in custody is a [DHS/ICE] Immigration Detainer. . . . ICE will not be notified of the admittance or release

---

[5] For instance, Minn. Stat. § 171.12, subd. 11(d) provides that "the commissioner or a driver's license agent must not share or disseminate any data on individuals who have applied for or been issued a noncompliant driver's license or identification card to any federal government entity that primarily enforces immigration law, except pursuant to a valid search warrant or court order issued by a state or federal judge."

of any individual based on any of these detainers."); Compl. ¶¶ 71–72, 87–88.

## C.    Harms to Federal Immigration Enforcement.

The challenged state measures have had concrete and ongoing effects on federal immigration enforcement in Minnesota. Olson Decl. ¶¶ 14–15, 20–22. As a result of the Attorney General's Opinions and related state and local restrictions, jurisdictions have ceased honoring immigration detainers and have declined to enter into or continue engaging in enforcement activity under § 1357(g) agreements. Compl. ¶¶ 5, 52–54, 76–79, 95–96; Olson Decl. ¶¶ 14–15, 20, 23. When state and local officials release removable aliens rather than transferring them directly into federal custody, DHS officers are forced to locate and arrest those individuals in the community. Compl. ¶¶ 87–89; Olson Decl. ¶¶ 13, 21.[6] At-large arrests increase risks of public confrontations; imperil officers, bystanders, and aliens; strain limited enforcement resources; and undermine Congress' objective of orderly and secure removal proceedings. *See Arizona*, 567 U.S. at 407–10; Olson Decl. ¶¶ 13, 18, 28–40, 43–48.

Those risks have materialized in Minnesota. Immigration officers conducting at-large enforcement operations have faced escalating hostility, obstruction, and violence while carrying out their lawful duties. Olson Decl. ¶¶ 28–47. They have been surrounded by crowds, blocked from leaving enforcement locations, assaulted, threatened, and subjected to dangerous interference with government vehicles and operations. *Id.* ¶¶ 28–

---

[6] Even the New York Times has recognized that sanctuary policies cause more "at-large arrests." Albert Sun, *How Many People Has Trump Deported So Far?*, New York Times (Jan. 17, 2026), https://www.nytimes.com/interactive/2026/01/18/us/trump-deportation-numbers-immigration-crackdown.html.

30, 34–40, 43–46. In multiple instances, officers have been forced to abort or alter enforcement actions due to safety concerns, resulting in delayed arrests, increased exposure to harm, and the diversion of additional federal resources to manage hostile conditions. *Id.* ¶¶ 18, 34–40. These incidents reflect the foreseeable consequences of forcing federal enforcement into public settings rather than permitting secure custodial transfers.

The loss of information sharing likewise impairs DHS's ability to identify, locate, and apprehend removable aliens in a timely manner. Compl. ¶¶ 7–8, 55–59, 62, 67–72, 80–84; Olson Decl. ¶¶ 13, 17–18. These harms are not speculative. The complaint alleges, and supporting evidence confirms, that Minnesota's laws have disrupted federally prescribed custody-transfer mechanisms, disabled congressionally authorized cooperative-enforcement programs, and suppressed information that federal law is designed to protect. Compl. ¶¶ 5–6, 54, 73–89, 96–97; Olson Decl. ¶¶ 13, 17–18, 20–21. The result is that dangerous aliens are free to endanger the public until federal officers expend significant resources to find and arrest them in public. Olson Decl. ¶¶ 13, 52. These public arrests are more volatile, often attract protests and outright obstruction, and increase the danger for officers, the public, and aliens. *Id.* ¶¶ 28–40, 43–47. They have also resulted in physical injuries to federal officers, significant damage to government property, and repeated interference with lawful federal operations. *Id.* ¶¶ 35–40, 43–47. Prior to the challenged measures, such incidents were rare; they have now become a recurring feature of immigration enforcement in Minnesota. *Id.* ¶ 43. Absent judicial relief, DHS reasonably expects these impacts to persist, further frustrating the operation of the federal immigration system as Congress designed it to function. *Id.* ¶¶ 22, 32–33.

10

## LEGAL STANDARDS

### A.    Rule 12(b)(6)

In considering a motion under Rule 12(b)(6), the Court must determine whether the complaint "contain[s] sufficient factual matter, which, when accepted as true and viewed in the light most favorable to the nonmoving party, states 'a claim to relief that is plausible on its face.'" *Perry v. Precythe*, 121 F.4th 711, 714 (8th Cir. 2024) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The complaint must be construed "liberally" and "read as a whole, not parsed piece by piece." *Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 795 (8th Cir. 2021).

### B.    Rule 12(b)(1)

Defendants also invoke Rule 12(b)(1), arguing that the Court lacks subject-matter jurisdiction over certain claims. A Rule 12(b)(1) motion can assert either a facial or factual challenge to jurisdiction. When resolving a factual attack, like the one here, the Court possesses broad authority to look beyond the pleadings, "weigh the evidence and satisfy itself as to the existence of its power to hear to the case." *Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 1990).

Defendants challenge standing by disputing the existence and traceability of the United States' alleged injuries. To the extent that their arguments turn on factual assertions about the real-world effects of the Attorney General's Opinion and the challenged laws, the Court may consider sworn evidence demonstrating those effects. The United States

accordingly has submitted a declaration showing that the challenged state actions have impaired federal enforcement efforts, causing concrete injuries. Under *Osborn*, the Court may consider this evidence in resolving the jurisdictional challenge and should deny Defendants' Rule 12(b)(1) motions.

## C.    Rules 12(b)(4) and 12(b)(5)

Minneapolis also invokes Rules 12(b)(4) and 12(b)(5), which permit dismissal for insufficiency of process or insufficiency of service of process. When a defendant brings a motion under either rule, the Court may—and typically must—consider evidence outside the pleadings, including affidavits and proofs of service, and doing so does not convert the motion into one for summary judgment. *Seretse v. Andersen Corp.*, 2013 WL 2434876, at *4 (D. Minn. June 4, 2013) (collecting cases). Although Rules 12(b)(4) and 12(b)(5) address distinct defects, courts frequently analyze service challenges under both provisions, and the distinction between them is often blurred. *Id.* (citing *Adams v. AlliedSignal Gen. Aviation Avionics*, 74 F.3d 882, 884 n.2 (8th Cir. 1996)).

On a motion to dismiss under either Rule 12(b)(4) or Rule 12(b)(5), the plaintiff bears the burden of making a prima facie showing that process and service were sufficient. *Id.* (citing *Hahn v. Bauer*, 2010 WL 396228, at *6 (D. Minn. Jan. 27, 2010)). Where the plaintiff makes that showing, the Court may consider whether any defect was technical, whether service was attempted in good faith, whether the defendant had actual notice, and whether the defect was cured—considerations that also inform the Court's analysis under Rule 4(m).

## ARGUMENT

**A.    The United States Has Standing, and this Case Is Justiciable.**

The United States has standing because it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "The United States has a legally protected interest in enforcing federal law." *United States v. Missouri*, 114 F.4th 980, 984 (8th Cir. 2024). A state impairs this interest and injures the federal government when it "withdr[aws] resources and manpower that further the enforcement of federal law." *Id.*

Here, the challenged laws and the Minnesota Attorney General's February 2025 Opinion interpreting the state constitution prevent state officials from complying with federal immigration detainers and lead them to believe that they cannot take enforcement action under 8 U.S.C. § 1357(g) agreements. Compl. ¶¶ 5, 52–54, 94–96; Olson Decl. ¶¶ 15, 19–20, 23. The challenged laws also prevent state officials from sharing immigration-status information with federal officials. Compl. ¶¶ 7–8, 56–59, 67–70, 80–83. Such sharing furthers the enforcement of federal law because immigration agents use immigration-status information to locate unlawful aliens and carry out their duty to detain and remove unlawful aliens from the United States. Because the challenged laws impair the federal government's interest in enforcing federal law in these ways, they inflict an

injury in fact. *Missouri*, 114 F.4th at 984–85.

