**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

| | |
|---|---|
| United States of America, | Case No. 0:25-cv-03798 (ECT/JFD) |
| Plaintiff, | |
| vs. | |
| State of Minnesota; City of Minneapolis, Minnesota; City of St. Paul, Minnesota; Hennepin County, Minnesota; Keith Ellison, Attorney General of Minnesota, in his official capacity; Dawanna S. Witt, Hennepin County Sheriff, in her official capacity, | **HENNEPIN COUNTY DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS** |
| Defendants. | |

Having filed similar lawsuits against alleged "sanctuary" jurisdictions throughout the country, the United States asks this Court to be the first to find merit in its arguments. But the United States fails to offer anything in its Complaint that would warrant a result different that that reached by sister courts around the nation. Here, as in those cases, the United States' claims fail on their face under basic principles of standing, statutory interpretation, and federalism. Defendants Hennepin County and Sheriff Witt (the "Hennepin Defendants") are entitled to dismissal.

## I.    Counts I, II, and VI Fail Under Both Rule 12(b)(1) and Rule 12(b)(6)

Counts I, II, and VI should never have been brought against the Hennepin Defendants (and the United States should have agreed to voluntarily dismiss them during the LR 7.1 meet-and-confer process). The Complaint fails to allege any connection between the Hennepin Defendants and the conduct at issue in these Counts, and the Counts

1

fail both for lack of standing and for failure to state a claim. The Court should dismiss them now.

The United States' arguments as to why the Hennepin Defendants may be held liable under Count I are baseless. The only case the Opposition cites for its argument that Count I is traceable to Hennepin County, *Bennett v. Spear*, 520 U.S. 154 (1997), does not support its position. Therein, the Supreme Court noted that an injury can be "fairly traceable" if it is "produced by determinative or coercive effect upon the action of someone else." *Id.* at 168-69. Here, there is no allegation that any action by the Hennepin Defendants caused or contributed to the challenged Attorney General opinion.[1] Moreover, the United States cites no authority for the far-fetched proposition (and its only argument as to liability) that it can challenge the action of one political entity (the State, in this case) and include additional defendants to "clarify" the law for those defendants.

The hearsay-laden declaration the United States attaches to its Opposition does not help its cause.[2] The standing challenges in this case have nothing to do with the supposed

---

[1] To the extent the United States purports to base Count I on the Directive, that is not reflected in the Complaint. If it was, that would make Count V wholly superfluous.

[2] Trump Administration Border Czar Tom Homan's public statements – which indicate that the federal government is concluding Operation Metro Surge because it has received the cooperation it needs – also undermine the suggestion in the Olson declaration that any of the policies challenged in this lawsuit, including the Directive, harmed the federal government. *See, e.g., WATCH: Border czar Tom Homan announces end to immigration crackdown in Minnesota* (Feb. 12, 2026), https://www.pbs.org/newshour/politics/watch-live-border-czar-tom-homan-holds-news-conference-in-minneapolis. The HCSO's policies have not changed. *See, e.g., Witt: Hennepin County didn't give ICE more jail access* (Feb. 13, 2026), https://www.mprnews.org/story/2026/02/13/witt-hennepin-county-didnt-give-ice-more-jail-access. Yet the federal government has declared victory and is leaving.

"real-world effects of the Attorney General's Opinion and the challenged laws." ECF No. 51, at 11. The challenges have to do with who is responsible for the Opinion and laws, not their purported impacts. Moreover, the Olson declaration merely shows the disastrous effects of the federal government's *own actions* in sending masked, undertrained officers to Minnesota and openly condoning their lawless conduct. The federal government's position is akin to storming out of a café because the owner refused to share the wifi password, punching a bystander on the sidewalk, and blaming the café owner for the consequences. It is beyond the pale.

Meanwhile, the United States makes no argument at all as to the Hennepin Defendants' liability for Counts II and VI, on either standing or whether it has stated a claim. Counts I, II, and VI should be dismissed.

