UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

United States of America,

             Plaintiff,

    vs.

State of Minnesota; City of Minneapolis, Minnesota; City of St. Paul, Minnesota; Hennepin County, Minnesota; Keith Ellison, Attorney General of Minnesota, in his official capacity; Dawanna S. Witt, Hennepin County Sheriff, in her official capacity,

             Defendants.

Civ. No. 25-3798 (ECT/JFD)

**NOTICE OF SUPPLEMENTAL AUTHORITY**

Defendants the State of Minnesota and Attorney General Keith Ellison submit this Notice of Supplemental Authority to apprise the Court of a recent decision from the United States District Court for the District of Colorado dismissing claims similar to those asserted in this action. *See United States v. Colorado*, Civil Action No. 25-cv-01391-GPG-KAS, 2026 WL 878882 (D. Colo. Mar. 31, 2026). A copy of the decision is attached as Exhibit 1.

Dated: April 7, 2026

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

**s/ Joseph R. Richie**
JOSEPH R. RICHIE
Special Counsel
Atty. Reg. No. 0400615

BRIAN S. CARTER
Special Counsel
Atty. Reg. No. 0390613

MADELEINE DEMEULES
Assistant Attorney General
Atty. Reg. No. 0402648

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 300-0921 (Voice)
(651) 282-5832 (Fax)
Joseph.Richie@ag.state.mn.us
Brian.Carter@ag.state.mn.us
Madeleine.DeMeules@ag.state.mn.us

*Attorneys for Defendants State of Minnesota
and Minnesota Attorney General Keith Ellison*

|#6335918-v1

2

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge Gordon P. Gallagher

Civil Action No. 25-cv-01391-GPG-KAS

UNITED STATES OF AMERICA,

     Plaintiff,

v.

STATE OF COLORADO,
JARED POLIS, Governor of Colorado, in his official capacity,
COLORADO GENERAL ASSEMBLY,
PHILIP WEISER, Attorney General of Colorado, in his official capacity,
CITY AND COUNTY OF DENVER,
DENVER CITY COUNCIL,
MIKE JOHNSTON, Mayor for the City and County of Denver, in his official capacity,
DENVER SHERIFF DEPARTMENT, and
ELIAS DIGGINS, Sheriff of Denver, Colorado, in his official capacity,

     Defendants.

---

**MEMORANDUM OPINION AND ORDER**

---

Before the Court are three motions: Motion to Dismiss by State of Colorado, Governor Jared Polis, and Attorney General Philip Weiser (D. 37); Defendant Colorado General Assembly's Motion to Dismiss Plaintiff's Claims Against it Pursuant to Fed.R.Civ.P. 12(b)(6) (D. 38); and City and County of Denver's Motion to Dismiss First Amended Complaint (D. 39).  The Court GRANTS all three motions for the following reasons.

1

## I.  BACKGROUND

This civil action arises from the enactment of state and local so-called "sanctuary laws" in Colorado (D. 31).[1]  Plaintiff, the United States of America, challenges four enacted Colorado state bills (House Bill 19-1124, Senate Bill 21-131, Senate Bill 21-1100, and Senate Bill 25-276) and two Denver municipal laws (Denver Executive Order No. 142 and Denver Ordinance No. 940-17) that, broadly speaking, limit the use of state resources for federal immigration enforcement purposes and seek to protect the rights and personal information of immigrants in Colorado. Plaintiff argues that, because the Constitution vests supreme authority over immigration in the Federal Government, these laws violate the Supremacy Clause of the U.S. Constitution (D. 31). Count one asserts that the challenged laws are both implicitly and expressly preempted by federal immigration laws (*id.* at ¶¶ 89–92).  Count two asserts that the challenged laws unlawfully discriminate against the Federal Government by "singl[ing] out federal immigration officials, expressly and implicitly, for unfavorable and uncooperative treatment" (*id.* at ¶ 95).  Count three asserts that Defendants' enforcement of the challenged laws impermissibly "effects direct regulation of the Federal Government" (*id.* at ¶ 99).

