UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

United States of America,

           Plaintiff,

   vs.

State of Minnesota; City of Minneapolis, Minnesota; City of St. Paul, Minnesota; Hennepin County, Minnesota; Keith Ellison, Attorney General of Minnesota, in his official capacity; Dawanna S. Witt, Hennepin County Sheriff, in her official capacity,

           Defendants.

Civ. No. 25-3798 (ECT/JFD)

**NOTICE OF SUPPLEMENTAL AUTHORITY**

Defendants the State of Minnesota and Attorney General Keith Ellison submit this Notice of Supplemental Authority to apprise the Court of a recent decision from the United States District Court for the District of Massachusetts dismissing claims similar to those asserted in this action. *See United States v. City of Boston*, --- F. Supp. 3d ---, Civil No. 25-12456-LTS, 2026 WL 1493706 (D. Mass. May 28, 2026). A copy of the decision is attached as Exhibit 1.

Dated: May 29, 2026

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

**s/ Joseph R. Richie**
JOSEPH R. RICHIE
Special Counsel
Atty. Reg. No. 0400615

BRIAN S. CARTER
Special Counsel
Atty. Reg. No. 0390613

MADELEINE DEMEULES
Assistant Attorney General
Atty. Reg. No. 0402648

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 300-0921 (Voice)
(651) 282-5832 (Fax)
Joseph.Richie@ag.state.mn.us
Brian.Carter@ag.state.mn.us
Madeleine.DeMeules@ag.state.mn.us

*Attorneys for Defendants State of Minnesota
and Minnesota Attorney General Keith Ellison*

|#6335918-v1

2

# Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil No. 25-12456-LTS |
| THE CITY OF BOSTON et al., | ) ) | |
| Defendants. | ) ) | |

ORDER ON DEFENDANTS' MOTION TO DISMISS (DOC. NO. 15)

May 28, 2026

SOROKIN, J.

More than a decade ago, the City of Boston adopted the Boston Trust Act, an ordinance limiting the City's cooperation with federal civil immigration enforcement. In September 2025, the United States sued the City (along with the Boston Police Department, Mayor, and Police Commissioner), seeking an injunction barring enforcement of the Boston Trust Act as well as a declaration of the Act's invalidity. The United States has not moved for a preliminary injunction. Pending before the Court is the defendants' motion to dismiss.

The United States' claims fail at the threshold because it lacks standing—specifically, the United States has not made a plausible showing that its alleged injuries are redressable by the judicial relief it seeks. For that reason, and as further explained below, the motion to dismiss (Doc. No. 15) is ALLOWED.

I.     BACKGROUND

A.     Federal Statutory and Regulatory Framework

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." Arizona v. United States, 567 U.S. 387, 394 (2012). "This authority rests, in part, on the National Government's constitutional power to 'establish an uniform Rule of Naturalization' and its inherent power as sovereign to control and conduct relations with foreign nations." Id. at 394–95 (citations omitted) (quoting U.S. Const. art. I, § 8, cl. 4). "The foundation of our laws on immigration and naturalization is the Immigration and Nationality Act (INA), . . . which sets out the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." Kansas v. Garcia, 589 U.S. 191, 195 (2020) (citation modified). "Agencies in the Department of Homeland Security," (or "DHS"), including Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP"), "play a major role in enforcing the country's immigration laws." Arizona, 567 U.S. at 397; see also, e.g., 8 U.S.C. § 1103(a).

Two categories of INA provisions and DHS regulations are pertinent here. See Doc. No. 1 ¶¶ 18–28;[1] see also United States v. Illinois, 796 F. Supp. 3d 494, 505 (N.D. Ill. 2025). First are provisions related to immigration detainers and administrative warrants. The INA authorizes federal immigration officers to use administrative warrants to arrest and detain certain noncitizens "pending a decision on whether the alien is to be removed from the United States."[2] 8 U.S.C. § 1226(a). In some circumstances, detention is mandatory rather than discretionary.

---

[1] Citations to "Doc. No. __" reference items appearing on the Court's electronic docketing system ("ECF"); pincites are to the page numbers in the ECF header or, for documents enumerated by paragraph, to paragraph numbers.

[2] This Order uses the term "noncitizen" as equivalent to the statutory term "alien." See 8 U.S.C. § 1101(a)(3); Nasrallah v. Barr, 590 U.S. 573, 578 n.2 (2020).

See Hernandez-Lara v. Lyons, 10 F.4th 19, 26 (1st Cir. 2021); Gomes v. Hyde, 804 F. Supp. 3d 265, 269–70 (D. Mass. 2025).  If a noncitizen has committed certain criminal offenses or is affiliated with terrorist activity, the federal government "shall" take the noncitizen into custody upon their release by arresting authorities.  8 U.S.C. § 1226(c)(1).  Under the Laken Riley Act, if a noncitizen is inadmissible on certain grounds and is charged with, arrested for, or convicted of certain violent offenses, DHS "shall issue a detainer" for that person and, if the person is not otherwise detained, DHS "shall effectively and expeditiously take custody" of them.[3]  Id. § 1226(c)(1)(E), (c)(3).  If a noncitizen is subject to a final order of removal, the federal government "shall remove" that person from the United States within a specified removal period, which begins—if the person is "detained or confined (except under an immigration process)"— on the day the person is "released from detention or confinement."  Id. § 1231(a)(1)(B)(iii).  If a noncitizen is "sentenced to imprisonment," DHS generally "may not remove" that noncitizen until they are "released from imprisonment."  Id. § 1231(a)(4)(A).  This restriction does not apply to noncitizens who face criminal charges but have not yet been sentenced.

DHS regulations authorize immigration officers to issue immigration "detainers" to any other federal, state, or local law enforcement agency.  8 C.F.R. § 287.7(a).  "A detainer serves to advise another law enforcement agency that [DHS] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien."  Id.  A detainer is "a request that such agency advise [DHS], prior to release of the alien, in order for [DHS] to arrange to assume custody, in situations when gaining immediate physical custody is either

---

[3] This provision is one of only two references to immigration detainers in the INA.  The other arises when a noncitizen is arrested for violation of a controlled-substances law and the arresting official requests that DHS determine whether to issue a detainer.  8 U.S.C. § 1357(d).  If DHS does issue a detainer and the noncitizen "is not otherwise detained," "the Attorney General shall effectively and expeditiously take custody" of the noncitizen.  Id.

