UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

United States of America,

      Plaintiff,

v.

State of Minnesota; City of Minneapolis,
Minnesota; City of St. Paul, Minnesota;
Hennepin County, Minnesota; Keith Ellison,
*Attorney General of Minnesota, in his
official capacity*; and Dawanna S. Witt,
*Hennepin County Sheriff, in her official
capacity*,

      Defendants.

File No. 25-cv-3798 (ECT/JFD)

**OPINION AND ORDER**

---

Tiberius T. Davis and Lauri Wiesner, Department of Justice, Washington, DC, for Plaintiff United States of America.

Joseph Robert Richie, Madeleine DeMeules, and Brian Scott Carter, Office of the Minnesota Attorney General, Saint Paul, MN, for Defendants State of Minnesota and Keith Ellison.

Heather Passe Robertson, Munazza Humayun, and Sara J. Lathrop, Minneapolis City Attorney's Office, Minneapolis, MN, for Defendant City of Minneapolis, Minnesota.

Alexander Hsu, Saint Paul City Attorney's Office, Saint Paul, MN, for Defendant City of Saint Paul, Minnesota.

Alan Martinson, Sarah C.S. McLaren, Sparrowleaf Dilts McGregor, and Spencer Davis VanNess, Hennepin County Attorney's Office, Minneapolis, MN, for Defendants Hennepin County, Minnesota, and Dawanna S. Witt.

---

The defendants in this case adopted and enforce so-called "sanctuary" laws and policies that restrict their participation in federal immigration enforcement. Some laws,

for example, limit the sharing of information Defendants may possess regarding noncitizens who have been present in their jurisdictions. Other laws forbid local law enforcement officers from engaging in immigration enforcement activities.

The United States claims these laws and policies violate the federal Constitution's Supremacy Clause in two ways: (1) It claims that federal law preempts them, and (2) it claims they burden the federal government in violation of the intergovernmental immunity doctrine. And it seeks a declaration that the sanctuary laws and policies are unconstitutional and an injunction prohibiting Defendants from enforcing them. The claims raise legal questions regarding the balance of power between the national government on the one hand, and a state and its political subdivisions on the other.

Defendants seek the case's dismissal on various grounds. To varying degrees, they all challenge subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). The City of Minneapolis challenges the sufficiency of process and its service under Rules 12(b)(4) and 12(b)(5). All Defendants challenge the Complaint's merits under Rule 12(b)(6). The motions will be granted—though not on every ground Defendants advance—and the case will be dismissed.

The short version is this: The United States' preemption challenge to the Minnesota Constitution fails for lack of subject-matter jurisdiction, but no other claim will be dismissed on this basis. The United States' service of process on the City of Minneapolis was deficient, but not so much as to warrant dismissal on this ground. The remaining claims fail on their merits. The preemption claims fail for several reasons, but primarily because, as the United States construes its assertedly preemptive laws, they violate the

anticommandeering doctrine.  The intergovernmental immunity claims fail because the challenged laws and policies do not discriminate against the United States in the sense the intergovernmental immunity doctrine requires.

I

A

Begin with a description of the United States' claims.  The United States claims in Count One that Article I, section 10 of the Minnesota Constitution, as interpreted by an advisory opinion issued by Minnesota Attorney General Keith Ellison, "conflict[s] with, and create[s] obstacles to, the enforcement of federal immigration law."  Compl. [ECF No. 1] ¶ 91; *see id.* ¶¶ 90–98.  The federal immigration law on which this preemption claim depends includes a statute and a regulation.  The statute authorizes the United States Attorney General to

> enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law.

8 U.S.C. § 1357(g)(1).  This statute does not require a State or any of its political subdivisions to enter into this type of agreement; these agreements are voluntary.  8 U.S.C. § 1357(g)(9) ("Nothing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement with the Attorney General under this

3

subsection."). At the same time, the statute does not forbid a State or any of its political subdivisions from voluntarily cooperating with the United States regarding immigration matters without an agreement. 8 U.S.C. § 1357(g)(10). The regulation concerns immigration detainers and reads as follows:

> (d) Temporary detention at Department request. Upon a determination by the Department to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department.

8 C.F.R. § 287.7(d).

Article I, section 10 of the Minnesota Constitution is "'textually identical' in all relevant respects" to the Fourth Amendment to the United States Constitution. *City of Golden Valley v. Wiebesick*, 899 N.W.2d 152, 158 (Minn. 2017) (quoting *State v. Carter*, 697 N.W.2d 199, 209 (Minn. 2005)). It reads:

> **§ 10. Unreasonable searches and seizures prohibited.** The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or things to be seized.

Minn. Const. art. I, § 10. On February 6, 2025, Attorney General Ellison issued an advisory opinion pursuant to Minnesota Statutes section 8.07[1] concluding that "Minnesota law

---

[1]    Advisory opinions issued by the Minnesota Attorney General are not binding on the courts and, except for "school matters," are not legally decisive. *See Berrier v. Minn. State Patrol*, 9 N.W.3d 368, 374 n.2 (Minn. 2024). The advisory-opinion statute reads:

prohibits state and local law enforcement agencies from holding someone based on an immigration detainer if the person would otherwise be released from custody." Adv. Op. [ECF No. 32-1] at 3.[2] The advisory opinion reached this conclusion in essentially four steps. (1) The opinion summarized the law regarding immigration detainers, including 8 C.F.R. § 287.7, and concluded that immigration detainers "are requests . . . not commands" and that, even if they were commands, the Tenth Amendment's anticommandeering principle would prohibit federal immigration officials from requiring state officials to imprison suspected noncitizens. Adv. Op. at 4–5. (2) The opinion concluded that an individual's continued detention after a state-imposed release date for the purpose of satisfying a federal immigration detainer is an "arrest" under the Fourth Amendment to the federal Constitution and Article I, section 10, of the Minnesota Constitution. *Id.* at 5. (3) The opinion concluded that "Minnesota law does not authorize

---

**8.07 OPINIONS: QUESTIONS OF PUBLIC IMPORTANCE; PUBLIC SCHOOLS.**

The attorney general on application shall give an opinion, in writing, to county, city, town, public pension fund attorneys, or the attorneys for the board of a school district or unorganized territory on questions of public importance; and on application of the commissioner of education shall give an opinion, in writing, upon any question arising under the laws relating to public schools. On all school matters such opinion shall be decisive until the question involved shall be decided otherwise by a court of competent jurisdiction.

Minn. Stat. § 8.07.

[2] Page citations are to pagination assigned by the court's CM/ECF system appearing in a document's upper right corner, not to a document's original pagination.

state and local officials to hold or arrest someone based on an immigration detainer." *Id.*
at 6. (4) Though 8 U.S.C. § 1357(g)(10) authorizes local law enforcement agencies to
cooperate with federal immigration officials, the opinion concluded that, "because
Minnesota law does not authorize detainer arrests, detainer arrests are not a permissible
form of cooperation under Section 1357(g)(10)." Adv. Op. at 9. Though the opinion
addressed "cooperation under Section 1357(g)(10)," it did not address the lawfulness of
agreements under § 1357(g)(1). *See* Adv. Op.

B

The United States claims in Count Two that several Minnesota statutes "conflict
with, and create obstacles to, the enforcement of federal immigration law," Compl. ¶ 100,
and in Count Six that these same statutes "unlawfully discriminate against the Federal
Government," *id.* ¶ 129. *See id.* ¶¶ 99–107 (preemption claim), ¶¶ 128–34 (discrimination
claim). The federal immigration laws on which the preemption aspect of this claim
depends include two statutes governing information sharing between the Immigration and
Naturalization Service and States or local government units, 8 U.S.C. §§ 1373(a) and 1644.
The statutes are practically identical. Section 1373(a) provides:

> Notwithstanding any other provision of Federal, State, or local
> law, a Federal, State, or local government entity or official may
> not prohibit, or in any way restrict, any government entity or
> official from sending to, or receiving from, the Immigration
> and Naturalization Service information regarding the
> citizenship or immigration status, lawful or unlawful, of any
> individual.

6

Section 1644 provides:

> Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.

Described at a high level, the challenged Minnesota statutes govern the management of driver's license information within the Department of Public Safety and forbid the Department from sharing immigration-status data with certain third parties, including federal immigration enforcement authorities. The first challenged statute is Minnesota Statutes § 171.12, subdivision 7b(e). It reads, in relevant part:

> Prior to disclosing to a data requester, other than the data subject, any data on individuals relating to a noncompliant driver's license or identification card, the commissioner [of the Minnesota Department of Public Safety] or a driver's license agent must require the data requester to certify that the data requester must not use the data for civil immigration enforcement purposes or disclose the data to a state or federal government entity that primarily enforces immigration law or to any employee or agent of any such government entity.

Minn. Stat. § 171.12, subdiv. 7b(e). A driver's license is "noncompliant" if it "is not acceptable for federal identification under the REAL ID Act." Minn. Stat. § 171.01, subdiv. 41(a); Minn. Stat. § 171.019, subdiv. 2(b)(1). The United States alleges that noncompliant licenses are issued to applicants who "do not prove that they are lawfully present in the United States" during the application process. Compl. ¶ 56 n.3; *see also* Minn. Stat. § 171.062 (listing requirements for application for noncompliant license). The next two challenged provisions appear in the same section and, like § 171.12, subdivision

7b(e), concern the sharing of data regarding noncompliant driver's license holders.  Section 171.12, subdivision 11(c) provides:

> As authorized or required by state or federal law, the commissioner or a driver's license agent may share or disseminate data on individuals who have applied for or been issued a noncompliant driver's license or identification card that are not immigration status data to a government entity, as defined in section 13.02, subdivision 7a,[3] or to a federal government entity that does not enforce immigration law, provided that the receiving entity must not use the data for civil immigration enforcement purposes or further disclose the data to a state or federal government entity that primarily enforces immigration law or to any employee or agent of any such government entity.

And subdivision 11(d) reads:

> Notwithstanding any law to the contrary, the commissioner or a driver's license agent must not share or disseminate any data on individuals who have applied for or been issued a noncompliant driver's license or identification card to any federal government entity that primarily enforces immigration law, except pursuant to a valid search warrant or court order issued by a state or federal judge.