1.    The evidence reveals that the United States' injuries are actual and ongoing, not speculative. Start with the Minnesota Attorney General's opinion that the Minnesota Constitution prohibits localities from assisting in immigration arrests and detention. As a result of this interpretation, localities have paused or declined to enter into § 1357(g) agreements because they believe that doing so would violate the state Constitution, and thus fear being sued. Compl. ¶¶ 5, 52–54, 76–79, 95–96; Olson Decl. ¶¶ 15, 20, 23. For the same reason, certain law-enforcement agencies stopped honoring immigration detainers. Compl. ¶¶ 54, 76–79, 87–89, 96; Olson Decl. ¶¶ 14–15, 19, 22–23. The refusal to enter into § 1357(g) agreements, the pausing of enforcement activity under existing agreements, and the reduced detainer compliance have required DHS to conduct more at-large arrests rather than secure custodial transfers. Olson Decl. ¶ 21. Such enforcement is less effective and more dangerous than working with localities to detain and safely transfer individuals. *Id.* ¶¶ 13, 21, 28–40, 43–47. DHS indeed must expend significant resources to investigate targets and deploy officers in the field to arrest them. *Id.* ¶¶ 13, 18. As has been seen, public actions can cause backlash and lead to unnecessary confrontations that put officers and the public at risk. *Id.* ¶¶ 24–40, 43–47. In addition, these at-large enforcement conditions have resulted in direct physical harm to DHS officers, including assaults, injuries requiring medical treatment, exposure to firearms, and vehicular attacks during enforcement operations, as well as repeated obstruction and damage to government vehicles that jeopardize officer safety and interfere with lawful federal duties. *Id.* ¶¶ 28–40, 43–47. DHS reasonably expects these impacts to persist absent judicial relief. *Id.* ¶¶ 22.

    **2.**     The United States' injury is traceable to Defendants. Minnesota argues that the Attorney General's Opinion is merely advisory and thus cannot cause harm. ECF 31 at 10. Minnesota also argues the Opinion's advisory label means that any challenge is unripe. *Id.* at 12–13. But the Attorney General is the state's chief legal officer and has "inherent *parens patriae* powers" to "maintain a legal action where state citizens have been harmed, where the state maintains a quasi-sovereign interest." *State v. Minnesota Sch. of Bus., Inc.*, 935 N.W.2d 124, 133 (Minn. 2019); *State of Minn. by Humphrey v. Standard Oil Co. (Indiana)*, 568 F. Supp. 556, 563 (D. Minn. 1983). The Minnesota Attorney General could well employ this power to bring suits against localities for violating the state constitution. In any event, some localities have paused or refused to enter into § 1357(g) agreements or honor detainers because they fear such a suit or at least treat the Minnesota Attorney General's Opinion as effectively binding. Compl. ¶¶ 5, 52–54, 76–79, 96; Olson Decl. ¶¶ 15, 19–20, 23. Absent an order invaliding the Opinion, several localities that previously were willing to honor detainers and enter into § 1357(g) agreements have indicated that they will abide by the Attorney General's interpretation of the Minnesota Constitution. Compl. ¶¶ 54, 76–77, 96.

    Moreover, Defendants challenge not only the Opinion but also the Minnesota Constitution to the extent that it conflicts with federal law. Compl. ¶¶ 91-98. Based on the Opinion, many localities believe that the constitution prohibits them from honoring detainers or adhering to § 1357(g) agreements. Compl. ¶¶ 5, 52–54, 96; Olson Decl. ¶¶ 19–20. Enjoining any enforcement of the Opinion by the Minnesota Attorney General (or enforcement of Article I, section 10 itself in this context) would redress the government's

injury. If the Attorney General's interpretation of the state constitution is right, the challenge is necessarily to the state constitution itself and any enforcement of it. The Minnesota Constitution surely is not advisory, and thus challenges to it are ripe.

Even if the Minnesota Attorney General lacked the authority to sue to enforce the state constitution, the United States would still be injured because, per the Attorney General's interpretation, the constitution prohibits localities from honoring detainers or entering § 1357(g) agreements. Again, localities likely will obey the state constitution absent judicial relief and stopped honoring detainers or participating in § 1357(g) agreements after the Opinion issued. Compl. ¶¶ 54, 76, 96; Olson Decl. ¶¶ 14, 19, 20, 23. A declaratory judgment declaring that the state constitution does not prohibit localities from honoring detainers or is preempted by federal law would thus redress the government's injury. *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992).

Minnesota argues that third party localities are choosing to abide by the Attorney General's guidance, ECF 31 at 11, but standing can exist where "third parties will likely react in predictable ways that in turn will likely injure the plaintiffs." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (quoting *California v. Texas*, 593 U.S. 659, 675 (2021)). That is the case here. Indeed, the Minnesota Attorney General issued the Opinion in response to a question about whether a county could honor DHS detainer requests. Minn. Att'y Gen. Advisory Op. 3a-20250206, at 1–2; Compl. ¶¶ 5, 52. According to the Attorney General, the answer under the Minnesota Constitution was no. The entire point of the Opinion was to advise localities and law-enforcement agencies that Minnesota law does not permit them assist the federal government with immigration arrests or

detentions. Many localities have predictably chosen to heed this advice. Compl. ¶¶ 54, 76–77, 96; Olson Decl. ¶¶ 15, 19–20, 23. Moreover, the Attorney General's December 2025 Opinion reaffirmed his prior interpretation of Article I, section 10 and acknowledged that the prior Opinion prompted confusion and induced some agencies to cease cooperation. This acknowledgement makes clear that this lawsuit is not an abstract disagreement; it is a live conflict over whether state law may prohibit voluntary cooperation with federal immigration enforcement. An injunction invalidating the challenged provisions, or a judgment declaring that they are invalid, would alter the legal landscape and redress the United States' injury. That is all that Article III requires.

3.      The United States' injury is also redressable by an injunction that blocks state officials from adhering to the challenged laws. *See Missouri*, 114 F.4th at 985. Defendants argue that the United States' injury is not redressable because detainers are mere "requests" and because local officials could choose not to cooperate even if the state provisions were enjoined. ECF 31 at 10-12. Although § 1357(g) agreements are voluntary, 8 C.F.R. § 287.7(d) mandates detention for 48 hours. Defendants have conflated their merits argument that detainers are not mandatory with standing. *See Missouri*, 114 F.at 985. And the United States has plausibly alleged that, but for the Attorney General's Opinion, localities would enter into or resume participating in § 1357(g) agreements and honor detainers. Compl. ¶¶ 76–77, 96; Olson Decl. ¶¶ 14, 19, 20, 23.

The Eighth Circuit has rejected the notion that a state can freely withdraw assistance without consequence. In *Missouri*, the court held that the federal government has a legally protected interest in enforcing federal law and that a state impairs that interest when it

"withdr[aws] resources and manpower" that facilitate enforcement. *Id.* at 984. The court concluded that an injunction against state impediments would redress the United States' injury because it would prevent the state from penalizing local officials for cooperating. Like in *Missouri*, in this case an order enjoining the challenged provisions would remove the principal legal obstacles to cooperation. Even if some local officials were reluctant to assist, the federal government need only show that relief will "partially redress" its injuries; it need not guarantee complete cooperation. *Ctr. for Biological Diversity v. Strommen*, 2021 WL 3683491, at *4 (D. Minn., Aug. 19, 2021).

    **4.**    Meanwhile, Hennepin County and St. Paul contend that they did not issue the Attorney General's Opinion and therefore cannot be blamed for the federal government's injury.[7] ECF 19 at 6–9; ECF 25 at 33–36. But as subsidiaries of Minnesota, Hennepin County and St. Paul are bound by the Minnesota Constitution. An injunction or declaratory judgment against them would clarify that the County and St. Paul must follow federal law, not contrary state law. In any event, Hennepin County's own Directive forbids honoring detainers absent a judicial warrant, which, as the County does not contest, injures the United States. St. Paul's ordinances similarly restrict detainers, § 1357(g) agreements, and information sharing, which injures the United States, as St. Paul does not contest. Even if the Attorney General's Opinion contributes to local resistance, Hennepin County's and St. Paul's policies independently obstruct federal law. And causation need not be traced

---

[7] Minnesota does not contest standing as to the United States' challenge to Minnesota Statute § 171.12, Subdivision 7b(e); Minnesota Statute § 171.12, Subdivision 11(c) and (d); and Minnesota Statute § 168.327, Subdivision 6. St. Paul does not contest standing as to its ordinances. And Hennepin County does not contest standing as to its Directive.

18

solely to one defendant; the traceability element is satisfied if each defendant's actions play a meaningful role in the plaintiff's injury. *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997).

**5.**    Minneapolis is no exception: its ordinances independently cause, and are redressably responsible for, the United States' injuries. Minneapolis argues that the United States lacks standing because any interference with federal immigration enforcement is attributable to the Minnesota Attorney General's Opinion or to discretionary choices by federal officers, rather than to Minneapolis's own law. That argument fails under settled Supremacy Clause precedent recognizing that the federal government has standing to challenge state or local enactments that independently obstruct federal operations, even where other legal or practical barriers may also exist. See *Arizona*, 567 U.S. at 399–400; *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *United States v. Washington*, 596 U.S. 832, 839–40 (2022).