## II. 8 C.F.R. § 287.7 Does Not Require the Hennepin Defendants to Hold Individuals in Jail on the Department of Homeland Security's Behalf

The fact of the matter is that the United States is asking this Court to be the first one to construe 8 C.F.R. § 287.7(d) to require state and local governments to detain individuals on the federal government's behalf. The Court should decline that invitation. And even if the United States' strained reading of the regulation was a plausible navigation of the statutory language (it is not), its argument runs aground on the shores of the Tenth Amendment.

### A. Pre-Emption

The United States' preemption arguments as to the Hennepin County Sheriff's Office's ("HCSO") policy of not holding individuals based solely on a civil immigration

3

detainer fail because the Opposition does not establish a conflict between that policy and 8 C.F.R. § 287.7 and 8 C.F.R. § 287.7 does not have preemptive effect.

As explained in the Hennepin Defendants' opening brief, ECF No. 19, at 11-15, 8 C.F.R. § 287.7 establishes that criminal justice agencies may, but are not required to, honor civil immigration detainers. The Opposition makes no effort to address most of those arguments, including those related to historic police powers, constitutional avoidance, and lack of preemptive power.[3]

The United States attempts to challenge this textual reading, one reached by numerous courts, *see* ECF No. 19, at 11-12, with several structural arguments, which may be easily dispensed with. First, it asserts that this textual reading would "render [8 C.F.R. § 287.7(d)] a dead letter." ECF No. 51, at 32.[4] Not true. § 287.7(a) speaks to detainers

---

[3] The United States does argue briefly, in the context of the Tenth Amendment, that 8 C.F.R. § 287.7(d) is part of "Congress's comprehensive scheme to regulate aliens." ECF No. 51, at 52. But, as noted below, Congress did not enact 8 C.F.R. § 287.7, and the Opposition does not offer any support for the contention that a regulatory provision directed only at state and local officials can be preemptive because it relates to a statute that also regulates private parties. The Opposition similarly fails to wrestle with the authority (including Supreme Court precedent) establishing that the relevant field of view is the challenged provision. *See* ECF No. 19, at 13-14 & n.3; *see also, e.g., Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 479-80 (2018) ("[T]he PASPA *provision* prohibiting state authorization of sports gambling is not a preemption *provision* because there is no way in which this *provision* can be understood as a regulation of private actors.") (emphasis added); *Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 372 (D.N.J. 2020) ("While sections 1373(a) and 1644 require the sharing of information regarding private individuals, these provisions plainly regulate the sharing of such information by state and local government officials, and significantly, they do not regulate private actors in any way.").

[4] The Opposition brief's page numbers do not begin on the first page, so they do not match up with the page numbers of the ECF document. Citations herein are to the ECF page numbers.

4

generally, whereas § 287.7(d) provides additional details about how long individuals are authorized to be held based on those detainers. In context, therefore, § 287.7(d), including the term "shall," is best interpreted as setting the maximum detainer period at no more than 48 hours, not inserting into the regulation a mandatory command to comply with an otherwise voluntary request. Indeed, the heading for § 287.7(d), "Temporary detention at Department request," reaffirms the voluntary nature of these detainers.

Second, the United States repeatedly invokes a supposed comprehensive Congressional "deal," "scheme," or "mechanism" in support of its reading of 8 C.F.R. § 287.7(d). *See* ECF No. 51, at 8, 29, 31-32, 34, 52-53. Congressional enactments are contained in the U.S. Code, not the Code of Federal Regulations.[5] Congress did not require states to hold "aliens"; it instead empowered the Department of Homeland Security to take custody of them, further undermining the United States's reading of the regulation. *See* 8 U.S.C. § 1226(c)(3) (allowing DHS to take custody of alien subject to detainer "if the alien is not otherwise detained by Federal, State, and local officials"). The United States' citations of *Nielsen v. Preap,* 586 U.S. 392 (2019), and *Demore v. Kim,* 538 U.S. 510 (2003), two cases interpreting § 1226(c), are therefore inapposite. Those cases may indicate that federal immigration law was designed to function alongside state custody processes, but they do not suggest that the state must provide affirmative assistance.