Defendants – the State of Colorado, Jared Polis, the Colorado General Assembly, Philip Weiser, the City and County of Denver, Denver City Council, Mike Johnston, the Denver Sheriff Department, and Elias Diggins – filed three separate motions to dismiss Plaintiff's claims (D. 37; D. 38; D. 39).  Defendants argue that the laws are not implicitly or expressly preempted by federal law, Plaintiff has failed to identify a comparator for its discrimination claim, and the complaint fails to state how Defendants are directly regulating the Federal Government, instead relying on

---

[1] In its complaint, Plaintiff refers to the challenged laws as the "Sanctuary Laws" (D. 31 at ¶ 3).

conclusory statements (D. 37; D. 39). Defendants also argue that Plaintiff's overall proposed interpretation and application of the Supremacy Clause violates the Tenth Amendment of the U.S. Constitution (D. 37 at 22; D. 39 at 12).

## II. THE CHALLENGED LAWS

Plaintiff challenges each of the named state and local laws in their entirety, but its arguments focus on provisions falling into three general categories: (1) limitations on state and local collection and disclosure of individuals' personal information for federal immigration enforcement purposes; (2) limitations on state and local detention of individuals for federal immigration enforcement purposes; and (3) limitations on state and local officials facilitating federal immigration official access to state and local facilities and individuals detained in state and local facilities.

### A. Limitations on state collection and disclosure of individuals' personal information for federal immigration enforcement purposes

The challenged state laws prohibit state probation offices from providing individuals' personal information to federal immigration authorities (C.R.S. § 24-76.6-103); prohibit state agencies from disclosing or making accessible personal identifying information for federal immigration enforcement purposes (C.R.S. §§ 24-74-103–107); and impose limitations on state agency collection of personal identifying information and third party access to state agency records (*id.*). The terms "personal information" and "personal identifying information" as they are used in these laws refer to information that may be used to identify a specific individual, such as name, date of birth, social security number, home or work contact information, and family or emergency contact information. C.R.S. §§ 24-76.6-101 and 24-74-102(1). Denver Executive Order No. 142

ordered the Denver Sheriff Department to stop seeking federal funds that require gathering and

disseminating national origin, immigration, or citizenship status information of individuals held in

Denver jails.  The Executive Order also ordered the City Attorney's Office to educate and train

city employees on the limitations around collecting and sharing personal information with federal

immigration enforcement officials, in line with state and local laws.

### B.  Limitations on state and local detention of individuals for federal immigration enforcement purposes

The challenged laws prohibit both state and local law enforcement officials from arresting

or detaining individuals on the basis of a civil immigration detainer or administrative warrant[2] –

i.e. without a judicial warrant.  C.R.S. § 24-76.6-102; Denver Revised Municipal Code § 28-

253(d).  Detaining includes denying or delaying an individual's release from custody.  C.R.S. § 24-

76.6-102(2)(a).  The state laws also prohibit state governmental entities from entering into or

renewing agreements to detain individuals for federal civil immigration purposes; prohibit state

governmental entities from entering into agreements to detain individuals in privately owned or

operated immigration detention facilities; and limit the allocation of state funds to privately owned

immigration detention facilities.  C.R.S. §§ 24-76.7-101–103.  The Denver Revised Municipal

Code §§ 28-250, 28-251 (Denver City Ordinance) also prohibits the use of city funds or resources

to assist in the enforcement of federal immigration laws as well as any contractual agreement

---

[2] A civil immigration detainer is a "request" that state or local law enforcement advise the Department of Homeland Security (DHS) prior to releasing someone in their custody so that DHS can arrange to assume custody.  8 C.F.R. § 287.7(a).  "DHS may also request, but not require, that custody be extended by a period not to exceed 48 hours, 'in order to permit assumption of custody by the Department'" (D. 31 at ¶ 29 (quoting 8 C.F.R. § 287.7(d)).  An administrative warrant is a grant of authority to federal immigration officers to arrest and detain an individual pending a decision on whether the individual is to be removed from the United States.  8 U.S.C. § 1226(a).  Unlike a criminal warrant, it is not signed by a federal judge or magistrate judge.  *See id.*

involving the city that would commit any employee to assist in the enforcement of federal immigration laws.  Denver Revised Municipal Code §§ 28-250, 28-251.

**C.  Limitations on state employees facilitating federal immigration official access to state and local facilities and individuals detained in state and local facilities**

On both a state and local level, the challenged laws require that before a state or local law enforcement official may coordinate an interview between federal immigration authorities and an individual incarcerated in a state jail or custodial facility, the detained individual must be advised that the interview is being sought by federal immigration authorities, the individual has the right to decline, remain silent, and speak to an attorney, and anything the individual says may be used against him or her in subsequent proceedings, including in federal immigration court.  C.R.S. § 24-76.6-102; Denver City Ord. No. 940-17.  The Denver Ordinance further bars federal immigration authorities access to city and county jails "for the purpose of conducting investigative interviews or any other purpose related to the enforcement of federal immigration" without a judicial warrant.