3

impracticable or impossible." Id. If DHS issues a detainer for a noncitizen who is "not otherwise detained by a criminal justice agency," DHS may request that the agency "maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by [DHS]." Id. § 287.7(d); see also Dep't of Homeland Sec., Form I-274A, Immigration Detainer—Notice of Action (2017) ("It is therefore requested that you . . . [m]aintain custody of the alien for a period not to exceed 48 hours beyond the time when he/she would otherwise have been released from your custody to allow DHS to assume custody." (emphasis omitted)); Morales v. Chadbourne, 793 F.3d 208, 212 (1st Cir. 2015) ("[A]n immigration detainer . . . is a request from ICE to another law enforcement agency to detain a non-citizen up to 48 hours so that ICE may investigate whether the non-citizen is subject to deportation." (citing 8 C.F.R. § 287.7(a), (d))); Galarza v. Szalczyk, 745 F.3d 634, 639–42 (3d Cir. 2014) (rejecting argument that detainers issued pursuant to 8 C.F.R. § 287.7(d) impose mandatory obligations on state and local agencies to detain noncitizens).

The second category of statutory and regulatory provisions at issue here comprises those related to information sharing and cooperation. As the Supreme Court has noted, "[c]onsultation between federal and state officials is an important feature of the immigration system." Arizona, 567 U.S. at 411. Congress "has encouraged the sharing of information about possible immigration violations." Id. at 412 (citing 8 U.S.C. § 1357(g)(10)(A)). Several statutory provisions prohibit restrictions on the sharing of "information regarding the citizenship or immigration status" of individuals:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

4

8 U.S.C. § 1373(a); see also id. § 1373(b) (similar); id. § 1644 (similar).  As other federal courts have concluded, the "phrase 'information regarding the citizenship or immigration status, lawful or unlawful, of any individual' is naturally understood as a reference to a person's legal classification under federal law."  United States v. California, 921 F.3d 865, 891–92 (9th Cir. 2019); see also, e.g., Illinois, 796 F. Supp. 3d at 516–19 (collecting cases).

More generally, the INA authorizes voluntary cooperation, formal and informal, between local, state, and federal officials.  States and localities may voluntarily enter into written agreements with DHS—often called "287(g) agreements"—authorizing state or local officers to perform the functions of an immigration officer "to the extent consistent with State and local law."  8 U.S.C. § 1357(g)(1); see also id. § 1357(g)(9) ("Nothing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement with the Attorney General under this subsection.").  The INA does not require a formal 287(g) agreement in order for state and local officials to communicate with DHS "regarding the immigration status of any individual" or to otherwise "cooperate" with DHS in the "identification, apprehension, detention, or removal of aliens not lawfully present in the United States."  Id. § 1357(g)(10).

B.    State and Local Law

Holding or detaining a person beyond the time the person would otherwise be released from state custody constitutes an "arrest" under Massachusetts law.  Lunn v. Commonwealth, 78 N.E.3d 1143, 1153 (Mass. 2017) (per curiam).  Whether state and local officers have authority to effect an arrest is a question of Massachusetts common and statutory law.  Id. at 1154 ("The authority to arrest is generally controlled by Massachusetts common law and statutes, which confer the power and also define the limits of that power.").  Massachusetts officers do not have

"inherent authority" to make arrests beyond the scope of authority established in the common law and by statute.  Id. at 1157–58.

In 2017, the Massachusetts Supreme Judicial Court held that Massachusetts law "provides no authority" for state or local law enforcement officers to "arrest [or] hold an individual solely on the basis of a [f]ederal civil immigration detainer[] beyond the time the individual would otherwise be entitled to be released from [s]tate custody." Id. at 1160. Likewise, Massachusetts law enforcement officers lack authority to conduct arrests pursuant to civil administrative warrants issued by federal immigration officials.  Id. at 1155 & n.21.  In Massachusetts, state and local law enforcement officers may not detain a noncitizen solely based on a federal civil immigration detainer or administrative warrant because no Massachusetts authority empowers them to do so.[4]

The Boston Trust Act is an ordinance that limits the City of Boston's official cooperation with federal civil immigration enforcement.  The Boston City Council adopted the Boston Trust Act in 2014 and amended the Act to its present form in 2019.  Doc. Nos. 1-1, 1-2; Bos., Mass., Mun. Code ch. 11, § 1.9 (2019).  The Act was originally adopted "to establish the City's policy for responding to ICE's civil immigration detainer requests."  Doc. No. 1-1 at 2.  The City Council found, among other things, that "[w]hen local law enforcement officials indiscriminately

---

[4] The Lunn court acknowledged that Congress could, in some circumstances, confer authority on state or local officials to make arrests for violations of federal law, but it concluded Congress had not done so with respect to civil immigration detainers, Lunn, 78 N.E.3d at 1154, 1156–60, and so it did not address whether such arrests (if authorized) would comply with the United States or Massachusetts constitutions, id. at 1146 n.1.  The United States appeared as amicus curiae and participated in oral argument the 2017 Lunn case.  Id. at 1146–47 n.3.  In that case, the United States "[did] not contend that § 1357(g)(10) affirmatively confers authority on State and local officers to make arrests pursuant to civil immigration detainers, where none otherwise exists." Id. at 1158 (emphasis in original).  Here, the United States does not argue that federal law independently confers authority on state and local officers that they lack as a matter of state law.

6

honor all ICE civil immigration detainer requests, including those that target non-criminal aliens, immigrant residents are less likely to cooperate and public trust erodes, hindering the ability and effectiveness of Boston's police force." Id.