Finally, Minnesota Statutes § 168.327, subdivision 6, requires each subscriber to the Department's driver and vehicle records subscription services to annually "audit [the subscriber's] uses of data and its information technology security procedures, including: (1) the methods and practices employed in the processing and use of driver and vehicle services data; and (2) compliance with the certification required under section 171.12, subdivision 7b, paragraph (e)."

---

[3]    Minnesota Statutes § 13.02, subdivision 7a, defines "government entity" as "a state agency, statewide system, or political subdivision."

C

The United States claims in Count Three that specific Minneapolis ordinances "conflict with, and create obstacles to, the enforcement of federal immigration law," Compl. ¶ 109, and in Count Seven that these same ordinances "unlawfully discriminate against the federal government," *id.* ¶ 136. *See id.* ¶¶ 108–114 (preemption claim), ¶¶ 135–38 (discrimination claim).[4]  The preemption aspect of this claim depends on each of the federal statutes and the regulation described above, 8 U.S.C. §§ 1357(g)(1), 1373, and 1644, and 8 C.F.R. § 287.7(d).

The challenged Minneapolis ordinances are part of a chapter that

> clarifies the communication and enforcement relationship between the city and the federal government including the United States Department of Homeland Security [("DHS")] and other federal agencies with respect to any and all efforts to investigate, enforce, or assist in the investigation or enforcement of (collectively, "enforce") any federal civil immigration law and any federal criminal immigration law that penalizes a person's presence in, entry, or reentry to, or employment in, the United States, when not accompanied by other criminal conduct (collectively, "federal immigration laws").

Minneapolis, Minn., Code of Ordinances, tit. 2, ch. 19, § 19.10.  Under this chapter, "[p]ublic safety officials shall not undertake any law enforcement action for the purpose of enforcing federal immigration laws, or to verify immigration status, including but not limited to questioning any person or persons about their immigration status." Minneapolis,

---

[4]   After the United States filed its Complaint and before Defendants filed their motions to dismiss, the City amended the challenged ordinances.  *See* ECF No. 38-6.  No party argues that the amendments moot any part of the United States' Complaint or change the analysis of Defendants' motions.  The ordinances' current versions are addressed here.

Minn., Code of Ordinances, tit. 2, ch. 19, § 19.30(1).  "Public safety officials shall not question, arrest, or detain any person for the purpose of enforcing federal immigration laws, including, but not limited to, through traffic stops or the creation of or participation in checkpoints."  Minneapolis, Minn., Code of Ordinances, tit. 2, ch. 19, § 19.30(3).  And "[c]ity certifying agencies shall not disclose personal information of victims obtained through the certification request process except as provided in the Minnesota Government Data Practices Act or as otherwise required by law or court order."  Minneapolis, Minn., Code of Ordinances, tit. 2, ch. 19, § 19.80(d).  A "certification request" is defined as

> [a] request made by a victim of crime, or the victim's attorney or other appropriate representative, to a city certifying agency for a U Nonimmigrant Status certification or a T Visa Declaration of Law Enforcement Officer for Victim of Trafficking in Persons for persons eligible under 8 U.S.C. §1101(a)(15)(T) and (U) as provided in the Victims of Trafficking and Violence Prevention Act of 2000.

Minneapolis, Minn., Code of Ordinances, tit. 2, ch. 19, § 19.80(a)(1).  A "city certifying agency" is "[a]ny city department having legal authority to sign a U Visa Nonimmigrant Status Certification or a T Visa Declaration of Law Enforcement Officer for Victim of Trafficking in Persons."   Minneapolis, Minn., Code of Ordinances, tit. 2, ch. 19, § 19.80(a)(2).

## D

The United States claims in Count Four that specific Saint Paul ordinances "conflict with, and create obstacles to, the enforcement of federal immigration law," Compl. ¶ 116, and it claims in Count Eight that these same ordinances "unlawfully discriminate against the federal Government," *id.* ¶ 140.  *See id.* ¶¶ 115–21 (preemption claim), ¶¶ 139–42

(discrimination claim).  Again, this claim's preemption aspect depends on each of the federal statutes and the regulation described above, 8 U.S.C. §§ 1357(g)(1), 1373, and 1644, and 8 C.F.R. § 287.7(d).

The challenged provisions appear in the Saint Paul Code of Ordinances, Part III, Title III, Chapter 44.  Chapter 44 "clarifies the communication and enforcement relationship between the city and the United States Department of Homeland Security . . . and other federal agencies with respect to the enforcement of civil immigration laws." Saint Paul, Minn., Code of Ordinances, pt. III, tit. III, ch. 44, § 44.01.  One challenged provision instructs that "[p]ublic safety officials may not undertake any law enforcement action for the sole purpose of detecting the presence of undocumented persons, or to verify immigration status, including but not limited to questioning any person or persons about their immigration status."  Saint Paul, Minn., Code of Ordinances, pt. III, tit. III, ch. 44, § 44.03(a)(1). Another provision directs that "[p]ublic safety officials may not question, arrest or detain any person for violations of federal civil immigration laws except when immigration status is an element of the crime or when enforcing 8 U.S.C. 1324(c)."  Saint Paul, Minn., Code of Ordinances, pt. III, tit. III, ch. 44, § 44.03(a)(3).  And, like Minneapolis, Saint Paul restricts the sharing of information obtained pursuant to the U- and T-visa certification processes.  The Saint Paul ordinance provides that "[c]ity certifying agencies must not disclose private or confidential information about victims obtained through the certification request process except as provided in the Minnesota Government Data Practices Act or as otherwise required by law or court order."  Saint Paul, Minn., Code of Ordinances, pt. III, tit. III, ch. 44, § 44.06(d).  The Saint Paul ordinance defines

"certification request" and "city certifying agency," in relevant part, in the same way the Minneapolis ordinance does. *See* Saint Paul, Minn., Code of Ordinances, pt. III, tit. III, ch. 44, § 44.06(a)(1)–(2).

E

The United States claims in Count Five that an administrative directive issued by the Hennepin County Sheriff "conflicts with, and creates obstacles to, the enforcement of federal immigration law," Compl. ¶ 123, and it claims in Count Nine that the directive "unlawfully discriminates against the federal Government," *id.* ¶ 144. *See id.* ¶¶ 122–27 (preemption claim), ¶¶ 143–46 (discrimination claim). Again, this claim's preemption aspect depends on the federal statutes and the regulation described above, 8 U.S.C. §§ 1373 and 1644, and 8 C.F.R. § 287.7(d).

The challenged directive reads:

> The Hennepin County Sheriff's Office will not hold individuals in custody at the Adult Detention Center when the only documentation for that individual to be held in custody is a [DHS/ICE] Immigration Detainer. These detainers (1247G, 1247A, 1200, and 1205) are administrative warrants which are not signed by a judge and do not constitute judicial authority to hold an individual. ICE <u>will not</u> be notified of the admittance or release of any individual based on any of these detainers. If continued detention of an individual for ICE is authorized based on a judicially signed immigration warrant, ICE will be notified when they become the holding agency. Absent a judicially signed immigration warrant authorizing the continued detention of an individual for ICE, that individual will be released from custody when all local charges or other holds have been disposed of.

Compl. ¶ 71.

12

II

A

Defendants raise a variety of Article III jurisdictional challenges under Rule 12(b)(1), and the first step is to determine the procedural nature of Defendants' jurisdictional challenges. "A court deciding a motion under Rule 12(b)(1) must distinguish between a 'facial attack' and a 'factual attack.'" *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). "In a facial attack, the court merely needs to look and see if plaintiff has sufficiently alleged a basis of subject matter jurisdiction." *Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914 (8th Cir. 2015) (citation modified). The court "restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn*, 918 F.2d at 729 n.6 (citation omitted). "Conversely, in a factual attack, the existence of subject matter jurisdiction is challenged in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *City of Branson*, 793 F.3d at 914–15 (citation modified). In that case, "the non-moving party does not have the benefit of 12(b)(6) safeguards." *Osborn*, 918 F.2d at 729 n.6.

Defendants challenge subject-matter jurisdiction on the face of the Complaint. *See* ECF No. 19 at 9 ("Nothing *in the Complaint* explains why Hennepin County, which is not a state agency, nor why Sheriff Witt, who is not a state commissioner, are included under Counts II and VI. There are zero allegations *in the Complaint* that allege *any* relationship between the Hennepin Defendants and the Statutes, let alone the traceability or redressability required for standing or a violation of law required to state a claim." (first

and second emphases added)); ECF No. 25 at 36 ("Plaintiff *alleges* no facts to support any inference that Saint Paul had any role or responsibility in issuing the challenged opinion from the Attorney General." (emphasis added)); ECF No. 31 at 10–11 (arguing "the Complaint does not *allege* an injury-in-fact" and "the Complaint *alleges* no injury that is caused by the [advisory opinion] or redressable by the Court" (emphases added)); ECF No. 37 at 23 ("[T]o establish jurisdiction as to Minneapolis, Plaintiff must *plausibly allege* Article III standing regarding injunctive relief as to Minneapolis." (emphasis added)). Consistent with these exclusively Complaint-directed contentions, no Defendant submitted a declaration or other evidence to support an Article III challenge.

In support of its opposition to Defendants' motions, the United States filed a declaration that includes testimony regarding many facts not alleged in the Complaint, ECF No. 51-2, but it would be inappropriate to consider the declaration in view of the facial character of Defendants' jurisdictional challenges. *Fuller v. Honeywell Int'l, Inc.*, No. 24-cv-279 (ECT/DJF), 2024 WL 3569496, at *2 n.4 (D. Minn. July 29, 2024) (noting that, in the Rule 12(b)(6) context, "[a] party cannot . . . defend a complaint by relying on a brief or affidavit that describes additional or different allegations that are not in the complaint" (first citing *Al-Saadoon v. Barr*, 973 F.3d 794, 805 (8th Cir. 2020), and then citing *In re Agape Litig.*, 773 F. Supp. 2d 298, 316 (E.D.N.Y. 2011))).

All of this means the familiar Rule 12(b)(6) standards govern Defendants' jurisdictional challenges. Under those standards, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014). The complaint must

14

allege facts plausibly showing that Article III's justiciability requirements are present. *See*

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Hawse v. Page*, 7 F.4th 685, 688–

89 (8th Cir. 2021) (applying the *Twombly/Iqbal* plausibility standard to jurisdictional

allegations); *Auer v. Trans Union, LLC*, 902 F.3d 873, 878 (8th Cir. 2018) (same); *Penrod*

*v. K&N Eng'g, Inc.*, No. 18-cv-2907 (ECT/LIB), 2019 WL 1958652, at *3–4 (D. Minn.