Minneapolis has enacted binding ordinances that independently restrict and deter cooperation with federal civil immigration enforcement, particularly through limits on communication with DHS. Chapter 19 of the Minneapolis Code is expressly directed at regulating "the communication and enforcement relationship between the city and the federal government including the United States Department of Homeland Security and other federal agencies with respect any and all efforts to [enforce] any federal civil immigration law." Ch. 19.10. Within that framework, the City prohibits officers from questioning individuals about immigration status, from undertaking law-enforcement actions for the purpose of detecting undocumented persons, and from disclosing specified categories of information in ways that predictably impede cooperation with DHS. *See*

19

Compl. ¶¶ 60–65, 84–85. These provisions operate as binding legal constraints on officer conduct, not as discretionary guidance, and apply regardless of whether Minneapolis operates a detention facility.

Minneapolis emphasizes that it does not operate a jail and therefore cannot accept or deny immigration detainers. But the United States' standing does not rest on custodial detention alone. Independent injury arises where a municipality restricts information-sharing and communication with federal immigration authorities—conduct that federal law expressly protects. *See* 8 U.S.C. §§ 1373, 1644; Compl. ¶¶ 7–8, 55–59, 62, 84–85. By regulating communications with DHS as a distinct category, and by structuring Chapter 19 around immigration-specific restrictions, Minneapolis has imposed legal barriers that predictably impede federal enforcement operations and force federal officers to operate with less information, greater risk, and diminished effectiveness.

Minneapolis's emphasis on the absence of alleged disciplinary proceedings is also misplaced. Article III does not require the United States to wait until a city has actually disciplined an officer for cooperating with federal law before challenging a municipal regime that predictably chills such cooperation in advance. Binding rules that threaten discipline or impose categorical prohibitions alter official conduct ex ante and give rise to a cognizable injury even absent completed enforcement. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014); *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 392–93 (1988). The complaint plausibly alleges that Minneapolis's ordinances have resulted in refusals to provide information to ICE and refusals to assist in enforcement operations, thereby impeding federal immigration enforcement. Compl. ¶¶ 84–85.

Redressability is satisfied because Minneapolis's ordinances themselves impose binding restrictions on communication and cooperation with DHS, and invalidating those restrictions would remove a legal barrier that presently impedes federal enforcement. The United States does not contend that enjoining Minneapolis's ordinances would compel cooperation by every city officer or eliminate all obstacles to federal enforcement. Article III requires no such certainty. It is enough that declaratory or injunctive relief would lift municipal prohibitions that currently deter information sharing and assistance, thereby partially redressing the federal government's injury. See *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992).

## B.    Federal Law Preempts the Challenged State and Local Provisions.

The Supremacy Clause declares that federal law is "the supreme Law of the Land," overriding contrary state law. *Arizona*, 567 U.S. at 399. "Under this principle, Congress has the power to preempt state law" expressly, implicitly through field preemption, or when state law conflicts with federal law. *Id.* An unlawful conflict occurs when "compliance with both federal and state regulations is a physical impossibility," or when "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143 (1963), and *Hines*, 312 U.S. at 67). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). "Federal regulations have no less pre-emptive effect than federal statutes." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).

The INA establishes a "comprehensive federal statutory scheme for regulation of immigration and naturalization." *Chamber of Com. v. Whiting*, 563 U.S. 582, 587 (2011). To effectuate this scheme, the INA defines categories of aliens who may not be admitted to the United States, criminalizes unlawful entry and reentry, specifies which aliens may be removed from the United States and the procedures for removal, and vests federal immigration authorities with broad discretion. *See Arizona*, 567 U.S. at 395-96.

When Congress amended the INA in 1996, it found that "deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers." *Nielsen*, 586 U.S. at 398 (quoting *Demore*, 538 U.S. at 513). That said, as part of cooperative federalism, Congress permitted states to detain, sentence, and incarcerate criminal aliens before the federal government takes them into custody. 8 U.S.C. § 1231(a)(4)(A). But Congress required federal immigration agents to detain criminal illegal aliens immediately upon their release from state or local custody. *See Nielsen*, 586 U.S. at 389–99 (referencing 8 U.S.C. § 1226(c)). Congress enacted provisions authorizing DHS to issue immigration detainers (8 C.F.R. § 287.7(d)), to enter into cooperative enforcement agreements with state and local law-enforcement agencies (8 U.S.C. § 1357(g)(1)), and to guarantee the free flow of information between federal and state officials (8 U.S.C. §§ 1373, 1644). The purpose of these provisions was to make immigration enforcement safer and more efficient, promote cooperation, and ensure that federal law enforcement could gain custody of aliens who were previously in state custody. The cooperation that Congress envisioned was part of the deal struck so that states could first subject aliens to their criminal justice system.

The challenged state and local provisions and Minnesota Attorney General's Opinion conflict with these measures. First, certain items conflict with 8 C.F.R. § 287.7(d) because they prevent or discourage state and local officers from maintaining custody over the subjects of DHS immigration detainers. Second, certain items conflict with 8 U.S.C. § 1357(g)(1) because they prohibit or discourage state and local law-enforcement agencies from performing immigration-enforcement functions under § 1357(g) agreements. Lastly, certain laws conflict with 8 U.S.C. § 1373 and § 1644 because they limit information-sharing between local officials and DHS.

### 1.  Certain Challenged Laws Conflict with 8 C.F.R. § 287.7(d).

Section 287.7(a) permits certain DHS officers to issue a detainer to state and local officials to "request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible." 8 C.F.R. § 287.7(a). Generally, such detainers are voluntary "requests" to maintain custody, inform DHS, and allow DHS to gain custody of an alien. *Id.* The amount of time needed is flexible based on the request. *Id.* By contrast, § 287.7(d) provides that when DHS issues an immigration detainer for an alien already in state or local custody, the receiving agency "*shall* maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department." 8 C.F.R. § 287.7(d) (emphasis added). The provision establishes a mandatory but time-limited custody-transfer mechanism designed to ensure that removable aliens are transferred securely and efficiently into federal custody, rather than released into the community and pursued later

23

through at-large arrests.

This mechanism is part and parcel of Congress's comprehensive scheme for regulating aliens under the INA. Congress permitted states to charge and detain aliens first, provided that they then enable federal law enforcement to gain custody over the aliens later. 8 U.S.C. § 1231(a)(4)(A); 8 U.S.C. § 1226(c)(1). Indeed, in certain circumstances, such as when an alien has committed a listed crime and is inadmissible under 8 U.S.C. § 1182(a)(6)(A), (C), or (7), DHS "shall issue a detainer," and when the alien is no longer "detained by . . . State[ ] or local officials, shall effectively and expeditiously take custody of the alien." 8 U.S.C. § 1226(c)(3). Some minimal cooperation from states is necessary for this cooperative federalism scheme to work; otherwise, states could use their position to impede federal enforcement.

The Minnesota Constitution—as interpreted by the Minnesota Attorney General's February 2025 Opinion—together with local policies such as the Hennepin County Sheriff's Directive, has the practical effect of preventing or deterring state and local officials from adhering to the custody-transfer mechanism by signaling that continued custody pursuant to a detainer, absent a judicial warrant, is unlawful under state law. *See* Compl. ¶¶ 5, 52–54, 71, 76, 96. The Attorney General interpreted the state constitution as prohibiting state and local authorities from detaining someone longer than state charges would allow, thus making it unconstitutional for local officials to honor detainers. *See* Compl. ¶¶ 52–53; Olson Decl. ¶¶ 17–18, 20. As a result, jurisdictions have ceased honoring detainers, federal agents have been forced to conduct at-large arrests, and removable aliens have been released who otherwise would have been transferred directly to federal custody.

*See* Compl. ¶¶ 73, 76–79, 87–89; Olson Decl. ¶¶ 9–14, 17–20. The Hennepin Directive explicitly refuses to honor detainers, and the Sheriff's Department will not even notify ICE of a criminal alien's release absent a judicial warrant. These laws undermine Congress's carefully balanced scheme and frustrate the federal objective of orderly custody transfers embodied in § 287.7(d) and 8 U.S.C. § 1226(c). *See* Compl. ¶¶ 92–93.

Defendants respond that immigration detainers are mere "requests," pointing to § 287.7(a), which describes a detainer as "a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody." 8 C.F.R. § 287.7(a); ECF 19 at 9-13; ECF 25 at 9-21; ECF 31 at 21-25. But Defendants ignore that subsection (a) speaks to all detainers regardless of time, while, by contrast, subsection (d) dictates that an agency "shall maintain custody" for a defined period to permit federal officials to assume custody. 8 C.F.R. § 287.7(d). The regulation thus contemplates a two-step process: a request that DHS be notified of an impending release, followed—if a detainer is lodged—by a short, mandatory period of continued custody to effectuate transfer. Reading subsection (a) to nullify subsection (d) would collapse that structure and render subsection (d) a dead letter.

Defendants attempt to reinforce their textual argument by invoking nonbinding cases that describe immigration detainers as "voluntary," but those cases do not control the Supremacy Clause analysis here. Relying on the premise that federal law does not compel state or local compliance, Defendants cite decisions such as *Galarza*, *United States v. California*, and *McHenry County* to argue that detainers cannot conflict with state measures that discourage or restrict cooperation. ECF 31 at 22–25. That argument conflates distinct

doctrines and misunderstands both what those decisions held and the nature of the conflict-preemption claim asserted in this case.