---

[5] The Hennepin Defendants do not contend that Code of Federal Regulations provisions have less preemptive effect than Acts of Congress. Rather, the contention is that requirements imposed by regulation cannot be said to be part of any Congressional bargain.

Third, the United States asserts that the challenged laws "frustrate" federal "objectives." *See* ECF No. 51, at 10, 32-34. But Congress did not enact an immigration policy that lets the federal government get whatever it wants. Like most laws, compromise was involved, and the best evidence of Congressional objectives is the statutory language Congress adopted. In this case, Congress did not require state and local governments to hold individuals without a judicial warrant.

Meanwhile, the United States' misses the point in its attempt to distinguish cases holding that warrantless arrest and detention by county officials pursuant to 8 C.F.R. § 287.7(d) could violate the Fourth Amendment. *See* ECF No. 51, at 34 n.8 (citing *Orellana v. Nobles Cnty.*, 230 F. Supp. 3d 934, 944-46 (D. Minn. 2017) & *Parada v. Anoka Cnty.*, 332 F. Supp. 3d 1229, 1243 (D. Minn. 2018)). The Hennepin Defendants do not contend that such detentions would *always* violate the Fourth Amendment. Rather, the fact that honoring detention requests would *sometimes* result in Fourth Amendment violations undermines the United States' argument that federal law makes compliance mandatory.

As the United States' brief progresses, it effectively concedes the detention point as to the Directive. The Opposition argues that the problem is "state interpretations and policies" that "foreclose that option." ECF No. 51, at 34. While it is difficult to understand how a state law could violate federal law by banning something that is not mandatory under

federal law, the distinction the United States makes[6] (in an attempt to escape the implications of the *McHenry County, California*, and *Galarza* decisions) favors the Hennepin Defendants. Local officials can decide not to honor detainers, which is precisely what the Hennepin County Sheriff has done here. "The United States does not contend that federal law compels state participation in immigration enforcement." ECF No. 51, at 33. The Hennepin Defendants agree.

### B. Tenth Amendment

Based on the above, the Court need not consider the Tenth Amendment. But, if the Court chooses to do so, the Opposition's Tenth Amendment arguments also fail. *See* ECF No. 51, at 52-53. Contrary to the Opposition, 8 C.F.R. § 287.7(d) does not "specify[] the time during which federal authorities may assume custody." *See id.* at 52. It asks state and local authorities to hold inmates past their release dates.[7] And *Congress* has not created "regulations for short-term mandatory detainers" at all, let alone as a "condition" for anything. *See id.* at 53. The United States is left with an assertion against all reason that

---

[6] The United States strains quite hard to make this distinction, requiring so many specific factual qualifiers that it loses sight of what distinctions matter. *See* ECF No. 51, at 33 (noting that the cases cited by defendants "did not consider whether a State may, consistent with the Supremacy Clause, adopt legal rules or authoritative interpretations that operate in practice to deter, prevent, or penalize voluntary compliance with a federally proscribed custody-transfer mechanism once a detainer was issued" and did not "examine the effect of a state attorney general's binding constitutional interpretation that chills cooperation by warning that continued compliance may expose local officials to state-law consequences").

[7] Contrary to the United States' assertion, ECF No. 51, at 53, this is not akin to transferring prisoners to federal custody pursuant to a writ of *habeas corpus prosequendum*. There is no tradition requiring a law enforcement agency to hold a person beyond the completion of their punishment absent a judicial (as opposed to an executive) order.

requiring state officials to house individuals beyond the expiration of their jail terms is not commandeering. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 471 (2018) ("[C]onspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States.").