### III.  LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true and interpreted in the light most favorable to the non-moving party, to state a claim to relief that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Additionally, the complaint must sufficiently allege facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed; however, a complaint may be dismissed because it asserts a legal theory not cognizable as a matter of law.  *Forest Guardians v. Forsgren*,

478 F.3d 1149, 1160 (10th Cir. 2007); *Golan v. Ashcroft*, 310 F. Supp. 2d 1215, 1217 (D. Colo. 2004). A claim is not plausible on its face "if [the allegations] are so general that they encompass a wide swath of conduct, much of it innocent," and the plaintiff has failed to "nudge [the] claims across the line from conceivable to plausible." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). In assessing a claim's plausibility, legal conclusions contained in the complaint are not entitled to the assumption of truth. *See Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). The standard, however, remains a liberal pleading standard, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (citation modified).

## IV.  ANALYSIS

The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The Supremacy Clause undoubtedly prevents states from contradicting or obstructing the federal immigration scheme, *Arizona v. United States,* 567 U.S. 387, 407 (2012), but it does not go so far as to compel state assistance. The decision to implement the federal immigration scheme is reserved to the states according to the Tenth Amendment of the U.S. Constitution. *See Printz v. United States*, 521 U.S. 898, 925 (1997). However, the basis for Plaintiff's claims is an interpretation of Congress's authority to regulate immigration that would compel state assistance. Therefore, the Court finds that Plaintiff fails to state claims upon which relief can be granted. *See United States v. Illinois,* 796 F.Supp.3d 494, 532 (N.D. Ill. 2025) (holding that similar state

6

"sanctuary laws" in Illinois are protected by the Tenth Amendment, "even if those policies frustrate the federal government's civil immigration efforts."); *United States v. New York*, 810 F. Supp. 3d 329, 355 (N.D.N.Y. 2025) (holding that similar "sanctuary laws" in New York reflected the state's "decision to not participate in enforcing civil immigration law – a decision protected by the Tenth Amendment . . . Finding that these same provisions constitute discrimination or impermissible regulation would provide an end-run around the Tenth Amendment.") (hereafter, *New York N.D.N.Y*).

The Tenth Amendment declares all "powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." U.S. Const. amend. X. Thus, "[i]f a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress." *New York v. United States*, 505 U.S. 144, 156 (1992) (hereafter, *New York*). In the Tenth Circuit, courts begin a Tenth Amendment analysis by determining "if the authority to act has been delegated by the Constitution to Congress." *Bd. of Cnty. Comm'rs, Fremont Cnty., Colorado v. United States E.E.O.C.*, 405 F.3d 840, 847 (10th Cir. 2005) (quoting *Kansas v. United States,* 214 F.3d 1196, 1198 (10th Cir. 2000). If the answer is yes, then Congress may act pursuant to Article I, but if the answer is no, then the power is deemed to have been reserved to the states. *Id.*

The Constitution confers upon Congress "broad, undoubted power over the subject of immigration and the status of aliens." *Arizona,* 567 U.S. at 394. "This authority rests, in part, on the National Government's constitutional power to 'establish an uniform Rule of Naturalization,'

7

Art. I, § 8, cl. 4, and its inherent power as sovereign to control and conduct relations with foreign nations." *Id.* Pursuant to this authority, the Federal Government has enacted an extensive statutory and regulatory scheme for the governance of immigration status, which includes inspection, investigation, arrest, detention, and removal of individuals found to be unlawfully present in the United States. *See id.* at 395; 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231. Nothing in this Order pretends to affect that complex regulatory scheme.