The Boston Trust Act provides: "A [City of Boston] law enforcement official shall not detain an individual solely on the basis of a civil immigration detainer request or an ICE administrative warrant after the individual is eligible for release from custody, unless ICE has a criminal warrant, issued by a Judicial Officer, for the individual." Bos., Mass., Mun. Code ch. 11, § 1.9(B). The Act prohibits Boston law enforcement officials and city employees from using "monies or personnel to interrogate, detain or arrest persons for immigration enforcement purposes, that are otherwise the responsibility of [ICE]," including the following:

1. Inquiring of an individual his or her immigration status;

2. Detaining an individual solely on the basis of a civil immigration detainer request;

3. Providing personal information . . . or [information] regarding a person's release date or time to [ICE];

4. Providing personal information . . . or [information] regarding a person's release date or time to ICE-HSI solely for the purpose of enforcing civil violations of United States immigration laws;[5]

5. Making arrests based solely on ICE administrative warrants including administrative warrants after the individual is eligible for release from custody; and

6. Performing the functions of an Immigration Officer.

Bos., Mass., Mun. Code ch. 11, § 1.9(D)(1)(a); see also id. § 1.9(A) (defining "personal information" as "[a]ny information that is maintained by an Agency that identifies or describes an individual, that can be used, either alone or in combination with other information, to identify

---

[5] ICE-HSI is the Homeland Security Investigations component of ICE. Bos., Mass., Mun. Code ch. 11, § 1.9(A).

individual subjects, such as his or her name, Social Security number, physical description, home address and/or work address"). It also prohibits City officials from "[t]ransfer[ring] an individual to immigration authorities unless authorized by a judicial warrant or other judicial order." Id. § 1.9(D)(1)(b).

The Trust Act's scope is circumscribed. For one, the Act "does not prevent any Boston law enforcement official or [City] employee" from responding to requests from ICE-HSI for information regarding a person's criminal history, or from conducting joint investigations and law enforcement activities "so long as the primary purpose of the partnership or task force is not to enforce civil violations of United States immigration laws." Id. § 1.9(D)(2)(b)–(c). It also does not prohibit Boston police officers from detaining or arresting people suspected of committing certain federal crimes, including the offense of illegal reentry. Id. § 1.9(D)(2)(a), (e) (citing 8 U.S.C. § 1326(a), (b)(2); 18 U.S.C. § 922(d)(5)). The Act contains a savings clause regarding information sharing: "This [Act] does not prohibit or restrict any government Agency from complying with 8 U.S.C. §§ 1373 and 1644." Id. § 1.9(D)(3).

In 2015, the Boston Police Department "honored all [nine] civil immigration detainer requests from ICE." Doc. No. 1 ¶ 39; see also Doc. No. 1-3. "But every year since then," the Department has "refus[ed] to honor any of ICE's civil immigration detainers," and its "proffered reason for refusing to honor ICE's immigration detainer requests is the Boston Trust Act." Doc. No. 1 ¶¶ 39, 40 & n.3; see also Doc. Nos. 1-4 to -10 (annual Boston Trust Act reports).

The complaint alleges that, "upon information and belief, because of the challenged laws, DHS lacks the ability to consistently and readily obtain from local law enforcement the release dates of aliens whom DHS has reason to believe are removable from the United States, and DHS lacks access to such aliens to facilitate the transfer of custody, even where DHS presents a

congressionally authorized civil administrative warrant of arrest or removal, see [8 U.S.C.] §§ 1226(a), 1231(a), or has transferred those aliens to local law enforcement in the first instance to permit their prosecution for a state crime."[6]  Doc. No. 1 ¶ 46.  According to the complaint, "the Boston Trust Act requires federal immigration officers either (1) to engage in difficult and dangerous efforts to re-arrest aliens who were previously in local custody, endangering immigration officers, the particular alien, and others who may be nearby, or (2) to determine that it is not appropriate to transfer an alien to local custody in the first place, in order to comply with their mission to enforce the immigration laws."  Id. ¶ 47.

C.   Procedural History

On September 4, 2025, the United States filed suit against the City of Boston, the Boston Police Department, Boston Mayor Michelle Wu, and Boston Police Commissioner Michael Cox.  Doc. No. 1.  The United States' challenge centers on two aspects of the Boston Trust Act: (1) the Act's prohibition on holding or arresting individuals solely on the basis of civil immigration detainers and administrative warrants, Bos., Mass., Mun. Code ch. 11, § 1.9(B), (D)(1)(a)(2), (5); and (2) its restriction on the sharing of personal information and release date and time with ICE officers, id. § 1.9(D)(1)(a)(3)–(4).  See Doc. No. 1 ¶¶ 54, 59, 63; see also Doc. No. 53 at 11–14, 18–19, 23; Doc. No. 61 at 3 (arguing "the United States has plausibly alleged each element of standing with respect to the Trust Act's detainer and information sharing provisions").  The United States advances three claims under the Supremacy Clause: (1) that the Boston Trust Act is preempted by federal immigration law, (2) that enforcement of the Boston Trust Act

---

[6] The complaint also alleges that, "[a]ccording to ICE, the Boston Police Department has refused to provide ICE agents access to the City's detention areas to arrange for a safe custodial transfer of an alien even when ICE agents are present at the police station and capable of taking custody of that alien."  Doc. No. 1 ¶ 41.  But the complaint does not cite a provision of the Boston Trust Act that requires this refusal or otherwise allege it is a consequence of the Trust Act.

discriminates against the federal government, and (3) that enforcement of the Boston Trust Act directly regulates the federal government.  Doc. No. 1 ¶¶ 52–64.  The complaint seeks an injunction barring the defendants from enforcing the Boston Trust Act, a declaratory judgment that the Act violates the Supremacy Clause and 8 U.S.C. § 1373, and fees and costs.  Id. at 16. The United States has never moved for a preliminary injunction or otherwise sought expedited relief or resolution.

On November 17, 2025, the defendants moved to dismiss the complaint.  Doc. No. 15. The motion to dismiss is fully briefed.[7]  Doc. Nos. 16, 53, 58.  On March 18, 2026, the Court ordered the parties to file supplemental memoranda addressing the United States' Article III standing as to each claim and form of relief sought.  Doc. No. 59.  The standing issue is also fully briefed.  Doc. Nos. 61, 65, 66.  The Court heard oral argument on May 13, 2026, and it now resolves the motion to dismiss.

II.   LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In so doing, the complaint must advance "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory."  Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1997).  Courts must "take all

---

[7] The Court recognizes the amicus briefs filed by Six Law Enforcement Officers (Doc. No. 41); American Civil Liberties Union of Massachusetts, Brazilian Women's Group, Cape Cod Coalition for Safe Communities, Dignidad, Dominican Development Center, Inc., East Boston Community Council, Greater Boston Legal Services, Haitian American New Vision of Waltham, Haitian Americans United, Immigrant Support Alliance, International Institute of New England, Jane Doe Inc., Massachusetts Immigrant and Refugee Advocacy Coalition, Massachusetts Law Reform Institute, Sisters of St. Joseph of Boston, Student Clinic for Immigrant Justice, and the Watertown Citizens for Peace, Justice & the Environment (Doc. No. 42); Twenty-Seven Cities, Counties, and Elected Officials (Doc. No. 43); the Commonwealth of Massachusetts (Doc. No. 44); and Federation for American Immigration Reform (Doc. No. 57).

factual allegations [in the complaint] as true and . . . draw all reasonable inferences in favor of the plaintiff." Rodríguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 96 (1st Cir. 2007). But "[t]he court need not accept a plaintiff's assertion that a factual allegation satisfies an element of a claim, . . . nor must a court infer from the assertion of a legal conclusion that factual allegations could be made that would justify drawing such a conclusion." Cordero-Hernández v. Hernández-Ballesteros, 449 F.3d 240, 244 n.3 (1st Cir. 2006).