May 2, 2019) (same).

B

Several general rules apply to all Defendants' jurisdictional challenges. "As the

party invoking federal jurisdiction, the plaintiff[] bear[s] the burden of demonstrating that

[it has] standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021) (citing *Lujan*

*v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). "[S]tanding is based on the facts as they

existed at the time the lawsuit was filed." *Steger v. Franco, Inc.*, 228 F.3d 889, 893 (8th

Cir. 2000). To establish Article III standing at the motion-to-dismiss stage, a plaintiff must

allege facts plausibly showing that it has "(1) suffered an injury in fact, (2) that is fairly

traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed

by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *see*

*Thole v. U.S. Bank N.A.*, 590 U.S. 538, 544 (2020) (noting that these elements must be

"plausibly and clearly allege[d]"); *Lujan*, 504 U.S. at 561.[5] "Jurisdictional issues, whether

they involve questions of law or of fact, are for the court to decide." *Osborn*, 918 F.2d at

---

[5]    The United States agrees it must establish its Article III standing as any other federal-court plaintiff would—that is, by plausibly alleging these three elements. *See* ECF No. 51 at 20–24.

15

729. "In assessing a plaintiff's Article III standing, we must 'assume that on the merits the plaintiffs would be successful in their claims.'" *Am. Farm Bureau Fed'n v. EPA*, 836 F.3d 963, 968 (8th Cir. 2016) (quoting *Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1105 (D.C. Cir. 2008)). Finally, "standing is not dispensed in gross." *TransUnion*, 594 U.S. at 431. "Plaintiffs must demonstrate standing for each claim that they press against each defendant, and for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (citation modified).

C

1

Minneapolis, Saint Paul, Hennepin County, and the Hennepin County Sheriff raise a causation argument. They contend that any injuries resulting to the United States from the challenged Minnesota state laws (the Minnesota Constitution as interpreted by the Attorney General opinion and the Minnesota statutes) are not traceable to the cities, county, or sheriff because they did not enact and do not enforce these state provisions. These laws are challenged in Counts One, Two, and Six.

This contention is persuasive. In suits like this involving constitutional challenges to state laws, "the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision." *Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017) (quoting *Digit. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015)); *accord Lackie v. Minn. State Univ. Student Ass'n*, No. 24-cv-1684 (LMP/LIB); 2025 WL 416764, at *4 (D. Minn. Feb. 6, 2026); *Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 779 (8th Cir. 2019) (explaining that an injury is "fairly

16

traceable where the named defendants possess the authority to enforce the complained-of provision" (citation modified)); *cf. United States v. Iowa*, 126 F.4th 1334, 1343 (8th Cir. 2025) (holding United States had standing to sue State of Iowa, Iowa Governor, and Iowa Attorney General, because they were responsible for enforcing challenged Iowa laws, thus establishing traceability), *reh'g granted and opinion vacated*, No. 24-2265, 2025 WL 1113191 (8th Cir. Apr. 15, 2025), *and vacated on other grounds*, No. 24-2265, 2025 WL 1140834 (8th Cir. Apr. 15, 2025).

Here, the Complaint alleges no facts tending to show—and the challenged state provisions give no reason to think—that Minneapolis, Saint Paul, Hennepin County, or the Hennepin County Sheriff possess enforcement authority over any of the challenged state laws. Because these Defendants lack enforcement responsibility over these provisions, the United States' injuries are not traceable to these Defendants, and injunctive or declaratory relief against them would have no effect. *Cf. Iowa*, 126 F.4th at 1343 (holding United States' injury caused by Iowa law "is likely redressable by a favorable judicial decision, specifically, an injunction against enforcing the Act, which would prevent [Iowa] state officials from interfering with U.S. enforcement of federal immigration law"). For these reasons, the United States has not plausibly alleged standing to assert Counts One, Two, and Six against the City of Minneapolis, the City of Saint Paul, Hennepin County, and the Hennepin County Sheriff. These claims will be dismissed without prejudice for lack of subject-matter jurisdiction with respect to these Defendants.

2

Minneapolis argues that the United States has not plausibly alleged an injury-in-fact resulting from the Minneapolis city ordinances. ECF No. 37 at 21–25. An injury-in-fact is the "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citation modified). "The United States has a legally protected interest in enforcing federal law." *United States v. Missouri*, 114 F.4th 980, 984 (8th Cir. 2024) (citing *United States v. Colo. Sup. Ct.*, 87 F.3d 1161, 1165 (10th Cir. 1996)), *cert. denied*, 146 S. Ct. 90 (2025); *see also United States v. Ekblad*, 732 F.2d 562, 563 (7th Cir. 1984) (per curiam) ("The United States has standing to seek relief from actual or threatened interference with the performance of its proper governmental functions."). "Interference with the federal government's interest in enforcing federal law is sufficient to establish that [a state law] injured the United States." *Missouri*, 114 F.4th at 985.

To have standing to obtain injunctive relief, the plaintiff must show that it is likely to suffer future injury by the defendant and that the sought-after relief will prevent that future injury. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983). "In future injury cases, the plaintiff must demonstrate that the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *In re SuperValu, Inc.*, 870 F.3d 763, 769 (8th Cir. 2017) (citation modified); *see Lujan*, 504 U.S. at 564 n.2 ("Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." (citation modified)).

18

"Allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation modified). And when a plaintiff seeks forward-looking declaratory or injunctive relief, "past injuries are relevant only for their predictive value." *Murthy*, 603 U.S. at 59. In other words, past injuries do not by themselves show a plaintiff's standing to seek prospective relief, but they may "serve as evidence of threatened future injury." *Id.*

Here, the Complaint plausibly alleges that the United States faces ongoing, certainly impending injuries stemming from the Minneapolis ordinances. The Complaint alleges that following the challenged ordinances' enactment, "local law enforcement officers have refused to provide ICE with information that aids ICE in immigration investigations" and that these "refusals have significantly impeded ICE's efforts to enforce our Nation's immigration laws." Compl. ¶ 84. The Complaint alleges that, because of the ordinances, "the city police department[] ha[s] refused to assist ICE by providing marked units and patrol officers to establish a perimeter during ICE enforcement operations," which would "reduce[] risks for ICE officers and the public because it creates a more secure environment." *Id.* ¶ 85. These allegations plausibly show an impairment to the United States' "legally protected interest in enforcing federal law." *Missouri*, 114 F.4th at 984. And though these allegations are backward-looking, it seems reasonable to infer that the

19

alleged injury-inflicting conduct will continue in the future.  Minneapolis has identified no reason to question the plausibility of that inference.[6]

3

Minnesota and its Attorney General raise jurisdictional challenges to the United States' claim that federal immigration law preempts Article I, section 10 of the Minnesota Constitution, as interpreted by the Attorney General's advisory opinion.  They argue (a) that the United States has not shown an Article III injury resulting from the challenged constitutional provision, (b) that, if the United States plausibly alleged an injury-in-fact, it has not plausibly alleged that the injury is traceable to the challenged constitutional provision or redressable via the relief it seeks, and (c) that, regardless, the claim is not ripe. ECF No. 31 at 10–14.

a

With respect to the United States' preemption claim against Minnesota and its Attorney General under 8 C.F.R. § 287.7(d), the Complaint plausibly alleges Article III injuries.  Again, the general rule is that the United States suffers an Article III injury-in-fact when a defendant "[i]nterfere[s] with the federal government's interest in enforcing federal law." *Missouri*, 114 F.4th at 984.  The Complaint's allegations supporting the § 287.7(d) preemption claim meet this rule.  The Attorney General's advisory opinion addressed § 287.7(d) detainers and concluded that "Minnesota law prohibits state and local

---

[6]     No other municipal Defendant challenged the United States' showing of Article III injury.  Regardless, essentially the same analysis would apply to the claims against Saint Paul, Hennepin County, and the Hennepin County Sheriff.

20

law enforcement agencies from holding someone based on an immigration detainer if the person would otherwise be released from custody." Adv. Op. at 3. The Complaint alleges that before the Attorney General issued the opinion, almost all local jails honored § 287.7(d) detainers, but that following the opinion's issuance, "most counties have refused to honor ICE detainers or provide ICE with notifications of release of aliens subject to removal." Compl. ¶ 76. Though the Complaint acknowledges that "[a] few counties" will notify ICE of a noncitizen's impending release, these counties "no longer allow ICE to take custody of such aliens in jails' sally ports." *Id.* ¶ 77. These practices, the Complaint alleges, substantially hinder federal immigration enforcement by causing ICE to miss out on chances to arrest noncitizens and adding significant inefficiencies to enforcement efforts, including delays as immigration officers wait for a noncitizen's release. *Id.* ¶ 78. In that way—and leaving causation and redressability aside for the moment—these allegations plausibly show interference with the United States' interest in immigration enforcement.

Minnesota and its Attorney General argue that the Complaint's § 287.7(d)–specific injury allegations are insufficient because "the United States never had any entitlement to the desired behavior in the first place," ECF No. 31 at 10, but this is not convincing. As I understand this argument, it conflates standing and the merits. From the United States' perspective, 8 C.F.R. § 287.7(d) requires a state or local agency to honor immigration detainers by maintaining custody of noncitizens to allow ICE to detain them. ECF No. 51 at 30–31. Minnesota and its Attorney General disagree. This disagreement concerns the regulation's proper interpretation, and that is a merits question. In the standing analysis, a

21

court assumes the plaintiff will be successful on its claims' merits. *Am. Farm Bureau Fed'n*, 836 F.3d at 968. Thus, for Article III standing's purposes, I assume § 287.7(d) requires state and local agencies to honor ICE detainers.