The cited cases addressed whether federal law affirmatively requires state or local officials to honor detainers or provide assistance, often in the context of damages liability (*Galarza*) or anti-commandeering principles (*California* and *McHenry County*). *Galarza v. Szalczyk*, 745 F.3d 634, 636 (3d Cir. 2014); *United States v. California*, 921 F.3d 865, 887–88 (9th Cir. 2019); *McHenry County v. Raoul*, 44 F.4th 581, 587–88 (7th Cir. 2022). They did not consider whether a State may, consistent with the Supremacy Clause, adopt legal rules or authoritative interpretations that operate in practice to deter, prevent, or penalize voluntary compliance with a federally prescribed custody-transfer mechanism once a detainer has issued. Nor did they examine the effect of a state attorney general's binding constitutional interpretation that chills cooperation by warning that continued compliance may expose local officials to state-law consequences.

The distinction matters. The United States does not contend that federal law compels state participation in immigration enforcement. The claim is that state law may not stand as an obstacle to the operation of a federal regulatory scheme that expressly contemplates brief continued custody to facilitate federal assumption of control. Even where participation is not mandatory, state measures may violate the Supremacy Clause if they prevent or deter voluntary cooperation in a manner that frustrates Congress's objectives. *Hines*, 312 U.S. at 67.

Federal regulations expressly provide that, when a detainer issues, the receiving agency "shall maintain custody" of the alien for a limited period to permit DHS to assume

custody. 8 C.F.R. § 287.7(d). State interpretations and policies that, as a practical matter, foreclose that option—by signaling that continued custody pursuant to a detainer is unlawful under state law or may expose officials to state-law consequences—nullify the federal mechanism that Congress and DHS adopted. They force federal officers to attempt arrests in the community, frustrate orderly custody transfers, and undermine the federal enforcement framework. That is the essence of obstacle preemption.

Nothing in *Galarza*, *California*, or *McHenry County* holds that a state may, consistent with the Supremacy Clause, take steps that impede the operation of a federal regulatory scheme. Nor do they hold that the absence of federal compulsion confers a license to obstruct federal objectives through state-law prohibitions or authoritative legal interpretations that chill cooperation. Accordingly, Defendants' "voluntariness" cases do not defeat Count One. The United States' claim turns on whether state law obstructs federal objectives. On that question, the complaint plausibly alleges a direct conflict, and dismissal is unwarranted.[8]

---

[8] St. Paul, Hennepin County, and Minneapolis briefly argue that honoring detainers would violate the Fourth Amendment. ECF 19 at 17-18; ECF 25 at 18; ECF 37 at 38-39. One case on which they rely concluded that an individual was held without probable cause; the other held that a locality had an illegal policy to detain based on race. *See Orellana v. Nobles Cnty.*, 230 F. Supp. 3d 934, 944-46 (D. Minn. 2017); *Parada v. Anoka Cnty.*, 332 F. Supp. 3d 1229, 1243 (D. Minn. 2018). Neither decision precludes honoring detainers generally. Immigration administrative warrants are consistent with the Fourth Amendment and have a long pedigree. *See Abel v. United States*, 362 U.S. 217, 233 (1960); *Lopez v. INS*, 758 F.2d 1390, 1393 (10th Cir. 1985) (aliens "may be arrested to administrative warrant issued without order of a magistrate"); *United States v. Ovando-Garzo*, 752 F.3d 1161, 1164 (8th Cir. 2014). And local law enforcement can rely on federal officers' probable cause findings under the collective-knowledge doctrine. *See Mendoza v. ICE*, 849 F.3d 408, 419 (8th Cir. 2017) ("County employees . . . reasonably relied on [ICE agent's] probable cause determination for the detainer.").

## 2. The Minnesota Constitution as Interpreted by the Attorney General's Opinion Conflicts with 8 U.S.C. § 1357(g)(1).

The Minnesota Constitution, as interpreted by the Attorney General's February 2025 Opinion, conflicts with 8 U.S.C. § 1357(g)(1) because it operates to prohibit or materially discourage state and local agencies from carrying out the core immigration-enforcement functions that Congress authorized through § 1357(g) agreements. Section 1357(g)(1) reflects Congress's judgment that the Secretary of Homeland Security may enter into written agreements with states and localities under which qualified state or local officers may perform specified "function[s] of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States" under federal supervision. Section 1357(g) agreements were intended "to deputize local law enforcement officers to perform immigration enforcement activities pursuant to a written agreement," namely to assist in arrests, issue detainers, detain and transport aliens, gather evidence, and prepare Notices to Appear. *Alas*, 63 F.4th at 274 (quotation omitted); *see* 8 C.F.R. § 287.5. "Under these agreements, state and local officials become de facto immigration officers, competent to act on their own initiative." *City of El Cenizo v. Texas*, 890 F.3d 164, 180 (5th Cir. 2018). Congress thus created a cooperative enforcement framework designed to expand federal immigration enforcement capacity through voluntary state participation, while ensuring that the scope of delegated authority would be defined by federal law.

By interpreting Article I, section 10 of the Minnesota Constitution as categorically precluding state and local officers from exercising arrest or custodial authority in connection with civil immigration enforcement, even when acting pursuant to a federally

approved § 1357(g) agreement, the Minnesota Attorney General has deprived such agreements of their central operational effect. The Attorney General's Opinion does not merely state that local law-enforcement agencies are not required to participate in § 1357(g) programs. Instead, it asserts a constitutional limitation that disables law-enforcement agencies from performing the very enforcement functions—apprehension and detention under federal supervision—that Congress expressly contemplated and authorized when it enacted § 1357(g)(1). Indeed, the Opinion obstructs the ability of the federal government to deputize willing local law enforcement, thereby frustrating Congress's objectives.

Defendants respond by contending that no conflict exists because the Attorney General's Opinion does not address § 1357(g) agreements at all, is nonbinding, and merely reflects Minnesota's lawful choice not to assist in federal immigration enforcement. ECF 25 at 16–17; ECF 31 at 17-18. Minnesota emphasizes that the Opinion concerns immigration detainers and custodial authority under state law, not deputation agreements, and therefore cannot interfere with § 1357(g). The state further argues that § 1357(g)(1) does not itself confer arrest or detention authority absent independent state authorization, and that any reduction in cooperation reflects voluntary state choice protected by the Tenth Amendment.

Those arguments misconceive both the nature of the Attorney General's Opinion and the conflict-preemption inquiry. *First*, conflict preemption asks whether state law, as authoritatively construed and applied, "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67. Here, the Attorney General did not merely opine on detainers in isolation. He announced a

categorical constitutional rule that Minnesota officers lack custodial authority for civil immigration purposes and that federal law, including § 1357(g)(1), does not supply such authority. That interpretation directly undercuts the operational premise of § 1357(g) agreements, which Congress enacted to allow qualified state officers to carry out federal immigration functions, including detention, under federal supervision. In any event, Minnesota's Constitution, not the Attorney General's Opinion, is what really matters. If the Attorney General's interpretation is right (as localities believe), then state law bans § 1357(g) agreements.

*Second*, the Opinion's nonbinding label does not defeat conflict preemption. Courts assess practical effect, not semantics. *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 636–37 (2013). The Complaint plausibly alleges, and the Attorney General's December 2025 follow-up Opinion confirms, that localities understood the prior Opinion's constitutional interpretation to foreclose custodial participation in civil immigration enforcement, and curtailed or abandoned § 1357(g) participation accordingly. Compl. ¶¶ 52–54, 76, 94, 96. As noted, there is reason to believe that the Attorney General could enforce this understanding. In any event, a state rule need not compel action to conflict with federal law; "a sufficient conflict exists if it interferes with the methods by which the federal statute was designed to reach [its] goal." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987).

*Third*, Minnesota argues that the Opinion disclaimed any opinion on § 1357(g) agreements. ECF 31 at 8 n.5. But § 1357(g) agreements typically allow local officials to investigate, arrest, and detain individuals for civil immigration violations. *See* 8 C.F.R. § 287.5; *Arizona*, 567 U.S. at 410, 413. Meanwhile, under the Attorney General's

interpretation of the state constitution, local law enforcement cannot assist with civil arrests or detention. Under Minnesota law, "a contract violating law or public policy is void." *Farmers Ins. Exch. v. Hjelle*, 2015 WL 303658, at *6 (Minn. Ct. App. Jan. 26, 2015). The Opinion thus effectively voids § 1357(g) agreements in Minnesota, notwithstanding its purported reservation of the issue.