### III. 8 U.S.C. §§ 1373 and 1644 Do Not Pre-Empt the Directive's Information-Sharing Provisions

The Directive's discussion of information-sharing is limited to a single sentence: "ICE <u>will not</u> be notified of the admittance or release of any individual based on [a civil immigration detainer]." ECF No. 1, at ¶ 71. Meanwhile, 8 U.S.C. §§ 1373 and 1644 address "information regarding the citizenship or immigration status, lawful or unlawful, of any individual," 8 U.S.C. § 1373(a), and "information regarding the immigration status, lawful or unlawful, of an alien in the United States," 8 U.S.C. § 1644. There is no conflict, express or otherwise.

### A. Express Pre-Emption

The United States attempts to add an express preemption claim to Count V via its Opposition by arguing that Sections 1373 and 1644 expressly pre-empt the HCSO's challenged information-sharing restriction. Even if the Court considers the claim, the argument fails.

The United States does not assert that the Directive restricts the sharing of citizenship or immigration status. Instead, the United States seeks, via the word "regarding," to expand the scope of Sections 1373 and 1644 to reach other sorts of information.

Initially, the United States fails to contend with the unanimous authority against it. *See* ECF No 19, at 15; *see also United States v. New York*, --- F. Supp. 3d ----, 2025 WL 3718641, *7 (N.D.N.Y. Dec. 23, 2025) (finding the narrower interpretation so well established that it was "unnecessary to spill further judicial ink on the issue, other than to note that this conclusion is amply supported by the text, structure, and history of § 1373") (citations and quotations omitted).

The United States has offered nothing to this Court to recommend a different result here. While it is true that terms like "regarding" generally do have a "broadening" effect, that is not true in the same way in the context of pre-emption: if "taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for '[r]eally, universally, relations stop nowhere.'" *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (alteration in original) (quoting H. James, Roderick Hudson xli (New York ed., World's Classics 1980)). We should not infer that Congress meant to reach any further than the words it actually used, particularly because the statute purports to instruct entities and officials as to what they can and cannot do, such that clarity is paramount. As the Ninth Circuit has noted, Congress used more expansive phrases elsewhere in Title 8 when seeking to reach more broadly. *See United States v. California*, 921 F.3d 865, 892 (9th Cir. 2019); *see also* 8 U.S.C. § 1360(a) ("such other relevant information as the Attorney General shall require as an aid"); 8 U.S.C. § 1360(b) ("Any information in any records kept by any department or agency of the Government as to the identity and location of aliens in the United States"). If Congress wanted to let the Department of Homeland Security dictate

what kind of information the statutes covered, or if it wanted those provisions to cover admission or release dates, it could have said so.

The Ninth Circuit also considered and rejected the United States' arguments, repeated in the Opposition, that the lack of the term "regarding" in Section 1373(c) shows that Section 1373(a) should be read broadly (Section 1373's focus on reciprocal communication suggests the opposite), and that legislative history supported its reading. *California¸* 921 F.3d at 892 & n.18. As to legislative history, the United States' argument fails because the cited conference report distinguished between two categories – "information regarding the immigration status of an alien" and "the presence, whereabouts, or activities of illegal aliens" – which suggests that the former category (included in the statutory language) does not include the latter (not included). *Id.* And, in any event, the statutory text controls. *Id.*; *see also Continental Resources, Inc. v. North Dakota Bd. of Univ. & Sch. Lands*, 136 F.4th 778, 785 (8th Cir. 2025) ("[W]e do not resort to legislative history to cloud a statutory text that is clear.") (quoting *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994)) (internal quotations omitted). This Court should likewise reject the United States' recycled, rejected arguments.