However, as the Supreme Court has recognized, the Constitution does not confer upon Congress the power to compel states to implement federal regulatory programs. *Printz,* 521 U.S. at 925 ("[T]he Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs."). Our nation was founded on a system of "dual sovereignty" in which "citizens would have two political capacities, one state and one federal, each protected from incursion by the other." *Id.* at 928 (quoting *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 838 (1995) (Kennedy, J., concurring)). To preserve such a system, state legislatures must necessarily be free to govern according to the interests and will of their constituents, not Congress. *See id.* at 920 ("The Constitution thus contemplates that a State's government will represent and remain accountable to its own citizens."); *New York,* 505 U.S. at 162 ("While Congress has substantial powers to govern the Nation directly, including in areas of intimate concern to the States, the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions."); *Murphy v. Nat'l Collegiate Athletic Ass'n,* 584 U.S. 453, 471 (2018) ("[C]onspicuously absent from the list of powers given to Congress [in the Constitution] is the power to issue direct orders to the governments of the States."). And at the heart of representative governance is the "allocation of

8

scarce resources among competing needs and interests." *Alden v. Maine,* 527 U.S. 706, 751 (1999) ("Today, as at the time of the founding, the allocation of scarce resources among competing needs and interests lies at the heart of the political process."). If Congress were authorized to dictate the allocation of state resources, the balance of power contemplated by our Constitution would be upended. *Id.* ("When the Federal Government asserts authority over a State's most fundamental political processes, it strikes at the heart of the political accountability so essential to our liberty and republican form of government."). Therefore, it is clearly established that Congress does not have the power to dictate the allocation of state resources, such as by compelling states to bear the cost of enforcing a federal regulatory program. As the Supreme Court stated in *New York,* "[i]f state residents would prefer their government to devote its attention and resources to problems other than those deemed important by Congress, they may choose to have the Federal Government rather than the State bear the expense of a federally mandated regulatory program." 505 U.S. at 168.

According to these principles, state implementation and enforcement of the federal immigration scheme is necessarily voluntary. This conclusion is further supported by the language and text of the federal immigration laws that Plaintiff cites in its complaint. For example, federal law permits the federal government to contract with state and local governments to further federal immigration enforcement but does not require such. 8 U.S.C. §§ 1357(g), 1103(a)(11)(b). Additionally, a civil immigration detainer is explicitly a "request" to state or local law enforcement. 8 C.F.R. § 287.7(a). Likewise, administrative warrants are issued by a federal agency rather than a judge, which multiple courts have held to mean that state and local

cooperation is voluntary. *See Galarza v. Szalcyzk,* 745 F.3d 634, 645 (3d Cir. 2014); *United States v. California,* 921 f.3d 865, 887 (9th Cir. 2019).

Yet Plaintiff's claims seek to effectively mandate Colorado expend state resources to implement the federal immigration scheme. First, holding that the limitations on collection and disclosure of individuals' personal information violates the Supremacy Clause would require Colorado and Denver to allow officials to spend time on the clock collecting and sharing information with the Federal Government (*see* D. 63 at 26 ("But if the federal government can require that state and local employees be permitted to spend their official time and resources sharing information with it, then the federal government wrests control of those employees' job duties from the state and local governments that employe them.")). Not only would this outcome compel Colorado and Denver to "bear the expense" of the federal civil immigration scheme by forcing them to pay officials performing functions solely for the purpose of a federal regulatory program, it would also remove authority over these officials from Colorado and Denver to the Federal Government. This is exactly the result contemplated and rejected in *Printz,* where the Supreme Court struck down a federal statute commanding state officers to conduct background checks pursuant to a federal regulatory program. 521 U.S. 898. The holding in *Printz* was clear: the Constitution does not grant Congress the authority to "dragoon" state officers into administering federal law. *Id.* at 928.

Second, holding that the prohibition on state and local officials arresting or detaining individuals pursuant to civil immigration detainers or administrative warrants violates the Supremacy Clause would require Colorado and Denver to allow use of law enforcement time, resources, and custodial facilities to arrest and hold individuals purely for federal civil immigration

10

purposes. Again, this would directly force Colorado and Denver to bear the cost of enforcing the federal immigration scheme and remove their authority to determine the proper allocation of state resources. The same is true for the challenged laws prohibiting governmental entities from contracting with the Federal Government to detain individuals for federal immigration purposes and imposing limitations on the allocation of state resources to privately-owned immigration detention facilities. Striking these laws down would require Colorado to permit use of state facilities and funds for federal immigration purposes. Additionally, because detainers contain an information sharing component (requesting that state officials notify DHS when an individual is eligible for release), requiring compliance would result in Congressional conscription of state and local employees for the same reasons as with the information sharing provisions discussed above.