As the party invoking federal jurisdiction, the United States bears the burden of demonstrating that it has standing. TransUnion LLC v. Ramirez, 594 U.S. 413, 430 (2021). "A plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" Id. at 431 (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)); see also Webb v. Injured Workers Pharmacy, LLC, 72 F.4th 365, 371 (1st Cir. 2023) (noting typical plausibility standard applies when evaluating standing at motion-to-dismiss stage).

III.   DISCUSSION

A.   Proper Defendants

In their motion to dismiss, the defendants argue that the United States fails to state a claim against Mayor Wu and Commissioner Cox, that it lacks standing as to them, and that any claims against them in their official capacities are redundant with the claims against the City in any event. Doc. No. 16 at 20–21. The defendants also point out that the Boston Police Department is not a suable entity—a status reflected in a long line of cases. Id. at 21 (citing Douglas v. Bos. Police Dep't, No. 10-cv-11049-WGY, 2010 WL 2719970, at *2 (D. Mass. July 1, 2010)). The United States failed to respond to these arguments in its opposition brief. See generally Doc. No. 53; see also Doc. No. 58 at 11 (noting failure to respond). At oral argument, the United States confirmed it has no objection to the dismissal of Mayor Wu, Commissioner

11

Cox, or the Boston Police Department as defendants.  Doc. No. 70 at 4–6.  The motion to dismiss

(Doc. No. 15) is therefore ALLOWED with respect to all claims against Mayor Wu,

Commissioner Cox, and the Boston Police Department.

B.     Standing

The Court now turns to the United States' standing to bring the claims it asserts against

the City of Boston.  The United States has failed to plausibly show that its alleged injuries are

redressable by this Court's judgment.  It therefore lacks Article III standing, and the motion to

dismiss must be allowed.

Federal courts are courts of limited jurisdiction.  A federal district court is not a roving

beacon of justice, free to opine on each question any party presents, no matter how

consequential.  See Food & Drug Admin. v. All. for Hippocratic Med., 602 U.S. 367, 378–82

(2024).  Instead, a federal court's power is limited to actual "Cases" and "Controversies" within

its jurisdiction.  U.S. Const. art. III, § 2; see also, e.g., Spokeo, Inc. v. Robins, 578 U.S. 330, 337

(2016) ("[N]o principle is more fundamental to the judiciary's proper role in our system of

government than the constitutional limitation of federal-court jurisdiction to actual cases or

controversies." (quoting Raines v. Byrd, 521 U.S. 811, 818 (1997))).

"A proper case or controversy exists only when at least one plaintiff establishes that she

has standing to sue."  Murthy v. Missouri, 603 U.S. 43, 57 (2024) (citation modified).  The party

invoking federal jurisdiction (here, the United States) bears the burden to establish the

"irreducible constitutional minimum" of Article III standing—that it (1) has suffered a

cognizable injury in fact that is both (2) traceable to the challenged conduct of the defendant and

(3) likely to be redressed by a favorable judicial decision.  See Spokeo, 578 U.S. at 338.

"Standing is not dispensed in gross.  Rather, a plaintiff must demonstrate standing for each claim

12

he seeks to press and for each form of relief that is sought." Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008) (citation modified).

The third element, redressability, requires a plaintiff to show "that a favorable resolution of her claim would likely redress the professed injury." Katz v. Pershing, LLC, 672 F.3d 64, 72 (1st Cir. 2012). "To determine whether an injury is redressable," courts "consider the relationship between the judicial relief requested and the injury suffered." Murthy, 603 U.S. at 73 (citation modified). Redress needs to be "likely," though it need not be complete. See Lujan, 504 U.S. at 560–61; Uzuegbunam v. Preczewski, 592 U.S. 279, 291 (2021); see also Katz, 672 F.3d at 72 ("Redressability is a matter of degree. To satisfy this requirement, the plaintiff need not definitively demonstrate that a victory would completely remedy the harm." (citation modified)). "The primary goals of [the redressability] requirement are to ensure that plaintiffs do not sue the wrong parties and that courts do not issue advisory opinions." Diamond Alt. Energy, LLC v. Env't Prot. Agency, 606 U.S. 100, 120 (2025). "It is a federal court's judgment, not its opinion, that remedies an injury; thus it is the judgment, not the opinion, that demonstrates redressability." Haaland v. Brackeen, 599 U.S. 255, 294 (2023).

The United States seeks injunctive relief, declaratory relief, and costs and fees. The Court assesses whether the claim for injunctive relief establishes standing. See California v. Texas, 593 U.S. 659, 672–73 (2021); Lewis v. Cont'l Bank Corp., 494 U.S. 472, 480 (1990).

1. *Detainer Provisions*

The Court first considers the United States' standing to seek an injunction barring enforcement of the Boston Trust Act's prohibition on Boston law enforcement officers detaining individuals solely based on federal civil immigration detainers or administrative warrants. Doc. No. 1 ¶ 6; Bos., Mass., Mun. Code ch. 11, § 1.9(B), (D)(1)(a). The United States alleges two injuries: (1) injuries "related to its obligation to enforce immigration laws"—in particular,

13

"increased operational costs to enforce federal immigration law"; and (2) a "sovereign harm" that "can substitute as a traditional injury in fact for purposes of standing." Doc. No. 61 at 3–5 (citing Doc. No. 1 ¶¶ 6, 23–24, 38–40, 44); Doc. No. 66 at 3–4 (citing Doc. No. 1 ¶¶ 38–40, 47). Because the United States has made no plausible showing that the Court's judgment could redress these asserted injuries, the United States lacks standing to pursue this claim for relief.