With respect to the United States' § 1357(g)(1) preemption claim against Minnesota and its Attorney General, the Complaint does not plausibly allege the United States' Article III injury. The Complaint addresses this distinct issue in four paragraphs. *See* Compl. ¶¶ 5, 94–96. The Complaint's primary Article-III-injury-supporting allegation for the § 1357(g)(1) preemption claim is that the opinion's interpretation of Article I, section 10, of the Minnesota Constitution interferes with federal immigration enforcement "*to the extent* [it] prohibit[s] State law enforcement officers from performing immigration enforcement functions under 8 U.S.C. § 1357(g) agreements." *Id.* ¶ 94 (emphasis added). The opinion does not address the lawfulness of agreements entered under § 1357(g)(1). *See* Adv. Op. It disclaims offering any opinion regarding "whether detainer arrests by Minnesota officials operating under a valid Section 287(g) agreement would comply with Minnesota law." *Id.* at 8 n.9. For this reason, the Complaint's allegation that the opinion "prohibits local officials from contracting with . . . federal immigration enforcement" is not plausible. Compl. ¶ 95. Consistent with this understanding of the advisory opinion, the section of the Complaint describing the challenged Minnesota laws' impact on federal immigration enforcement does not mention § 1357(g)(1) agreements or municipalities' refusal to enter them as injuries suffered by the United States. Compl. ¶¶ 73–89. Finally, the Complaint's allegation that "[l]ocal law enforcement agencies . . . refuse to . . . enter into § 1357(g)(1) agreements" does not plausibly show Article III injury. Compl. ¶ 96.

The allegation is too high-level.  The Complaint does not, for example, identify any local law enforcement agency that refused to enter a § 1357(g)(1) agreement, and it does not identify how any local law enforcement agency's refusal to enter a § 1357(g)(1) agreement independently impaired federal immigration enforcement.

b

"Causation [or traceability] requires the plaintiff to show 'that the injury was likely caused by the defendant,' and redressability requires the plaintiff to demonstrate 'that the injury would likely be redressed by judicial relief.'"  *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 111 (2025) (quoting *TransUnion LLC*, 594 U.S. at 423).  "Where traceability and redressability depend on the conduct of a third party not before the court, standing is not precluded, but it is ordinarily substantially more difficult to establish."  *Kohls v. Ellison*, 166 F.4th 728, 731 (8th Cir. 2026) (citation modified).  In this situation, "plaintiffs attempting to show causation generally cannot 'rely on speculation about the unfettered choices made by independent actors not before the courts.'"  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (quoting *Clapper*, 568 U.S. at 415 n.5).  "Therefore, to thread the causation needle in those circumstances, the plaintiff must show that the third parties will likely react in predictable ways that in turn will likely injure the plaintiffs."  *Id.* (citation modified); *see Iowa v. Wright*, 154 F.4th 918, 939 (8th Cir. 2025) ("The Supreme Court has explained that an indirect harm to states by federal rules is still fairly traceable to the challenged rule if the harm is a 'predictable effect' of the rule 'on the decisions of third parties.'" (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019))).

23

The Complaint's allegations do not plausibly show that the Attorney General's advisory opinion caused Minnesota localities to refuse to honor § 287.7(d) detainers. The opinion is not binding, *see* Minn. Stat. § 8.07, meaning no municipality was legally obligated to follow its guidance, and any municipality that acted in conformity with the opinion chose to do so voluntarily. For those reasons, it is more accurate to say that the immigration-enforcement interference the United States identifies as its injury results from the voluntary decisions of third parties, not from a rule having the force of law adopted by Minnesota or a legally consequential action taken by the Attorney General. *See Pendarvis v. Wilson*, No. 24-6654, 2026 WL 371143, at *3 (4th Cir. Feb. 10, 2026) (Wilkinson, J., concurring) (stating that Article III standing elements "are manifestly missing" in case challenging state attorney general's advisory opinion); *see also Campaign for S. Equal. v. Miss. Dep't of Hum. Servs.*, 175 F. Supp. 3d 691, 702 (S.D. Miss. 2016) (concluding that state attorney general's opinion did not establish Article III standing because, among other reasons, it was advisory and non-binding). The United States does not argue that the advisory opinion presaged legal action by the Minnesota Attorney General against municipalities that did not adopt and adhere to the advisory opinion's legal analysis. It identifies no legal authority or evidence to support the conclusion that a reasonable fear of prosecution by the Attorney General motivated a municipality or group of them to cease honoring § 287.7(d) detainers. If an advisory opinion might conceivably cause Article III injury, the Complaint's allegations still fall short. To show causation, the Complaint alleges a temporal connection between the advisory opinion's issuance and municipalities' refusals to honor § 287.7(d) detainers. *See* Compl. ¶ 76. Without more, however, it would

24

be speculative to conclude that the opinion was a dispositive factor in any municipality's

decision-making process.  For example, prior to the opinion's issuance, three courts in

Minnesota had reached essentially the same conclusion.  *Esparza v. Nobles County*, No.

A18-2011, 2019 WL 4594512, at *10 (Minn. Ct. App. Sep. 23, 2019) ("We conclude that

the district court did not clearly abuse its discretion in determining that respondents are

likely to prevail on the contested issues that (A) appellants' continued detention of

respondents after their release from state custody is a new seizure, and (B) state and federal

law do not authorize appellants to seize respondents based on ICE detainers and

warrants."); *Parada v. Anoka County*, 332 F. Supp. 3d 1229, 1243 (D. Minn. 2018)

(concluding it is "clearly established that an ICE Detainer alone cannot support local law

enforcement's continued detention of an alien"); *Orellana v. Nobles County*, 230 F. Supp.

3d 934, 944–46 (D. Minn. 2017) (holding that noncitizen's continued detention based on

immigration detainer after she would have been released on state charge violated Fourth

Amendment).  In other words, any municipality's decision not to honor § 287.7(d)

detainers could have been motivated by any number of reasons that were just as non-

binding as the Attorney General's advisory opinion.  The Complaint does not allege facts

showing it was plausible—as opposed to merely conceivable—that the advisory opinion

caused any municipality to reach this decision.  For all these reasons, Count One will be

dismissed for lack of subject-matter jurisdiction.[7]

---

[7]    The conclusion that the United States has not shown it possesses Article III standing
to pursue its claim that federal law preempts the Minnesota Constitution as interpreted by
the advisory opinion makes it unnecessary to consider the ripeness argument advanced by
Minnesota and the Minnesota Attorney General.

III

Minneapolis seeks the case's dismissal for insufficient process and insufficient service of process under Rules 12(b)(4) and 12(b)(5).  ECF No. 37 at 16–21.  Though Minneapolis was not properly served until after the 90-day Rule 4(m) deadline, the better answer is not to dismiss the case on these grounds.

"Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant."  *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999).  "In the absence of service of process (or waiver of service by the defendant), a court ordinarily may not exercise power over a party the complaint names as defendant."  *Id.* "If a defendant is improperly served, a federal court lacks jurisdiction over the defendant," *Printed Media Servs., Inc. v. Solna Web, Inc.*, 11 F.3d 838, 843 (8th Cir. 1993), even if the defendant "had actual notice of the lawsuit," *Adams v. AlliedSignal Gen. Aviation Avionics*, 74 F.3d 882, 885–86 (8th Cir. 1996) (citing *Printed Media Servs.*, 11 F.3d at 843).  "In reviewing a motion to dismiss for insufficient service, the Court is required to consider matters outside the pleadings, including affidavits of service."  *Rimmer v. John Doe, Inc.*, No. 13-cv-548 (JNE/JJG), 2013 WL 5655865, at *2 (D. Minn. Oct. 16, 2013) (citing *Devin v. Schwan's Home Servs., Inc.*, No. 04-cv-4555 (RHK/AJB), 2005 WL 1323919, at *2 (D. Minn. May 20, 2005)).  To survive a motion to dismiss for insufficient service, "the plaintiff must establish prima facie evidence that there was sufficient . . . service of process."  *Hahn v. Bauer*, No. 09-cv-2220 (JNE/JJK), 2010 WL 396228, at *6 (D. Minn. Jan. 27, 2010) (citing *Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.*, 51 F.3d 1383, 1387 (8th Cir.

26

1995)). "A prima facie case is the establishment of a legally required rebuttable presumption or where a party's production of enough evidence allows the fact-trier to infer the fact at issue and rule in the party's favor." *Devin*, 2005 WL 1323919, at *3 (citation modified).

Rule 4(m) requires that service be completed "within 90 days after the complaint is filed." Fed. R. Civ. P. 4(m). A plaintiff may serve a municipal corporation by "(A) delivering a copy of the summons and of the complaint to its chief executive officer; or (B) serving a copy of each in the manner prescribed by that state's law for serving a summons or like process on such a defendant." Fed. R. Civ. P. 4(j)(2). Minneapolis may be served by delivering process to the mayor, Minneapolis, Minn., Charter, art. VII, § 7.1(a) ("The chief executive officer is the Mayor . . . ."), or to the city clerk, Minn. R. Civ. P. 4.03(e)(2) (stating the chief executive officer or the clerk of a defendant city may be served).

The facts relevant to this issue are straightforward. The Complaint was filed on September 29, 2025, ECF No. 1, meaning service was required to be completed on or before December 28, 2025. Two days after the Complaint was filed, the United States notes, "the longest government shutdown in history began, making it impossible for [the United States] to serve Defendants until the shutdown ended on November 12." ECF No. 51 at 59. The United States explains that the shutdown "had significant effects on government operations that took time to ameliorate." *Id.* The United States mistakenly attempted to serve Minneapolis by "deliver[ing] a copy of the summons and complaint to the Hennepin County Auditor's Office on November 20, 2025." *Id.*; *see* ECF No. 51-3 at 4 (proof of service form dated November 20, 2025). The United States corrected service

27

on January 8, 2026, by serving an assistant clerk with the city. *See* ECF No. 51-4 at 3–4 (showing proof of service and Minnesota publication listing service recipient as someone authorized to receive service).

"An objection under Rule 12(b)(4) concerns the form of the process rather than the manner or method of its service." 5B *Wright & Miller's Federal Practice & Procedure* § 1353 (4th ed. Apr. 2026 Update). This includes issues with the content of the summons. *Id.* By contrast, "[a] Rule 12(b)(5) motion is the proper vehicle for challenging the mode of delivery, the lack of delivery, or the timeliness of delivery of the summons and complaint." *Id.* (footnotes omitted). Although the distinction between a Rule 12(b)(4) issue and Rule 12(b)(5) problem "is often blurred, and it is appropriate to present and analyze service issues under both rules," *Adams*, 74 F.3d at 884 n.2, the issue here is a straightforward problem with the timeliness of service, meaning it should be analyzed under Rule 12(b)(5).