*Fourth*, while state law plays a role in regulating local law-enforcement agencies that enter into § 1357(g) agreements, it cannot functionally ban such agreements by prohibiting the conduct that such agreements authorize. Again, § 1357(g) agreements deputize local law enforcement to "become de facto immigration officers, competent to act on their own initiative." *El Cenizo*, 890 F.3d at 180. Local officers gain immigration-enforcement authority and "shall be considered to be acting under color of *Federal authority* for purposes of *determining the liability, and immunity from suit*, of the officer or employee in a civil action brought under Federal or State law." 8 U.S.C. § 1357(g)(8) (emphasis added); *Silva v. United States*, 866 F.3d 938, 942 (8th Cir. 2017). States cannot completely obstruct the deputization mechanism by effectively banning the functions that Congress intended § 1357(g) agreements to confer.

*Fifth*, Defendants' reliance on the voluntariness of § 1357(g) agreements likewise misses the point. The United States does not contend that Minnesota law-enforcement agencies must participate in § 1357(g) programs. Rather, the United States contends that Minnesota may not disable the very custodial authority that Congress made available if local law-enforcement agencies choose to participate. Voluntariness addresses whether participation is compelled; it does not authorize a State to redefine or nullify the substance

of a federal program in a manner that renders participation functionally impossible. Doing so impedes the federal government's ability to deputize willing participants. As the Supreme Court has made clear, even if federal law does not compel state participation, state measures are preempted when they threaten to frustrate federal statutory objectives or undermine the operation of a federal scheme. *Crosby*, 530 U.S. at 366, 373–74.

Accordingly, the United States has plausibly alleged that the Attorney General's Opinion operates as an obstacle to the purposes and objectives of § 1357(g)(1). At the pleading stage, that is sufficient to state a claim for conflict preemption. Dismissal of Count One is therefore unwarranted.

### 3. Minnesota and the Cities' Information-Sharing Restrictions Conflict with 8 U.S.C. §§ 1373 and 1644.

Sections 1373 and 1644 prohibit any state or local government from enacting laws or policies that restrict the exchange of "information regarding the citizenship or immigration status" of any individual with federal immigration authorities. 8 U.S.C. §§ 1373(a)–(b), 1644. Congress enacted these provisions to ensure that state and local officials remain free to communicate with DHS about the presence, whereabouts, and activities of aliens, and to prevent States from imposing gag rules that impede federal immigration enforcement. *New York*, 179 F.3d at 35–36. Again, this cooperation is a key part of the INA. Congress allowed states to detain aliens before federal immigration authorities but required states to provide information about the aliens whom they detain, their status, and when they will be released.

Several state statutes and local ordinances conflict with that objective. For example,

Minn. Stat. § 171.12 subd. 7b(e) and subd. 11(d) restricts the circumstances under which the Department of Transportation may share information about holders of "noncompliant" driver's licenses—individuals who have not demonstrated lawful presence—with federal authorities. Minn. Stat. § 171.12 subd. 11(c) permits disclosure of such information only to state and federal agencies that do not enforce immigration law, expressly barring voluntary sharing with DHS. St. Paul ordinances similarly restrict the saving and sharing of immigration information with DHS. Part III, Title III, Chapter 44.01(a), 44.02(a)(2), 44.06(d). The Hennepin County Sheriff's Administrative Directive expressly states that "ICE will not be notified of the admittance or release of any individual based on any of these detainers." And Chapter 19 of the Minneapolis Code explicitly governs "the communication and enforcement relationship between the city and the federal government including the United States Department of Homeland Security and other federal agencies with respect any and all efforts to [enforce] any federal civil immigration law." Ch. 19.10. The challenged ordinances prevent officers from verifying immigration status and prohibit the disclosure of "personal information of victims," even if the information is immigration-status information. Ch. 19.30(a)(1), (3); 19.60(a)(1), (d). These measures selectively suppress information that is critical to federal immigration enforcement in violation of express federal preemption and operate in practice to obstruct the communication channels that §§ 1373 and 1644 were enacted to protect.

### a. The Laws are Expressly Preempted.

The information-sharing prohibitions in the sanctuary policies violate express federal law. Compl. ¶¶ 32, 103, 110, 125. Section 1373(a) provides that a "State[] or local

government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to" federal immigration officials "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *See also* 8 U.S.C. § 1644 (similar). The challenged laws clearly run afoul of that prohibition by withholding information on immigration status, including release dates and detention.

Minneapolis argues that its ordinances do not restrict information sharing, but rather simply limit certain inquiries by local officers. That distinction fails as a matter of substance. Federal law protects the ability of local officials to communicate information to DHS; it does not condition that protection on how the information is obtained or whether a particular inquiry is formally permitted. A state or local government may not evade §§ 1373 and 1644 by prohibiting questions, forbidding the recording or maintenance of information, or restricting disclosure of information once obtained, where the practical effect is to suppress communications with DHS. *See New York*, 179 F.3d at 35–36.

Minneapolis's own Code confirms that suppression is the point. Chapter 19 is directed at regulating communications with DHS, not at governing information sharing across the board. Ch. § 19.10. When a municipality adopts immigration-enforcement-specific restrictions on questioning, collection, and disclosure, it erects legal barriers to communication that Congress expressly forbade. Labels cannot obscure function: laws that predictably prevent information from being conveyed to DHS conflict with §§ 1373 and 1644 regardless of whether they are styled as inquiry restrictions rather than disclosure bans. *See Arizona*, 567 U.S. at 408–10.

Defendants also argue that Sections 1373 and 1644 should be construed narrowly

34

to reach only a person's formal "citizenship or immigration status," excluding contact information, release dates, or similar data. ECF 19 at 15-16; ECF 25 at 18-19; ECF 31 at 25-27; ECF 37 at 33-36. Defendants rely on *United States v. New York*, 2025 WL 3718641, at *7 (N.D.N.Y. Dec. 23, 2025), and *United States v. Illinois*, 796 F. Supp. 3d 494, 518 (N.D. Ill. 2025), which read the statutes in that limited manner.

Defendants are incorrect. The statutory text, structure, and purpose confirm that "information regarding the citizenship or immigration status" of an individual encompasses information that bears directly on that status. The term "regarding" has a "broadening effect," ensuring coverage not only of the subject itself but also of matters relating to it. *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717–18 (2018). Congress's choice to include the "information regarding" modifier in §§ 1373(a) and (b), but not in § 1373(c), further indicates an intent to sweep more broadly. *Loughrin v. United States*, 573 U.S. 351, 358 (2014); *Russello v. United States*, 464 U.S. 16, 23 (1983). Legislative history confirms that understanding. Congress enacted § 1373 to ensure communication "regarding the presence, whereabouts, or activities of illegal aliens." H.R. Rep. No. 104-725, at 383 (1996); *see also* S. Rep. No. 104-249, at 19-20 (1996). Minnesota's laws frustrate that purpose by preventing state officials from sharing precisely the information that DHS needs to locate and apprehend removable aliens.

The information restricted by these laws is clearly covered by the preemption provision in any event. The laws prohibit the sharing of information about non-compliant license applicants, which generally means individuals who lack lawful immigration status. The restricted information includes the applicant's address, which can bear on status. *See*

8 U.S.C. § 1306(b) (failing to notify the federal government of a new address, *see* 8 U.S.C. § 1305, subjects an alien to mandatory detention and removal). The St. Paul ordinances are even broader and clearly encompass such information. Minneapolis's ordinances similarly prevent officers from inquiring about immigration status or disclosing the "personal information of victims," including immigration-status information. Ch. 19.30(a)(1), (3); 19.60(a)(1), (d).[9] And the Hennepin County Directive restricts information on release dates. Hennepin County says that release dates are not immigration-status information, but they directly bear on immigration status because aliens are allowed to remain in the country until they are released by state officials. *See* 8 U.S.C. § 1231(a)(1)-(4). Release by state officials thus changes the detained person's immigration status. Given the breadth of Sections 1373 and 1644, they preempt the information-sharing restrictions at issue here.

### b. The Laws are Obstacle Preempted.

Even if Defendants' construction were correct, it would not defeat the United States' claim. Obstacle preemption does not turn on the narrowest conceivable parsing of statutory language. Under settled Supreme Court precedent, state law is preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67; *Arizona*, 567 U.S. at 399. The inquiry is functional and

---

[9] St. Paul and Minneapolis claim that their ordinances do not prevent officials from sharing immigration status and related information, and do not conflict with federal law because they contain savings clauses. ECF 25 at 18-19; ECF 37 at 36-37. But this assertion is inconsistent with ICE's experience. If the cities were willing to stipulate that their employees can freely convey immigration-status information to DHS, the United States would consider dismissing its claim as to the city ordinances.

practical: whether the challenged state measures interfere with the operation of the federal scheme that Congress adopted. *Crosby*, 530 U.S. at 373.