Additionally, even under a broad reading of Section 1373 and 1644, the United States has failed to establish that the information addressed in the Directive would be covered. The United States casually asserts that "[r]elease by state officials…changes the detained person's immigration status." ECF No. 51, at 43. Not true. Release means that the federal government can remove the person from the country, but it does not result in a change in immigration status. *See Gomez v. Lynch*, 831 F.3d 652, 660-61 (5th Cir. 2016)

10

(noting that unlawful status is a distinct concept from deportability or inadmissibility, which is reflected in the structure of the INA); Steel on Immigration Law § 3.1 (2025 update) ("Persons in the United States can generally be divided into seven categories: citizens; nationals; permanent resident aliens; temporary residents; asylees and refugees; nonimmigrants; and persons without legal status."). Indeed, while the INA includes various provisions that address immigration status and adjustments to immigration status, 8 U.S.C. § 1231(a), cited by the United States, is not one of them. Thus, 8 U.S.C. §§ 1373 and 1644 could only cover the Directive if the statutes were read to cover all information that might be relevant to immigration enforcement, an expansive reading that the statutory language cannot possibly bear.

As with 8 C.F.R. § 287.7, the United States' argument as to pre-emption via 8 U.S.C. §§ 1373 and 1644 also must fail because those provisions do not regulate private actors and therefore do not have any pre-emptive effect. *See* p. 4 & n.3, *supra*; ECF No. 19, at 13-15. Further, the United States fails to contend with the doctrine of constitutional avoidance, which suggests that any ambiguity should be construed to avoid the Tenth Amendment issues. *See* ECF No. 19, at 13, 15.

### B. Obstacle Pre-Emption

The United States' obstacle pre-emption argument is essentially as follows: Even if the Congressional enactments do not actually prohibit the challenged policies, including the Directive, the Court should hold the policies pre-empted because Congress had a broader "objective." This argument is remarkable and unpersuasive. Congress specifically spoke to the sharing of information. The United States asks this Court to look past this

11

statutory plain language and find that 8 U.S.C. §§ 1373 and 1644 have a wider penumbra and reach more conduct. It is an express preemption argument dressed up in obstacle preemption's clothing. Unsurprisingly, none of the cases the United States cites support this unique argument. *See Arizona v. United States*, 567 U.S. 387, 400 (2012) ("In preemption analysis, courts should assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress.") (quotations omitted).

To be sure, the HCSO's decision not to voluntarily provide additional information beyond what is required does not make ICE's job any easier, but that is not the same thing as creating an obstacle. *See, e.g., California¸* 921 F.3d at 888 ("[R]efusing to help is not the same as impeding[.]") (citations and quotations omitted); *New York*, 2025 WL 3718641, at *7 ("Plaintiff's conflict preemption claim is foreclosed by Plaintiff's inability to identify any federal statute that requires New York State to provide DMV information for standard license applicants to federal immigration authorities."); *United States v. Illinois*, 796 F. Supp. 3d 494, 531 (N.D. Ill. 2025) ("Because any collaboration under the INA is permissive, not mandatory, there is no hook for the United States's preemption argument with respect to maintaining or sharing information about people in custody."). The United States might *want* more information to meet its deportation goals, but that is not the same thing as a statutory mandate.

Finally, the attempt to rely on the Olson declaration to support the United States' position, ECF No. 51, at 44, is not only improper; it is also irrelevant to the pre-emption question.

### C. Tenth Amendment

As with 8 C.F.R. § 287.7, the Court need not reach the Tenth Amendment question as to 8 U.S.C. §§ 1373 and 1644.

If the Court does consider this question, the United States' arguments are unpersuasive. The Opposition relies extensively on *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999), which drew a distinction between compelling action by state and local governments and prohibiting certain state actions. ECF No. 51, at 35. But the Supreme Court subsequently rejected that distinction as "empty," concluding that it was "happenstance" that its earlier decisions on the issue of commandeering involved laws "command[ing] 'affirmative' action as opposed to imposing a prohibition." *Murphy*, 584 U.S. at 474-75.