Similarly, holding that the limitations on federal immigration official access to city and county jails for interview and immigration enforcement purposes violates the Supremacy Clause would require the city and county of Denver to allow the Federal Government access to and use of its facilities for federal immigration purposes.[3] Aside from the fact that the Constitution does not explicitly enumerate Congressional power to commandeer state and local facilities for federal purposes and that such commandeering imposes a financial burden on state and local governments, the Fifth Amendment has been interpreted to proactively forbid federal physical occupation of state and local property without just compensation. *See Yee v. City of Escondido, Cal.*, 503 U.S. 519, 527 (1992) ("The government effects a physical taking [] where it *requires* the landowner to submit to the physical occupation of his land."); *United States v. 50 Acres of Land*, 469 U.S. 24,

---

[3] The court in *Illinois* held that because the language of federal immigration laws permits but does not require "allow[ing] federal immigration officials access to detainees held in state facilities," there was no "hook" for the United States' preemption argument with respect to providing access to individuals in detention for state and local offenses to facilitate ICE interviews. *Illinois,* 796 F.Supp.3d at 530–531 (quoting *Arizona,* 567 U.S. at 410).

31 (1984) ("[I]t is most reasonable to construe the reference to "private property" in the Takings Clause of the Fifth Amendment as encompassing the property of state and local governments when it is [taken] by the United States.").

Finally, holding that the requirement that state and local officials inform detained individuals of certain rights before coordinating an interview with federal immigration officials violates the Supremacy Clause and would impermissibly shift authority over these officials from Colorado and Denver to the Federal Government.  In contrast to Plaintiff's other arguments that would have the Court require Colorado and Denver to allow state and local officials to engage in certain conduct, Plaintiff's argument here would prohibit Colorado and Denver from requiring officials to engage in certain conduct.  In both instances, Plaintiff seeks to usurp control over Colorado and Denver officials by dictating what the officials can and cannot do.  The difference between Congress "command[ing] 'affirmative' action as opposed to imposing a prohibition" is an "empty" distinction.  *Murphy,* 584 U.S. at 474 (holding that a federal statute prohibiting state authorization of sports gambling violated the Tenth Amendment because it "unequivocally dictate[d] what a state legislature may and may not do").  The Federal Government does not have the power to direct the Colorado legislature or Colorado state and local officials in such a fashion. *See New York,* 505 U.S. at 166 ("We have always understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts.").

For these reasons, holding in favor of Plaintiff on any of its claims would result in allowing Congress to conscript Colorado and Denver resources to implement the federal immigration scheme.  But Colorado and Denver have the right to refuse to expend their resources to implement

12

a federal regulatory program.  Therefore, any holding in favor of Plaintiff would run afoul of the Tenth Amendment, and the Court need not discuss Plaintiff's preemption, discrimination, or federal regulation arguments.[4]

## V.  CONCLUSION

Accordingly, the Motion to Dismiss by State of Colorado, Governor Jared Polis, and Attorney General Philip Weiser (D. 37); Defendant Colorado General Assembly's Motion to Dismiss Plaintiff's Claims Against it Pursuant to Fed.R.Civ.P. 12(b)(6) (D. 38); and City and County of Denver's Motion to Dismiss First Amended Complaint (D. 39) are GRANTED.  It is FURTHER ORDERED that the Clerk of the Court shall close this case.

DATED March 31, 2026.

BY THE COURT:

Gordon P. Gallagher
United States District Judge

---

[4] Two other district courts, in *Illinois*, 796 F.Supp.3d 494 and *New York N.D.N.Y.*, 810 F.Supp.3d 329, faced with similar claims from Plaintiff regarding state "sanctuary laws" have extensively analyzed Plaintiff's preemption, discrimination, and direct regulation arguments.  Both courts dismissed Plaintiff's claims, finding no express or implied preemption, Plaintiff failed to identify a valid comparator as needed for its discrimination claim, and no direct regulation of the federal government.

This Court his fully reviewed those very thorough opinions, issued by the Honorable Lindsay C. Jenkins (N.D. Ill.) and the Honorable Mae A. D'Agostino (N.D.N.Y).  This Court is wholly in accord with those courts and adopts their analysis and reasoning.  While this Court is aware that Judge Jenkins and Judge D'Agostino sit in different Circuits, that bears little relevance in this circumstance because much of the foundation of their analysis is based in the United States Constitution and interpretation thereof by the United States Supreme Court (as opposed to Circuit-specific law) and is thus *stare decisis* for all Circuits.  And the state and local laws and ordinances challenged in each case are substantially similar across all three cases.

While agreeing with the analysis of both Judges Jenkins and D'Agostino, I found the Constitutional bar presented by the Tenth Amendment dispositive of all matters and determined that further discussion of that topic was warranted.