The redressability problem here is as straightforward as it is fatal to the United States' claim. As a matter of Massachusetts law, Boston law enforcement officers may not detain a person solely based on a federal civil immigration detainer or administrative warrant because no authority empowers them to do so. See Lunn, 78 N.E.3d at 1160. With or without the Boston Trust Act, then, Boston police officers cannot detain a person pursuant solely to a federal civil immigration detainer or administrative warrant.[8] The relief the United States seeks—an order enjoining the City of Boston from enforcing the Trust Act's prohibition on detaining noncitizens solely pursuant to a civil immigration detainer or administrative warrant—could not alter this status quo. Because the Court's judgment cannot alleviate the United States' "operational" injury, even in part, the United States has not plausibly shown redressability.[9]

---

[8] The challenged provisions of the Boston Trust Act prohibit Boston law enforcement officers and other city employees from "[d]etaining an individual solely on the basis of a civil immigration detainer request" and "[m]aking arrests based solely on ICE administrative warrants including administrative warrants after the individual is eligible for release from custody." Bos., Mass., Mun. Code ch. 11, § 1.9(B), (D)(1)(a). As the defendants and the Commonwealth of Massachusetts as amicus curiae aptly put it, these provisions merely provide that Boston police "do not take actions that state law forbids." Doc. No. 44 at 18; accord Doc. No. 16 at 3–4.

[9] The United States did not address Lunn in its complaint or in its opposition to the City's motion to dismiss (despite the City's discussion of Lunn in its briefing, Doc. No. 16 at 3–4). The Court ordered the parties to submit supplemental briefing regarding Article III standing and specifically directed them to address the Supreme Judicial Court's holding in Lunn (as well as the Trust Act's savings clause, discussed below). Doc. No. 59. In its supplemental briefing regarding standing, the United States argues that "Lunn has nothing to do with this case" because (1) the Boston Trust Act was initially enacted before Lunn was decided, (2) the ordinance does not specifically refer to Lunn, and (3) the Boston Police Commissioner's annual (Boston Trust Act–

It is true, as the United States argues, that redress need not be "complete" to support Article III standing.  Doc. No. 61 at 9–10; see also, e.g., Uzuegbunam, 592 U.S. at 291; Antilles Cement Corp. v. Fortuno, 670 F.3d 310, 317–19 (1st Cir. 2012).  But the United States as plaintiff "must show that the [C]ourt can fashion a remedy that will at least lessen its injury." Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc., 958 F.3d 38, 49 (1st Cir. 2020); see also, e.g., Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec., 909 F.3d 446, 465 (D.C. Cir. 2018) (plaintiff lacked standing to challenge agency directive where statute "prohibits all the same conduct" and "invalidation of the [d]irective alone would do nothing to help [plaintiff's] plight as long as [the statute] remains good law"); cf. Uzuegbunam, 592 U.S. at 291 (noting that although nominal damages "often cannot provide full redress," they are nevertheless "damages paid to the plaintiff" that "affect the behavior of the defendant towards the plaintiff" and "thus independently provide" at least partial redress (citation modified)); Antilles Cement Corp., 670 F.3d at 317–19 (plaintiff had standing to challenge two laws despite not challenging third, overlapping law because challenged laws "place[d] more onerous burdens on" plaintiff than unchallenged law did, so plaintiff's injury "would at least be alleviated" by requested relief). Here, a court order enjoining enforcement of the Boston Trust Act could not lessen or alleviate

_____

required) reports state that detainer requests were "[not] acted upon per the Boston Trust Ordinance" without referring to Lunn.  Doc. No. 61 at 9 (citing Doc. Nos. 1-2, 1-7).  This argument is well wide of the mark.  Lunn held that state law prohibits law enforcement officers from detaining persons solely on the authority of a civil immigration detainer after the expiration of the state-law basis for their custody.  Put differently, Lunn's holding means that Boston police officers lack authority to do what the United States would like them to (at least) have the option to do—hold noncitizens beyond the time they are entitled to release so that ICE can take custody of them.  Lunn's holding is, plainly, central to answering the question whether a federal court could redress the United States' alleged injuries.  Whether the Trust Act (or reports filed pursuant to it) cite Lunn is immaterial.  And though decided after the Boston Trust Act was first enacted, Lunn did not cite, construe, or depend on the Trust Act; instead, it turned on existing state statutory and common law.

15

the United States' injury.  The moral victory of a favorable federal-court opinion (but see infra note 10) is inadequate (and irrelevant); it is a court's judgment, not its opinion, that provides redress.  Brackeen, 599 U.S. at 294.  To conclude otherwise would be to render an impermissible advisory opinion.  See Diamond Alt. Energy, 606 U.S. at 120.

To illustrate why redressability is absent here, consider another lawsuit in which the United States established its standing to challenge policies similar to the Boston Trust Act (though its claims were dismissed on the merits[10]).  The United States sued Illinois, Cook County, and the City of Chicago, seeking an injunction against enforcement of state and local laws that prohibit government officials from, among other things, honoring ICE detainers.  Illinois, 796 F. Supp. 3d at 506, 508–11.  The district court concluded that enjoining the challenged state and local laws would render state and local law enforcement "free to cooperate with federal immigration authorities" and would "remove definitive impediments to federal immigration policy."  Id. at 510.  Although such an injunction "would not guarantee state and local cooperation," it would "provid[e] state and local officials the option" to cooperate and would, thereby, "at least partially redress" the alleged injuries.  Id. at 510 n.8.  The United States thus established redressability (along with the other Article III requirements).

Here, by contrast, the injunctive relief the United States seeks would not render Boston law enforcement officers "free to cooperate" with ICE detainers and administrative warrants, nor

---

[10] The present case is one of nearly a dozen suits the United States brought in 2025 against cities and states with so-called "sanctuary" policies.  So far, four suits have reached final judgment— all dismissing the United States' claims in their entirety.  Illinois, 796 F. Supp. 3d 494; United States v. New York, 810 F. Supp. 3d 329 (N.D.N.Y. 2025); United States v. New York, 814 F. Supp. 3d 266 (N.D.N.Y. 2025); United States v. Colorado, No. 25-CV-01391-GPG-KAS, 2026 WL 878882 (D. Colo. Mar. 31, 2026).  The United States' briefing in this case largely ignored those thoughtful, persuasive opinions and did not attempt to explain why this Court should reach a different conclusion on the merits (if it reached the merits).