Typically, where service has not been completed by the Rule 4(m) deadline,

> a district court must engage in a two-step analysis . . . . First, it must inquire whether the plaintiff has demonstrated good cause for his failure to serve within the prescribed . . . period. If the district court concludes that good cause is shown, it must extend the time for service. *See* Fed. R. Civ. P. 4(m) (stating that "if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period"); *see also Adams v. AlliedSignal Gen. Aviation Avionics*, 74 F.3d 882, 887 (8th Cir. 1996). Second, if good cause is not shown, the district court still retains the discretion to grant an extension of the time for service. *Adams*, 74 F.3d at 887. To warrant such a permissive extension, a plaintiff must demonstrate excusable neglect. *Coleman v. Milwaukee Bd. of Sch. Dirs.*, 290 F.3d 932, 934 (7th Cir. 2002).

*Colasante v. Wells Fargo Corp.*, 81 F. App'x 611, 612–13 (8th Cir. 2003) (per curiam).

"It has been stated that a showing of good cause requires at least excusable neglect—good

faith and some reasonable basis for noncompliance with the rules." *Id.* at 613 (citation

modified). "At its core, however, the standard of good cause, like many others in the law,

is necessarily amorphous." *Id.* The good-cause determination is a fact-dependent,

discretionary decision. *Id.* "The determination of whether neglect is excusable 'is at

bottom an equitable one, taking account of all relevant circumstances surrounding the

party's omission.'" *Kurka v. Iowa County*, 628 F.3d 953, 959 (8th Cir. 2010) (quoting

*Chorosevic v. MetLife Choices*, 600 F.3d 934, 946 (8th Cir. 2010)).

> In determining whether neglect is excusable, the following factors are particularly important: (1) the possibility of prejudice to the defendant, (2) the length of the delay and the potential impact on judicial proceedings, (3) the reason for the delay, including whether the delay was within the party's reasonable control, and (4) whether the party acted in good faith. *See Pioneer Inv. Servs. Co.* [*v. Brunswick Assocs. Ltd.*], 507 U.S. [380,] 395 [(1993)]; *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 496 F.3d 863, 866 (8th Cir. 2007) (citation omitted). These factors do not bear equal weight as the reason for delay is generally a key factor in the analysis. *See In re Guidant Corp.*, 496 F.3d at 867.

*Id.*

I conclude the United States has demonstrated at least excusable neglect. It is

difficult to see how delayed service prejudiced Minneapolis. To show it suffered prejudice,

Minneapolis cites federal immigration-enforcement activities, including Operation Metro

Surge and its consequences, ECF No. 37 at 20, but these enforcement activities had nothing

to do with the missed service deadline. The length of the delay was not great—eleven

days—and it has had no consequential impact on these proceedings. The government shutdown and its attendant consequences are legitimate reasons for the delay. And there is no reason to think that delayed service occurred in bad faith. Finally, a dismissal on this basis almost certainly would result in inefficiencies. The United States would be left to sue Minneapolis in a separate case that would no doubt be related to this case, leaving the parties back where we started—litigating motions to dismiss that the United States and Minneapolis have fully briefed and argued, and which I am prepared to decide. There is no good reason to return the case against Minneapolis to the start line.

IV

A

In reviewing a motion to dismiss under Rule 12(b)(6), a court must accept "as true all factual allegations in the complaint" and draw "all reasonable inferences" in the plaintiff's favor. *Gorog*, 760 F.3d at 792. Although the factual allegations need not be detailed, they "must be enough to raise a right to relief above the speculative level. *Twombly*, 550 U.S. at 555. The complaint must include "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

Considering "matters outside the pleadings" generally transforms a Rule 12(b)(6) motion into one for summary judgment, but not when the relevant materials are "necessarily embraced" by the pleadings. *Zean v. Fairview Health Servs.*, 858 F.3d 520,

30

526 (8th Cir. 2017). Materials embraced by the complaint include "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." *Id.* (quoting *Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012)).

Here, Minnesota, the Minnesota Attorney General, Minneapolis, and Saint Paul submitted exhibits that may be considered in adjudicating the motions to dismiss. *See* ECF Nos. 26, 32-1, 38-1 to 38-6, 64-1. Minnesota and its Attorney General filed the Attorney General's advisory opinion, ECF No. 32-1, and a copy of the United States' amicus brief filed in *Esparza*, 2019 WL 4594512, ECF No. 64-1. Minneapolis filed publicly available information regarding ports of entry in Minnesota, ECF No. 38-1, and the relevant Minneapolis ordinances and related public records, ECF Nos. 38-2 to 38-6. And Saint Paul submitted its relevant ordinances. ECF No. 26. No party questions these exhibits' authenticity, and they are matters of public record that may be considered in ruling on the motions to dismiss. At the same time, the United States submitted information that cannot be considered in adjudicating the motions. The United States cites Field Office Director Olson's declaration, ECF No. 51-2, to oppose Defendants' Rule 12(b)(6) motions. *See, e.g.*, ECF No. 51 at 31. For the same reasons this declaration testimony could not be considered in evaluating Defendants' Rule 12(b)(1)–based facial jurisdictional challenges,

31

it cannot be considered to decide Defendants' Rule 12(b)(6) motions.  *See Fuller*, 2024 WL 3569496, at *2 n.4.[8]

B

Turn to the merits of the preemption claims for which the United States established its Article III standing to pursue.  To recap, these include the claim that 8 U.S.C. §§ 1373 and 1644 preempt the Minnesota statutes (Count Two), but only to the extent the claim is asserted against Minnesota and its Attorney General; the claim that 8 U.S.C. §§ 1373 and 1644, 8 C.F.R. § 287.7(d), and 8 U.S.C. § 1357(g) preempt the Minneapolis ordinances (Count Three); the claim that these same federal statutes and regulation preempt the Saint Paul ordinances (Count Four); and the claim that these same federal statutes and regulation, excluding 8 U.S.C. § 1357(g), preempt the Hennepin County Sheriff's directive (Count Five).

1

Several background principles and rules apply across the board to all of these claims.  The Supremacy Clause provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land."  U.S. Const., art. VI, cl. 2.  The federal government's ability to preempt state law is "an extraordinary power in a federalist system" and one that a court "must assume Congress does not exercise lightly."  *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).  It may exercise

---

[8]   Minneapolis submitted declaration testimony regarding the burdens Operation Metro Surge imposed on the City's legal resources.  *See* ECF No. 38 ¶¶ 8–10.  Minneapolis does not reference this portion of the declaration to support its Rule 12(b)(6) motion, and it will not be considered.

32

this power expressly or impliedly. "Express preemption occurs where a federal law explicitly prohibits or displaces state regulation in a given field." *Johnson v. MFA Petroleum Co.*, 701 F.3d 243, 248 (8th Cir. 2012). Congress may impliedly preempt state law through conflict or field preemption. Conflict preemption includes "cases where compliance with both federal and state regulations is a physical impossibility and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citation modified). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects . . . ." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Id.* (quoting *Savage v. Jones*, 225 U.S. 501, 533 (1912)). The Supreme Court has cautioned, however, that courts may not conduct a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives; such an endeavor would undercut the principle that it is Congress rather than the courts that pre-empts state law." *Chamber of Com. v. Whiting*, 563 U.S. 582, 607 (2011) (citation modified). A "high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." *Id.* (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 110 (1992) (Kennedy, J., concurring in part and concurring in the judgment)); *see also Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 919 (8th Cir. 2025) ("[A] court should

33

not find pre-emption too readily in the absence of clear evidence of a conflict." (quoting *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 885 (2000))). "[T]he proper approach is to reconcile the operation of both statutory schemes with one another rather than holding one completely ousted." *Bird*, 157 F.4th at 919 (citation modified). Though not at issue here, field preemption occurs "[w]here Congress occupies an entire field" and "even complementary state regulation is impermissible." *Arizona*, 567 U.S. at 401.

"Notwithstanding the supremacy of federal law, consideration of issues arising under the Supremacy Clause starts with the assumption that the historic police powers of the States are not to be superseded by Federal Act unless that is the clear and manifest purpose of Congress." *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1140 (8th Cir. 2024) (citation modified), *cert. denied*, 145 S. Ct. 768 (2024)). But "an 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000). And immigration enforcement fits this category. *Bird*, 157 F.4th at 919 (explaining that "immigration is not a traditional subject of state regulation" and that "the Supreme Court has 'long recognized the preeminent role of the Federal Government with respect to the regulation of aliens within our borders.'" (quoting *Toll v. Moreno*, 458 U.S. 1, 10 (1982))). For this reason, I assume the non-preemption assumption does not apply here.

2

The United States' legal theories implicate the Tenth Amendment's anticommandeering rule. The rule flows from the "incontestable" proposition "that the Constitution established a system of 'dual sovereignty.'" *Printz v. United States*, 521 U.S.

34

898, 918 (1997) (quoting *Gregory*, 501 U.S. at 457).   In this system, "Congress may not simply 'commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.'"  *New York v. United States*, 505 U.S. 144, 161 (1992) (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 288 (1981)).  "[T]he framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States."  *Id.* at 166.   Therefore, "'[t]he Federal Government' may not 'command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.'"  *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 473 (2018) (quoting *Printz*, 521 U.S. at 935); *accord Haaland v. Brackeen*, 599 U.S. 255, 281 (2023).  "This rule applies . . . not only to state officers with policymaking responsibility but also to those assigned more mundane tasks."  *Murphy*, 584 U.S. at 473.  Congress cannot legislate to transform state governments or their political subdivisions into "regional offices []or administrative agencies of the Federal Government."  *New York*, 505 U.S. at 188; *see Minnesota ex rel. Ellison v. Noem*, 818 F. Supp. 3d 1030, 1041–43 (D. Minn. 2026).  As Justice O'Connor explained in *New York*, the result of applying the anticommandeering doctrine in any specific case "may appear 'formalistic.'"  505 U.S. at 187.  Regardless, "the Constitution protects us from our own best intentions:   It divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day."  *Id.*

As the United States interprets its assertedly preemptive statutes and regulation in this case, they would violate the Tenth Amendment's anticommandeering rule.   The

35

Complaint characterizes 8 U.S.C. §§ 1373 and 1644 as statutes that forbid a "state or local government entity" from prohibiting the transmission of "immigration-status information to DHS, maintaining such information, or exchanging such information with any other . . . government entity," including the federal government.  Compl. ¶ 102.  The United States claims that a state and its municipalities cannot prohibit their officers "from voluntarily entering into § 1357(g) agreements" because "[d]oing so would inhibit the federal government from 'deputiz[ing] local law enforcement officers' to act as federal immigration officers."  ECF No. 51 at 52 (quoting *United States v. Alas*, 63 F.4th 269, 274 (4th Cir. 2023)).  And the United States interprets 8 C.F.R. § 287.7(d) to require states and their subdivisions to honor detainers issued under that regulation.  *See* ECF No. 51 at 52–54.