Here, Congress's objective is clear. Sections 1373 and 1644 were enacted to ensure that state and local officials may communicate freely and voluntarily with federal immigration authorities, without fear of state-law penalties or restrictions. State measures that prohibit, condition, or selectively suppress such communication—particularly where they single out DHS for disfavored treatment—stand as obstacles to that objective. That is precisely what the challenged laws do.

Defendants' provisions do not merely reflect a passive decision not to assist federal immigration enforcement. They affirmatively prohibit or restrict voluntary communication with DHS while permitting or encouraging communication with other agencies. That selective suppression of information materially impairs DHS's ability to carry out its statutory duties and undermines Congress's objective of ensuring free communication between state and federal immigration officials. While it is voluntary for individual officials to share information, a state or locality may not enact laws that obstruct federally protected channels of communication or selectively gag state officials in a manner that frustrates federal objectives. *Hines*, 312 U.S. at 67; *Arizona*, 567 U.S. at 399. As the complaint and Olson Declaration make clear, when state and local authorities withhold immigration-status information or fail to notify ICE of release dates, federal officials lose timely visibility into when removable individuals will be released from custody, making it significantly more difficult to take them into federal custody at the point of release and forcing officers instead to locate and arrest them later in the community, even where federal

law requires detention. Compl. ¶¶ 71, 76–79, 87–89; Olson Decl. ¶¶ 13, 21–22. The impediment exists even with respect to information about driver's licenses and other information that states possess. But it is especially true with respect to information about aliens who are detained by states and localities, as they can detain aliens first and then impede federal enforcement by withholding key information, as Hennepin County does. This noncooperation undermines the federalism balance embodied in the INA, which allows states to first detain aliens but then requires DHS to obtain custody after release. The challenged laws do not merely decline assistance; they actively obstruct federal immigration enforcement, especially when taken together.

C.      **The Challenged Provisions Violate the Intergovernmental Immunity Doctrine.**

The intergovernmental immunity doctrine "generally immunizes the Federal Government from state laws that directly regulate or discriminate against it." *Washington*, 596 U.S. at 835 (citing *South Carolina v. Baker*, 485 U.S. 505, 523 (1988)). Discrimination exists where a State "single[s] out the Federal Government for unfavorable treatment" or "treats someone else better than" the federal government. *Id.* at 839; *Washington v. United States*, 460 U.S. 536, 545-46 (1983).

The challenged laws and policies single out and discriminate against the federal government. Minnesota Statutes § 171.12, Subdivision 7b(e), Subdivision 11(c)-(d), and § 168.327, Subdivision 6 allow Minnesota's Department of Transportation to share information regarding persons seeking non-compliant driver's licenses except "for civil immigration enforcement purposes" or to a "federal government entity that primarily enforces immigration law." The Hennepin County Sheriff's Directive expressly says that

38

the department will not hold someone pursuant to a "[DHS/ICE] Immigration Detainer" and that "ICE will not be notified of the admittance or release of any individual based on any of these detainers." St. Paul Code of Ordinances, Part III, Title III, Chapter 44 makes clear that the entire Chapter restricts "the communication and enforcement relationship between the city and [DHS] and other federal agencies with respect to the enforcement of civil immigration laws." Ch. 44.01. So does Chapter 19 of the Minneapolis Code; the entire chapter governs "the communication and enforcement relationship between the city and the federal government including the United States Department of Homeland Security and other federal agencies with respect any and all efforts to [enforce] any federal civil immigration law," but does not restrict the communication and enforcement relationship with state or local authorities. Ch. 19.10.  Each of these laws explicitly singles out federal immigration-enforcement agencies for disfavored treatment compared to state and local agencies. Such discriminatory treatment, just because Defendants disapprove of federal immigration law, is patently unconstitutional. *See Washington*, 596 U.S. at 839; *United States v. King Cnty., Washington*, 122 F.4th 740, 757–58 (9th Cir. 2024) (rejecting argument that "significant differences" between ICE, whose flights carried out deportations, and other charterers justified inconsistent treatment).

Relying primarily on nonbinding cases, Defendants contend that discrimination requires proof that the federal government is treated worse than some other actor, and that neutral prohibitions applicable to all requesters cannot be discriminatory. ECF 19 at 18–19; ECF 25 at 29–32; ECF 31 at 28–30; ECF 37 at 44–47. Defendants thus argue that restrictions targeted at federal immigration authorities cannot be discriminatory so long as

39

the state does not treat all federal officers differently from state or local officers. That argument misstates governing doctrine and fails on its own terms.

Minneapolis's attempt to characterize its ordinances as neutral inquiry restrictions does not defeat the United States' intergovernmental-immunity claim. Discrimination does not require an express prohibition on all information sharing; it is enough that a law singles out a federal function or federal agency for unfavorable treatment. *See Washington*, 596 U.S. at 839–40. Chapter 19 is expressly concerned with communications involving civil immigration enforcement, not with law-enforcement communications generally. Ch. § 19.10. By imposing immigration-enforcement-specific limits on questioning, information collection, and disclosure—while permitting similar conduct for other law-enforcement purposes—Minneapolis has discriminated against the federal government in the performance of a core federal function. *See North Dakota v. United States*, 495 U.S. 423, 435–38 (1990).

More broadly, Supreme Court precedent does not impose a precise comparator rule. The Court has framed the inquiry as whether a state has singled out the federal government or a federal function for less favorable treatment, not whether the favored comparator is private or state-level. *Id.* at 438 (asking whether the state "treats someone else better than" the federal government); *Washington*, 596 U.S. at 839 (prohibiting laws that "singl[e] out the Federal Government for unfavorable treatment"). Nothing in that precedent suggests that discrimination disappears merely because the state disfavors one federal function while permitting cooperation with others. Instead of needing a direct comparator, discrimination exists unless there are "*significant* differences between the two classes justify[ing] the

differential treatment." *Dawson v. Steager*, 586 U.S. 171, 176 (2019) (emphasis added). Policy differences and preference by the state as to part of the federal government does not pass muster. *See King County*, 122 F.4th at 757–58; *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014). When a state targets a discrete federal mission—here, immigration enforcement—for special burdens or exclusions, it singles out the federal government in a constitutionally relevant way.

In any event, the challenged provisions satisfy Defendants' proposed comparator rule as well. Minnesota law affirmatively permits information sharing and cooperation with state agencies, local agencies, and federal entities that do not enforce immigration law, while withholding that cooperation when the same information or assistance would be provided to DHS. For example, Minn. Stat. § 171.12, subd. 11(c) authorizes disclosure of driver's-license data to state agencies and "a federal government entity that does not enforce immigration law" but expressly forbids disclosure to a "federal government entity that primarily enforces immigration law." Minnesota speaks out of both sides of its mouth, claiming there is no comparator because only the federal government engages in immigration enforcement but also claiming that its laws apply equally to a null set of state entities engaging primarily in immigration law. ECF 31 at 28-29. Defendants cannot avoid discrimination by making the law apply to non-existent actors. In effect, the laws regulate only the sharing of information with the federal government.

And it cannot be that states can discriminate against the federal government by

41

targeting uniquely federal functions.[10] That would give states *more* leeway to target federal functions, completely undermining the point of intergovernmental immunity. For example, a locality cannot discriminate against the federal government by banning military recruiting even though it is a uniquely federal function. *See United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010). The intergovernmental immunity doctrine exists precisely to prevent states from leveraging their control over information, custody, or instrumentalities to impede federal functions they disfavor. *Washington*, 596 U.S. at 839. The statutes here do just that by treating non-federal actors and non-immigration authorities more favorably than federal immigration officials, satisfying any plausible comparator requirement.

Local implementation confirms the discriminatory structure. The Hennepin County Sheriff's Directive permits cooperation with a wide range of law-enforcement requests—including criminal warrants and non-immigration detainers—while categorically barring compliance with immigration detainers or the sharing of release information for immigration purposes. The Directive therefore treats state and local law-enforcement partners more favorably than DHS when seeking access to the same information or the same individuals. That is discrimination in practice, not merely in theory.

Defendants respond that any disparate impact on federal immigration enforcement is irrelevant because Minnesota is merely declining to assist and because increased federal

---

[10] This logic does not hold up in other anti-discrimination contexts. For example, discriminating on the basis of pregnancy is unlawful because only women can get pregnant. *See Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 676 (1983); *Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 667 (6th Cir. 2000). This is so even though such discrimination does not affect a similar comparator or even all women.

enforcement burdens cannot establish discrimination. But intergovernmental immunity does not turn on whether a state characterizes its conduct as noncooperation. The doctrine forbids states from imposing special disabilities on federal operations or from selectively withholding generally available assistance in a manner that disfavors the federal government. *North Dakota*, 495 U.S. at 435–38. Where, as here, a state allows cooperation and information sharing across the board except when the request comes from federal immigration authorities, the state has imposed a discriminatory condition on federal operations. And, again, the government has explained how this lack of cooperation harms the federal government.