Another case the Opposition relies on extensively, *New York v. Department of Justice*, 951 F.3d 84 (2d Cir. 2020), was decided as an issue of federal funding, concluding that the amount of money at stake (less than 0.1% of the state's budget) was not large enough to constitute commandeering. *Id.* at 114-16. The panel did include *dicta* about a facial challenge to 8 U.S.C. § 1373, but that analysis rested on the fact that the district court did not identify the reserved powers Section 1373 infringed upon. *Id.* at 112-14. Here, the United States is trying to dictate how Minnesota jails operate, a function that falls well within the traditional police powers of states. *See Berman v. Parker*, 348 U.S. 26, 32 (1954) (listing "[p]ublic safety, public health, morality, peace and quiet, law and order" as "some of the more conspicuous examples of the traditional application of the police power.").

13

Ultimately, the United States is asking state and local policymakers to "stand aside and allow the federal government to conscript the time and cooperation of local employees." *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 873 (N.D. Ill. 2018), *aff'd and remanded sub nom.*, 957 F.3d 772 (7th Cir. 2020), *opinion amended and superseded*, 961 F.3d 882 (7th Cir. 2020), *aff'd and remanded sub nom.*, 961 F.3d 882 (7th Cir. 2020). This is not allowed.

In any event, and in the alternative, the Directive would still survive even if the United States were correct that the "anticommandeering doctrine [merely] protects states from being forced to act." ECF No. 51, at 47. In the context of the Directive, there can be no doubt that forced action is precisely what the United States seeks.[8] The Directive is not a restriction on officials sharing information; it is a decision by such an official (the Sheriff) not to share information. *See Sessions*, 321 F. Supp. 3d at 869 ("A state's ability to control its officers and employees lies at the heart of state sovereignty."). Any requirement to abandon that decision and share that information, therefore, is a forced action inconsistent with the Tenth Amendment.

Finally, the United States' claim of a broad right to collect information from the states is without support. In *Haaland v. Brackeen*, 599 U.S. 255 (2023), the Supreme Court

---

[8] The Opposition cites *United States v. Missouri*, 114 F.4th 980 (8th Cir. 2024), for the proposition that "[t]he Eighth Circuit has rejected the notion that a state can freely withdraw assistance without consequence." ECF No. 51, at 24. *Missouri* instead establishes that withdrawal of assistance may constitute an injury for standing purposes; whether the United States "is entitled to that assistance" is a different question. 114 F.4th at 984-85 (quotations and citations omitted).

held that Congress could impose "ancillary recordkeeping requirements." *Id.* at 291. That is a far cry from the continuous collection and dissemination of data that would be involved under the United States' proposed broad reading of 8 U.S.C. §§ 1373 and 1644, and there appears to be no court that has endorsed the United States' position. Other courts have rightly rejected the United States' argument. *See, e.g., Illinois*, 796 F. Supp. 3d at 523-24; *Grewal*, 475 F. Supp. 3d at 378 n.21. The Hennepin Defendants are entitled to dismissal of Count V.

**IV.      The United States' Intergovernmental Immunity Arguments Lack Merit**

The United States does not dispute that an intergovernmental immunity claim requires demonstration that the federal government is receiving less favorable treatment. *See Washington v. United States*, 460 U.S. 536, 544-45 (1983) ("The State does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them."). Yet, apart from conclusory suggestions, the United States fails to allege a single way in which the Hennepin Defendants are treating the federal government worse than others.