"provid[e] . . . local officials the option" to honor ICE's requests.  Id. at 510 & n.8.  Boston

police officers' authority to conduct arrests derives from, and is delimited by, state law.  Lunn,

78 N.E.3d at 1154.  In Massachusetts, there is simply no source of authority empowering Boston

police officers to do what the United States would like them to do.[11]  An order enjoining the

Boston Trust Act would not liberate the City to empower its officers to take actions state law

does not authorize, nor give Boston police officers the individual choice to honor ICE detainers.

Other governmental actors could conceivably give the United States the relief it seeks.

The Massachusetts Supreme Judicial Court (but not this Court) could conclude Lunn was

wrongly decided as a matter of state law.  Or the Massachusetts legislature (but not this Court)

could enact a statute authorizing Massachusetts law enforcement officers to arrest people

pursuant to federal civil immigration detainers.  See Lunn, 78 N.E.3d at 1156–58 & n.25.  Or

Congress (but not this Court) could enact federal legislation granting local law enforcement

officers this authority.[12]  See id. at 1154, 1159–60.  But this Court's order enjoining enforcement

of the Boston Trust Act decidedly would not alleviate the United States' injury.  Cf. Murthy, 603

U.S. at 57–58, 74 (identifying "bedrock principle" that "a federal court cannot redress injury that

results from the independent action of some third party not before the court").  The United States

therefore cannot satisfy redressability as to its "operational" injury.

The United States also claims, somewhat opaquely, that the Boston Trust Act's detention-

related provisions cause it "sovereign harm" that would be redressed by an injunction.  Doc. No.

61 at 3, 7.  To the extent this injury relates to the frustration of, or withdrawal of support for,

---

[11] The United States concedes it does not seek a positive injunction compelling Boston police
officers to conduct arrests and detentions they lack authority to conduct as a matter of state law.
Doc. No. 70 at 51–52.

[12] The Court expresses no opinion about the constitutionality or wisdom of these hypothetical
enactments.

federal civil immigration enforcement operations, see Doc. No. 66 at 2–4; see also Illinois, 796 F. Supp. 3d at 509; United States v. Missouri, 114 F.4th 980, 984 (8th Cir. 2024), the foregoing discussion encompasses this injury.  But elsewhere, the federal government contends it suffers a "sovereign harm" from the existence of an allegedly preempted local ordinance (separate from any concrete harm from the ordinance's enforcement), and that this harm "can substitute as a traditional injury in fact."  Doc. No. 61 at 3–4.  In explicating its position at oral argument, the United States asserted this theory would apply equally to a nonbinding city-council resolution (e.g., one expressing the City's view that ICE should not deport people) as to an enactment with the force of law.  Doc. No. 70 at 48–50.  In other words, the United States argues its sovereignty is injured by—and it can therefore file suit in federal court to challenge and enjoin—not only any local or state enactment arguably preempted by federal statute but any pronouncement of a position contrary to federal policy.

The implications of this argument are sweeping.  See United States v. California, No. 2:25-cv-06230-MCS, 2026 WL 784514, at *4–5 (C.D. Cal. Mar. 18, 2026) (noting theory that "mere existence of a preempted state law creates a sovereign injury to the federal government" is not supported by binding authority and has potentially sweeping consequences (emphasis in original)); cf. California, 593 U.S. at 670–71 ("The party who invokes the power [of Article III courts] must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement." (alteration in original) (quoting Massachusetts v. Mellon, 262 U.S. 447, 488 (1923))).  It suggests that any official statement opposing federal policies or positions suffices to provide the United States standing to seek an injunction, even if the statement lacks any practical effect.  The United States cites no on-point authority for this essentially limitless view of sovereign injury.

18

Regardless, the United States has failed to show such an injury would be redressed, in part or in whole, by the injunction it seeks here. The Court has already explained why an injunction could not redress the United States' concrete injuries stemming from the Trust Act's enforcement, either under the "operational" theory or the "frustration" theory. That leaves the United States' challenge to the Trust Act's existence—in essence, its request for a declaratory judgment of the Act's invalidity. "In these circumstances, injunctive relief could amount to no more than a declaration that the statutory provision [the plaintiff] attack[s] is unconstitutional, i.e., a declaratory judgment." California, 593 U.S. at 673. But "that is the very kind of relief that cannot alone supply jurisdiction otherwise absent." Id.; see also id. at 670–73 (cautioning that finding standing without "possibility of any judicial relief" would allow a federal court to issue an impermissible advisory opinion (quoting Los Angeles v. Lyons, 461 U.S. 95, 129 (1983) (Marshall, J., dissenting))); All. for Hippocratic Med., 602 U.S. at 378–79 ("[F]ederal courts do not issue advisory opinions about the law—even when requested by the President.").

Finally, at oral argument, the United States advanced arguments it had not made in the complaint, original motion-to-dismiss briefing, or supplemental briefing regarding standing. The United States was unable to explain, to any satisfactory degree, why the arguments it advanced in the hearing differed from its earlier litigation positions or why the briefing omitted its new arguments, nor did it ask to amend its pleadings. See, e.g., Doc. No. 70 at 29–30, 39–42.

Those unbriefed arguments are waived.[13]  See, e.g., Stanley v. Am. Econ. Ins. Co., No. 24-cv-10622-DJC, 2026 WL 194632, at *6 (D. Mass. Jan. 26, 2026) ("[T]he First Circuit has

---

[13] In any event, these belated arguments would not alter the Court's conclusions regarding standing. The United States argued that, because the Lunn court did not decide "whether the detention of an individual pursuant to a [f]ederal civil immigration detainer by a Massachusetts officer who is operating under [a 287(g) agreement] would be lawful," Lunn, 78 N.E.3d at 1158 n.26, the relief sought in this case could at least partially redress the United States' injuries. Doc.