So construed, these provisions would commandeer Defendants' legislative and executive processes in significant ways.  They would prohibit Defendants from enacting and enforcing immigration-specific information-sharing and immigration-cooperation restrictions, *see Murphy*, 584 U.S. at 472 (explaining that Congress "lacks the power directly to compel the States to require or prohibit" acts (quoting *New York*, 506 U.S. at 166)), thereby undermining political control and accountability, *see New York*, 506 U.S. at 169 ("Accountability is thus diminished when, due to federal coercion, elected state officials cannot regulate in accordance with the views of the local electorate in matters not pre-empted by federal regulation.").  The prohibitions would deprive Defendants of control over important resources.  For example, "a state would be unable to limit or control how much work time employees spend assisting federal immigration agencies with their

36

enforcement efforts," shifting resources away from state priorities and in turn implicating cost and budgetary concerns. *Colorado v. U.S. Dep't of Just.*, 455 F. Supp. 3d 1034, 1060 (D. Colo. 2020). And the prohibitions would "redistribute[] local decision-making power by transferring that power from local policymakers to line-level employees who are empowered to decide for themselves whether" to communicate or cooperate with federal immigration authorities. *City of Chicago v. Barr*, 961 F.3d 882, 898 (7th Cir. 2020). In effect, Defendants would be precluded from electing not to participate in immigration enforcement, and the choice to participate (and the extent of that participation) would be in the hands of local officers.

This conclusion finds support in several cases. *See, e.g.*, *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019) (explaining that a State "has the right, pursuant to the anticommandeering rule, to refrain from assisting with federal [immigration enforcement] efforts"), *cert. denied*, 590 U.S. 1015 (2020); *United States v. New York*, 810 F. Supp. 3d 329, 350 (N.D.N.Y. 2025) ("The Tenth Amendment prohibits Congress from conscripting state and local officials and resources to assist with federal regulatory schemes, like immigration enforcement."); *United States v. Illinois*, 796 F. Supp. 3d 494, 523–24 (N.D. Ill. 2025) (identifying reasons why §§ 1373(a) and 1644 violate the anticommandeering rule); *County of Ocean v. Grewal*, 475 F. Supp. 3d 355, 378 & n.20 (D.N.J. 2020) (explaining that, "broadly construed," 8 U.S.C. §§ 1373(a) and 1644, "would violate the Tenth Amendment under the anticommandeering doctrine" and citing cases finding § 1373 "unconstitutional under the Tenth Amendment"), *aff'd sub nom.*, *Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of N.J.*, 8 F.4th 176 (3d Cir. 2021); *Colorado*, 455 F. Supp. 3d at

37

1057–60 (identifying reasons why §§ 1373(a) and 1644 violate the anticommandeering rule); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 872 (N.D. Ill. 2018) (finding that § 1373 constitutes unconstitutional commandeering), *aff'd sub nom.*, *City of Chicago v. Barr*, 957 F.3d 722 (7th Cir. 2020), *amended and superseded by*, *Barr*, 961 F.3d 882; *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 331 (E.D. Pa. 2018) (holding that "Section 1373 violates the Tenth Amendment of the Constitution"), *aff'd in part, vacated in part on other grounds sub nom.*, *City of Philadelphia v. Att'y Gen. of the U.S.*, 916 F.3d 276 (3d Cir. 2019); *City and County of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 953 (N.D. Cal. 2018) (finding that § 1373 "is unconstitutional"), *aff'd in part, vacated in part on other grounds sub nom.*, *City and County of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020).

3

Anticommandeering aside, the United States' preemption claims fail for other reasons. To the extent they are based on 8 U.S.C. § 1357(g) and 8 C.F.R. § 287.7(d), the preemption claims fail because these provisions are voluntary and cannot carry preemptive force. To recap, the United States claims that Minneapolis City Ordinance § 19.30(3) and Saint Paul City Ordinance § 44.03(a)(3) conflict with both provisions. Compl. ¶¶ 111–13 (Minneapolis City Ordinance); Compl. ¶¶ 117–18, 120 (Saint Paul Ordinance). The United States claims that the Hennepin County Sheriff's directive conflicts with 8 C.F.R. § 287.7(d). Compl. ¶¶ 124, 126.

The analysis of these claims begins with a review of the statute and regulation. Again, the statute authorizes the Attorney General to

38

> enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law.

8 U.S.C. § 1357(g)(1).  From the perspective of a State or its political subdivisions, the decision whether to enter into an agreement under this section is unquestionably voluntary. *See* 8 U.S.C. § 1357(g)(9) ("Nothing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement with the Attorney General under this subsection.").

The regulation permits "authorized immigration officer[s]" to issue "detainers." 8 C.F.R. § 287.7(a).  A detainer "serves to advise another law enforcement agency that" the Department of Homeland Security "seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." *Id.*  According to the regulation, a "detainer is a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible." *Id.*  Section 287.7(d) reads:

> (d) Temporary detention at Department request. Upon a determination by the Department to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to

39

> exceed 48 hours, excluding Saturdays, Sundays, and holidays
> in order to permit assumption of custody by the Department.

*Id.* § 287.7(d).

The disputed issue is whether § 287.7(d) requires local agencies to maintain custody of noncitizens when they are the subject of a detainer issued under this paragraph, or whether the regulation leaves the detention decision with local agencies. If the regulation imposes no requirement, then everyone seems to agree it cannot be conflict-preemptive due to physical impossibility of a local ordinance or policy providing that § 287.7(d) detainers will not be honored.

The better answer is that the regulation describes a process by which the Department may request—not require—that a noncitizen "not otherwise detained by a criminal justice agency" be detained. Interpretation "begins with the regulation's plain language." *Solis v. Summit Contractors, Inc.*, 558 F.3d 815, 823 (8th Cir. 2009). And courts should interpret provisions within a regulatory regime to be consistent and harmonious with one another and avoid readings that render provisions contradictory. A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 180 (2012) ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory."). According to their ordinary meaning, the words "seek" and "request" in § 287.7(a) indicate that § 287.7(d) detainers are not compulsory. *Seek, The American Heritage Dictionary of the English Language* (3d ed. 1992) ("[t]o inquire for; request"); *Seek, The New Shorter Oxford English Dictionary* (Thumb Index ed. 1993) ("Ask for, demand, request."); *Seek, Webster's New World College Dictionary* (4th ed. 2002) (defining "seek" as "to try to get or find out by

40

asking or searching" or "to request; ask for"); *Seek, Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) ("to ask for" or "to try to acquire or gain"); *Request, The American Heritage Dictionary of the English Language* (3d ed. 1992) ("[t]o express a desire for; ask for"); *Request, The New Shorter Oxford English Dictionary* (Thumb Index ed. 1993) ("Ask to be favoured with or given (a thing), ask for; express a wish or desire *that*, *to do*; ask to be allowed *to do*; ask (a person) *to do* something."); *Request, Webster's New World College Dictionary* (4th ed. 2002) (defining "request" as "the act of asking, or expressing a desire, for something; solicitation or petition"); *Request, Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) ("the act or an instance of asking for something"). To maintain consistency throughout § 287.7, the better reading of § 287.7(d) is that it limits the time a local agency may detain a noncitizen pursuant to a § 287.7(d) detainer to 48 hours.

This interpretation finds support in every case to have addressed the issue. *See N.S. v. Dixon*, 141 F.4th 279, 282 (D.C. Cir. 2025) ("[A]n ICE detainer is a 'request,' not an order, for another law enforcement agency hold a particular alien."); *Galarza v. Szalczyk*, 745 F.3d 634, 639–45 (3d Cir. 2014) (observing that "no U.S. Court of Appeals has ever described ICE detainers as anything but requests" and agreeing with that interpretation of § 287.7(d)); *Garcia v. Speldrich*, No. 13-cv-3182 (PJS/LIB), 2014 WL 3864493, at *12 (D. Minn. Aug. 6, 2014) ("Section 287.7 is clear that detainers are merely 'request[s]' to law-enforcement agencies to hold individuals." (citing *Galarza*, 745 F.3d at 645)); *United States v. Illinois*, 796 F. Supp. 3d 494, 528 (N.D. Ill. 2025) ("While the INA requires agents to issue detainers in some situations, *see* § 1226(c)(3), no provision of the INA requires a

41

State to take any action in response to one."); *United States v. Abrego*, 787 F. Supp. 3d 830, 856 n.22 (M.D. Tenn. 2025) ("[A] detainer is merely a request by ICE for the court to hand over the defendant when the court's business with that defendant is concluded."); *United States v. Valdez-Hurtado*, 638 F. Supp. 3d 879, 885 (N.D. Ill. 2022) ("The ICE detainer request is no more than a request, and the DHS regulation upon which the government relies does not require USMS or any law enforcement agency to continue to hold a released criminal defendant in jail or agency custody beyond the time when such defendant ordinarily would be released under a BRA release order."); *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 510 (N.D. Cal. 2017) ("ICE civil detainer requests are voluntary and local governments are not required to honor them."). Having determined that § 1357(g) agreements and § 287.7 detainers are not mandatory, it follows that the challenged laws are not conflict preempted due to physical impossibility. *See Arizona*, 567 U.S. at 399.