Accordingly, the challenged provisions impermissibly discriminate against the federal government and its immigration authorities. They single out federal immigration enforcement for uniquely adverse treatment, both as compared to state and local actors, and do so through binding legal rules rather than ad hoc discretion. That differential treatment violates the intergovernmental immunity doctrine. Counts Six through Nine therefore state a valid claim under the Supremacy Clause.

**D.      The Federal Provisions Do Not Violate the Tenth Amendment.**

Defendants contend that the federal provisions at issue—8 U.S.C. §§ 1373, 1644, 1357(g)(1), and the detainer regulation—run afoul of the Tenth Amendment because they regulate the state and commandeer its officials. ECF 19 at 13-14; ECF 31 at 14-20; ECF 25 at 21-28; ECF 37 at 41-43. That argument misapprehends both the scope of the anticommandeering doctrine and the nature of the federal provisions at issue. The federal provisions do not affirmatively compel Minnesota or its political subdivisions to legislate

43

or administer a federal program. Federal law either regulates aliens and prevents states and localities from impeding immigration enforcement or seeks voluntary cooperation that a state cannot outright ban. Immigration law is a power granted to the federal government, so states cannot interfere with it. *Arizona*, 567 U.S. at 394. Yet Defendants would flip the Constitution on its head by giving states and localities an unfettered right to impede federal immigration. Under their view, it is difficult to see how Congress could ever expressly preempt contrary state laws, as doing so would be "a regulation on the state." In any event, anticommandeering principles do not apply to the United States' conflict preemption or intergovernmental immunity claims.

The anticommandeering doctrine, as articulated in *New York v. United States*, 505 U.S. 144 (1992), *Printz v. United States*, 521 U.S. 898 (1997), and *Murphy v. NCAA*, 584 U.S. 453, 477 (2018), prohibits Congress from requiring states to enact legislation or from conscripting state officials to enforce a federal regulatory program. But the doctrine does not prohibit Congress from regulating federal operations, authorizing voluntary cooperation, or preventing states from erecting legal barriers that interfere with the execution of federal law. None of the federal provisions challenged here compel state action in the manner condemned by *New York*, *Printz,* or *Murphy*. As the Second Circuit made clear, "the Tenth Amendment's shield against the federal government's using state and local governments to enact and administer federal programs" cannot be converted "into a sword allowing states and localities to . . . frustrate[ ] federal programs." *New York*, 179 F.3d at 35. That is precisely what Defendants laws and policies do; they actively seek to

44

frustrate federal immigration enforcement. The Tenth Amendment does not allow states to subsume the Supremacy Clause in this way.

**1.**     Start with section 1357(g)(1), which is a paradigmatic example of non-commandeering legislation. It authorizes the Secretary of Homeland Security to enter into written agreements with states and localities under which qualified state or local officers may perform specified immigration-enforcement functions. Participation is entirely voluntary, and the statute neither requires law-enforcement agencies to enter into such agreements nor obligates officers to carry out federal functions. Defendants themselves emphasize this voluntariness in arguing that § 1357(g)(1) does not compel participation. That concession is fatal to any claim of commandeering. What a state cannot do is functionally prohibit its localities from voluntarily entering into § 1357(g) agreements. Doing so would inhibit the federal government from "deputiz[ing] local law enforcement officers" to act as federal immigration officers. *Alas*, 63 F.4th at 274. The Minnesota Constitution thus unconstitutionally regulates the federal government's ability to deputize officers for federal purposes, and the federal government is not commandeering those officers because their participation is voluntary.

**2.**     The detainer regulation, 8 C.F.R. § 287.7(d), likewise does not commandeer state officials. It governs the mechanics of federal custody transfer once a detainer has issued, specifying the time during which federal authorities may assume custody. This carries out a key function of Congress's comprehensive scheme to regulate *aliens* in the INA, not state legislatures. *See Arizona*, 567 U.S. at 396. Congress could have directed that any removable aliens be immediately taken by federal authorities but instead agreed to let

states subject aliens to their criminal justice systems first as part of cooperative federalism. *See* 8 U.S.C. § 1231(a)(4)(A). In return, Congress imposed certain conditions on states, such as allowing regulations for short-term mandatory detainers so that federal officials can safely gain custody, and information sharing provisions under Sections 1373 and 1644.

Defendants are actively undermining this scheme and impeding federal enforcement by trying to have it both ways: they get to detain aliens for their own criminal justice ends but then prohibit detainers or information sharing with federal officials to carry out their lawful duties. This is not the deal that Congress struck when it allowed states to take aliens first. Instead, this flips Congress's scheme on its head and allows states like Minnesota to obstruct and thwart federal immigration enforcement. The Tenth Amendment does not sanction such conduct. Indeed, the Tenth Amendment is informed by history. *See Printz*, 521 U.S. at 905. And the federal government has long been able to order the transfer of state prisoners, including aliens. *See Carbo v. United States*, 364 U.S. 611, 620 (1960) (noting the long pedigree of the use of the writ of *habeas corpus prosequendum* to allow federal prosecution of state prisoners); Act of July 6, 1798, ch. 66, §§ 2-3, 1 Stat. 577, 577-578 (authorizing state courts to issue orders to "apprehend[ ]" potentially deportable enemy aliens and adjudicate their deportability but requiring a federal marshal to execute the removal). By Defendants' logic, they could also ignore federal habeas or a federal judicial warrant because those instruments tell the state to transfer a criminal. The reality is that the preemptive federal laws do not require states to enact legislation, alter their enforcement priorities, or administer a federal program. At most, they prescribe how federal officers may take custody of aliens already in state or local detention—a quintessential regulation

of federal enforcement operations, not a conscription of state officials.

**3.** Sections 1373 and 1644 also fall well outside the anticommandeering prohibition and regulate aliens, not state legislatures. First, the information sharing provisions regulate aliens and do not require state legislatures to do anything. As the Supreme Court stated in *Murphy*, "language might appear to operate directly on the States" but in substance merely prevents the states from obstructing federal regulation of private parties. 584 U.S. at 478 (discussing 49 U.S.C. app. § 1305(a)(1) (1988)). In substance, and considering their place in the broader statutory scheme, sections 1373(a) and 1644 are components of the INA's regulation of the detention and removal of *aliens*—a regulatory system that "certainly confers rights and places restrictions on large numbers of private persons." *New York v. DOJ*, 951 F.3d 84, 114 n.27 (2d Cir. 2020). Fundamentally, the information is about aliens and pertains to the federal government's authority and ability to detain and remove them.

Second, the provisions certainly do not commandeer state and local officials to enforce federal law. As the Second Circuit explained in *City of New York*, 1373(a) and 1644 do not "compel[] state and local governments to enact or administer any federal regulatory program," nor do they "affirmatively conscript[] states, localities, or their employees into the federal government's service." 179 F.3d at 35. Instead, they "prohibit state and local governmental entities or officials only from directly restricting the voluntary exchange of immigration information with [federal officials]." *Id.* The court squarely rejected the argument that the Tenth Amendment gives states a right to impose blanket non-cooperation rules, explaining that "states do not retain under the Tenth Amendment an

47

untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs." *Id.*

That reasoning directly addresses the theory advanced by Defendants. Defendants repeatedly mischaracterize the federal provisions as infringing state sovereignty because they limit Minnesota's ability to bar its officers from cooperating with federal immigration authorities. But the anticommandeering doctrine protects states from being forced to act; it does not confer a constitutional entitlement to prohibit cooperation or obstruct federal enforcement mechanisms. As *New York* makes clear, the Supremacy Clause permits Congress to ensure that willing state and local officials remain free to assist federal authorities, even while preserving the state's ability to withhold its own resources and decline participation.

Third, even if sections 1373(a) and 1644 regulated states, there would still be no commandeering problem. Those statutes merely require "the provision of information to the Federal Government." *Printz*, 521 U.S. at 918. The Supreme Court has recognized that providing information does "not involve . . . the forced participation of the States' executive in the actual administration of a federal program." *Id.* In short, the Supreme Court's Tenth Amendment cases are not properly read to invalidate reporting requirements, such as the requirement for "state and local law enforcement agencies to report cases of missing children to the Department of Justice." *Id.* at 936 (O'Connor, J., concurring) (citing 42 U.S.C. § 5779(a) (transferred to 34 U.S.C. § 41307)); *see also Haaland v. Brackeen*, 599 U.S. 255, 291 (2023) ("Congress may impose ancillary recordkeeping requirements related to state-court proceedings without violating the Tenth Amendment.").