The United States seeks to get around this problem by asserting that the "*Directive* permits cooperation with a wide range of law-enforcement requests— including criminal warrants and non-immigration detainers—while categorically barring compliance with immigration detainers or the sharing of release information for immigration purposes." ECF 51, at 49 (emphasis added). This is misguided, at best. *See Illinois*, 796 F. Supp. 3d at 534 (holding that discrimination based on enforcement context does not violate intergovernmental immunity). Criminal warrants are not legally equivalent to civil

detainers, and the Directive explicitly *allows* continued detention based on a judicially-signed immigration warrant, just like any judicial order. As to "non-immigration detainers" – there are no well-pleaded allegations in the Complaint that such a legal mechanism even exists let alone that HCSO extends detentions based on such a request. Similarly, there are no well-pleaded allegations about the HCSO sharing admission and release dates with other law enforcement agencies based on a non-immigration detainer. This Court should reject the United States's invitation to read the Directive in isolation absent this context. *See North Dakota v. United States*, 495 U.S. 423, 438 (1990) (plurality) ("[I]n analyzing the constitutionality of a state law, it is not appropriate to look to the most narrow provision addressing the Government or those with whom it deals. A state provision that appears to treat the Government differently on the most specific level of analysis may, in its broader regulatory context, not be discriminatory."). The United States's threadbare assertions are not sufficient to plausibly allege a claim of differential treatment.

To the extent the United States is arguing that no comparator is required because the Directive explicitly targets federal immigration enforcement, that argument finds no support in the case law[9] and amounts to little more than an attempt to circumvent the Tenth Amendment. Immigration law is exclusive to the federal government, so whether a law regarding assistance with immigration enforcement mentions the federal government or

---

[9] In *United States v. City of Arcata*, 629 F.3d 986 (9th Cir. 2010), cited by the United States, the Ninth Circuit's finding of discrimination rested on the fact that the law at issue treated "identical conduct" differently based on whether it was done by a federal agent (or employee) or not. *Id.* at 991.

16

not is substantively irrelevant. And just because no one other than the federal government does something is not a basis to force the states to do the federal government's bidding. *See McHenry Cnty. v. Raoul*, 44 F.4th 581, 594 (7th Cir. 2022) ("The mere fact that the [challenged state law] touches on an exclusively federal sphere is not enough to establish discrimination."). Indeed, to hold otherwise would allow the federal government to compel state and local governments to do all manner of things on its behalf in areas where the federal government has occupied the field, in direct contravention of the Supreme Court's Tenth Amendment jurisprudence. The United States offers no limiting principle, and there is none. The Hennepin Defendants exercised their discretion not to assist in the enforcement of immigration law; that's basic federalism, not discrimination.

Perhaps realizing the weakness of their arguments, the United States seeks to bolster those arguments through the Olson Declaration, which asserts – without any factual basis or legal support – that Minnesota is discriminating against immigration officers. ECF No. 51-2, at ¶ 49-51. The Court should reject this improper attempt to amend the Complaint by way of conclusory, hearsay statements attached to a response to a motion to dismiss. *See* Fed. R. Civ. P. 12(d); *Jenkins v. Winter*, 540 F.3d 742, 748 (8th Cir. 2008) ("'When an affidavit contains an out-of-court statement offered to prove the truth of the statement that is inadmissible hearsay, the statement may not be used to support or defeat a motion for summary judgment.'") (quoting *Brooks v. Tri–Systems, Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005)). The Hennepin Defendants are entitled to dismissal of Count IX.

**CONCLUSION**

The Court should dismiss the claims against the Hennepin Defendants with prejudice.

Respectfully submitted,

MARY F. MORIARTY
Hennepin County Attorney

Dated:  February 20, 2026

*s/   Alan A. Martinson*
SARAH MCLAREN (0345878)
Sr. Assistant County Attorney
LEAF MCGREGOR (0389140)
SPENCER DAVIS-VANNESS (0402894)
ALAN A. MARTINSON (0392031)
Assistant County Attorneys
300 South Sixth Street, A-1200
Minneapolis, MN  55487
(651) 348-5532
Sarah.McLaren@hennepin.us
Leaf.McGregor@hennepin.us
Spencer.Davis-VanNess@hennepin.us
Alan.Martinson@hennepin.us

*Attorneys for Defendants Hennepin County,*
*Minnesota and Dawanna S. Witt, Hennepin*
*County Sheriff, in her official capacity*