19

'consistently held . . . except in extraordinary circumstances, arguments not raised in a party's initial brief and instead raised for the first time at oral argument are considered waived.'" (quoting United States v. Pizarro-Berríos, 448 F.3d 1, 5 (1st Cir. 2006))); Peter Pan Bus Lines, Inc. v. Greyhound Lines, Inc., 189 F. Supp. 3d 217, 225 (D. Mass. 2016) (collecting cases).[14]

---

No. 70 at 52–57. The logic goes like this: Suppose the Court enjoined enforcement of the Boston Trust Act as the United States seeks. Then, at some future point, perhaps the City might change tack and decide to enter into a voluntary 287(g) agreement with DHS whereby Boston police officers could hold noncitizens pursuant to federal civil immigration detainers (assuming Boston police officers would have authority to make such arrests under a 287(g) agreement in the absence of a state statute granting that authority, but cf. 8 U.S.C. § 1357(g)(1) (stating agreements may be made "to the extent consistent with State and local law")). Such an attenuated logical chain is not the stuff of which Article III standing is made—particularly in the absence of any factual allegations, or reasonable inferences therefrom, that the City is likely to, or has demonstrated a scintilla of interest in, entering a 287(g) agreement. The complaint's factual allegations do not plausibly permit such an inference. See Doc. No. 1 ¶¶ 2, 6, 37.

[14] One of the new and waived arguments warrants additional comment. At oral argument, the United States asserted that DHS regulations impose a mandate on local and state law enforcement agencies to detain noncitizens for up to forty-eight hours when an ICE detainer issues. Doc. No. 70 at 32, 34–35, 39–42; 8 C.F.R. § 287.7(d). This position is an about-face from the United States' position in its briefing, which explained that "[a] detainer might also ask the City to retain custody over the alien for a brief period, thereby ensuring a safe transfer into federal custody," Doc. No. 53 at 11 (emphasis added) (citing 8 C.F.R. § 287.7(d)), and reiterated, "the Federal Government . . . does not expect Boston police to arrest particular aliens or extend the custody of those who would otherwise be released," id. at 16. This is not a minor detail—on the federal government's briefing, the City's noncooperation frustrates and undermines a voluntary, collaborative process; on its oral-argument position, the City defies a federal mandate each time it does not hold a noncitizen at ICE's request. The United States did not acknowledge that its oral-argument position materially departed from its briefing position, nor did it offer a reasoned explanation for the shift. Doc. No. 70 at 32–33, 41–42.

The United States' newly announced position is rooted in the regulation's use of the word "shall." 8 C.F.R. § 287.7(d). Of course, the word "shall" might suggest a command, especially if one looked no further than that isolated term. But, as the Supreme Court has explained, the proper interpretation of statutory or regulatory text requires reading and interpreting the text's words "in their context, not in isolation." Sw. Airlines Co. v. Saxon, 596 U.S. 450, 455 (2022) (citation modified). Doing so reveals numerous persuasive authorities, including DHS's own regulations and guidance, that undermine the federal government's newfound position.

For starters, the regulation itself defines a detainer as "a request." 8 C.F.R. § 287.7(a). A request is "the act or instance of asking for something" or "something asked for." Request, Merriam-Webster's Collegiate Dictionary 1058 (11th ed. 2003). On DHS's detainer forms sent to local and state authorities, see 8 C.F.R. § 287.7(a), DHS describes the forty-eight-hour hold as both a "request" and a ceiling on the amount of time an agency may hold a person pursuant to a

20

Because a favorable judgment from this Court could not provide any relief to the United States, the United States has failed to satisfy the "redressability" prong of Article III standing with respect to the Boston Trust Act's detention and arrest provisions.

2.  *Information-Sharing Provisions*

The United States also lacks standing to challenge the information-sharing provisions of the Boston Trust Act because its alleged injuries are neither traceable to the Boston Trust Act nor redressable by the judicial relief it seeks. See All. for Hippocratic Med., 602 U.S. at 380 ("The second and third standing requirements—causation and redressability—are often flip sides of the same coin." (citation modified)).

---

detainer. See Dep't of Homeland Sec., Form I-274A, Immigration Detainer—Notice of Action (2017) ("**IT IS THEREFORE REQUESTED THAT YOU** . . . **[m]aintain custody** of the alien for a period **NOT TO EXCEED 48 HOURS** beyond the time when he/she would otherwise have been released from your custody to allow DHS to assume custody." (emphasis in original)). ICE's public website states, "Immigration detainers are only requests. They don't impose any obligations on law enforcement agencies." Immigration Detainers, U.S. Immigr. & Customs Enf't, https://www.ice.gov/immigration-detainers [https://perma.cc/FX5P-GR7Z] (last visited May 14, 2026) (emphasis added) ("An immigration detainer is a request from ICE that asks a federal, state or local law enforcement agency . . . [to] [h]old the alien for up to 48 hours beyond the time they would ordinarily release them so DHS has time to assume custody . . . ." (emphasis omitted)).

The First Circuit has described detainers as requests. Morales, 793 F.3d at 212 ("[A]n immigration detainer . . . is a request from ICE to another law enforcement agency to detain a non-citizen up to 48 hours so that ICE may investigate whether the non-citizen is subject to deportation." (citing 8 C.F.R. § 287.7(a), (d))). The Third Circuit has thoroughly rejected the position that § 287.7(d) mandates that agencies hold the subjects of immigration detainers. Galarza, 745 F.3d at 639–42. No federal statute authorizes DHS to impose such a mandate. Id. at 640 ("[N]o provisions of the [INA] authorize federal officials to command local or state officials to detain suspected aliens subject to removal."); accord Lunn, 78 N.E.3d at 1152. Indeed, the United States as amicus curiae in Lunn conceded that § 287.7(d) "defines the maximum length of time that an alien with an immigration detainer may be held. It does not require local law enforcement agencies to hold anyone." Lunn, 78 N.E.3d at 1152 & n.18 (emphasis added).

The United States failed to grapple with any of the foregoing contrary authority (not to mention its own briefing position in this case) when it asserted for the first time at oral argument that § 287.7(d) holds are mandatory. That is not to say parties' positions cannot evolve or be refined over the course of litigation when there is a good-faith, reasoned explanation for such clarification. That was not the case here.

21

Federal law prohibits local governments (among others) from restricting their agencies and employees from sending DHS "information regarding the citizenship or immigration status, lawful or unlawful, of any individual."  8 U.S.C. § 1373(a); see also id. § 1373(b) (similar); id. § 1644 (similar as to "information regarding the immigration status, lawful or unlawful, of an alien in the United States").  The Trust Act bars Boston law enforcement officers and other employees from providing ICE with individuals' "personal information" and information "regarding a person's release date or time."[15]  Bos., Mass., Mun. Code ch. 11, § 1.9(D)(1)(a)(3). It defines "personal information" as information that "identifies or describes an individual, that can be used, either alone or in combination with other information, to identify individual subjects, such as his or her name, Social Security number, physical description, home address and/or work address."  Id. § 1.9(A).  Finally, it provides: "This [Act] does not prohibit or restrict any government Agency from complying with 8 U.S.C. §§ 1373 and 1644."  Id. § 1.9(D)(3).