As a fallback, the United States argues that the challenged ordinances and directive are conflict preempted because they pose obstacles to the INA's "comprehensive federal statutory scheme for regulation of immigration and naturalization," ECF No. 51 at 29 (quoting *Whiting*, 563 U.S. at 587), of which § 1357(g) and § 287.7 are important parts. As I understand it, the argument goes like this: In 1996, Congress amended the INA due to "concern that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers." *Nielsen v. Preap*, 586 U.S. 392, 398 (2019) (citation modified). At the same time, however, Congress permits both the state and federal government to sentence and imprison noncitizens who have committed

42

crimes before the federal government removes them from the country. 8 U.S.C. § 1231(a)(4)(A). In the United States' view, this reflects Congress's respect for "cooperative federalism." ECF No. 51 at 29. The INA requires that certain categories of noncitizens who have committed crimes be taken into federal custody "when the alien is released" from criminal custody. 8 U.S.C. § 1226(c); *Nielsen*, 586 U.S. at 398. The United States argues that provisions enabling immigration enforcement cooperation between federal and local agencies, 8 U.S.C. § 1357(g), allowing for the issuance of immigration detainers, 8 C.F.R. § 287.7, and "guarantee[ing] the free flow of information between state and federal officials," 8 U.S.C. §§ 1373, 1644, were enacted to "make immigration enforcement safer and more efficient, promote cooperation, and ensure that federal law enforcement could gain custody of aliens who were previously in state custody." ECF No. 51 at 29. According to the United States, this is all "part of the deal struck so that states could first subject aliens to their criminal justice system." *Id.*

This description of the legal landscape may be accurate, but it does not persuasively explain how the challenged ordinances and directive pose an obstacle to the implementation of either 8 U.S.C. § 1357(g) or 8 C.F.R. § 287.7. These provisions are as much a part of that larger landscape as any other statute or regulation. They say enforcement agreements and immigration detainers issued to local agencies are respectively options and requests, not mandates. And in that way, these provisions define the extent of the federal government's immigration enforcement interests. Accepting the United States argument would require recharacterizing either provision, or perhaps both, as mandatory (contrary to their plain meaning) in service of more effective immigration

43

enforcement, but the way to achieve that is to amend the statute and regulation, not contort

obstacle-preemption principles.

Again, this conclusion finds support in several cases. In *California*, for example,

the Ninth Circuit explained:

> California's decision not to assist federal immigration enforcement in its endeavors is not an "obstacle" to that enforcement effort. The United States' argument that SB 54 makes immigration enforcement far more burdensome begs the question: more burdensome than what? The laws make enforcement more burdensome than it would be if state and local law enforcement provided immigration officers with their assistance. But refusing to help is not the same as impeding. If such were the rule, obstacle preemption could be used to commandeer state resources and subvert Tenth Amendment principles.

921 F.3d at 888 (9th Cir. 2019) (citation modified); *see also McHenry County v. Raoul*, 44

F.4th 581, 592 (7th Cir. 2022) ("[T]he choice of a state to refrain from participation cannot

be invalid under the doctrine of obstacle preemption where, as here, it retains the right of

refusal." (quoting *California*, 921 F.3d at 890); *United States v. Colorado*, --- F.3d ---, No.

25-cv-01391, 2026 WL 878882 (D. Colo. Mar. 31, 2026) ("The Supremacy Clause

undoubtedly prevents states from contradicting or obstructing the federal immigration

scheme, *Arizona v. United States*, 567 U.S. 387, 407 (2012), but it does not go so far as to

compel state assistance."), *appeal filed*, 2026 WL 878882 (10th Cir. June 2, 2026). In

drafting legislation, "Congress may have hoped or expected that States would cooperate

with" any detainer requests, but states are not "bound by that hope or expectation."

*McHenry*, 44 F.4th at 592; *accord California*, 921 F.3d at 891 ("[W]hen questions of

federalism are involved, we must distinguish between expectations and requirements.");

*see Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) ("Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law; a litigant must point specifically to 'a constitutional text or a federal statute' that does the displacing or conflicts with state law.").

4

Though the parties understandably dispute at some length whether any of the challenged provisions conflict with 8 U.S.C. §§ 1373 and 1644, there is a straightforward answer to whether these statutes have preemptive force. As the Supreme Court explained in *Murphy*,

> Preemption is based on the Supremacy Clause, and that Clause is not an independent grant of legislative power to Congress. Instead, it simply provides "a rule of decision." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 324 (2015). It specifies that federal law is supreme in case of a conflict with state law. Therefore, in order for the PASPA provision to preempt state law, it must satisfy two requirements. First, it must represent the exercise of a power conferred on Congress by the Constitution; pointing to the Supremacy Clause will not do. Second, since the Constitution "confers upon Congress the power to regulate individuals, not States," *New York,* 505 U.S., at 166, the PASPA provision at issue must be best read as one that regulates private actors.

*Murphy*, 584 U.S. at 477; *see Ocean Cnty. Bd. of Comm'rs*, 8 F.4th at 181 (explaining that these two requirements apply "regardless of the type of preemption claimed"). Sections 1373 and 1644 "cannot satisfy the second prerequisite" because neither statute regulates private actors. *Ocean Cnty. Bd. of Comm'rs*, 8 F.4th at 181–82; *see Illinois*, 796 F. Supp. 3d at 521–22 (same); *Colorado v. U.S. Dep't of Just.*, 455 F. Supp. 3d 1034, 1059 (D. Colo.

45

2020) (same). If it mattered, the same could be said of 8 U.S.C. § 1357(g) and 8 C.F.R. § 287.7.

C

Turn next to the United States' Supremacy Clause-based discrimination claims. "The Constitution's Supremacy Clause generally immunizes the Federal Government from state laws that directly regulate or discriminate against it." *United States v Washington ("Washington II")*, 596 U.S. 832, 835 (2022) (citing *South Carolina v. Baker*, 485 U.S. 505, 523 (1988)). "A state law discriminates against the Federal Government or its contractors if it singles them out for less favorable treatment or if it regulates them unfavorably on some basis related to their governmental status." *Id.* at 839 (citation modified). A State "does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them." *Washington v. United States ("Washington I")*, 460 U.S. 536, 544–45 (1983). A state law is not "unconstitutional just because it indirectly increases" the federal government's costs, "so long as the law imposes those costs in a neutral, nondiscriminatory way." *Washington II*, 596 U.S. at 839. The rule forbidding States from directly regulating or discriminating against the federal government is "often called the intergovernmental immunity doctrine." *Id.* at 838.

In *Washington II*, the Supreme Court concluded that a Washington workers' compensation statute unlawfully discriminated against the federal government. *Id.* at 835. The statute applied only to federal contract workers at the "Hanford" federal nuclear site. *Id.* at 836. The statute "ma[de] it easier for federal contract workers at Hanford to establish

46

their entitlement to workers' compensation" benefits by "creat[ing] a causal presumption that certain diseases and illnesses are caused by cleanup work at Hanford." *Id.* "Because the Federal Government pays workers' compensation claims for federal contractors at Hanford, . . . Washington's law increase[d] workers' compensation costs for the Federal Government." *Id.* The Court had little difficulty concluding that the Washington statute violated the intergovernmental immunity doctrine. *Id.* at 839. As the Court explained, the law applied explicitly to just federal contractors, and through its causal presumption (among perhaps other provisions), it "treat[ed] federal workers differently than state or private workers." *Id.* That differential treatment, in turn, imposed costs on the federal government that state or private entities did not bear. *Id.*

Though our Eighth Circuit Court of Appeals has not addressed intergovernmental immunity (the parties cite no Eighth Circuit case, and I have found none), other circuits have, and four relatively recent decisions applying the doctrine to immigration-related state and municipal laws are informative. Begin with *United States v. King County*, 122 F.4th 740 (9th Cir. 2024). There, the United States sued to challenge a King County executive order. *Id.* at 747. The order governed contracts between the County and entities that provided essential services to flights operating out of a County-owned airport. *Id.* The order directed County officials to ensure that these essential-service providers were contractually prohibited from servicing ICE charter flights. *Id.* Soon after the County issued the order, the three essential-service providers "announced that [they] would no longer service ICE." *Id.* ICE relocated its flights to another airport, resulting in "increased operational costs" and "increased security concerns." *Id.* at 749. For two reasons, the court

47

found that the order "fail[ed] under the intergovernmental immunity doctrine." *Id.* at 756. First, the executive order put the County in charge of ICE's "transportation and deportation operations" by effectively forbidding the federal government from using contractors "to transport noncitizens, a necessary step in the classically federal function of immigration enforcement." *Id.* at 756–57. As the Ninth Circuit understood intergovernmental immunity, "the Supremacy Clause precludes states from dictating to the federal government who can perform federal work." *Id.* at 757 (citation modified). Second, the executive order "on its face discriminate[d] against the United States by singling out the federal government and its contractors for unfavorable treatment or regulating them unfavorably on some basis related to their governmental status." *Id.* (citation modified). In the court's view, the order treated contractors who serviced ICE charter flights differently from those who did not. *Id.*

In *GEO Group, Inc. v. Newsom*, the Ninth Circuit addressed whether a California statute prohibiting the operation of private detention facilities within the state violated the intergovernmental immunity doctrine. 50 F.4th 745, 750 (9th Cir. 2022) (en banc). Federal law requires the Department of Homeland Security to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." *Id.* at 751 (quoting 8 U.S.C. § 1231(g)(1)). In California, a state statute "prohibits local governments from entering into new agreements or expanding existing agreements to house immigration detainees." *Id.* (citing Cal. Civ. Code § 1670.9(a)–(b)). For that reason, ICE relies in California "almost exclusively on privately owned and operated facilities." *Id.* The court held that the California statute prohibiting the operation of private detention facilities

48

violated the intergovernmental immunity doctrine because the statute "would give California the power to control ICE's immigration detention operations in the state by preventing ICE from hiring the personnel of its choice." *Id.* at 757.[9] Key to this holding was the Ninth Circuit's understanding of two Supreme Court cases—*Johnson v. Maryland*, 254 U.S. 51 (1920), and *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956). *See GEO Grp., Inc.*, 50 F.4th at 754–55, 756. In *Johnson*, the Supreme Court "explained that a state cannot demand that federal employees 'desist from performance until they satisfy a state officer upon examination that they are competent.'" *GEO Group, Inc.*, 50 F.4th at 755 (quoting *Johnson*, 254 U.S. at 57). In *Leslie Miller, Inc.*, the Court "held that a state law requiring building contractors to obtain a state license could not be enforced under the Supremacy Clause against a contractor hired on a federal construction project." *Id.* at 756 (citing *Leslie Miller, Inc.*, 352 U.S. at 189–90). From these cases, the Ninth Circuit drew the overarching rule that "when federal law gives discretion to a federal official to hire a contractor to perform federal work, a state cannot override the federal official's decision to do so." *Id.* at 757. "That," the Ninth Circuit explained, "is a level of control over federal operations that the Supremacy Clause does not tolerate." *Id.*

In *McHenry County v. Raoul*, the Seventh Circuit held that an Illinois statute "prohibiting State agencies and political subdivisions from contracting to house immigration detainees" did not violate the intergovernmental immunity doctrine. 44 F.4th

---

[9]     Though the court reversed a district court's denial of preliminary injunctive relief, *see GEO Grp., Inc.*, 50 F.4th at 751, and it cited the preliminary-injunction factors as part of its decision, *see id.* at 753, the court seemed to phrase its holding, not as a preliminary assessment of the merits, but as a definitive legal conclusion, *see id.* at 751.