*Murphy* did not change this rule. As the Second Circuit held, *Murphy* dealt with a federal law that compelled state legislatures to ban sports gambling, something core to historical police powers. *New York*, 951 F.3d at 113. By contrast, immigration enforcement is a core federal power on which states cannot intrude. *Id.* at 113-14. Thus the Second Circuit correctly rejected a similar argument that *Murphy* invalidated Section 1373. *Id. Murphy* did not suggest that Congress is constitutionally barred from regulating federal operations, authorizing voluntary cooperation, or preventing states from imposing legal restrictions that interfere with federal law. 584 U.S. at 470–72, 477–79.

**4.** In any event, the "private actors" principle articulated in *Murphy* addresses the limits of express preemption and the anticommandeering doctrine. *Id.* at 470–72. Anticommandeering has no application to traditional obstacle-preemption or intergovernmental immunity analysis. Conflict preemption asks whether state law interferes with the operation of federal law, not whether the federal statute regulates private conduct. *Hines*, 312 U.S. at 67. The Supreme Court has never required that a federal statute be directed at private actors to have preemptive effect under obstacle preemption.

Indeed, many classic conflict-preemption cases involve federal statutes that structure federal authority, enforcement discretion, or foreign policy—rather than regulating private individuals. For example, in *Arizona*, the Supreme Court invalidated a state provision because it interfered with federal immigration-enforcement discretion, even though the relevant federal statutes governed federal officers, not private actors. 567 U.S. at 407–10. And in *Crosby*, the Court held that Massachusetts's Burma sanctions law was preempted because it conflicted with federal foreign-policy legislation that directed the

49

President's actions and discretion. 530 U.S. at 368–73, 388. The federal statute there likewise did not regulate private conduct, yet it preempted state law because of the obstacle that the state law created.

Defendants' reliance on district-court decisions such as *United States v. Illinois*, 796 F. Supp. 3d 494 (N.D. Ill. 2025); *Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355 (D.N.J. 2020); *Colorado v. DOJ*, 455 F. Supp. 3d 1034 (D. Colo. 2020); and *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Penn. 2018) is likewise misplaced. ECF 31 at 20. Those cases reason, largely by extension from *Murphy*, that §§ 1373 and 1644 do not regulate private actors and therefore cannot supply a preemptive rule of decision. This reasoning is incorrect for the reasons explained previously. Moreover, Defendants' cited cases do not hold that *Murphy* displaces ordinary obstacle-preemption analysis or that a federal enactment must regulate private conduct to have preemptive effect in the conflict-preemption context. To the contrary, Supreme Court conflict-preemption cases turn on whether state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines*, 312 U.S. at 67, including where the federal enactments structure federal authority and discretion rather than regulating private parties.

Because the United States asserts a conflict-preemption claim, the relevant question is whether Minnesota's information-sharing restrictions interfere with Congress's objectives in enacting §§ 1373 and 1644. They do. Federal officials' power to dictate the transfer of an alien from state to federal custody is worthless if federal officials do not know which aliens they can take into custody or when they can do so. Such obstacle preemption is not subject to anticommandeering principles.

Similarly, the Tenth Amendment does not allow states to regulate or discriminate against the federal government. *See Washington*, 596 U.S. at 835. To rule otherwise would put the Tenth Amendment above the Supremacy Clause. That would get the Constitution backwards—federal power is limited by enumerated powers but is supreme in its realm. And the "Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394. The Tenth Amendment, on the other hand, is a "truism that all is retained which has not been surrendered." *United States v. Darby*, 312 U.S. 100, 124 (1941). So allowing states to discriminate against the federal government, as defendants do with their sanctuary policies, would "transfer the supremacy . . . to the states." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 432 (1819).

**E.      The Claims Against Minneapolis Should Not Be Dismissed Under Rule 4(m).**

Under Federal Rule of Civil Procedure 4(m), a plaintiff ordinarily must serve a defendant within 90 days of filing the complaint. If the plaintiff shows good cause for failing to perfect service, the court must extend the time, and even in the absence of good cause the court has discretion to allow additional time to accomplish service. *Kurka v. Iowa Cnty.*, 628 F.3d 953, 957–58 (8th Cir. 2010); *Colasante v. Wells Fargo Corp.*, 81 F. App'x 611, 612 (8th Cir. 2003). In the Eighth Circuit, good cause is satisfied when the plaintiff acted in good faith and had a reasonable basis for non-compliance with the deadline. *See Kurka*, 628 F.3d at 957–58. Courts consider whether the plaintiff diligently attempted service, the length of the delay, whether the defendant had actual or constructive notice of the action, and whether the defendant was prejudiced by the delay. *Id.* at 957–59. They also recognize a strong preference for resolving cases on the merits and caution that

Rule 4(m) operates as a case-management tool, not a punitive device. See *Hustad v. Mitsubishi Heavy Indus. Am., Inc.*, 2005 WL 348298, at *2 (D. Minn. Feb. 10, 2005). Courts favor discretionary extensions when a technical error is promptly corrected and the defendant suffers no prejudice. *See id.* at *2–3; *Rollerblade, Inc. v. Rappelfeld*, 165 F.R.D. 92, 94–95 (D. Minn. 1995).

The United States meets these standards. First, it made a diligent, good-faith attempt to serve Minneapolis within the Rule 4(m) period. The complaint was filed on September 29, 2025. Two days later, the longest government shutdown in history began, making it impossible for Plaintiffs to serve Defendants until the shutdown ended on November 12. The shutdown had significant effects on government operations that took time to ameliorate. Even so, the U.S. Marshals Service delivered a copy of the summons and complaint to the Hennepin County Auditor's Office on November 20, 2025, more than a month before the Rule 4(m) deadline. *See* Proof of Service at 1 (Nov. 20, 2025). Though the individual who accepted service turned out not to be a proper agent for the City, this attempt demonstrates diligence and satisfies the good-cause requirement, especially given the lengthy shutdown. *See Kurka*, 628 F.3d at 957–58.

Second, after learning of the defect, the United States promptly cured it. On January 8, 2026, the Marshals Service served an Assistant City Clerk—an individual authorized to accept service for Minneapolis—thereby perfecting service only 11 days after the service deadline. *See* Proof of Service at 1–2 (Jan. 8, 2026). Minneapolis has identified no prejudice from this brief delay, and the city clearly had notice of the suit given the close relationship between it and the Defendants who were properly served. The city argues that

other lawsuits have increased their burden, but it is hard to imagine that an 11-day delay made a significant difference. The city also argues that excusing the delay would disrupt the proceedings because the Court would need to move the March 2 motion hearing or hold two hearings. ECF 37 at 19–20. But the United States agreed to respond to Minneapolis's motion by February 6, so that the March 2 hearing could proceed as scheduled as to all Defendants' motions. Moreover, as Minneapolis admits, Rule 4(m) dismissals are "without prejudice." ECF 37 at 16. Dismissal thus would simply necessitate refiling, which would be pointless and inefficient.

Courts in this Circuit routinely deny Rule 4(m) motions under similar circumstances. In *Hustad*, the court granted a discretionary extension where the plaintiff attempted service within the prescribed period but served the wrong entity; the court emphasized the lack of prejudice and rejected dismissal as an unnecessarily harsh sanction, noting that the defendant had actual notice and that the plaintiff's diligence warranted allowing the case to proceed. 2005 WL 348298, at *2–3. Similarly, in *Rollerblade*, the court declined to dismiss a complaint where service was effected after the deadline but the defendant was aware of the lawsuit and would suffer no prejudice; the court observed that dismissal would merely require refiling and would not serve the interests of fairness or efficiency. 165 F.R.D. at 94–95. These decisions reflect the Eighth Circuit's broader view that dismissal under Rule 4(m) should be reserved for cases of prolonged delay or clear disregard of the rules, and that a short, harmless delay accompanied by diligent efforts to serve warrants an extension.

In sum, the United States attempted service well within the 90-day period, promptly

corrected the technical defect, and caused no prejudice to Minneapolis. Because Rule 4(m) is intended to manage cases rather than punish litigants, and because courts favor resolving disputes on the merits, the circumstances strongly support a discretionary extension and preclude dismissal. The complaint should not be dismissed under Rule 4(m).

## **CONCLUSION**

For the foregoing reasons, Defendants' Motions to Dismiss should be denied.

Dated: February 6, 2026                                Respectfully submitted,

BRETT A. SHUMATE                              */s/ Julian M. Kurz*
Assistant Attorney General,                          JULIAN M. KURZ
Civil Division                                                  Trial Attorney
                                                                      U.S. Department of Justice
DREW ENSIGN                                         Office of Immigration Litigation,
Deputy Assistant Attorney General,          P.O. Box 868, Ben Franklin Station
Office of Immigration Litigation                Washington, DC 20044
                                                                      (202) 598-7283
TIBERIUS DAVIS                                       julian.m.kurz@usdoj.gov
Counsel to the Assistant Attorney General

ELIANIS N. PEREZ                                     *Counsel for Plaintiff*
Assistant Director