The United States seeks a judgment "declaring that the Boston Trust Act violates 8 U.S.C. § 1373 and is therefore invalid" and an injunction prohibiting the City "from enforcing the Boston Trust Act."  Doc. No. 1 at 16.  As reiterated at oral argument, the United States asserts a facial challenge to the Boston Trust Act.  See, e.g., Doc. No. 1 ¶ 43; Doc. No. 70 at 57, 80.  It does not argue, nor does it make any factual allegations suggesting, that the City or its officers enforce the Boston Trust Act in a manner that deviates from the Trust Act's plain text.

The United States alleges it is injured because enforcement of the Boston Trust Act violates § 1373 and that an injunction would redress its injury by "prevent[ing] future violations

---

[15] The Trust Act also bars providing this information to ICE-HSI "solely for the purpose of enforcing civil violations of United States immigration laws."  Bos., Mass., Mun. Code ch. 11, § 1.9(D)(1)(a)(4).

of federal law."[16]  Doc. No. 61 at 10.  But the Boston Trust Act, on its own terms, does not

prohibit the sharing of information "regarding the citizenship or immigration status, lawful or

unlawful, of any individual."  8 U.S.C. § 1373(a).  The information whose sharing the Trust Act

restricts (namely, release date and time and limited personally identifying information) falls

squarely outside the ambit of § 1373, and the United States' implausible argument to the contrary

has been roundly rejected by other federal courts.  See Illinois, 796 F. Supp. 3d at 516–19

(collecting cases).  In case there was any ambiguity (and there is not), the Trust Act expressly

provides that none of its provisions preclude compliance with 8 U.S.C. §§ 1373 and 1644.[17]

In short, there is a fatal disconnect between the injury the United States alleges and the

judicial relief it seeks.  See Murthy, 603 U.S. at 73.  Any injury the United States has suffered

from alleged violations of § 1373 is not traceable to the Boston Trust Act's challenged

provisions, which are facially consistent with § 1373.  A court order enjoining enforcement of

the Boston Trust Act would not redress the United States' § 1373–based claims of injury, just as

an order requiring Boston to comply with § 1373 would be redundant with the ordinance's

existing provisions and provide no incremental relief.  Accordingly, the United States lacks

Article III standing with respect to the Boston Trust Act's information-sharing provisions.[18]

---

[16] The complaint focuses primarily on § 1373, and no party suggests there is a material difference, for present purposes, between the scope of § 1373 and § 1644.  In any event, the Boston Trust Act is facially consistent with both §§ 1373 and 1644.

[17] This is not a case in which a law "unambiguously commands action" contrary to its purported "savings clause," City & County of San Francisco v. Trump, 897 F.3d 1225, 1239–40 (9th Cir. 2018), nor where the law would "destroy itself" through its savings clause, League of United Latin Am. Citizens v. Exec. Off. of the Pres., 780 F. Supp. 3d 135, 175 (D.D.C. 2025) (quoting Tex. & Pac. Ry. Co. v. Abilene Cotton Co., 204 U.S. 426, 446 (1907)).  The savings clause in the Boston Trust Act merely confirms what the plain text of the ordinance states: the Act's restrictions on information sharing do not reach the information covered by §§ 1373 and 1644.

[18] Even if this fundamental defect in the United States' challenge is considered through a merits lens rather than as a question of standing—and whether the United States' position is that § 1373 reaches "predicate facts necessary to determine one's citizenship or immigration status," as

23

A dismissal for lack of Article III standing is without prejudice.  Hochendoner v. Genzyme Corp., 823 F.3d 724, 736 (1st Cir. 2016).  The Court notes, however, that the United States has never sought leave to amend its complaint or suggested that it would seek such leave were the Court to grant the motion to dismiss.  Indeed, the Court and parties discussed this issue during oral argument, and the United States still did not say or suggest that it would seek leave to amend if its complaint were dismissed.  Doc. No. 70 at 11–17.  As the foregoing illustrates, the United States is unlikely to cure the jurisdictional defects that led to this dismissal.

---

stated in its briefing, Doc. No. 53 at 14, or that it reaches all information "pertinent to immigration status" as stated at oral argument, Doc. No. 70 at 63—the conclusion is the same. Federal law prohibits the restriction of sharing a limited, straightforward category: information "regarding the citizenship or immigration status, lawful or unlawful, of any individual."  8 U.S.C. § 1373(a); see also, e.g., California, 921 F.3d at 891–92 ("[T]he phrase 'information regarding the citizenship or immigration status, lawful or unlawful, of any individual' is naturally understood as a reference to a person's legal classification under federal law . . . ."). The information whose sharing Boston restricts—personally identifying information and information about a person's release date and time—is beyond the scope of § 1373.  See Steinle v. City & County of San Franscisco, 919 F.3d 1154, 1164 (9th Cir. 2019) ("The statutory text at issue clearly does not include release-date information."); Illinois, 796 F. Supp. 3d at 516–19 (persuasively explaining that "text, structure, and history of § 1373" support conclusion that statute "only pertains to information regarding a person's legal classification under federal law" and noting that "[t]his issue has been treated extensively by other courts," which have "each rejected the United States'[] capacious reading of § 1373"); see also California, 921 F.3d at 891–92 (noting that while terms like "'regarding' may generally have 'a broadening effect,'" if "the term 'regarding' were 'taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes preemption would never run its course, for "[r]eally, universally, relations stop nowhere"'" (first quoting Lamar, Archer & Cofrin, LLP v. Appling, 584 U.S. 709, 717 (2018); and then quoting N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655 (1995))); United States v. New York, 814 F. Supp. 3d 266, 277 (N.D.N.Y. 2025) (noting United States' position has been rejected by other courts to confront issue and finding it "unnecessary to spill further judicial ink" to reach same conclusion).

24

IV.     <u>CONCLUSION</u>

For the foregoing reasons, the motion to dismiss is ALLOWED.  All claims against

Mayor Michelle Wu, Commissioner Michael Cox, and the Boston Police Department are

DISMISSED.  All claims against the City of Boston are DISMISSED WITHOUT PREJUDICE.

SO ORDERED.

  /s/ Leo T. Sorokin
United States District Judge