581, 585, 592–94 (7th Cir. 2022). The plaintiffs in the case were Illinois counties that had contracted with the federal government to house immigration detainees and who stood to lose those contracts and associated revenue if the statute remained in effect. *Id.* at 586. To support their intergovernmental immunity challenge, the counties invoked federal statutes addressing immigration detention, including 8 U.S.C. § 1231(g), *see id.* at 585, the same statute the Ninth Circuit cited in *GEO Group, Inc.*, 50 F.4th at 751. But the Seventh Circuit reached a different holding. The court concluded that the Illinois statute "impose[d] no direct regulation on any federal official or agency," but regulated "only State and local entities and law enforcement." *McHenry County*, 44 F.4th at 593. And, the court reasoned, the statute did not discriminate against the United States because federal immigration authorities remained free to "house immigration detainees in [their] own facilities or those of private entities" and because the Act, in the court's view, did not single out the federal government or its contractors "for less favorable treatment" in comparison with another entity. *Id.* at 593–94 (citation modified). Nor was the court persuaded by the counties' argument that the statute discriminated "because it affect[ed] an exclusively federal domain." *Id.* at 594. In the court's understanding, a showing of differential treatment was necessary, but the counties did not "identify any actors similarly situated to the federal government that receive more favorable treatment under the" Illinois law. *Id.* (citation modified).

Finally, in *United States v. California*, the Ninth Circuit preliminarily addressed the intergovernmental immunity doctrine's application to three California statutes designed to protect California residents from federal immigration enforcement. 921 F.3d 865 (9th Cir.

2019).  The first statute required, among other things, that California employers give their employees notice of immigration inspections.  *Id.* at 875.  The court concluded that this provision likely did not violate the intergovernmental immunity doctrine because its notice requirement was "directed at the conduct of *employers*, not the United States or its agents, and no federal activity is regulated."  *Id.* at 880.  As the court explained, "the mere fact that the actions of the federal government are incidentally *targeted* by [the statute] does not mean that they are incidentally *burdened*."  *Id.* (citation modified).  The second statute "require[d] the California Attorney General to conduct 'reviews of county, local, or private locked detention facilities in which noncitizens are being housed or detained for purposes of civil immigration proceedings in California."  *Id.* at 875 (quoting Cal. Gov't Code § 12532(a)).  The court determined that this provision likely violated intergovernmental immunity because it "impose[d] a specialized burden on federal activity."  *Id.* at 882; *see id.* at 883 (explaining the provision violated intergovernmental immunity because its "requirements burden federal operations, and *only* federal operations").  The third statute limited the discretion of law enforcement officers in California to cooperate with federal immigration authorities.  *Id.* at 876.  As the court explained, subject to some exceptions, the statute

> prohibite[d] state and local law enforcement agencies from "[i]nquiring into an individual's immigration status"; "[d]etaining an individual on the basis of a hold request"; "[p]roviding information regarding a person's release date or" other "personal information," such as "the individual's home address or work address"; and "[a]ssisting immigration authorities" in certain activities.

51

*Id.* (quoting Cal. Gov't Code § 7284.6(a)(1)).  The court determined that these provisions did not violate intergovernmental immunity, explaining that the opposite conclusion "would imply that California *cannot* choose to discriminate against federal immigration authorities by refusing to assist their enforcement efforts—a result that would be inconsistent with the Tenth Amendment and the anti-commandeering rule." *Id.* at 891.

The state laws and municipal provisions the United States challenges here do not violate the intergovernmental immunity doctrine.  The challenged provisions do not regulate the federal government.  With one exception, the challenged Minnesota statutes regulate only Minnesota officials.  Three of the four challenged statutes govern the management of driver's license information within the Department of Public Safety and restrict the Department's disclosure of specific immigration-status data with third parties. *See* Minn. Stat. §§ 171.12, subdivs. 7b(e), 11(c), 11(d).  The exception is Minnesota Statute § 168.327, subdivision 6.  It imposes annual auditing requirements on subscribers to the Department's driver and vehicle records subscription services, but the United States does not allege it subscribes to this service. *See* Compl.  Like the Minnesota statutes, the Minneapolis and Saint Paul ordinances restrict the cities' own officers' immigration-enforcement activities and limit their officials' disclosure of personal information belonging to U- and T-Visa applicants. *See* Minneapolis, Minn., Code of Ordinances, title 2, ch. 19, §§ 19.10; 19.30(1), (3); 19.80(a)(1), (2); 19.80(d); Saint Paul, Minn., Code of Ordinances, part III, title III, ch. 44, §§ 44.01; 44.03(a)(1), (2), (3); 44.06(d).  And the Hennepin County Sheriff's directive regulates the Sheriff's actions regarding detainees who are the subject of federal immigration detainers and "judicially

52

signed immigration warrant[s]."  Compl. ¶ 71.  In this way, the challenged provisions are materially different from the laws challenged in *Washington II*, *King County*, and *GEO Group, Inc.*  They do not command the federal government or its contractors to act.  They do not forbid the federal government or its contractors from acting.  They do not control how the federal government or its contractors undertake their work.  Rather, they regulate how state and local officials perform their duties.

The challenged provisions do not single the federal government out for less favorable treatment, at least not in any sense that shows an intergovernmental immunity violation.  The Minnesota Statutes' immigration-related disclosure prohibitions apply, not just to the federal government, but to private entities and state governments as well.  Minnesota Statute § 171.12, subdivision 7b(e), for example, applies to any "data requester," and that term is not limited to the federal government.  Minn. Stat. § 171.12, subdiv. 7b(e).  And the statute requires any requester to certify that the data will not be used "for civil immigration enforcement purposes" or disclosed to any "state or federal government entity" with primary immigration-enforcement responsibilities.  *Id.*  The restrictions in Minnesota Statute § 171.12, subdivision 11(c) apply similarly "to a state or federal government entity that primarily enforces immigration law or to any employee or agent of any such government entity."  Minn. Stat. § 171.12, subdiv. 11(c).  And the audit requirements in Minnesota Statute § 168.327, subdivision 6 apply to subscribers to the Department's driver and vehicle records subscription services across the board, whether they are private entities, a state government, or the federal government.  Minn. Stat. § 168.327, subdiv. 6.  The challenged city ordinances and Hennepin County Sheriff's

directive cannot be characterized as discriminatory because the United States has not identified a similarly situated actor who receives more favorable treatment under these provisions. *See McHenry County*, 44 F.4th at 594 ("The mere fact that the Act touches on an exclusively federal sphere is not enough to establish discrimination.").[10]

Finally, accepting the United States' intergovernmental-immunity claims here would seem inconsistent with the anticommandeering-rule-based rejection of its preemption claims. At least to some degree, the doctrines are opposite sides of the same coin. In other words, a finding that any of the challenged provisions violates intergovernmental immunity would imply that a Defendant must assist with the federal government's immigration enforcement efforts. *See United States v. California*, 921 F.3d at 891. But I've separately concluded that a state or political subdivision's forced assistance would violate the anticommandeering doctrine. The United States does not explain how that conflict might be reconciled or appropriate.

---

[10]     Consider a hypothetical in which the federal government constructs, owns, and operates an immigration detention center in rural Minnesota. Assume the detention center is served by a single county road with a 60-miles-per-hour speed limit, and that the road serves only the detention center. No doubt the county would discriminate against the federal government if it set a federal-vehicle-specific speed limit of 10 miles per hour while continuing to apply the 60-miles-per-hour limit to everyone else. But if the road were destroyed—say, by a flood—it is difficult to understand how the county's decision not to rebuild the road would be discriminatory towards the federal government in the intergovernmental-immunity sense.

**ORDER**

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.      The Motion to Dismiss of Hennepin County and Dawanna S. Witt, Hennepin County Sheriff [ECF No. 17] is **GRANTED** as follows: Insofar as they are asserted against Hennepin County and Sheriff Witt, Counts One, Two, and Six are **DISMISSED WITHOUT PREJUDICE** for lack of subject-matter jurisdiction.  Counts Five and Nine are **DISMISSED WITH PREJUDICE**.

2.      The Motion to Dismiss of the City of Saint Paul [ECF No. 23] is **GRANTED** as follows: Insofar as they are asserted against the City of Saint Paul, Counts One, Two, and Six are **DISMISSED WITHOUT PREJUDICE** for lack of subject-matter jurisdiction.  Counts Four and Eight are **DISMISSED WITH PREJUDICE**.

3.      The Motion to Dismiss of the State of Minnesota and Minnesota Attorney General Keith Ellison [ECF No. 29] is **GRANTED** as follows: Insofar as it is asserted against the State of Minnesota and Minnesota Attorney General Keith Ellison, Count One is **DISMISSED WITHOUT PREJUDICE** for lack of subject-matter jurisdiction.  Insofar as they are asserted against the State of Minnesota and Attorney General Keith Ellison, Counts Two and Six are **DISMISSED WITH PREJUDICE**.

4.      The Motion to Dismiss of the City of Minneapolis [ECF No. 36] is **GRANTED** as follows: Insofar as they are asserted against the City of Minneapolis, Counts One, Two, and Six are **DISMISSED WITHOUT PREJUDICE** for lack of

subject-matter jurisdiction.   Counts Three and Seven are **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: July 20, 2026                          s/ Eric C. Tostrud_____
                                              Eric C. Tostrud
                                              Chief Judge, United States District Court